**ORAL ARGUMENT NOT YET SCHEDULED**

No. 13-5252

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

NATIONAL ASSOCIATION OF MANUFACTURERS;
CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA;
BUSINESS ROUNDTABLE,

*Appellants*,

v.

SECURITIES AND EXCHANGE COMMISSION,

*Appellee*,

AMNESTY INTERNATIONAL USA; AMNESTY INTERNATIONAL LTD.,

*Intervenors for Appellee.*

On Appeal from the United States District Court for the District of Columbia, Case
No. 1:13-cv-00635, Judge Robert L. Wilkins

**OPENING BRIEF OF APPELLANTS**

Peter D. Keisler
Jonathan F. Cohn
Erika L. Myers
Sidley Austin LLP
1501 K St., NW
Washington, DC 20005
202.736.8000
pkeisler@sidley.com
*Counsel for Appellants the National
Association of Manufacturers, the Chamber
of Commerce of the United States of America,
and Business Roundtable*

September 11, 2013

Additional Counsel on Inside Cover

*Of Counsel*:
Rachel L. Brand
Steven P. Lehotsky
National Chamber
Litigation Center, Inc.
1615 H St., NW
Washington, DC 20062
202.463.5337
*Counsel for Appellant the
Chamber of Commerce of the
United States of America*

*Of Counsel*:
Quentin Riegel
National Association of
Manufacturers
733 10th St., NW
Suite 700
Washington, DC 20001
202.637.3000
*Counsel for Appellant the
National Association of
Manufacturers*

*Of Counsel*:
Maria Ghazal
Business Roundtable
300 New Jersey Ave., NW
Suite 800
Washington, DC 20001
202.496.3268
*Counsel for Appellant Business
Roundtable*

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

The following information is provided pursuant to D.C. Circuit Rule 28(a)(1):

**(A)    Parties and *Amici***

Appellants

National Association of Manufacturers

Chamber of Commerce of the United States of America

Business Roundtable

*Amici* for Appellants

Professor Marcia Narine; Ambassador Jendayi Frazer; Dr. J. Peter Pham

American Coatings Association, Inc.; American Chemistry Council; Can Manufacturers Institute; Consumer Specialty Products Association; National Retail Federation; Precision Machined Products Association; The Society of the Plastics Industry, Inc.

Appellee

United States Securities and Exchange Commission

Intervenors for Appellee

Amnesty International USA

Amnesty International Ltd.

*Amici* for Appellee

Better Markets, Inc.

Senator Barbara Boxer, Senator Dick Durbin, Russ Feingold, Howard Berman, Congressman Wm. Lacy Clay, Congressman Keith Ellison, Congressman Raul Grijalva, Congressman John Lewis, Congressman Ed Markey, Congressman Jim McDermott, Congresswoman Gwen Moore, Congresswoman Maxine Waters

Global Witness Limited; Fred Robarts; Gregory Mthembu-Salter

**(B)    Rulings Under Review**

This appeal challenges the final order in case 1:13-cv-00635, reproduced in the appendix at JA919, entered by Judge Robert L. Wilkins on July 23, 2013, denying Appellants' motion for summary judgment and granting Appellee's and Intervenor-Appellees' cross-motions for summary judgment.

**(C)    Related Cases**

This case was previously before this Court as Case No. 12-1422, on a petition for direct review of Final Rule 13p-1 and Form SD, *Conflict Minerals*, 77 F.R. 56,274 (Sept. 12, 2012).  After the Court held in *American Petroleum Institute v. SEC*, 714 F.3d 1329 (D.C. Cir. 2013), that it lacked jurisdiction over such petitions, at Appellants' request it transferred this case to the district court pursuant to 28 U.S.C. §1631. Order, Case No. 12-1422 (D.C. Cir. filed May 2, 2013).  Counsel is aware of no related cases currently pending in any other court.

# RULE 26.1 DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Local Rule 26.1, the National Association of Manufacturers, the Chamber of Commerce of the United States of America, and Business Roundtable respectfully submit this Corporate Disclosure Statement and state as follows:

1. The National Association of Manufacturers (NAM) states that it is a nonprofit trade association representing small and large manufacturers in every industrial sector and in all 50 states. The NAM is the preeminent U.S. manufacturers' association as well as the nation's largest industrial trade association. The NAM has no parent corporation, and no publicly held company has 10% or greater ownership in the NAM.

2. The Chamber of Commerce of the United States of America (Chamber) states that it is a non-profit, tax-exempt organization incorporated in the District of Columbia. The Chamber is the world's largest business federation, representing 300,000 direct members and indirectly representing an underlying membership of more than three million businesses and organizations of all sizes, sectors, and regions. The Chamber has no parent corporation, and no publicly held company has 10% or greater ownership in the Chamber.

3. Business Roundtable (BRT) states that it is an association of chief executive officers of leading U.S. companies with $7.4 trillion in annual revenues and more than 16 million employees. BRT member companies comprise more than a third of the

total value of the U.S. stock market and invest $158 billion annually in research and development—equal to 62 percent of U.S. private R&D spending.  BRT companies pay more than $200 billion in dividends to shareholders and generate more than $540 billion in sales for small and medium-sized businesses annually.  BRT companies give more than $9 billion a year in combined charitable contributions.  BRT has no parent corporation, and no publicly held company has 10% or greater ownership in BRT.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ......i

RULE 26.1 DISCLOSURE STATEMENT..........................................................iii

TABLE OF AUTHORITIES ..................................................................viii

GLOSSARY ....................................................................................xiii

INTRODUCTION...........................................................................1

JURISDICTIONAL STATEMENT ...................................................2

STATUTES AND REGULATIONS....................................................3

STATEMENT OF ISSUES ................................................................3

STATEMENT OF THE CASE ...........................................................4

STATEMENT OF FACTS ..................................................................5

A.      Factual Background ...............................................................5

      1.      Uses of Tin, Tantalum, Tungsten, and Gold ...................5

      2.      Identifying the Country of Origin of Tin, Tantalum, Tungsten, and Gold ..................................................................8

      3.      Identifying the Mine of Origin......................................11

      4.      Determining Whether Minerals Finance Armed Groups..............12

B.      Statutory And Regulatory Background......................................14

      1.      Section 1502.................................................................14

      2.      The Rulemaking Process................................................15

         a.      The Proposed Rule...............................................15

         b.      The Final Rule.......................................................18

      3.      The District Court Decision..........................................21

SUMMARY OF ARGUMENT ..................................................................24

STANDARD OF REVIEW ......................................................................25

ARGUMENT ...........................................................................................26

I.   THE COMMISSION MISINTERPRETED THE STATUTE AND
     ARBITRARILY REJECTED ALTERNATIVES THAT WOULD
     HAVE SIGNIFICANTLY REDUCED COSTS ...................................26

     A.   The Commission Misinterpreted The Statute And Acted
          Arbitrarily In Refusing To Create A *De Minimis* Exception .....................26

          1.   The Commission Misinterpreted The Statute As Precluding
               A *De Minimis* Exception ....................................................27

          2.   The Commission's Refusal To Create A *De Minimis*
               Exception Is Arbitrary And Capricious ............................30

     B.   The Commission Misinterpreted the Statute's "Did Originate"
          Requirement And Imposed Unnecessary Burdens ...................................35

          1.   The Statute Says "Did Originate," Not "May Have
               Originated." ...........................................................................35

          2.   The "May Have Originated" Standard Is Arbitrary And
               Capricious, And Imposes Unnecessary Burdens ...........................39

     C.   The Rule's Inclusion Of Non-Manufacturers Is Contrary To The
          Statute ......................................................................................41

     D.   The Phase-In Period Is Arbitrary And Capricious ....................................45

     E.   The Commission's Decisions Increased The Rule's Costs Without
          Corresponding Benefits, In Violation Of the Commission's
          Statutory Obligation Not To Impose Unnecessary Burdens ...................47

     F.   The Commission's Errors Require Vacatur ...............................................51

II.  SECTION 1502 AND THE RULE COMPEL SPEECH IN
     VIOLATION OF THE FIRST AMENDMENT ................................52

     CONCLUSION .........................................................................................58

CERTIFICATE OF COMPLIANCE.....................................................................59

CERTIFICATE OF SERVICE.............................................................................60

ADDENDUM

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Advocates for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.,*
 429 F.3d 1136 (D.C. Cir. 2005) ....................................................................51

*Ala. Power Co. v. Costle,*
 636 F.2d 323 (D.C. Cir. 1979) .............................................................. 28, 33

*Am. Bar Ass'n v. FTC,*
 430 F.3d 457 (D.C. Cir. 2005) .............................................................. 29, 43

*Am. Petrol. Inst. v. SEC,*
 714 F.3d 1329 (D.C. Cir. 2013) ....................................................................5

*Am. Petrol. Inst. v. SEC,*
 No. 12-1668, 2013 WL 3307114 (D.D.C. July 2, 2013) ....................... 28, 33

*Ass'n of Admin. Law Judges v. FLRA,*
 397 F.3d 957 (D.C. Cir. 2005) ....................................................................28

*Boos v. Barry,*
 485 U.S. 312 (1988) ....................................................................................56

*Bradford Nat'l Clearing Corp. v. SEC,*
 590 F.2d 1085 (D.C. Cir. 1978) ...................................................................47

*\*Bus. Roundtable v. SEC,*
 647 F.3d 1144 (D.C. Cir. 2011) .....................................................26, 46, 50

*Comcast Corp. v. FCC,*
 579 F.3d 1 (D.C. Cir. 2009) .................................................................. 51, 52

*Conn. Nat'l Bank v. Germain,*
 503 U.S. 249 (1992) ....................................................................................42

*Denotes authorities most relied upon.

viii

*Edenfield v. Fane,*
  507 U.S. 761 (1993) .................................................................54

*Global-Tech Appliances, Inc. v. SEB S.A.,*
  131 S. Ct. 2060 (2011) ..............................................................40

*Holder v. Humanitarian Law Project,*
  130 S. Ct. 2705 (2010) .........................................................55, 56

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983) ........................................................26, 30, 49

*Nat'l Fuel Gas Supply Corp. v. FERC,*
  468 F.3d 831 (D.C. Cir. 2006) ..................................................29

*\*Nat'l Ass'n of Mfrs. v. NLRB,*
  717 F.3d 947 (2013) ...........................................................57, 58

*\*Peter Pan Bus Lines, Inc. v. Fed. Motor Carrier Safety Admin.,*
  471 F.3d 1350 (D.C. Cir. 2006) ...........................................43, 44

*Prill v. NLRB,*
  755 F.2d 941 (D.C. Cir. 1985) ..................................................43

*Pub. Citizen v. Fed. Motor Carrier Safety Admin.,*
  374 F.3d 1209 (D.C. Cir. 2004) ...........................................40, 49

*\*R.J. Reynolds Tobacco Co. v. FDA,*
  696 F.3d 1205 (D.C. Cir. 2012) .......................................43, 54, 56

*Rodriguez v. United States,*
  480 U.S. 522 (1987) .................................................................50

*Rumsfeld v. Forum for Academic & Institutional Rights, Inc.,*
  547 U.S. 47 (2006) ...................................................................52

*SEC v. Wall Street Publ'g Inst.,*
  851 F.2d 365 (D.C. Cir. 1988) ..................................................54

*TSC Indus., Inc. v. Northway, Inc.,*
  426 U.S. 438 (1976) .........................................................38, 39, 40

*Turner Broad. Sys., Inc. v. FCC,*
  520 U.S. 180 (1997) .................................................................54

*United States v. Bean,*
  537 U.S. 71 (2002) ................................................................ 41, 43

*Vill. of Barrington, Ill. v. Surface Transp. Bd.,*
  636 F.3d 650 (D.C. Cir. 2011) ................................................ 36, 39

*Yusupov v. Att'y Gen. of U.S.,*
  650 F.3d 968 (3d Cir. 2011) .........................................................55

*Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio,*
  471 U.S. 626 (1985) ....................................................................53

## STATUTES AND REGULATIONS

Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No.
  111-203, 124 Stat. 1376 (2010) ................................. 3, 4, 12, 13, 47

5 U.S.C. §706(2)(A)-(C) .................................................................25

15 U.S.C. §78c(f) ...................................................................... 4, 49

15 U.S.C. §78*l*(h) ..........................................................................28

15 U.S.C. §78m(p) ........................... 3, 4, 14, 15, 35, 37, 41, 42, 43, 52

15 U.S.C. §78mm(a)(1) ..................................................................28

15 U.S.C. §78w(a)(2) .................................................. 4, 23, 26, 47, 49

28 U.S.C. §1291 ..............................................................................3

28 U.S.C. §1331 ..............................................................................2

77 F.R. 56,274 (Sept. 12, 2012) ........................................................3

Release No. 34-63547, 2010 WL 5121983 (Dec. 15, 2010) ......................... 15, 31

## LEGISLATIVE HISTORY

*The Costs and Consequences of Dodd-Frank Section 1502: Impacts on America and the
  Congo: Hearing on Pub. L. 111-203 §1502 Before the H.R. Subcomm. on Int'l
  Monetary Policy & Trade* (May 10, 2012), *available at*
  http://financialservices.house.gov/uploadedfiles/112-124.pdf ...................... 7, 9, 54

*The Unintended Consequences of Dodd-Frank's Conflict Minerals Provision: Hearing Before the H.R. Subcomm. on Monetary Policy and Trade* (May 21, 2013), *available at* http://financialservices.house.gov/uploadedfiles/113-23.pdf ............................42

156 Cong. Rec. S3103 (daily ed. May 4, 2010) ..................................................42

156 Cong. Rec. S3866 (daily ed. May 18, 2010) .......................................... 37, 42

156 Cong. Rec. S3976 (daily ed. May 19,. 2010) ...............................................37

H.R. Rep. No. 111-517 (2010) (Conf. Rep.) .......................................................37

## OTHER AUTHORITIES

BSR, *Conflict Minerals and the Democratic Republic of the* Congo (2010), *available at* http://www.bsr.org/reports/BSR_Conflict_Minerals_and_the_DRC.pdf ..............6

CASM, *Beyond Conflict* 61 (2009), *available at* http://www.resourceglobal.co.uk/documents/Beyond%20Conflict_RCS_CASM.pdf. ...................................................................................................16

Nicolas Cook, Congressional Research Serv., *Conflict Minerals in Central Africa: U.S. and International Responses* (July 20, 2012), *available at* http://fpc.state.gov/documents/organization/196034.pdf ....................................55

Geology.com, *Many Uses of Gold*, http://geology.com/minerals/gold/uses-of-gold.shtml (last visited Sept. 10, 2013). ........................................................7

Gov't Accountability Office, *SEC Conflict Minerals Rule: Information on Responsible Sourcing and Companies Affected* (July 2013), *available at* http://www.gao.gov/assets/660/655972.pdf ................................... 8, 11, 13, 14, 17

ITIA Newsletter, *A Family's Day With Tungsten* (Dec. 2007), *available at* http://www.itia.info/assets/files/Newsletter_2007_12.pdf. ......................................6

OECD, *Downstream Implementation of the OECD Due Diligence Guidance for Responsible Supply Chains of Minerals from Conflict-Affected and High-Risk Areas* (Jan. 2013), *available at* http://www.oecd.org/daf/inv/mne/DDguidanceTTTpilotJan2013.pdf ....6, 11, 14

*Oxford English Dictionary* (2013) ......................................................................38

Suzan Salman, *A Clinical Study Evaluating the Effect of 0.4% Stannous Fluoride Gel in Controlling Plaque and Gingivitis*, 23 J. Baghdad College Dentistry 97 (2011) ...............7

U.S. Geological Survey, *Mineral Commodity Summaries* (2012) ...............................................8

World Bank, *Growth with Governance in the Mining Sector* (2008),
    http://documents.worldbank.org/curated/en/2008/04/9402456/congo-
    democratic-republic-growth-governance-mineral-sector-project ............................16

World Gold Council, *Gold for Good: Gold and Nanotechnology in the Age of Innovation*
    (Jan. 2010), *available at*
    http://www.gold.org/download/rs_archive/gold_and_nanotechnology_in
    _the_age_of_innovation.pdf...........................................................................................7

World Gold Council, *Technology*, http://www.gold.org/technology/ (access
    "Gold's Role" hyperlink) (last visited Sept. 10, 2013) ....................................7

# GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| BRT | Business Roundtable |
| Chamber | Chamber of Commerce of the United States of America |
| DRC | Democratic Republic of the Congo |
| GAO | Government Accountability Office |
| NAM | National Association of Manufacturers |
| OECD | Organisation for Economic Co-operation and Development |
| SEC | Securities and Exchange Commission |

## INTRODUCTION

The Securities and Exchange Commission's (SEC's) "conflict minerals" rule was motivated by good intentions—to reduce funding to armed groups and help end the terrible conflict in the Democratic Republic of the Congo (DRC). But as the dissenting Commissioners observed, good intentions are no substitute for rigorous analysis, and the Commission's analysis was woefully inadequate. The Commission misinterpreted and misapplied the statute in four fundamental respects: refusing to create a *de minimis* exception, requiring companies to undertake onerous due diligence and file reports whenever their minerals "may have originated" in the DRC, expanding the rule's scope to non-manufacturers, and providing for an irrational transition period.

In making these decisions, the Commission arbitrarily rejected alternatives that would have greatly reduced the rule's astronomical costs. Indeed, this is one of the costliest rules in SEC history by the SEC's own calculations, imposing burdens on American businesses of $3 to $4 billion for initial compliance, plus $200 to $600 million annually thereafter. Yet the Commission admitted it had no idea whether the rule would provide *any* benefits to the people of the DRC, and a number of commenters provided evidence that the rule would unintentionally make the humanitarian situation worse by giving rise to a *de facto* embargo that would further impoverish and destabilize the region.

The SEC nonetheless contends, and the district court held, that the Commission did not need to evaluate whether the challenged aspects of the rule will further the statute's purpose, simply because Congress directed the agency to create *a* rule. At the same time, the SEC insists that the challenged aspects of the rule are discretionary agency decisions warranting *Chevron* deference, and the district court accepted that argument as well. But these positions are irreconcilable; the SEC cannot have it both ways.

Furthermore, neither argument is defensible. First, Congress did not mandate the challenged aspects of the rule, and the SEC's conclusions to the contrary misinterpret the statute. Second, the agency's decisions were arbitrary and capricious, and in violation of its heightened obligations under the Securities Exchange Act of 1934, because they greatly multiplied the rule's unprecedented burdens without a showing of any benefits to the Congolese people, and were otherwise irrational and unsupported.

In addition, the rule and its authorizing statute violate the First Amendment by compelling companies to indicate publicly on their websites that their products contribute to human rights abuses in the DRC—a statement, for most companies, as unfounded as it is politically charged.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction pursuant to 28 U.S.C. §1331. On July 23, 2013, it denied Appellants' motion for summary judgment and granted Appellee's and

Intervenor-Appellees' cross-motions, finally disposing of the case.  Appellants filed a notice of appeal on August 12, 2013.  This Court has jurisdiction under 28 U.S.C. §1291.

## STATUTES AND REGULATIONS

Section 1502 of Pub. L. No. 111-203, 124 Stat. 1376, 2213-18 (2010), 15 U.S.C. §78m(p) (Section 1502), and 77 F.R. 56,274 (Sept. 12, 2012) are reproduced in the Addendum.

## STATEMENT OF ISSUES

1.      Whether the Commission erroneously concluded it lacked authority to adopt a *de minimis* exception, and whether its refusal to adopt such an exception is arbitrary and capricious.

2.      Whether the Commission's interpretation of "did originate" in 15 U.S.C. §78m(p)(1)(A) to mean "may have originated" is erroneous or arbitrary and capricious.

3.       Whether the Commission's interpretation of 15 U.S.C. §78m(p)(2)(B) as including non-manufacturers who contract for the manufacture of products is erroneous or arbitrary and capricious.

4.      Whether providing a shorter transition period for larger companies is arbitrary and capricious, when larger companies will have to depend on smaller companies to comply with the rule.

3

5.      Whether the Commission violated its duty under 15 U.S.C. §78w(a)(2) and 15 U.S.C. §78c(f) to conduct an adequate analysis of the impact of its rule.

6.      Whether 15 U.S.C. §78m(p) and the rule compel speech in violation of the First Amendment.

## STATEMENT OF THE CASE

In 2010, Congress passed the Dodd-Frank Wall Street Reform and Consumer Protection Act.  One provision, Section 1502, is directed at the issue of "conflict minerals"—tin, tantalum, tungsten, and gold.  *See* §1502(a) (stating that "the exploitation and trade of conflict minerals originating in the Democratic Republic of the Congo is helping to finance conflict characterized by extreme levels of violence in the eastern Democratic Republic of the Congo, particularly sexual- and gender-based violence, and contributing to an emergency humanitarian situation").  The provision does not directly restrict use of these minerals.  Instead, it requires the SEC to issue a rule requiring companies to submit reports and make public disclosures regarding their sourcing of these minerals.

On August 22, 2012, by a 3-2 vote, the Commission adopted a final rule. JA719-810.  The rule requires companies to determine whether any quantity of the minerals—even a "trace" amount—is "necessary to the functionality or production" of a product they manufacture or "contract to manufacture."  JA724, JA742.  If so, the companies must conduct a "reasonable country of origin inquiry" to determine whether there is reason to believe the minerals "may have originated" in the DRC or

4

one of nine adjoining countries, comprising most of central Africa (DRC region). JA758.

If a company has reason to believe its minerals "may have originated" in the covered countries, it must conduct "due diligence" on the minerals' source, determine whether the minerals may have directly or indirectly financed armed groups in the DRC region, obtain a private sector audit, and file a "Conflict Minerals Report" that describes its due diligence and which of its products were not "found to be DRC conflict free." JA726, JA758.

The rule was published on September 12, 2012, and became effective on November 13, 2012. JA719. On October 19, 2012, Appellants petitioned this Court for review. After the Court held in *American Petroleum Institute v. SEC*, 714 F.3d 1329 (D.C. Cir. 2013), that it lacked jurisdiction over such petitions, it transferred the case to the district court at Appellants' request. On July 23, 2013, the district court denied Appellants' motion for summary judgment and granted Appellees' cross-motions for summary judgment.

## STATEMENT OF FACTS

### A.     Factual Background

#### 1.     Uses of Tin, Tantalum, Tungsten, and Gold

Tin, tantalum, tungsten, and gold are commonly used in a multitude of products, including "everyday goods like tin cans, light bulbs, ballpoint pens, and sewing thread." JA704. A few examples illustrate their pervasive presence:

- Tin is found in solders, plastics, coatings for food cans, eyeglasses, watches, sports and fitness equipment, metallicized yarns, electrical products such as toys, phones, computers, audio equipment, GPS devices, and appliances, and automotive parts such as brake pads.  OECD, *Downstream Implementation of the OECD Due Diligence Guidance for Responsible Supply Chains of Minerals from Conflict-Affected and High-Risk Areas* 11 (Jan. 2013) (*OECD Report*); BSR, *Conflict Minerals and the Democratic Republic of Congo* 6 (2010) (*BSR Report*), http://www.bsr.org/reports/BSR_Conflict_ Minerals_and_the_DRC.pdf.

- Tantalum is present in superalloys for jet and power plant turbines, cutting tools, *BSR Report* 6, camera lenses, corrosion-resistant equipment for chemical processing, medical devices and implants, automotive parts such as airbags and skid control, and electronics such as cell phones and computers, *OECD Report* 11.

- Tungsten is used in aerospace components, lighting, electronics, *BSR Report* 7, jewelry, decorative crafts, power tools, lawn mowers, *OECD Report* 12, window heating systems, X-Ray machines, dental drills, golf clubs, darts, and remote-control racing cars, ITIA Newsletter, *A Family's Day With Tungsten* 3-11 (Dec. 2007), http://www.itia.info/assets/files/Newsletter_2007_12.pdf.

- Gold is used in jewelry, electronics, medical equipment, aerospace equipment, *BSR Report* 8, anti-lock brakes, airbag-inflating sensors,

http://www.gold.org/technology/(access "Gold's Role" hyperlink), and dental fillings, http://geology.com/minerals/gold/uses-of-gold.shtml.

The minerals appear in miniscule amounts in many additional products. Shoe soles, for instance, may contain tiny amounts of tin, as may buttons and zippers. *The Costs and Consequences of Dodd-Frank Section 1502: Impacts on America and the Congo: Hearing on Pub. L. 111-203 §1502 Before the H.R. Subcomm. on Int'l Monetary Policy & Trade* (May 10, 2012) (statement of Stephen Lamar, Am. Apparel & Footwear Ass'n) (*House Testimony*). Fluoride compounds used in toothpaste and mouthwash sometimes contain tin as well. Suzan Salman, *A Clinical Study Evaluating the Effect of 0.4% Stannous Fluoride Gel in Controlling Plaque and Gingivitis*, 23 J. Baghdad College Dentistry 97 (2011). Minute "nanoparticles" of gold are used in home pregnancy testing kits, stained glass, colored pottery glazes, and technologies targeting cancerous tumors. World Gold Council, *Gold for Good: Gold and Nanotechnology in the Age of Innovation* (Jan. 2010), http://www.gold.org/download/rs_archive/gold_and_nanotechnology_in_the_age_of_innovation.pdf. And tin, tantalum and tungsten are all used in alloys and catalysts. *See* JA148. The minerals are thus used by numerous companies "spread over an array of industries, from [the] high-tech field to food and beverage producers, as well as energy and medical technology sectors." JA489.

### 2.    Identifying the Country of Origin of Tin, Tantalum, Tungsten, and Gold

The sources of these minerals are as varied as their uses.  Only a small percentage of the world's mineral supply comes from the DRC:  3% of the global supply of tin; 12% of tantalum; less than 1% of tungsten; and less than 1% of gold. Government Accountability Office, *SEC Conflict Minerals Rule: Information on Responsible Sourcing and Companies Affected* 10 (July 2013) (*GAO Report*) (2010-2011 figures).  The rest of the 400,000 tons mined each year comes from dozens of other countries on six continents.  U.S. Geological Survey, *Mineral Commodity Summaries* (2012).

Generally, the source of the minerals contained in a particular manufactured product is unknown.  This is largely because, with very few exceptions, manufacturers do not buy directly from mines.  Instead, there are often "ten, twelve, or even more layers of intermediaries between the mines" and the final manufacturer.  JA432.

Manufacturers may not even know whether their products contain certain minerals.  "Although one might expect that a purchaser of products would know what is in the products they purchase, that is often far from the truth."  JA160.  Rather, "[m]any companies purchase parts, components, or subsystems based on certain performance capabilities without specifying the materials."  JA383.  Moreover, the materials used "may be considered proprietary," *id.*, and manufacturers "typically do not have the necessary leverage to force a supplier to disclose" this information, JA160.

8

These difficulties are amplified when trace amounts of the minerals are involved.  For instance, tin is sometimes used as a catalyst or stabilizer by sub-suppliers manufacturing coatings, sealants, and specialty chemicals.  ADD 113-14.  The tin is generally washed away in processing, but trace amounts may remain.  And, "[b]ecause of batch variances, it is possible that a catalyst remains in one batch but not another."  ADD-114.  To determine whether products contain trace amounts of tin, the manufacturer would "have to conduct very frequent testing at substantial expense."  *Id.*  Similarly, because "very, very small quantities" of tin are occasionally present in the plastics in buttons or shoe soles, manufacturers of clothing and footwear would have to test thousands of products every year to discover whether *de minimis* amounts of tin are present in a handful.  *House Testimony* (statement of Stephen Lamar).

Even if the manufacturer knows its products contain a mineral, identifying the country of origin is often extremely difficult and expensive.  First, the supply chain is not "a transparent, linear process," but rather "a complex, multi-layered network of trading companies and suppliers."  JA160.  Second, manufacturers, particularly of complex products, frequently purchase enormous numbers of parts from numerous suppliers.  A vehicle, for instance, "typically contains thousands of parts or components, and most of these contain multiple materials."  JA421.  Wireless handsets for phones "commonly contain about 1,000 parts."  JA432.  A "747 aircraft incorporates some six million parts."  JA573.  And "Boeing's defense business—

9

which represents only one half of the Company's total business—acquired well over 190 million piece parts" in 2010.  JA572.

Each part may have its own distinct supply chain.  Indeed, a single manufacturer may obtain parts from "tens of thousands" of suppliers.  JA401.  AT&T, for example, has "over 50,000 direct suppliers."  JA432.  Boeing's defense business had "almost 8,000 direct suppliers [in 2010]," and its "commercial aircraft business had almost 2,000 direct suppliers."  JA572-73 (emphasis omitted).  One member of the NAM has "over 22,000 direct material suppliers."  JA630.  And each of a manufacturer's "direct suppliers may have thousands of direct suppliers itself, and many of those indirect suppliers will have a comparable number of suppliers."  JA573.

 Typically, manufacturers "only have direct contact" with their own suppliers, and know little to nothing about this vast web of sub-suppliers.  JA160.  Suppliers often consider their supply chains to be proprietary, and "may be unwilling to identify to the public company customer all [their] sources of supply."  JA463; *see* JA423.  Even when sub-suppliers can be identified, they "could be small businesses and/or non-public companies located anywhere in the world … without the infrastructure, resources, and capability to meaningfully comply" with requests for information on the identity or source of minerals.  JA476.

Moreover, even if a company succeeded in mapping its supply chain, the map "would be out of date as soon as it was released."  JA572.  Not only do "[c]ompanies change suppliers," but their "suppliers change suppliers, and their suppliers change

suppliers all the time." JA585. Boeing, for instance, estimates that up to a quarter of

its direct suppliers change every year. JA573. This fluidity is necessary; "supply

chains must be able to shift at a moment's notice to address small-scale disruptions

like a fire at a critical supplier's facility, as well as large-scale disruptions like [nuclear

disasters]—and, of course, to reflect changes in price or quality of inputs." JA572.

Due to the complex, constantly shifting, global nature of supply chains, attempting to

identify the country of origin of minerals contained in products is extremely

challenging and tremendously costly. *See OECD Report* 39-41; JA630; JA422.

### 3.    Identifying the Mine of Origin

As difficult as it is to trace the minerals to their country of origin, it is even

harder to trace them to the mine. This is particularly true for the small percentage of

minerals that comes from the DRC, a country long ravaged by a brutal war involving

more than twenty different armed groups and several neighboring countries. JA72;

*House Testimony* (statement of Mvemba Dizolele). Fighting continues in the eastern

DRC, and armed groups continue to commit grave human rights abuses. JA73. After

decades of instability and war, the central government has little control. *GAO Report*

17.

The multitude of armed groups, political instability, and lack of government

control make it extremely difficult to identify mines. There are literally thousands of

mines in the DRC, many of them "artisanal mines," which are mostly "very small

scale operations" dug "by hand or with basic tools." JA680, Dep't of State, *Democratic*

*Republic of the Congo Mineral Exploitation by Armed Groups & Other Entities* (2012) (*State Dep't Map*).  "[T]here may be over 2,000 [mines] in eastern DRC alone."  *GAO Report* 19.  And "[m]any of the mining sites in eastern DRC are inaccessible to outsiders due to remoteness, a lack of passable roads, and the dangers stemming from the presence of militia, undisciplined army troops, and bandits."  *State Dep't Map*, JA680.

### 4.    Determining Whether Minerals Finance Armed Groups

Equally challenging is determining whether minerals benefit armed groups.  The State Department reports that a "[l]ack of verifiable data makes it difficult … to comprehensively verify the armed groups or other entities that are either present at mines or have access to revenue streams emanating from them."  *Id.*  Sending independent monitoring groups to each mine, in addition to being burdensome and dangerous, is unlikely to provide reliable data.  Organizations that have tried have found that armed groups "were often alerted to the [monitoring] group's visits and left in advance of the validators' arrival."  JA694.  And even if one could determine whether armed groups are profiting from a particular mine, the information would not remain reliable for long, because "[t]he situation on the ground is in flux."  *State Dep't Map*, JA680; *see* JA694.

Furthermore, even if one could determine that no armed group "physically control[led]" a particular mine, §1502(e)(5)(A), that would not exclude the possibility that such a group had access to the revenue stream "emanating from" the mine, *State Dep't Map*, JA680.  Some groups "tax, extort, or control … trade routes" or "trading

facilities." §1502(e)(5)(B); JA115. Indeed, armed groups will "seek control of any significant revenue-producing activity in the region." *GAO Report* 18.

Tracking the minerals from the mines to the country's borders and confirming that no armed group had access to the revenues is fraught with difficulty. The minerals pass through numerous hands, largely without documentation or supervision from DRC authorities. First, merchants purchase minerals from miners and take them to trading houses. JA89. Because of the weakness of the central government, around 90% of merchants and trading houses operate "without proper licenses and registration." *Id.*

Trading houses then sell minerals to export companies, who sell them to foreign buyers, often smuggling minerals "across Congo's porous borders." JA91. At each stage, minerals from different locations are combined, so that "one shipment container of mineral concentrate … will usually contain material from hundreds of miners, passing through the hands of many traders." JA172. The minerals are then sold to smelters and refiners, many located in China, at which point "supplies from all over the globe are mixed together," and metal is extracted from the ore. JA92; *GAO Report* 26.

For years, international and trade organizations, including the Organisation for Economic Cooperation and Development (OECD), the United Nations, the Electronic Industry Citizenship Coalition, and ITRI, a tin industry group, have been attempting to design systems to reduce mineral funding to armed groups in the DRC

without harming the country's population and economy, including systems to track minerals and certify that particular smelters are "conflict-free."  But "the DRC government lacks capacity to mitigate corruption and smuggling," and the resulting "illegal trade of minerals undermines the exercise of due diligence in the DRC and affects the credibility of due diligence-based certification and traceability systems." *GAO Report* 19.  The extreme difficulties and expense of ensuring that minerals from the region are "conflict-free" have led many to avoid sourcing from the region entirely, leading to a *de facto* embargo that is devastating the DRC's economy and legitimate mining communities.  *OECD Report* 16-17, 61; *GAO Report* 18; *see infra* p.15-16.

### B.      Statutory And Regulatory Background

#### 1.      Section 1502

Section 1502 directs the SEC to issue a rule requiring public companies "to disclose annually" whether "conflict minerals [that] are necessary to the functionality or production of a product manufactured" by the company "did originate in the Democratic Republic of the Congo or an adjoining country."  15 U.S.C. §78m(p)(1)(A), (2)(B).  Companies whose minerals "did originate" in the region must submit a public report that describes "the measures taken by the person to exercise due diligence on the source and chain of custody of such minerals, which measures shall include an independent private sector audit."  *Id.* §78m(p)(1)(A)(i).  The report must also describe "the facilities used to process the conflict minerals, the country of

origin of the conflict minerals, … the efforts to determine the mine or location of origin with the greatest possible specificity," and the products that "are not DRC conflict free," and must be publicly posted on the company's website. *Id.*

### 2.    The Rulemaking Process

### a.    The Proposed Rule

The Commission issued a Notice of Proposed Rulemaking in December 2010. The proposed rule far exceeded what the statute required: it contained no *de minimis* exception (that is, no exception for use of minute or trace amounts of minerals), covered companies that manufactured no products, and required companies to submit reports unless they could prove the negative that their products contained no conflict minerals from the DRC region. Despite the proposed rule's reach, the Commission offered only a sparse, 10-page economic analysis, which estimated that the costs of compliance would be only $71.2 million. Release No. 34-63547, 2010 WL 5121983, at *34 (Dec. 15, 2010).

The Commission received over 13,000 comments. JA722-23. Several explained that the Commission's economic analysis was incorrect by orders of magnitude. JA378, JA520, JA539; JA781-83. Commenters also questioned whether the rule would have any benefits for the DRC. Some commenters asserted the rule would help by reducing funding to armed groups. JA780. Others, however, including non-profit groups and affected governments, explained that the new disclosure regime

would actually harm the DRC and the entire region of Central Africa by damaging legitimate mining and the communities that rely on it.  *See, e.g.*, JA449.

These concerns have already been realized.  Because of the difficulty in determining whether minerals fund armed groups, anticipation of the rule led to a *de facto* embargo, harming the millions of impoverished Congolese dependent on the country's mining sector.[1]  *See, e.g.*, JA453 (nearly all of the "certified smelters" have found it necessary to "explicitly avoid[] sourcing any materials from the DRC Zone"); JA427 ("The loss of income from mining has caused profound economic hardship"); JA554 ("No more circulation of money, no more mining activities, no more social commitment."); JA669 ("Thousands of miners experienced a sudden loss of livelihood.  Many have been unable to afford school enrollment fees or pay for their families' health needs.").  The embargo has impacted the nine neighboring countries as well, causing harm to their mining industries.  JA446; JA449.  Compounding the problem, many artisanal miners were demobilized soldiers, who, having lost their mining income, "may return to fighting for the militias."  JA488.

---

[1] In 2008, approximately 10 million Congolese (16% of the population) depended on mining.  The World Bank, *Growth with Governance in the Mining Sector* (2008).  Mining is important to the economies of neighboring countries as well.  In Tanzania, around 20% of the population—1.5 million people—depend on artisanal mining.  CASM, *Beyond Conflict* 61 (2009), http://www.resourceglobal.co.uk/documents/Beyond%20Conflict_RCS_CASM.pdf.

Commenters also suggested that, despite the embargo, armed groups continue to profit. Due to the DRC's porous borders, armed groups smuggle minerals, especially gold, which is "very easy to smuggle." JA89; JA693. Gold is also very easy to refine, JA254, so that even a complete embargo by major refineries would not stop DRC gold from reaching the world market, *see* JA627. Unsurprisingly, armed groups' revenues from gold appear to be skyrocketing. JA693. Indeed, by some commenters' accounts, armed groups' mineral revenues have *increased* since Dodd-Frank's passage, as warlords shift their focus to smuggling gold. *Compare* JA90 (estimating that in 2009 armed groups obtained $180 million from all four minerals), *with* JA693 (estimating that eastern DRC's gold trade is now worth $300 million a year, most of which goes to an armed group). A recent GAO report estimates that "several tons of gold worth hundreds of millions of dollars are smuggled from the eastern DRC through neighboring countries, where it is ultimately smelted and sold to jewelers in markets, such as the United Arab Emirates." *GAO Report* 20.

Addressing the rule's content, and its astronomical costs, a number of commenters requested a *de minimis* exception and proposed a variety of possible *de minimis* standards. JA396-97. Commenters also explained that the proposed due diligence and reporting requirements exceeded the statutory limits, and that the SEC should impose those obligations "on only those companies that actually have a reason to believe that they use [a mineral] that does, in fact, originate in the DRC or surrounding countries." JA246-47. In addition, several commenters explained that

17

the proposed rule's inclusion of non-manufacturers was contrary to the statute. *See, e.g.*, JA260; JA614. And many commenters explained that it was critical for the final rule to include a sensible phase-in period, because "the infrastructure necessary for compliance does not exist." JA480; JA391. Finally, commenters explained that the proposed rule compelled speech in violation of the First Amendment, by forcing companies to indicate publicly that "their products support human rights violations, even when there is no reason to believe that is true." JA243; *see also* JA187.

### b.    The Final Rule

On August 22, 2012, in a 3-2 decision, the Commission promulgated the final rule. The Commission drastically increased its cost estimates:  $3-4 billion for initial compliance and $207-609 million per year for ongoing compliance. JA779. The Commission, however, provided *no* estimate of *any* benefits of the rule. Instead, it stated that "[t]he statute … aims to achieve compelling social benefits, which we are unable to readily quantify with any precision, both because we do not have the data to quantify the benefits and because we are not able to assess how effective Section 1502 will be in achieving those benefits." JA780. Indeed, not only did the Commission fail to "quantify" the benefits "with any precision"—it failed to determine there were any benefits at all. The Commission likewise failed to measure whether there were any marginal benefits of the choices it made among available regulatory alternatives. JA787.

18

The SEC changed the proposed rule but did not correct its most fundamental failings.  For instance, despite the absence of any showing of benefit to the DRC, the Commission refused to create a *de minimis* exception, because "[t]he statute itself does not contain a *de minimis* exception."  JA743.  The Commission recognized that "by not including a *de minimis* exception, even minute or trace amounts of a conflict mineral could trigger disclosure obligations," and the rule would therefore "be more costly," *id*.  Nevertheless, the Commission rejected every *de minimis* exception proposed, even one that would exclude only those companies that use less than one gram of the minerals in total per year.

Next, although the final rule modified the "reasonable country of origin inquiry," by eliminating the requirement to prove a negative, the rule still conflicts with the text of the statute.  Whereas the statute requires a conflict minerals report and due diligence from companies only if the company's minerals "did originate" in the DRC, the rule requires the report and due diligence if the company has a reason to believe merely that its conflict minerals "*may* have originated" in the region.  JA758 (emphasis added).

The final rule also continues to cover *non*-manufacturers who "contract to manufacture" products, despite comments explaining that this extension is contrary to the statutory text, which plainly does not cover non-manufacturers.  According to the Commission, the statute is "clear," compelling the result in the final rule, JA736, which admittedly would increase costs, JA790, without any identifiable benefit.

19

Acknowledging "legitimate concerns about the feasibility of preparing the required disclosure in the near term because of the stage of development of the supply chain tracing mechanisms," the final rule includes a phase-in period. JA754. For four years, small companies (those with a public float of less than $75 million, JA726 n.57) may describe their minerals as having "undeterminable origin" if they are unable to trace their supply chains. Although such companies must submit conflict minerals reports, those reports need not be audited by an independent third party. JA755. Oddly, however, the phase-in period will last only two years for larger companies, even though, as the Commission recognized, "many smaller companies are part of larger companies' supply chains and would need to provide conflict minerals information so that the larger companies could meet their obligations under the rule." JA806.

Finally, the Commission acknowledged concerns that the rule "could lead to incorrect and misleading disclosures and could unfairly punish companies that lack complete visibility into their supply chains." JA766. It responded, however, only by changing the wording of the compelled disclosure that companies must display on their websites, from stating that a product is "not DRC conflict free" to stating that the product has "not been found to be DRC conflict free." JA768.

Commissioners Paredes and Gallagher dissented. Commissioner Paredes stated that, although the rule was well-intentioned, "[t]he best of intentions cannot substitute for a rigorous analysis by this agency of whether the social benefits that

20

Section 1502 strives for are likely to be realized by the final rule." JA715 (*Paredes Dissent*). "Although the Commission finds itself in a difficult position by having to undertake a rulemaking that falls far outside its zone of expertise," he explained, "the agency still must base its final rule on a reasoned assessment that considers the potential consequences of its judgments." *Id.* The Commission, he concluded, had not met this obligation. The "rulemaking suffers from an analytical gap that I cannot overlook—namely, there is a failure to assess whether and, if so, the extent to which the final rule will in fact advance its humanitarian goal as opposed to unintentionally making matters worse." *Id.*

Commissioner Gallagher similarly concluded that the SEC had failed to meet this obligation. JA710-12 (*Gallagher Dissent*). He feared the rule could unintentionally harm the DRC, by "contribut[ing] to a reduction in, or abandonment of, commercial activity in the DRC—a *de facto* economic embargo—as U.S. issuers scramble to avoid a 'scarlet letter.'" JA710. Moreover, he concluded, the Commission's discretionary decisions, including its refusal to adopt a *de minimis* exception, had significantly increased the costs of the rule, with no corresponding benefits. JA711-12.

### 3.     The District Court Decision

In district court, Appellants argued that the SEC misconstrued the statute and arbitrarily imposed unnecessary costs by (1) refusing to create a *de minimis* exception; (2) extending the due diligence and reporting obligations to companies whose minerals "may have originated" in the DRC region; (3) expanding the rule to cover

non-manufacturers; and (4) designing an irrational phase-in period. Further, Appellants contended that the SEC violated its statutory obligations to analyze the impact of its rules by imposing these enormous costs without finding they would yield any benefits. Finally, Appellants argued that the statute and rule violated the First Amendment by compelling companies to state publicly on their websites that their products had not been found to be "DRC conflict free."

The district court rejected these arguments. "[W]hile the Court agree[d] that the SEC's explanation arguably could have been more thorough," it held that the refusal to create a *de minimis* exception was reasonable, because "the SEC believed that any type of categorical *de minimis* exception had the potential to swallow the rule." JA889, JA891-92. The court credited the SEC's "belie[f]," even though the agency failed to analyze whether any (let alone all) of the proposed *de minimis* exceptions would in fact swallow the rule. JA891-92. And the court deferred to this belief, despite the agency's statements that it felt bound by the statute, unable to exercise any discretion warranting deference. JA886.

Next, the court held that requiring due diligence and a report from issuers whose minerals "may have originated" in the DRC region was consistent with the statutory text, which merely imposes these obligations on companies whose minerals "did originate" in the region. JA893. The court concluded that the SEC's decision was reasonable because there was no "discernible difference" between the words "did" and "may" other than "semantic[s]." JA897.

22

The court also deferred to the SEC's extension of the rule to issuers who contract to manufacture products. Despite the agency's statement that "the statutory intent to include issuers that contract to manufacture their products is *clear*," JA736 (emphasis added), the court held that the SEC had exercised discretion and did not erroneously believe it was compelled to include non-manufacturers. JA900. Further, the court held that the agency's decision to include non-manufacturers was reasonable, even though the agency found that it would increase costs without any discernible benefits. JA901.

As to the phase-in period, the court found that it is "undoubtedly true" "that some large issuers rely upon smaller issuers covered by the Rule as part of their supply chains," and that, "[i]n those circumstances, the disparate transition periods may pose some unique difficulties that might not otherwise exist." JA902. Nonetheless, the court held that the design of the phase-in period was reasonable. JA902.

Turning to the SEC's cost-benefit analysis, the court sustained it even though the agency had determined that the rule would impose massive costs without any identifiable benefits. According to the court, the Exchange Act "only obligate[s] the SEC to 'consider' the impact that a rule or regulation may have on various *economic-related factors*—efficiency, competition, and capital formation," *but see* 15 U.S.C. §78w(a)(2), and the SEC had "considered" those factors by determining that the rule would harm efficiency and competition. JA874. Furthermore, because the rule was promulgated pursuant "to an express, statutory directive from Congress," the court

held that the SEC's "role was not to 'second-guess' Congress's judgment as to the benefits of disclosure, but to, instead, promulgate a rule that would promote the benefits Congress identified." JA877.

As to the First Amendment, the court recognized that "it is well settled that the First Amendment protects against government infringement on the right to speak freely and the right to refrain from speaking at all." JA907. It applied intermediate scrutiny, finding that the "mandate[d] public disclosure of [conflict minerals] information on company websites" "trigger[s] a more stringent constitutional analysis." JA909. However, the court held that intermediate scrutiny was satisfied—even though neither Congress nor the SEC had identified any discernible benefit—principally because "judicial review is particularly deferential" in "the foreign relations context." JA912-13.

## SUMMARY OF ARGUMENT

The Commission misconstrued the statute and acted arbitrarily and capriciously in violation of the APA and the Exchange Act. First, the Commission misinterpreted the statute as precluding a *de minimis* exception, thus significantly increasing the rule's costs. Second, the Commission incorrectly interpreted the term "did originate" to mean "*may* have originated," vastly expanding the rule's reach and costs. Third, the Commission mistakenly read the statute to cover companies who contract to manufacture products, extending the rule's reach and costs to many companies who manufacture nothing. Fourth, the Commission arbitrarily created a shorter phase-in

24

period for larger companies, even though it recognized that larger companies would need to depend on information from smaller companies to comply.

In promulgating these four aspects of the rule, the SEC imposed requirements that will exacerbate the competitive harms to U.S. companies and rejected alternatives that would have lessened the burdens.  Moreover, the Commission conceded that it could not identify *any* benefits for the Congolese people, or even determine whether the rule would make the tragic situation in the DRC even worse.  The Commission simply asserted it was "not able to assess how effective Section 1502 will be in achieving those benefits."  JA780, JA795.  This remarkable lack of analysis violates the SEC's statutory obligations to apprise itself of the impact of the rule and the available regulatory alternatives before saddling U.S. public companies with a regulation that, by the agency's own estimation, will cost $3 to $4 billion for initial compliance, plus $200 to $600 million per year for ongoing compliance.

Finally, Section 1502 and the rule violate the First Amendment by compelling companies to make misleading and stigmatizing public statements on their websites linking their products to terrible human rights abuses.

### STANDARD OF REVIEW

Under the APA, this Court "shall hold unlawful and set aside agency action ... found to be arbitrary, capricious, an abuse of discretion, … otherwise not in accordance with law[,] ... contrary to constitutional right, [or] in excess of statutory jurisdiction."  5 U.S.C. §706(2)(A)-(C).  An agency's failure to "examine the relevant

data and articulate a satisfactory explanation for its action," or to "consider an

important aspect of the problem," makes its action arbitrary and capricious. *Motor*

*Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

## ARGUMENT

## I.  THE COMMISSION MISINTERPRETED THE STATUTE AND ARBITRARILY REJECTED ALTERNATIVES THAT WOULD HAVE SIGNIFICANTLY REDUCED COSTS.

The Commission fundamentally misconstrued the statute and failed adequately

to explain and support four critical decisions it made in promulgating the rule:

(1) refusing to create a *de minimis* exception; (2) construing the word "did" to mean

"may"; (3) extending the rule to non-manufacturers; and (4) designing an irrational

phase-in period.  Moreover, the rule is arbitrary and capricious, and violates the SEC's

heightened obligations under the Exchange Act to determine the impact of its rules.

*Bus. Roundtable v. SEC*, 647 F.3d 1144, 1148 (D.C. Cir. 2011); 15 U.S.C. §78w(a)(2).

### A.  The Commission Misinterpreted The Statute And Acted Arbitrarily In Refusing To Create A *De Minimis* Exception.

One "fundamental flaw in the rule" is that it contains no *de minimis* exception,

*Gallagher Dissent*, JA712, and, as a result, "even minute or trace amounts of a conflict

mineral could trigger disclosure obligations," JA743.  According to the Commission's

release, a *de minimis* exception would be inconsistent with the statute, and the agency's

hands were therefore tied.  But this is manifestly incorrect as a matter of statutory

interpretation.

Recognizing its error, the Commission contended at oral argument before the district court that, despite what the release states, the agency actually rejected a *de minimis* exception as a matter of discretion. But even if this revisionist history could be credited, the rule would still fail. Because the refusal to create a *de minimis* exception greatly increases costs without any benefits, it is manifestly arbitrary and capricious.

### 1.    The Commission Misinterpreted The Statute As Precluding A *De Minimis* Exception.

Although many commenters urged the Commission to adopt a *de minimis* exception, it refused, stating "we are of the view that Congress intended not to provide for a *de minimis* exception," and such an exception "would be contrary to the Conflict Minerals Statutory Provision and Congressional purpose." JA743. The Commission inferred that Congress intended to preclude a *de minimis* exception because "a conflict mineral used in even a very small amount could be 'necessary' to the product's functionality or production," and so fall within the statute's literal terms. *Id.* If Congress "had intended that the provision be limited further, so as not to apply to a *de minimis* use of conflict minerals," the Commission explained, "Congress would have done so explicitly." *Id.*

This reasoning is plainly incorrect, as even the SEC now appears to recognize, for two independent reasons. First, the Commission has express statutory authority to create exemptions from section 78m, where the conflict minerals provision is

27

codified.  15 U.S.C. §78*l*(h) (authorizing the Commission to "exempt in whole or in part any issuer or class of issuers from the provisions of ... section 78m" when "not inconsistent with the public interest or the protection of investors"); 15 U.S.C. §78mm(a)(1) (similar).  Second, "[u]nless Congress has been extraordinarily rigid"—which it was not here—the Commission has implied "*de minimis* authority to provide exemption when the burdens of regulation yield a gain of trivial or no value." *Ala. Power Co. v. Costle*, 636 F.2d 323, 360-61 (D.C. Cir. 1979).  The fact that Section 1502 does not "explicitly" include a *de minimis* exception, JA743, thus provides no basis for the agency's refusal to create one, given that the agency had both express and implied authority to do so.  *See Ass'n of Admin. Law Judges v. FLRA*, 397 F.3d 957, 962 (D.C. Cir. 2005) ("[A] de minimis exception is generally not express; rather, it is inherent in most statutory schemes, by implication.").

It is likewise irrelevant that a trace amount of a mineral can be "necessary to the functionality or production of a product," and thus fall within the statute's literal terms.  JA743.  Indeed, the agency's conclusion that "an exemption would be 'inconsistent' with the 'structure and language'" of the statute is "no answer at all," and "ignores the meaning of 'exemption,' which, by definition, is an exclusion or relief from an obligation, and hence will be inconsistent with the statutory requirement on which it operates." *Am. Petrol. Inst. v. SEC*, __ F. Supp. 2d __, No. 12-1668, 2013 WL 3307114, at *13 (D.D.C. July 2, 2013).

Accordingly, the Commission conceded at oral argument that it had authority to create a *de minimis* exception.  JA889; *see* JA832.  Indeed, Commission counsel even stated that the agency would consider granting *de minimis* exceptions to the rule on an individualized basis—contradicting the agency's position in its release that any *de minimis* exception would undermine the rule.  JA851-52.  The agency's abandonment of the indefensible reasoning set forth in its release alone requires reversal and vacatur.  *Am. Bar Ass'n v. FTC*, 430 F.3d 457, 471 (D.C. Cir. 2005) ("[W]e cannot affirm an agency's actions based on the *post hoc* rationale of its litigating position.").[2]

The district court nonetheless held that the agency had properly recognized its authority to create a *de minimis* exception, on the ground that Appellants did "not identify any clear statement ... showing that the Commission believed its interpretation was 'plainly' required by the statute."  JA886.  But the agency's release—as well as its briefs below—are replete with erroneous assertions that the agency could not create a *de minimis* exception because it would be inconsistent with the statute.  Indeed, the agency stated in its brief below that "[i]t was not for the Commission, through *de minimis* exemptive authority, to find that 'Congress overreached' and to bring the

---

[2] Even if the SEC relied on multiple rationales, its decision cannot stand because it was primarily based on its erroneous belief that Congress intended to preclude a *de minimis* exception.  When an agency "has relied on multiple rationales (and has not done so in the alternative), and [a court] conclude[s] that at least one of the rationales is deficient, [the court] will ordinarily vacate the [action] unless [it is] certain that [the agency] would have adopted it even absent the flawed rationale."  *Nat'l Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831, 839 (D.C. Cir. 2006).

statutory 'requirements back into line.'"  JA822; JA743 ("[W]e are of the view that Congress intended not to provide for a *de minimis* exception."); JA787-95 (not including *de minimis* issue in discussion of the "Commission's Exercise of Discretion"); JA824 ("[T]he Commission's broader conclusion that … 'we believe Congress intended the disclosure provisions to apply to the use of even small amounts of conflict minerals originating in the Covered Countries' necessarily precluded the adoption of any" *de minimis* threshold).  Because the Commission rejected a *de minimis* exception based on a clearly erroneous statutory construction, this Court should reverse.

### 2.    The Commission's Refusal To Create A *De Minimis* Exception Is Arbitrary And Capricious.

But even if the Commission had recognized its discretion to create a *de minimis* exception, its refusal to create one is arbitrary and capricious.  The case for a *de minimis* exception is particularly compelling where, as here, application of the rule to tiny and difficult-to-ascertain usages of the minerals imposes massive costs without producing any identifiable benefits.  The agency nonetheless failed to "examine the relevant data and articulate a satisfactory explanation for its action, including a rational connection between the facts found and the choices made." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.  Indeed, the sole reason the agency gave—aside from its erroneous statutory interpretation—was that the minerals "are often used in products 'in very limited

quantities,' so including a *de minimis* threshold 'could have a significant impact on' the final rule." JA743.

That bare theoretical assertion was accompanied by no analysis, and the Commission never found—and could not plausibly have claimed—that *any de minimis* threshold would have such consequences. To the contrary, this issue could easily have been addressed by creating an appropriately limited *de minimis* threshold. A number of commenters proposed such exceptions. Some suggested, for example, that the SEC could "[s]et[] a very low *de minimis* threshold," JA525, such as for "trace, nominal, or insignificant amounts," JA740; *see* JA269 (proposing exception for "trace" amounts).

Others suggested that the SEC could set the threshold based on the *total* amount of minerals an issuer uses annually, thus ensuring that the exception would not apply to issuers who use very small amounts per product, but significant amounts overall. *See* JA623 (proposing exception "if all widgets that an issuer manufactures or contracts for manufacture contain, in the aggregate, only negligible quantities of the subject metals"); JA460 (proposing threshold based on the "fair market value" of the total amount of minerals an issuer uses annually); JA219 (similar). One commenter even proposed an exception for companies that use less than "1 g[ram] per year." JA236. Indeed, the SEC's own request for comments raised the possibility of setting a *de minimis* threshold "based on the amount of conflict minerals used by issuers … in their overall enterprise." Release No. 34-63547, 2010 WL 5121983, at *29 (Dec. 15,

31

2010).  In promulgating the final rule, however, the SEC inexplicably failed to consider this alternative, even for companies whose products contain, in total, only trace amounts of the minerals.

The Commission provided no rationale for concluding that a properly designed *de minimis* standard, applying only to "those whose use of conflict minerals from the Congo is incidental or negligible," would materially affect conditions in the region. *Gallagher Dissent*, JA712.  At the same time, as the SEC itself recognized, the lack of a *de minimis* exception materially increases costs.  JA743.  It needlessly sweeps into the rule many companies whose products have no impact on mining in the DRC.  For instance, the plastic used in shoe soles sometimes contains minute amounts of tin. *House Testimony* (statement of Stephen Lamar).  Because there is no *de minimis* exception, many shoe manufacturers will have to "expend[] extraordinary resources to trace the origin of a mineral that sometimes is encountered at *de minimis* levels in a few ... products," even though the companies "simply don't have the purchasing power or the business relationships to affect change" in supply chains.  *Id.*

 "The use of metal compounds in catalys[t]s" also "exemplifies why a *de minimis* standard is needed."  JA397.  Metal catalysts are "broadly used to chemically react with and manufacture a range of materials, from solvents to fuels to polymers."  *Id.* "The catalysts are typically not consumed in the reaction, and can be reclaimed, reprocessed and reused.  Trace levels of the catalyst, however, will be found in the … manufactured product."  *Id.*  The metals "may be present in parts per million or less."

32

JA384. An adhesive made from a polymer and containing "parts per million" of tin may, in turn, be used as one very small part of a component that is itself only one of thousands or millions of components in a final product. JA397.

It strains credulity to believe that requiring a manufacturer to "undertake[] a complex and costly analysis" to attempt to determine the origin of a trace amount of tin would be anything other than a waste of resources. JA269. Yet, far from excepting catalysts, the SEC specifically included them: "a conflict mineral used as a catalyst or in another manner in the production process of a product [is] 'necessary to the production' of the product if that conflict mineral …. is contained in any amount, including trace amounts, in the product." JA742. "[I]t is unreasonable for the Commission *not* to consider … the use of [its] exemptive authority," *Gallagher Dissent*, JA712, to avoid "mandat[ing such] pointless expenditures of effort," *Ala. Power Co.*, 636 F.2d at 360; *see Am. Petrol. Inst.*, 2013 WL 3307114, at *13 ("[A]n agency decision as to exemptions must ... be the product of reasoned decisionmaking.").

The district court held that while "the SEC's explanation arguably could have been more thorough in some respects, the Court cannot say that the Commission's determination was unreasonable or devoid of a 'rational connection' in violation of the APA," because the agency's conclusion that a *de minimis* exception could undermine the rule "is supported by the record, including in comments proffered by the State Department, by members of the legislative branch, and by some industry stakeholders." JA889-90.

33

But the State Department's entire discussion of the issue consisted of only two sentences that were no less conclusory than the Commission's:  "In light of the nature in which the covered materials are often used in products, *i.e.*, often in very limited quantities, such a change could have a significant impact on the proposed regulations. A *de minimis* threshold should not be considered under current circumstances." JA445.  The other commenters opposed to the exception simply repeated the same concern.  *See* JA602 (arguing that an exception could undermine the rule because a "computer logic chip contains perhaps a few milligrams of tantalum," but the "semiconductor industry as a whole consumes over 100 tons of tantalum metal annually").  None offered any reason why this concern could not be addressed by setting a *de minimis* threshold based on the total amount used per issuer, rather than per product.

The district court further held that the Commission did not err "in failing to analyze the many *de minimis* thresholds that commentators proposed," because an agency "need not consider every alternative proposed nor respond to every comment made."  JA891.  The problem here, however, is not that the agency failed to respond individually to each comment, but that it failed to respond to an entire group of comments that completely undermined its only rationale (apart from its erroneous statutory interpretation) for refusing to create the exception.  To this day, the SEC has not explained how an exception for issuers who use only trace amounts per year

34

would undermine the statute, and its refusal to create a *de minimis* exception was arbitrary and capricious.

**B.    The Commission Misinterpreted the Statute's "Did Originate" Requirement And Imposed Unnecessary Burdens.**

The rule requires a report and audit from companies who, after inquiry, have a "reason to believe" that their minerals "*may* have originated" in the region. JA758 (emphasis added). This standard is inconsistent with the statutory text, which requires a report and audit only from companies whose minerals "did originate" in the region. 15 U.S.C. §78m(p)(1)(A). In addition, the SEC's analysis of this "may have originated" standard is deeply deficient, as it fails adequately to consider the standard's impact on reporting companies and the DRC, and fails to show that its enormous additional costs are warranted.

**1.    The Statute Says "Did Originate," Not "May Have Originated."**

Section 1502 provides for reporting obligations only for companies whose minerals "did originate" in the DRC region. The provision unambiguously states that the Commission shall require companies to disclose whether their minerals "*did originate* in the Democratic Republic of the Congo or an adjoining country, and, in cases in which such conflict minerals *did originate* in any such country, submit to the Commission a report," including a description of "due diligence on the source" of the minerals. 15 U.S.C. §78m(p)(1)(A) (emphases added). Yet, contrary to the statutory text, the rule requires a company to file a report unless, "based on its reasonable

country of origin inquiry, the issuer has no reason to believe that its conflict minerals *may have originated* in the Covered Countries." JA758 (emphasis added). According to the SEC, "requiring further steps by issuers that have reason to believe that they have necessary conflict minerals that may have originated in the Covered Countries is necessary to carry out the requirements contemplated by the statute." JA759. This conclusion is incorrect. By its terms, the statute requires a report only from those companies whose minerals "did originate" in the DRC region, while the SEC's far broader standard will require a report from companies whose minerals in fact *did not* originate in the region, simply because they are unable to determine the minerals' source. Thus, the statute "unambiguously foreclose[s] the agency's statutory interpretation," which "exceed[s] the statute's clear boundaries." *Vill. of Barrington, Ill. v. Surface Transp. Bd.*, 636 F.3d 650, 659-60 (D.C. Cir. 2011).

The district court held that the SEC's interpretation is reasonable and entitled to *Chevron* deference because "the statute is silent as to *how* companies go about determining 'whether' their minerals 'did originate' in the Covered Countries in the first place," and "[t]he SEC, exercising its interpretive authority, sought to gap-fill this silence through the 'reasonable country of origin' inquiry." JA893. This reasoning misses the mark. Appellants are not challenging the SEC's statutory authority to require companies to undertake an inquiry to determine whether their minerals "did originate" in the DRC. The issue is what conclusion, after that reasonable inquiry is

complete, is sufficient to trigger the statutory due diligence and reporting requirements.

The statute is not silent on this point. It provides a clear answer: These obligations apply only to issuers who conclude that their minerals "did originate" in the DRC. The statute plainly states that issuers must "submit to the Commission a report" describing their due diligence only "*in cases in which* such conflict minerals *did originate* in any such country." 15 U.S.C. §78m(p)(1)(A) (emphases added). Congress considered, and rejected, other standards for triggering disclosure.

Indeed, Congress specifically rejected the very standard that the SEC later imposed: an earlier version of the bill would have required reports on due diligence for minerals that "originated *or may have originated*" in the DRC region. 156 Cong. Rec. S3866 (daily ed. May 18, 2010) (emphasis added). The district court concluded that Congress did not "clearly limit[] the Rule's scope to minerals that 'did originate' in the Covered Countries," in part because a floor statement refers to the "originated or may have originated" standard. JA893 n.19. This floor statement, however, addressed the earlier version of the bill, which included the additional "or may have originated" language. 156 Cong. Rec. S3976 (daily ed. May 19, 2010) (statement of Sen. Feingold). Congress later removed that language from the bill, instead requiring reports only when minerals "did originate" in the region. H.R. Rep. No. 111-517, at 851 (2010) (Conf. Rep.). The SEC's "may have originated" standard is inconsistent with the "did originate" standard that Congress ultimately chose.

37

The district court held that the SEC's interpretation is permissible because "any discernible difference" between a "did originate" standard and a "may have originated" standard is "semantic." JA897. Not so. The change from "did" to "may have" vastly extends the reach of the rule. The word "may" is an extremely expansive one, "expressing ... subjective possibility, *i.e.* the admissibility of a supposition." *Oxford English Dictionary* (2013) (definition of "may"). Indeed, the Supreme Court has held that a "'might' formulation" should not be used in other SEC disclosure regimes precisely because it "is too suggestive of mere possibility, however unlikely," and will therefore result in an "avalanche of trivial information[;] a result that is hardly conducive to informed decisionmaking." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 448-49 (1976).

The SEC's interpretation of the regulation confirms that the "may have originated" standard is an extraordinarily broad one, covering an issuer who believes there is even a *five percent chance* that its minerals originated in the DRC region. JA840; *see* JA897 n.21. And any issuer who cannot determine the origin of its minerals after a reasonable, good-faith inquiry (for instance, because the issuer has a complex supply chain, or its suppliers refuse to provide information), apparently also falls within the "may have originated" standard, merely because a small percentage of the global supply of the minerals originates in the region. JA767 (requiring reports when issuers are unable to determine the minerals' origin). Because of the ubiquity of tin, tantalum, tungsten, and gold, *see supra* p.5-7, and the difficulty of tracing them through a supply

38

chain, *see supra* p.8-11, it is likely that the vast majority of issuers will be unable to avoid the onerous costs of this extremely broad standard. Thus, the SEC's "may have originated" standard "clearly exceed[s]" the agency's "range of interpretive discretion," and goes beyond "the statute's clear boundaries." *Vill. of Barrington*, 636 F.3d at 659-60.

> **2. The "May Have Originated" Standard Is Arbitrary And Capricious, And Imposes Unnecessary Burdens.**

Moreover, even if the Commission's standard were consistent with the statutory text, the rule would be arbitrary and capricious. The SEC acknowledged that its standard "will be more costly than only requiring a report if the issuer has affirmatively determined that its minerals did come from the Covered Countries." JA789. Indeed, the overbroad and vague "may have originated" standard comes close to forcing companies to "prove a negative" and determine that their minerals did *not* originate in the DRC region, a requirement that the SEC itself found overly burdensome, JA788, particularly because the regulation exposes companies to substantial liability if their disclosures are deemed inadequate, JA749.

And the SEC was unable to justify these added costs by pointing to *any* benefit. *Id.* In fact, its "insistence on [such broad] disclosure may accomplish more harm than good." *TSC Indus.*, 426 U.S. at 448-49. Requiring companies to report that their products have not been found to be DRC conflict free merely because they are unable to determine their origin, or believe there is a remote possibility that the minerals

could have come from the region, will not single out companies whose products actually have ties to the conflict, but rather will result in a useless "avalanche of trivial information." *Id.* Imposing enormous costs without any discernible benefits is arbitrary and capricious. *Pub. Citizen v. Fed. Motor Carrier Safety Admin.*, 374 F.3d 1209, 1218 (D.C. Cir. 2004).

The SEC's other attempts to defend this standard are meritless as well. The SEC asserts that a stricter standard is necessary because "if we allowed an issuer to stop its inquiry ... there would be an incentive for issuers to avoid learning the ultimate source of the minerals." JA759. The suggestion that a stricter standard is needed to prevent willful blindness is a *non sequitur.* The rule separately requires companies to design a good faith inquiry, and to perform it in good faith. JA757; *see also Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2068 (2011) (willful blindness is equivalent to knowledge). Appellants agree that companies should conduct a good-faith inquiry, but the question is what must a company do *after* it conducts that inquiry and cannot determine the country of origin. In light of the statutory text, the high costs of preparing an audited public report, and the absence of marginal benefits, the Commission erred in creating the "may have originated" standard.

### C.    The Rule's Inclusion Of Non-Manufacturers Is Contrary To The Statute.

By its terms, Section 1502 applies to a company only if "conflict minerals are necessary to the functionality or production of a product *manufactured by*" that company.  15 U.S.C. §78m(p)(2)(B) (emphasis added).  Thus, the statute applies only to manufacturers.   Manufacturers must then describe in their reports both "the products *manufactured*" and the products "*contracted to be manufactured*" that "are not DRC conflict free."  *Id.* §78m(p)(1)(A)(ii) (emphases added).

The SEC seriously misread these provisions, erroneously concluding that the statute applies to companies that do not manufacture any products, as long as they contract for the manufacture of products.  JA735.  The Commission reasoned that "the statutory intent to include issuers that contract to manufacture their products is clear based on the statutory obligation for issuers to describe in their Conflict Minerals Reports products that are manufactured and contracted to be manufactured."  JA736.

In fact, just the opposite is true:  Congress's use of the term "contract to manufacture" in §78m(p)(1)(A)(ii) shows that Congress *did not* intend to cover those who only contract to manufacture products when it used the term "manufactured" in §78m(p)(2)(B).  It is a basic principle of statutory construction that Congress's use of "different terms … generally implies that different meanings were intended."  *United States v. Bean*, 537 U.S. 71, 76 n.4 (2002).  Furthermore, the legislative history confirms

41

this intent.  An earlier version of the bill would have covered any person if conflict minerals were included in "a product of such person."  156 Cong. Rec. S3103 (daily ed. May 4, 2010) (amendment by Sen. Brownback).  Congress amended the language to read "a product *manufactured by* such person," showing its intent to limit the statute to manufacturers.  156 Cong. Rec. S3866 (daily ed. May 18, 2010) (amendment by Sen. Brownback) (emphasis added).

The SEC nonetheless rejected this plain meaning, claiming it would make the statute "internally inconsistent."  JA736.  It does not.  Section 78m(p)(2)(B) sets forth *who* is required to submit reports: companies that manufacture products.  Section 78m(p)(1)(A)(ii), by contrast, sets forth *what products* the reports must describe: the products the company manufactures, and the products it contracts to have manufactured.  The SEC erred in concluding that Congress must have meant something different from what it said.  *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992).

The district court held that the statute has "no clear and plain meaning," due to "the ambiguity inherent in the term 'manufacture,'" which "might well include entities that contract out the manufacture of products."  JA898-99.  Because of such purported ambiguity, the district court deferred to the SEC's interpretation.  This was erroneous for three reasons.

First, whatever the term "manufacture" may encompass in other contexts, here it is clear that Congress did not intend it to include contracts to manufacture:

Congress used only "manufactured" in §78m(p)(2)(B) and both "manufacture" and "contract to manufacture" in §78m(p)(1)(A)(ii), showing that it intended those different terms to have different meanings. *Bean*, 537 U.S. at 76 n.4. Congress's choice of words, which the district court was not free to question, was perfectly reasonable. Given the enormous costs of developing an infrastructure to conduct due diligence, Congress logically chose a narrower trigger in determining the companies to which the rule would apply, but then comprehensively covered the products to be included in those companies' reports.

Second, because the Commission wrongly believed that its "interpretation is compelled by Congress," that interpretation is entitled to no deference, and the rule cannot be upheld. *Peter Pan Bus Lines, Inc. v. Fed. Motor Carrier Safety Admin.*, 471 F.3d 1350, 1354 (D.C. Cir. 2006); *see Prill v. NLRB*, 755 F.2d 941, 948 (D.C. Cir. 1985) ("[A]n agency regulation must be declared invalid, even though the agency might be able to adopt the regulation in the exercise of its discretion, if it was not based on the agency's own judgment but rather on the unjustified assumption that it was Congress' judgment.") (alterations omitted).

Although the SEC's attorneys contended below that the statute is ambiguous on this issue, JA897, this argument provides no basis for deference because it is inconsistent with the Commission's release. *Am. Bar Ass'n*, 430 F.3d at 471. In the release, the SEC plainly stated "we believe the statutory intent to include issuers that contract to manufacture their products is *clear* based on the statutory obligation for

43

issuers to describe in their Conflict Minerals Reports products that are manufactured and contracted to be manufactured." JA736 (emphasis added); *see also* JA790 ("[T]he final rule applies to issuers that contract to manufacture products. This requirement is based on our interpretation of the statute in light of our understanding of the statutory intent and a reading of the statute's text."). Indeed, the release gives no other reason for including issuers that contract to manufacture, aside from the SEC's conclusion that the text is "clear" and Congress intended to cover such issuers. JA736.

The district court concluded that the SEC's "use of the word 'clear' in describing its understanding of statutory intent" did not show that the SEC believed the statute to be clear, but rather "indicate[d] that the SEC sought to exercise its judgment in a manner consistent with the statute's underlying purpose." JA900 (citing *Ass'n of Private Sector Colls. & Univs. v. Duncan*, 681 F.3d 427, 445 (D.C. Cir. 2012)). This conclusion ignores the agency's statement that its interpretation is based on its "reading of the statute's text." JA790. Where, as here, the agency "rest[s] simply on its parsing of the statutory language," its interpretation is not entitled to *Chevron* deference. *Peter Pan*, 471 F.3d at 1354.

Third, even if the SEC had discretion and claimed to be exercising that discretion, its conclusion would still need to be set aside because of its failure to perform a proper cost-benefit analysis. The "contract to manufacture" standard needlessly sweeps into the rule retailers and others who manufacture nothing. The

44

SEC offered no justification for imposing enormous costs on such companies, and identified no benefits from subjecting them to the rule.  Compliance with the rule is likely to be especially burdensome to retailers, because "supply-chain monitoring processes and mechanisms … may well be wholly foreign to [them]," JA614, and the rule will require them to create such processes from scratch.  Indeed, retailers frequently deal only with intermediaries and have limited knowledge about the supply chain used to manufacture the good.  *See id.*

### D.     The Phase-In Period Is Arbitrary And Capricious.

The Commission recognized the need for a phase-in period, given that "the infrastructure necessary for compliance does not exist."  JA480.  During the phase-in period, companies that are unable to trace their supply chains may describe their minerals as "DRC conflict undeterminable," and, while they still must conduct due diligence and submit a report, they need not have the report audited.  JA754.

The SEC determined that the phase-in period for small companies should last four years, noting that this period "is appropriate because these issuers may lack the leverage to obtain detailed information regarding the source of a particular conflict mineral."  JA768.  But the SEC then arbitrarily provided only a two-year period for larger companies, even though it elsewhere recognized that "many smaller companies are part of larger companies' supply chains and would need to provide conflict minerals information so that the larger companies could meet their obligations under the rule."  JA806.  Indeed, the SEC's justification for refusing to exempt small

businesses from the rule was that they "could still be required to track and provide their conflict minerals information for larger issuers," and any such exemption "could increase the burden on larger companies that rely on smaller reporting company suppliers to provide conflict minerals information." JA794.

There is a fundamental flaw in this reasoning. If small companies cannot comply with the rule for four years, and large companies will have to rely on small companies to comply, how will large companies be able to comply in two years? The SEC's decision to structure the phase-in period in this way "is internally inconsistent and therefore arbitrary." *Bus. Roundtable*, 647 F.3d at 1153.

The district court recognized that it is "undoubtedly true" "that some large issuers rely upon smaller issuers covered by the Rule as part of their supply chains," and that "the disparate transition periods may pose some unique difficulties that might not otherwise exist." JA902. However, the court held that the transition period was nonetheless reasonable, because the country of origin inquiry and due diligence requirements still apply during the transition period. *Id.* But, as the Commission itself recognized, many smaller companies will not be able to determine the origin of their minerals during the phase-in period even after completing due diligence, JA768, and larger companies must depend on smaller companies for information, JA806. Accordingly, if smaller companies need a four-year phase-in period in which they may describe their goods as having an "undeterminable" origin, then so do larger companies.

46

**E.    The Commission's Decisions Increased The Rule's Costs Without Corresponding Benefits, In Violation Of the Commission's Statutory Obligation Not To Impose Unnecessary Burdens.**

The SEC recognized that each challenged aspect of the rule will increase the burdens on competition.  JA743, JA789-90.  Accordingly, 15 U.S.C. §78w(a)(2) required the Commission to determine whether these burdens are "necessary or appropriate" to further the purposes of the statute—here, the "compelling social benefits" of "decreas[ing] the conflict and violence in the DRC."[3] JA795; JA780; *see* §1502(a), (c)(1).  The SEC cannot make this determination without analyzing "the likelihood that the [regulatory] action will achieve those [statutory] objectives." *Bradford Nat'l Clearing Corp. v. SEC*, 590 F.2d 1085, 1105 (D.C. Cir. 1978).  Yet the Commission failed to conduct this analysis, stating "we are unable to readily quantify [the benefits] with any precision, both because we do not have the data to quantify the benefits and because we are not able to assess how effective Section 1502 will be in achieving those benefits."  JA780, JA795.  As noted, the Commission failed even to determine whether there would be benefits at all.  *Id.*

As Commissioner Paredes aptly said, "[t]he best of intentions cannot substitute for a rigorous analysis by this agency of whether the social benefits that Section 1502 strives for are likely to be realized by the final rule."  JA715.  It was critical for the SEC to provide this analysis given the danger that an overly stringent rule could

---

[3] The Commission recognized the rule was not intended to—and would not—benefit investors or public companies.  JA780.

backfire and unintentionally harm the Congolese people by creating a devastating *de facto* embargo.  As the Commission conceded below, it "received a number of comments fiercely debating whether the disclosure regime would actually yield such a benefit" to the DRC, JA818, or would instead "exacerbat[e] conditions," JA816 n.3.

Some commenters argued that the rule will help the DRC, JA780, but others, including government agencies in adjoining countries and non-profit organizations in the DRC, argued the contrary.  JA780 n.719.  These comments were far from conclusory.  Commenters explained that anticipation of the rule was already leading to a *de facto* embargo, harming the millions of Congolese who depend on the country's mining sector, and millions more in the nine neighboring countries.  *See supra* p.15-16.  For instance, one non-profit group found it to have "been devastating to the mining communities and the broader economy of Eastern DRC."  JA669.  A mining cooperative in the DRC explained that, with "[e]ach passing day children die from lack of food and medicines."  JA554.  And a DRC industry group wrote that "we can confirm today that as expected" there is "more smuggling," a "very big decrease in revenue" for the government, and a "huge impact" on the livelihoods of innocent Congolese.  JA610.

The Commission mentioned this dispute only in a footnote.  JA780 n.719.  And, in that footnote, the Commission did not even attempt to resolve the serious questions as to the rule's likely impact on the people it was intended to help.  Nor did it address whether its final rule would have any impact on armed groups, who

continue to profit by smuggling minerals, most notably gold.  *See supra* p.17.  It could well be that the SEC's rule will fail to disrupt funding to armed groups, while causing serious harms to miners and the DRC economy.  Indeed, as commenters discussed, the rule could have a destabilizing influence on the region.  *See supra* p.16.  "[I]f there is anything that seems to be a reliable predictor of chaos and violence anywhere in the world, it is economic hopelessness."  *Gallagher Dissent*, JA710.

"More is expected, and should be expected" from an SEC analysis.  *Gallagher Dissent*, JA711.  The agency has a statutory obligation to "base its final rule on a reasoned assessment that considers the potential consequences of its judgments," *Paredes Dissent*, JA715.  "Without such a cost-benefit analysis, accounting for benefits as well as costs," the agency's analysis cannot "pass muster in this court."  *Pub. Citizen*, 374 F.3d at 1222; *see Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (it is arbitrary and capricious to "entirely fail[] to consider an important aspect of the problem").

The district court held that the SEC's analysis was adequate because "[b]y their terms," 15 U.S.C. §78w(a)(2) and §78c(f) "only obligate the SEC to '*consider*' the impact that a rule or regulation may have on various *economic-related factors*—efficiency, competition, and capital formation."  JA874 (second emphasis in original).  But section 78w(a)(2) does not only require the SEC to "consider" "economic-related factors"; it provides that the agency "*shall not adopt* any such rule or regulation which would impose a burden on competition not necessary or appropriate *in furtherance of the purposes of this chapter* [15]."  15 U.S.C. §78w(a)(2) (emphases added).  As the SEC

49

recognized, the rule will burden competition, and the challenged aspects of the rule will increase that burden. JA795; *see* JA719, JA743, JA789-90. The SEC cannot logically determine whether those burdens "are necessary or appropriate in furtherance of the purposes" of the statute (which, of course, is part of chapter 15) without determining whether they *will* further the statute's purposes: "to decrease the conflict and violence in the DRC" and "promot[e] peace and security." JA795.[4] Yet the SEC completely failed to undertake this analysis. Moreover, as *Business Roundtable* held, 15 U.S.C. §78(c)(f) obligates the agency to consider whether the added costs of the agency's choices are necessary to further a regulation's purposes; the failure "to view a cost at the margin, is illogical and, in an economic analysis, unacceptable." 647 F.3d at 1151.

The district court reasoned that the SEC did not have to determine whether the rule would actually promote its intended benefits, because the agency created the rule under an "express, statutory directive *from Congress*, which was driven by *Congress's*

---

[4] The district court further concluded that the SEC need not determine whether the rule will further the statute's purposes because those purposes are "humanitarian" rather than "economic." JA874. The entire premise of the statute, however, is to impose *economic* incentives on American businesses to achieve humanitarian goals. Predicting how the rule will affect the economic decision-making of American businesses (whether they will react by using conflict-free sources in the region, or by embargoing the region altogether) is within the Commission's capabilities. Moreover, Congress does not "pursue[] its purposes at all costs," *Rodriguez v. United States*, 480 U.S. 522, 525-26 (1987), and assuredly did not intend the SEC to impose astronomical costs on American companies by making discretionary choices that benefit no one and are ultimately counterproductive.

*determination* that the due diligence and disclosure requirements it enacted would help to promote peace and security in the DRC." JA877 (emphasis in original). Of course, the Commission had to follow the congressional directive to impose *a* rule. But the Commission did not have to adopt the particular rule it ultimately promulgated, which erroneously (1) excluded a *de minimis* exception; (2) replaced the word "did" with the word "may"; (3) extended the rule to non-manufacturers; and (4) created an irrational phase-in period. Congress did not require these four aspects of the SEC's rule, and each of these decisions greatly increased the rule's already enormous and unprecedented costs, despite yielding no additional humanitarian benefit (at least none identified by the Commission). The agency's failure to analyze the added costs of these decisions is "illogical" and "unacceptable." *Bus. Roundtable*, 647 F.3d at 1151.

### F.    The Commission's Errors Require Vacatur.

These numerous errors in statutory interpretation, economic analysis, and reasoned decision-making require vacatur. An "unsupported agency action normally warrants vacatur," and there is no reason to depart from that ordinary practice here. *Advocates for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 429 F.3d 1136, 1151 (D.C. Cir. 2005). Vacatur is plainly necessary given "the seriousness of the rule's deficiencies (and thus the extent of doubt whether the agency chose correctly)." *Comcast Corp. v. FCC*, 579 F.3d 1, 8 (D.C. Cir. 2009) (alteration omitted).

The Commission's erroneous decisions not to create a *de minimis* exception and to extend the rule to non-manufacturers will impose costs upon companies that,

under a properly structured rule, would have no compliance burdens.  Moreover, the Commission's overbroad "may have originated" standard greatly increases compliance burdens by requiring companies to conduct costly due diligence and file reports if there is even a remote possibility that their minerals originated in the DRC region. The agency's deficient cost-benefit analysis, under which it imposed crushing costs without showing any benefits, casts further doubt on all of these regulatory choices.

Vacatur will not have "disruptive consequences." *Id.*  This factor "is weighty only insofar as the agency may be able to rehabilitate its rationale for the regulation," and the regulation here will clearly require significant changes. *Id.* at 9.  Also, vacatur will not cause disruption because companies have not yet filed disclosures, so there is still time to restructure compliance programs.  Vacatur is especially critical because the compliance costs are enormous and because there is a significant possibility that the rule, as currently structured, could harm the people it was intended to help.

## II.   SECTION 1502 AND THE RULE COMPEL SPEECH IN VIOLATION OF THE FIRST AMENDMENT.

The First Amendment "prohibits the government from telling people what they must say." *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 61 (2006).  Section 1502 violates this right by compelling companies to publicly state on their own websites that their products are "not DRC conflict free."  15 U.S.C. §78m(p)(1)(A)(ii).  This compelled disclosure is intended to serve as a "scarlet letter," *Gallagher Dissent*, JA710, "[f]orcing a company to associate itself publicly with groups

engaged in human rights violations" and to "stigmatize [itself] and harm its business," JA246.

Even worse, this compelled disclosure will frequently be false or misleading. Many of the companies forced to make it will not be manufacturing products containing minerals that funded armed groups. Rather, the companies will simply be unable to determine the minerals' origins. *See supra* p.8-12. Further, requiring a company to carry the message that its product is not "conflict free" merely because, say, one out of a thousand parts retains a tiny residue of a catalyst containing tin, is to mandate that the company convey a highly loaded and contestable characterization— one that embodies a particular ideological view of what kinds of remote connections to a war-torn region fairly link a company to the conflict.

Strict scrutiny applies here. The compelled disclosures are not commercial, but rather "pregnant with political judgments and connotations," JA187, and they must be placed on companies' websites, which typically contain non-commercial as well as commercial speech. Even if the disclosures were commercial, the statute likewise fails intermediate scrutiny, because it does not "directly and materially advance[]" a substantial government interest, and is broader than necessary. *R.J. Reynolds Tobacco Co. v. FDA*, 696 F.3d 1205, 1212 (D.C. Cir. 2012).[5]

---

[5] The rational basis standard set forth in *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626 (1985), does not apply because, as the SEC conceded below, the compelled disclosures are not aimed at preventing consumer

Petitioners do not contest that the government's interest in promoting peace and security in the DRC is substantial, even compelling. However, the statute and rule fail to "directly and materially advance[]" that interest. *R.J. Reynolds*, 696 F.3d at 1212; *see supra* p.15-17. As this Court recently explained, "[a] restriction that provides only ineffective or remote support for the government's purposes, is not sufficient." *Id.* at 1218-19 (internal citation omitted). Moreover, "mere speculation or conjecture" is insufficient to uphold a speech restriction. *Id.* at 1219. Congress must "base its conclusions" about the efficacy of a speech restriction "upon substantial evidence." *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 196 (1997); *see Edenfield v. Fane*, 507 U.S. 761, 770-71 (1993).

 "[S]ubstantial evidence" that disclosure requirements on U.S. public companies will directly ameliorate the violent conflict in the DRC is lacking. Indeed, Congress did not even hold hearings on the likely impact of Section 1502 until *after* the law passed, and so "did not have an opportunity to consider the section[']s implement[ation] and whether it would help in the conflict in the DRC, and what effect it would have on the DRC and the ... manufacturers in the United States." *House Testimony* (statement of Rep. Miller). Moreover, the belated congressional

---

deception. JA909; *R.J. Reynolds*, 696 F.3d at 1212. Further, the relaxed standard set forth in *SEC v. Wall Street Publishing Institute*, 851 F.2d 365, 373 (D.C. Cir. 1988), does not apply because the rule does not regulate "[s]peech relating to the purchase and sale of securities," and because the disclosures must be made publicly on company websites, JA909.

hearings raised serious concerns that the law was *not* advancing Congress's goals, but instead "has had a significant adverse effect on innocent bystanders in the DRC," resulting in "a *de facto* embargo," and that "[d]espite the economic consequences, there is no indication that the violence is subsiding." *The Unintended Consequences of Dodd-Frank's Conflict Minerals Provision: Hearing Before the H.R. Subcomm. on Monetary Policy and Trade* (May 21, 2013); *see* Nicolas Cook, Congressional Research Serv., *Conflict Minerals in Central Africa: U.S. and Int'l Responses* (July 20, 2012) (concluding that the "conflict in eastern DRC has long posed a complex set of intractable security, governance, and human rights challenges, which [Section 1502] alone [is] unlikely to overcome—and may complicate"). After more than a year of studying the issue, the SEC likewise was "not able to assess how effective Section 1502 will be in achieving those benefits." JA780.

The district court nonetheless held, citing *Holder v. Humanitarian Law Project*, 130 S. Ct. 2705, 2727 (2010), that Congress had substantial evidence that Section 1502 would directly advance its intended goals, because "the foreign relations context in which Congress enacted Section 1502" required the court's review to be "particularly deferential." JA912-13. But unlike in *Humanitarian Law Project*, there is "little to which to defer in this case." *Yusupov v. Att'y Gen. of the United States*, 650 F.3d 968, 980-81 (3d Cir. 2011). Again, Congress held *no* hearings evaluating the likely impact of Section 1502 before passing the law, and the scattered floor statements by a few individual

Senators on which the district court relied[6] do not warrant deference in light of the serious doubts as to the law's effectiveness raised in later congressional hearings and in the administrative record. Further, in *Humanitarian Law Project* deference was warranted because "Congress [was] conscious of its own responsibility to consider how its actions may implicate constitutional concerns" and "not to abridge First Amendment rights." 130 S. Ct. at 2728. Here, by contrast, Congress never considered the First Amendment implications of Section 1502, nor whether it could have advanced the same objectives without compelling speech. Given these factors, no special deference is due. *Boos v. Barry*, 485 U.S. 312, 316, 321-22 (1988) (without such Congressional judgments, applying "the most exacting scrutiny" to a law regulating speech near foreign embassies).

The statute and regulation also fail intermediate scrutiny because they are "more extensive than is necessary to serve [the government's] interest." *R.J. Reynolds*, 696 F.3d at 1217. The government could, for instance, have allowed companies to describe the results of their due diligence in language they consider accurate, rather than compelling them to state that certain products have not been found to be "DRC conflict free." And, based on disclosures made to the agency, the government could

---

[6] Contrary to the district court's premise, floor statements by two Senators do not equate with "Congress's view" or show that "Congress concluded" anything. *See, e.g.*, JA857-58. Further, the fact that Congress previously held hearings on other bills relating to the DRC provides no basis for deference, as those bills differed from Section 1502 in numerous respects. *Cf.* JA915.

have itself compiled and published a list of products it considers to have problematic ties to the DRC conflict. By instead forcing companies to denounce their own products on their own websites, using the government's language, Section 1502 and the rule violate the First Amendment.

The SEC's attempts to mitigate these fatal First Amendment problems by subtly changing the wording of the compelled disclosure to "not been found to be DRC conflict free," and by allowing companies to add further explanatory language, are clearly insufficient. JA767. Stating on one's own website that a product has "not been found to be DRC conflict free" will still leave consumers with the misleading and harmful impression that the company is complicit in human rights abuses. In any event, it is no answer to the First Amendment objection to say that a private party is being compelled to convey the *government's* position. *Nat'l Ass'n of Mfrs. v. NLRB*, 717 F.3d 947, 957 (D.C. Cir. 2013) (invalidating rule where "the government selected the message and ordered its citizens to convey that message" and holding it irrelevant that the message was "to that extent 'government speech'").

Further, the ability to add qualifying language does little to remove the unfair stigma. "In other words, the company would first be required to confess but then be allowed to accompany the confession with a (sort of) retraction." JA246. This Court has rejected the argument that a First Amendment violation can be cured by allowing a company to add additional disclosures alongside compelled speech. *Nat'l Ass'n of*

*Mfrs.*, 717 F.3d at 958.  Compelling this burdensome and stigmatizing speech violates

companies' First Amendment rights.

## CONCLUSION

For the foregoing reasons, Appellants request that the district court's judgment

be reversed.

Dated: September 11, 2013                    Respectfully submitted,

/s/ Peter D. Keisler
Peter D. Keisler
    *Counsel of Record*
Jonathan F. Cohn
Erika L. Myers
Sidley Austin LLP
1501 K St., NW
Washington, DC 20005
202.736.8027
*Counsel for Appellants the*
*National Association of*
*Manufacturers, the Chamber of*
*Commerce of the United States of*
*America, and Business Roundtable*

*Of Counsel*:
Rachel L. Brand
Steven P. Lehotsky
National Chamber
Litigation Center, Inc.
1615 H St., NW
Washington, DC 20062
202.463.5337
*Counsel for Appellant the*
*Chamber of Commerce of the*
*United States of America*

*Of Counsel*:
Quentin Riegel
National Association of
Manufacturers
733 10th St., NW
Suite 700
Washington, DC 20001
202.637.3000
*Counsel for Appellant the*
*National Association of*
*Manufacturers*

*Of Counsel*:
Maria Ghazal
Business Roundtable
300 New Jersey Ave., NW
Suite 800
Washington, DC 20001
202.496.3268
*Counsel for Appellant Business*
*Roundtable*

## CERTIFICATE OF COMPLIANCE

In accordance with Circuit Rule 32(a) and Rule 32(a)(7) of the Federal Rules of Appellate Procedure, the undersigned certifies that the accompanying brief has been prepared using 14-point Garamond Roman typeface, and is double-spaced (except for headings and footnotes).

The undersigned further certifies that the brief is proportionally spaced and contains 13,984 words exclusive of the certificate required by Circuit Rule 28(a)(1), statutory and evidentiary addendum, table of contents, table of authorities, signature lines, and certificates of service and compliance. The words of Opening Brief of Appellants do not exceed 14,000 words, as mandated by Fed. R. App. P. 32(a)(7)(B)(i). The undersigned used Microsoft Word 2007 to compute the count.

/s/ Peter D. Keisler
Peter D. Keisler

## CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of September, 2013, I electronically filed the foregoing Opening Brief of Appellants with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to all registered CM/ECF users.

/s/ Peter D. Keisler
Peter D. Keisler

# ADDENDUM

Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, Pub.
L. No. 111-203, § 1502, 124 Stat. 1376, 2213...........................................................ADD-1

SEC Final Rule, *Conflict Minerals*, 77 F.R. 56,274 (Sept. 12, 2012).......................ADD-7

Declaration of Joseph H. Boley...................................................................ADD-100

Declaration of Mary Beth Gammons...........................................................ADD-103

Declaration of Brent Grazman....................................................................ADD-106

Declaration of Paul G.P. Hoogenboom.......................................................ADD-113

Declaration of Michael G.R. Sinnaeve........................................................ADD-117

Declaration of Douglas R. Means...............................................................ADD-121

Dodd Frank Act Section 1502
SEC. 1502. CONFLICT MINERALS.

(a) SENSE OF CONGRESS ON EXPLOITATION AND TRADE OF CONFLICT MINERALS ORIGINATING IN THE DEMOCRATIC REPUBLIC OF THE CONGO.—It is the sense of Congress that the exploitation and trade of conflict minerals originating in the Democratic Republic of the Congo is helping to finance conflict characterized by extreme levels of violence in the eastern Democratic Republic of the Congo, particularly sexual- and gender-based violence, and contributing to an emergency humanitarian situation therein, warranting the provisions of section 13(p) of the Securities Exchange Act of 1934, as added by subsection (b).

(b) DISCLOSURE RELATING TO CONFLICT MINERALS ORIGINATING IN THE DEMOCRATIC REPUBLIC OF THE CONGO.—Section 13 of the Securities Exchange Act of 1934 (15 U.S.C. 78m), as amended by this Act, is amended by adding at the end the following new subsection:

''(p) DISCLOSURES RELATING TO CONFLICT MINERALS ORIGINATING IN THE DEMOCRATIC REPUBLIC OF THE CONGO.—

''(1) REGULATIONS.—

''(A) IN GENERAL.—Not later than 270 days after the date of the enactment of this subsection, the Commission shall promulgate regulations requiring any person described in paragraph (2) to disclose annually, beginning with the person's first full fiscal year that begins after the date of promulgation of such regulations, whether conflict minerals that are necessary as described in paragraph (2)(B), in the year for which such reporting is required, did originate in the Democratic Republic of the Congo or an adjoining country and, in cases in which such conflict minerals did originate in any such country, submit to the Commission a report that includes, with respect to the period covered by the report—

''(i) a description of the measures taken by the person to exercise due diligence on the source and chain of custody of such minerals, which measures shall include an independent private sector audit of such report submitted through the Commission that is conducted in accordance with standards established by the Comptroller General of the United States, in accordance with rules promulgated by the Commission, in consultation with the Secretary of State; and

''(ii) a description of the products manufactured or contracted to be manufactured that are not DRC conflict free ('DRC conflict free' is defined to mean the products that do not contain minerals that directly or indirectly finance or benefit armed groups in the Democratic Republic of the Congo or an adjoining country), the entity that conducted the independent private sector audit in accordance with clause (i), the facilities used to process the conflict minerals, the country of origin of the conflict minerals, and the efforts to determine the mine or location of origin with
the greatest possible specificity.

''(B) CERTIFICATION.—The person submitting a report under subparagraph (A) shall certify the audit described in clause (i) of such subparagraph that is included in such report. Such a certified audit shall

ADD-1

constitute a critical component of due diligence in establishing the source and chain of custody of such minerals.

''(C) UNRELIABLE DETERMINATION.—If a report required to be submitted by a person under subparagraph (A) relies on a determination of an independent private sector audit, as described under subparagraph (A)(i), or other due diligence processes previously determined by the Commission to be unreliable, the report shall not satisfy the requirements of the regulations promulgated under subparagraph (A)(i).

''(D) DRC CONFLICT FREE.—For purposes of this paragraph, a product may be labeled as 'DRC conflict free' if the product does not contain conflict minerals that directly or indirectly finance or benefit armed groups in the Democratic Republic of the Congo or an adjoining country.

''(E) INFORMATION AVAILABLE TO THE PUBLIC.—Each person described under paragraph (2) shall make available to the public on the Internet website of such person the information disclosed by such person under subparagraph (A).

''(2) PERSON DESCRIBED.—A person is described in this paragraph if—

''(A) the person is required to file reports with the Commission pursuant to paragraph (1)(A); and

''(B) conflict minerals are necessary to the functionality or production of a product manufactured by such person.

''(3) REVISIONS AND WAIVERS.—The Commission shall revise or temporarily waive the requirements described in paragraph (1) if the President transmits to the Commission a determination that—

''(A) such revision or waiver is in the national security interest of the United States and the President includes the reasons therefor; and

''(B) establishes a date, not later than 2 years after the initial publication of such exemption, on which such exemption shall expire.

''(4) TERMINATION OF DISCLOSURE REQUIREMENTS.—The requirements of paragraph (1) shall terminate on the date on which the President determines and certifies to the appropriate congressional committees, but in no case earlier than the date that is one day after the end of the 5-year period beginning on the date of the enactment of this subsection, that no armed groups continue to be directly involved and benefitting from commercial activity involving conflict minerals.

''(5) DEFINITIONS.—For purposes of this subsection, the terms 'adjoining country', 'appropriate congressional committees', 'armed group', and 'conflict mineral' have the meaning given those terms under section 1502 of the Dodd-Frank Wall Street Reform and Consumer Protection Act.''.

ADD-2

(c) STRATEGY AND MAP TO ADDRESS LINKAGES BETWEEN CONFLICT MINERALS AND ARMED GROUPS.—

(1) STRATEGY.—

(A) IN GENERAL.—Not later than 180 days after the date of the enactment of this Act, the Secretary of State, in consultation with the Administrator of the United States Agency for International Development, shall submit to the appropriate congressional committees a strategy to address the linkages between human rights abuses, armed groups, mining of conflict minerals, and commercial products.

(B) CONTENTS.—The strategy required by subparagraph

(A) shall include the following:

(i) A plan to promote peace and security in the Democratic Republic of the Congo by supporting efforts of the Government of the Democratic Republic of the Congo, including the Ministry of Mines and other relevant agencies, adjoining countries, and the international community, in particular the United Nations Group of Experts on the Democratic Republic of Congo, to—

(I) monitor and stop commercial activities involving the natural resources of the Democratic Republic of the Congo that contribute to the activities of armed groups and human rights violations in the Democratic Republic of the Congo; and

(II) develop stronger governance and economic institutions that can facilitate and improve transparency in the cross-border trade involving the natural resources of the Democratic Republic of the Congo to reduce exploitation by armed groups and promote local and regional development.

(ii) A plan to provide guidance to commercial entities seeking to exercise due diligence on and formalize the origin and chain of custody of conflict minerals used in their products and on their suppliers to ensure that conflict minerals used in the products of such suppliers do not directly or indirectly finance armed conflict or result in labor or human rights violations.

(iii) A description of punitive measures that could be taken against individuals or entities whose commercial activities are supporting armed groups and human rights violations in the Democratic Republic of the Congo.

(2) MAP.—

(A) IN GENERAL.—Not later than 180 days after the date of the enactment of this Act, the Secretary of State shall, in accordance with the recommendation of the United Nations Group of Experts on the Democratic Republic of the Congo in their December 2008 report—

(i) produce a map of mineral-rich zones, trade routes, and areas under the control of armed groups in the Democratic Republic of the Congo and adjoining countries based on data from multiple sources,

ADD-3

including—

(I) the United Nations Group of Experts on the Democratic Republic of the Congo;

(II) the Government of the Democratic Republic of the Congo, the governments of adjoining countries, and the governments of other Member States of the United Nations; and

(III) local and international nongovernmental organizations;

(ii) make such map available to the public; and

(iii) provide to the appropriate congressional committees an explanatory note describing the sources of information from which such map is based and the identification, where possible, of the armed groups or other forces in control of the mines depicted.

(B) DESIGNATION.—The map required under subparagraph (A) shall be known as the ''Conflict Minerals Map'', and mines located in areas under the control of armed groups in the Democratic Republic of the Congo and adjoining countries, as depicted on such Conflict Minerals Map, shall be known as ''Conflict Zone Mines''.

(C) UPDATES.—The Secretary of State shall update the map required under subparagraph (A) not less frequently than once every 180 days until the date on which the disclosure requirements under paragraph (1) of section 13(p) of the Securities Exchange Act of 1934, as added by subsection (b), terminate in accordance with the provisions of paragraph (4) of such section 13(p).

(D) PUBLICATION IN FEDERAL REGISTER.—The Secretary of State shall add minerals to the list of minerals in the definition of conflict minerals under section 1502, as appropriate.

The Secretary shall publish in the Federal Register notice of intent to declare a mineral as a conflict mineral included in such definition not later than one year before such declaration.

(d) REPORTS.—

(1) BASELINE REPORT.—Not later than 1 year after the date of the enactment of this Act and annually thereafter until the termination of the disclosure requirements under section 13(p) of the Securities Exchange Act of 1934, the Comptroller General of the United States shall submit to appropriate congressional committees a report that includes an assessment of the rate of sexual- and gender-based violence in war-torn areas of the Democratic Republic of the Congo and adjoining countries.

(2) REGULAR REPORT ON EFFECTIVENESS.—Not later than 2 years after the date of the enactment of this Act and annually thereafter, the Comptroller General of the United States shall submit to the appropriate congressional committees a report that includes the following:

(A) An assessment of the effectiveness of section 13(p) of the Securities Exchange Act of 1934, as added

by subsection (b), in promoting peace and security in the Democratic Republic of the Congo and adjoining countries.

(B) A description of issues encountered by the Securities and Exchange Commission in carrying out the provisions of such section 13(p).

(C)(i) A general review of persons described in clause (ii) and whether information is publicly available about—

(I) the use of conflict minerals by such persons; and

(II) whether such conflict minerals originate from the Democratic Republic of the Congo or an adjoining country.

(ii) A person is described in this clause if—

(I) the person is not required to file reports with the Securities and Exchange Commission pursuant to section 13(p)(1)(A) of the Securities Exchange Act of 1934, as added by subsection (b); and

(II) conflict minerals are necessary to the functionality or production of a product manufactured by such person.

(3) REPORT ON PRIVATE SECTOR AUDITING.—Not later than 30 months after the date of the enactment of this Act, and annually thereafter, the Secretary of Commerce shall submit to the appropriate congressional committees a report that includes the following:

(A) An assessment of the accuracy of the independent private sector audits and other due diligence processes described under section 13(p) of the Securities Exchange Act of 1934.

(B) Recommendations for the processes used to carry out such audits, including ways to—

(i) improve the accuracy of such audits; and

(ii) establish standards of best practices.

(C) A listing of all known conflict mineral processing facilities worldwide.

(e) DEFINITIONS.—For purposes of this section:

(1) ADJOINING COUNTRY.—The term ''adjoining country'', with respect to the Democratic Republic of the Congo, means a country that shares an internationally recognized border with the Democratic Republic of the Congo.

(2) APPROPRIATE CONGRESSIONAL COMMITTEES.—The term ''appropriate congressional

ADD-5

committees'' means—

(A) the Committee on Appropriations, the Committee on Foreign Affairs, the Committee on Ways and Means, and the Committee on Financial Services of the House of Representatives; and

(B) the Committee on Appropriations, the Committee on Foreign Relations, the Committee on Finance, and the Committee on Banking, Housing, and Urban Affairs of the Senate.

(3) ARMED GROUP.—The term ''armed group'' means an armed group that is identified as perpetrators of serious human rights abuses in the annual Country Reports on Human Rights Practices under sections 116(d) and 502B(b) of the Foreign Assistance Act of 1961 (22 U.S.C. 2151n(d) and 2304(b)) relating to the Democratic Republic of the Congo or an adjoining country.

(4) CONFLICT MINERAL.—The term ''conflict mineral'' means—

(A) columbite-tantalite (coltan), cassiterite, gold, wolframite, or their derivatives; or

(B) any other mineral or its derivatives determined by the Secretary of State to be financing conflict in the Democratic Republic of the Congo or an adjoining country.

(5) UNDER THE CONTROL OF ARMED GROUPS.—The term ''under the control of armed groups'' means areas within the Democratic Republic of the Congo or adjoining countries in which armed groups—

(A) physically control mines or force labor of civilians to mine, transport, or sell conflict minerals;

(B) tax, extort, or control any part of trade routes for conflict minerals, including the entire trade route from a Conflict Zone Mine to the point of export from the Democratic Republic of the Congo or an adjoining country; or

(C) tax, extort, or control trading facilities, in whole or in part, including the point of export from the Democratic Republic of the Congo or an adjoining country.

ADD-6



# FEDERAL REGISTER

| Vol. 77 | Wednesday, |
| No. 177 | September 12, 2012 |

Part II

## Securities and Exchange Commission

17 CFR Parts 240, 249, and 249b
Conflict Minerals; Disclosure of Payments by Resource Extraction Issuers; Final Rules

## SECURITIES AND EXCHANGE COMMISSION

**17 CFR Parts 240 and 249b**

[Release No. 34–67716; File No. S7–40–10]

RIN 3235–AK84

### Conflict Minerals

**AGENCY:** Securities and Exchange Commission.

**ACTION:** Final rule.

**SUMMARY:** We are adopting a new form and rule pursuant to Section 1502 of the Dodd-Frank Wall Street Reform and Consumer Protection Act relating to the use of conflict minerals. Section 1502 added Section 13(p) to the Securities Exchange Act of 1934, which requires the Commission to promulgate rules requiring issuers with conflict minerals that are necessary to the functionality or production of a product manufactured by such person to disclose annually whether any of those minerals originated in the Democratic Republic of the Congo or an adjoining country. If an issuer's conflict minerals originated in those countries, Section 13(p) requires the issuer to submit a report to the Commission that includes a description of the measures it took to exercise due diligence on the conflict minerals' source and chain of custody. The measures taken to exercise due diligence must include an independent private sector audit of the report that is conducted in accordance with standards established by the Comptroller General of the United States. Section 13(p) also requires the issuer submitting the report to identify the auditor and to certify the audit. In addition, Section 13(p) requires the report to include a description of the products manufactured or contracted to be manufactured that are not "DRC conflict free," the facilities used to process the conflict minerals, the country of origin of the conflict minerals, and the efforts to determine the mine or location of origin. Section 13(p) requires the information disclosed by the issuer to be available to the public on its Internet Web site.

**DATES:** *Effective Date:* November 13, 2012.

*Compliance Date:* Issuers must comply with the final rule for the calendar year beginning January 1, 2013 with the first reports due May 31, 2014.

**FOR FURTHER INFORMATION CONTACT:** John Fieldsend, Special Counsel in the Office of Rulemaking, Division of Corporation Finance, at (202) 551–3430, 100 F Street NE., Washington, DC 20549–3628.

**SUPPLEMENTARY INFORMATION:** We are adopting new Rule 13p–1 [1] and new Form SD [2] under the Securities Exchange Act of 1934 ("Exchange Act").[3]

### Table of Contents

I. Background and Summary
  A. Statutory Provision
  B. Summary of the Proposed Rules
  C. Summary of Comments on the Proposed Rules
  D. Summary of Changes to the Final Rule
  E. Flowchart Summary of the Final Rule
II. Discussion of the Final Rule
  A. "Conflict Minerals" Definition
    1. Proposed Rules
    2. Comments on the Proposed Rules
    3. Final Rule
  B. Step One—Issuers Covered by the Conflict Mineral Provision
    1. Issuers That File Reports Under the Exchange Act
    a. Proposed Rules
    b. Comments on the Proposed Rules
    i. Issuers that File Reports Under Sections 13(a) and 15(d) of the Exchange Act
    ii. Smaller Reporting Companies
    iii. Foreign Private Issuers
    c. Final Rule
    2. "Manufacture" and "Contract To Manufacture" Products
    a. Proposed Rules
    b. Comments on the Proposed Rules
    i. "Manufacture"
    ii. "Contract To Manufacture"
    c. Final Rule
    i. "Manufacture"
    ii. "Contract To Manufacture"
    3. Mining Issuers as "Manufacturing" Issuers
    a. Proposed Rules
    b. Comments on the Proposed Rules
    4. When Conflict Minerals Are "Necessary" to a Product
    a. Proposed Rules
    b. Comments on the Proposed Rules
    i. "Necessary to the Functionality"
    ii. "Necessary to the Production"
    iii. *De Minimis* Threshold
    c. Final Rule
    i. Contained in the Product
    ii. Intentionally Added
    iii. "Necessary to the Functionality"
    iv. "Necessary to the Production"
    v. *De Minimis* Threshold
  C. Location, Status, and Timing of Conflict Minerals Information
    1. Location of Conflict Minerals Information
    a. Proposed Rules
    b. Comments on the Proposed Rules
    c. Final Rule
    2. "Filing" of Conflict Minerals Information
    a. Proposed Rules
    b. Comments on the Proposed Rules
    c. Final Rule
    3. Uniform Reporting Period
    a. Proposed Rules
    b. Comments on the Proposed Rules
    c. Final Rule
    4. Time Period for Providing Conflict Minerals Information
    a. Proposed Rules
    b. Comments on the Proposed Rules
    c. Final Rule
    5. Conflict Minerals Already in the Supply Chain
    a. Proposed Rules
    b. Comments on the Proposed Rules
    c. Final Rule
    6. Timing of Implementation
    a. Proposed Rules
    b. Comments on the Proposed Rules
    c. Final Rule
  D. Step Two—Determining Whether Conflict Minerals Originated in the Democratic Republic of the Congo or Adjoining Countries and the Resulting Disclosure
    1. Reasonable Country of Origin Inquiry
    a. Proposed Rules
    b. Comments on the Proposed Rules
    c. Final Rule
    2. Disclosures in the Body of the Specialized Disclosure Report
    a. Proposed Rules
    b. Comments on the Proposed Rules
    c. Final Rule
  E. Step Three—Conflict Minerals Report's Content and Supply Chain Due Diligence
    1. Content of the Conflict Minerals Report
    a. Proposed Rules
    b. Comments on the Proposed Rules
    c. Final Rule
    2. Due Diligence Standard in the Conflict Minerals Report
    a. Proposed Rules
    b. Comments on the Proposed Rules
    c. Final Rule
    3. Independent Private Sector Audit Requirements
    a. Proposed Rules
    b. Comments on the Proposed Rules
    c. Final Rule
    i. Auditing Standards
    ii. Auditor Independence
    iii. Audit Objective
    4. Recycled and Scrap Minerals
    a. Proposed Rules
    b. Comments on the Proposed Rules
    c. Final Rule
    i. Definition of "Recycled and Scrap Sources"
    ii. Due Diligence for Conflict Minerals From "Recycled and Scrap Sources"
  F. Other Matters
III. Economic Analysis
  A. Introduction
  B. Benefits and Costs Resulting From the Mandatory Reporting Requirement
    1. Benefits
    2. Cost Estimates in the Comment Letters
    a. General Comments
    b. Specific Comments
    i. Manufacturing Industry Association Comments
    ii. Electronic Interconnect Industry Association Comments
    iii. University Group Comments
    iv. Environmental Consultancy Company Comments
    v. Other Specific Comments
  C. Benefits and Costs Resulting From Commission's Exercise of Discretion

---

[1] 17 CFR 240.13p–1.

[2] 17 CFR 249.448.

[3] 15 U.S.C. 78a *et seq.*

1. Reasonable Country of Origin Inquiry
2. Information in the Specialized Disclosure Report
3. "DRC Conflict Undeterminable"
4. "Contract To Manufacture"
5. Nationally or Internationally Recognized Due Diligence Framework (Including Gold)
6. Liability for the Audit and Audit Certifications
7. Audit Objective
8. Conflict Minerals From Recycled and Scrap Sources
9. Conflict Minerals "Outside the Supply Chain"
10. Conflict Mineral Derivatives
11. Method and Timing of Disclosure on Form SD
12. "Necessary to the Functionality or Production"
13. Categories of Issuers
14. Not Including Mining Issuers as Manufacturing Issuers
D. Quantified Assessment of Overall Economic Effects
IV. Paperwork Reduction Act
    A. Background
    B. Summary of the Comment Letters
    C. Revisions to PRA Reporting and Cost Burden Estimates
    1. Estimate of Conducting Due Diligence, Including the Audit
    2. Estimate of Preparing the Disclosure
    3. Revised PRA Estimate
V. Final Regulatory Flexibility Act Analysis
    A. Reasons for, and Objectives of, the Final Action
    B. Significant Issues Raised by Public Comments
    C. Small Entities Subject to the Final Rule
    D. Reporting, Recordkeeping, and Other Compliance Requirements
    E. Agency Action To Minimize Effect on Small Entities
VI. Statutory Authority and Text of the Final Rule

# I. Background and Summary

## A. Statutory Provision

On December 15, 2010, we proposed a number of amendments to our rules [4] to implement the requirements of Section 1502 ("Conflict Minerals Statutory Provision") of the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Act"),[5] relating to new disclosure and reporting obligations by issuers concerning "conflict minerals" [6] that originated in the Democratic Republic of the Congo ("DRC") or an

adjoining country [7] (together with the DRC, the "Covered Countries").[8] Section 1502 amended the Exchange Act by adding new Section 13(p).[9] New Exchange Act Section 13(p) requires us to promulgate disclosure and reporting regulations regarding the use of conflict minerals from the Covered Countries.[10]

As reflected in the title of Section 1502(a), which states the "Sense of the Congress on Exploitation and Trade of Conflict Minerals Originating in the Democratic Republic of the Congo," in enacting the Conflict Minerals Statutory Provision, Congress intended to further the humanitarian goal of ending the extremely violent conflict in the DRC, which has been partially financed by the exploitation and trade of conflict minerals originating in the DRC. This section explains that the exploitation and trade of conflict minerals by armed groups is helping to finance the conflict and that the emergency humanitarian crisis in the region warrants the disclosure requirements established by Exchange Act Section 13(p).[11]

Similarly, the legislative history surrounding the Conflict Minerals Statutory Provision, and earlier legislation addressing the trade in conflict minerals, reflects Congress's motivation to help end the human rights abuses in the DRC caused by the conflict.[12] Other parts of the Conflict

Minerals Statutory Provision also point to the fact that Congress intended to promote peace and security.[13] For example, the Conflict Minerals Statutory Provision states that once armed groups no longer continue to be directly involved and benefiting from commercial activity involving conflict minerals, the President may take action to terminate the provision.[14] To accomplish the goal of helping end the human rights abuses in the DRC caused by the conflict, Congress chose to use the securities laws disclosure requirements to bring greater public awareness of the source of issuers' conflict minerals and to promote the exercise of due diligence on conflict mineral supply chains. By doing so, we

---

[4] Conflict Minerals, Release No. 34–63547 (Dec. 15, 2010) [75 FR 80948] (the "Proposing Release").

[5] Public Law 111–203, 124 Stat. 1376 (July 21, 2010).

[6] The term "conflict mineral" is defined in Section 1502(e)(4) of the Act as (A) columbite-tantalite, also known as coltan (the metal ore from which tantalum is extracted); cassiterite (the metal ore from which tin is extracted); gold; wolframite (the metal ore from which tungsten is extracted); or their derivatives; or (B) any other mineral or its derivatives determined by the Secretary of State to be financing conflict in the Democratic Republic of the Congo or an adjoining country.

[7] The term "adjoining country" is defined in Section 1502(e)(1) of the Act as a country that shares an internationally recognized border with the DRC, which presently includes Angola, Burundi, Central African Republic, the Republic of the Congo, Rwanda, South Sudan, Tanzania, Uganda, and Zambia.

[8] In the Proposing Release, we referred to the DRC and its adjoining countries as the "DRC Countries." In this release, we use the term "Covered Countries" instead. Both terms have the same meaning. For consistency within this release, there are instances when we refer to the text of the Proposing Release and use the term "Covered Countries" instead of "DRC Countries," which was used in the Proposing Release.

[9] 15 U.S.C. 78m(p).

[10] See Exchange Act Section 13(p)(1)(A). This Exchange Act Section requires that the Commission promulgate rules no later than 270 days after the date of enactment.

[11] See Section 1502(a) of the Act ("It is the sense of the Congress that the exploitation and trade of conflict minerals originating in the Democratic Republic of the Congo is helping to finance conflict characterized by extreme levels of violence in the eastern Democratic Republic of the Congo, particularly sexual- and gender-based violence, and contributing to an emergency humanitarian situation therein, warranting the provisions of section 13(p) of the Securities Exchange Act of 1934, as added by subsection (b).").

[12] The Congo conflict has been an issue raised in the United States Congress for a number of years. For example, in the 109th Congress, then-Senator Sam Brownback, along with Senator Richard J. Durbin and then-Senator Barack Obama, among others, co-sponsored S. 2125, the Democratic Republic of Congo Relief, Security, and Democracy Promotion Act of 2006. See Public Law 109–456

(Dec. 22, 2006) (stating that the National Security Strategy of the United States, dated September 17, 2002, concludes that disease, war, and desperate poverty in Africa threatens the United States' core value of preserving human dignity and combating global terror). The legislation committed the United States to work toward peace, prosperity, and good governance in the Congo. As another example, in the 110th Congress, then-Senator Brownback and Senator Durbin introduced S. 3058, the Conflict Coltan and Cassiterite Act, which would have prohibited the importation of certain products containing columbite-tantalite or cassiterite that was mined or extracted in the DRC by groups that committed serious human rights and other violations. See S. 3058, 110th Cong. (2008). As a further example, in the 111th Congress, then-Senator Brownback introduced S. 891, the Congo Conflict Minerals Act of 2009. See S. 891, 111th Cong. (2009). This bill would have required U.S.-registered companies selling products using conflict minerals to disclose annually to the Commission the country of origin of these minerals and, if the country of origin was one of the Covered Countries, to disclose the mine of origin. Additionally, later in the 111th Congress, then-Senator Brownback sponsored S.A. 2707, which was similar to S. 891. See S.A. 2707, 111th Cong. (2009). We note also that the Democratic Republic of Congo Relief, Security, and Democracy Promotion Act of 2006 states that the National Security Strategy of the United States, dated September 17, 2002, concludes that disease, war, and desperate poverty in Africa threatens the United States' core value of preserving human dignity and threatens the United States' strategic priority of combating global terror. See Pub. L. 109–456 (Dec. 22, 2006). See also U.S. Gov't Accountability Office, GAO–12–763, Conflict Minerals Disclosure rule: SEC's Actions and Stakeholder-Developed Initiatives (Jul. 2012) (discussing the Democratic Republic of Congo Relief, Security, and Democracy Promotion Act of 2006), available at http://www.gao.gov/products/GAO–12–763.

[13] See Section 1502(d)(2)(A) of the Act (stating that two years after enactment of the Act and annually thereafter, "the Comptroller General of the United States shall submit to the appropriate congressional committees a report that includes" an "assessment of the effectiveness" of the Conflict Minerals Statutory Provision "in promoting peace and security" in the Covered Countries).

[14] See Exchange Act Section 13(p)(4) (stating that the provision "shall terminate on the date on which the President determines and certifies to the appropriate congressional committees * * * that no armed groups continue to be directly involved and benefitting from commercial activity involving conflict minerals").

USCA Case #13-5252    Document #1455974    Filed: 09/11/2013    Page 86 of 198

understand Congress's main purpose to have been to attempt to inhibit the ability of armed groups in the Covered Countries to fund their activities by exploiting the trade in conflict minerals. Reducing the use of such conflict minerals is intended to help reduce funding for the armed groups contributing to the conflict and thereby put pressure on such groups to end the conflict. The Congressional object is to promote peace and security in the Covered Countries.[15]

Congress chose to use the securities laws disclosure requirements to accomplish its goals. In addition, one of the co-sponsors of the provision noted in a floor statement that the provision will "enhance transparency" and "also help American consumers and investors make more informed decisions."[16] Also, as discussed throughout the release, a number of commentators on our rule proposal, including co-sponsors of the legislation and other members of Congress, have indicated that the Conflict Minerals Statutory Provision will provide information that is material to an investor's understanding of the risks in an issuer's reputation and supply chain.[17]

Exchange Act Section 13(p) mandates that we promulgate regulations requiring that a "person described"[18] disclose annually whether any "conflict minerals" that are "necessary to the functionality or production of a product manufactured by such person"[19] originated in the Covered Countries, and make that disclosure publicly available on the issuer's Internet Web site.[20] If such a person's conflict minerals originated in the Covered Countries, that person must submit a report ("Conflict Minerals Report") to us that includes a description of the measures taken by the person to exercise due diligence on the minerals' source and chain of custody.[21] Under Exchange Act Section 13(p), the measures taken to exercise due diligence "shall include an independent private sector audit" of the Conflict Minerals Report that is conducted according to standards established by the Comptroller General of the United States, in accordance with our promulgated rules, in consultation with the Secretary of State.[22] The person

submitting the Conflict Minerals Report must also identify the independent private sector auditor[23] and certify the independent private sector audit.[24]

Further, according to Exchange Act Section 13(p), the Conflict Minerals Report must include "a description of the products manufactured or contracted to be manufactured that are not DRC conflict free,"[25] the facilities used to process the conflict minerals, the country of origin of the conflict minerals, and "the efforts to determine the mine or location of origin with the greatest possible specificity."[26] Also, Exchange Act Section 13(p) dictates that each person described "shall make available to the public on the Internet Web site of such person" the conflict minerals information required by Exchange Act Section 13(p)(1)(A).[27]

## B. Summary of the Proposed Rules

We proposed rules to apply to certain issuers that file reports with us under Exchange Act Sections 13(a)[28] or 15(d).[29] Based on the Conflict Minerals Statutory Provision, we proposed a disclosure requirement for conflict minerals that would divide into three

---

[15] *See* Exchange Act Section 1502(c)(1)(B)(i) (stating that the Secretary of State, in consultation with the Administrator of the United States Agency for International Development, shall submit to Congress a plan to "promote peace and security" in the Covered Countries).

[16] *See* 156 *Cong. Rec.* S3976 (daily ed. May 19, 2010) (statement of Sen. Feingold) ("Mr. President, I am pleased to be an original cosponsor of two amendments to the Restoring American Financial Stability Act that seek to ensure there is greater transparency around how international companies are addressing issues of foreign corruption and violent conflict that relate to their business. Creating these mechanisms to enhance transparency will help the United States and our allies more effectively deal with these complex problems, at the same time that they will also help American consumers and investors make more informed decisions.").

[17] *See, e.g.,* letters from Aditi Mohapatra of Calvert Asset Management Company, Inc. on behalf of 49 investors, including the Social Investment Forum and Interfaith Center of Corporate Responsibility (Mar. 2, 2011) ("SIF I"); Boston Common Asset Management, LLC, Calvert Asset Management Co., Inc., Interfaith Center on Corporate Responsibility, Jesuit Conference of the United States, Marianist Province of the US, Mercy Investment Services, Inc., Missionary Oblates of Mary Immaculate, Responsible Sourcing Network, Sustainalytics, Trillium Asset Management, and Tri-State Coalition for Responsible Investment (Feb. 1, 2012) ("SIF II"); Calvert Investments (Oct. 18, 2011) ("Calvert"); General Board of Pension and Health Benefits of The United Methodist Church (Mar. 7, 2011) ("Methodist Pension"); State Board of Administration of Florida (Feb. 3, 2011) ("FRS"); and Teachers Insurance and Annuity Association and College Retirement Equities Fund (Mar. 2, 2011) ("TIAA–CREF"). *See also* letters from Catholic Relief Services (Feb. 8, 2011) ("CRS I") ("We submit these comments with the hope the SEC will consider the need of investors to access information to make sound business decisions that

reflect both their social and their financial concerns."); Enough Project (Mar. 31, 2011) ("Enough Project I") and Enough Project (May 31, 2011) ("Enough Project II") (stating that advancing the "goal of resolving a humanitarian crisis that continues to cause countless deaths and unimaginable suffering" is "of great interest to many, including investors"); Senator Richard J. Durbin and Representative Jim McDermott (Feb. 28, 2011) ("Sen. Durbin/Rep. McDermott") (suggesting that the provision's purposes were both to end conflict in the DRC and to provide current information for investors, and the latter purpose is identical to the purpose of requiring the disclosure of other information in an issuer's periodic reports) and Senator Patrick Leahy, Senator Christopher Coons, Congressman Howard Berman, Congressman Jim McDermott, Congressman Donald Payne, Congressman Gregory Meeks, and Congressmember Karen Bass (Feb. 16, 2012) ("Sen. Leahy *et al.*") (asserting that an issuer's conflict minerals information is "critical to both investors and to capital formation" because "when a publicly traded company relies on an unstable black market for inputs essential to manufacturing its products it is of deep material interest to investors").

[18] The term "person described" is defined in Exchange Act Section 13(p)(2) as one who is required to file reports under Exchange Act Section 13(p)(1)(A), and for whom the conflict minerals are necessary to the functionality or production of a product manufactured by such person. Exchange Act Section 13(p)(1)(A) does not provide a definition but refers back to Exchange Act Section 13(p)(2).

[19] Exchange Act Section 13(p)(2)(B).

[20] *See* Exchange Act Section 13(p)(1)(E) (stating that each issuer "shall make available to the public on the Internet Web site of such [issuer] the information disclosed under" Exchange Act Section 13(p)(1)(A)).

[21] *See* Exchange Act Section 13(p)(1)(A)(i).

[22] *See id.* (requiring in the Conflict Minerals Report "a description of the measures taken by the person to exercise due diligence on the source and chain of custody of such [conflict] minerals, which measures shall include an independent private sector audit of such report"). The Conflict Minerals Statutory Provision assigns certain responsibilities to other federal agencies. In developing our proposed rules, our staff has consulted with the

staff of these other agencies in developing our proposed rules. These agencies include, including the Government Accountability Office (the "GAO"), which is headed by the Comptroller General of the United States, and the United States Department of State.

[23] *See* Exchange Act Section 13(p)(1)(A)(ii) (stating that the issuer must provide a description of the "entity that conducted the independent private sector audit in accordance with" Exchange Act Section 13(p)(1)(A)(i)").

[24] As noted in Exchange Act Section 13(p)(1)(B), if an issuer is required to provide a Conflict Minerals Report that includes an independent private sector audit, that issuer "shall certify the audit" and that certified audit "shall constitute a critical component of due diligence in establishing the source and chain of custody of such minerals."

[25] The term "DRC conflict free" is defined in Exchange Act Section 13(p)(1)(A)(ii) and Exchange Act Section 13(p)(1)(D). Exchange Act Section 13(p)(1)(A)(ii) defines "DRC conflict free" as "the products that do not contain minerals that directly or indirectly finance or benefit armed groups in the" Covered Countries. Similarly, Exchange Act Section 13(p)(1)(D) defines "DRC conflict free" as products that do "not contain conflict minerals that directly or indirectly finance or benefit armed groups in the" Covered Countries. We note that the definitions in the two sections are slightly different in that Exchange Act Section 13(p)(1)(A)(ii) refers to "minerals" without any limitation, whereas Exchange Act Section 13(p)(1)(D) refers specifically to "conflict minerals." We believe, based on the totality of the Conflict Minerals Statutory Provision, that "DRC conflict free" is meant to refer only to "conflict minerals," as that term is defined in Section 1502(e)(4) of the Act, that directly or indirectly finance or benefit armed groups in the Covered Countries, and not to all minerals that directly or indirectly finance or benefit armed groups in the Covered Countries.

[26] *See* Exchange Act Section 13(p)(1)(A)(ii).

[27] *See* Exchange Act Section 13(p)(1)(E).

[28] 15 U.S.C. 78m(a).

[29] 15 U.S.C. 78o(d).

steps. The first step would have required an issuer to determine whether it was subject to the Conflict Minerals Statutory Provision. An issuer would have only been subject to the Conflict Minerals Statutory Provision if it was a reporting issuer for which conflict minerals were "necessary to the functionality or production of a product manufactured" [30] or contracted to be manufactured by such person. If an issuer did not meet that definition, the issuer was not required to take any action, make any disclosures, or submit any reports. If, however, an issuer met this definition, that issuer would move to the second step.

The second step would have required the issuer to determine after a reasonable country of origin inquiry whether its conflict minerals originated in the Covered Countries. If the issuer determined that its conflict minerals did not originate in the Covered Countries, the issuer was to disclose this determination and the reasonable country of origin inquiry it used in reaching this determination in the body of its annual report. The issuer also would have been required to provide on its Internet Web site its determination that its conflict minerals did not originate in the Covered Countries, disclose in its annual report that the disclosure was posted on its Internet Web site, and disclose the Internet address on which this disclosure was posted. It would further have been required to maintain records demonstrating that its conflict minerals did not originate in the Covered Countries. Such an issuer would not have any further disclosure or reporting obligations with regard to its conflict minerals.

If, however, the issuer determined that its conflict minerals did originate in the Covered Countries, if it was unable to conclude that its conflict minerals did not originate in the Covered Countries, or if it determined that its conflict minerals were from recycled or scrap sources, the issuer would have been required to disclose this conclusion in its annual report. Also, the issuer would have been required to note that the Conflict Minerals Report, which included the certified independent private sector audit report, was furnished as an exhibit to the annual report; furnish the Conflict Minerals Report; make available the Conflict Minerals Report on its Internet Web site; disclose that the Conflict Minerals Report was posted on its Internet Web site; and provide the Internet address of that site. This issuer would then have moved to the third step.

Finally, the third step would have required an issuer with conflict minerals that originated in the Covered Countries, or an issuer that was unable to conclude that its conflict minerals did not originate in the Covered Countries, to furnish a Conflict Minerals Report. The proposed rules would have required an issuer to provide, in its Conflict Minerals Report, a description of the measures it had taken to exercise due diligence on the source and chain of custody of its conflict minerals, which would have included a certified independent private sector audit of the Conflict Minerals Report that identified the auditor and was furnished as part of the Conflict Minerals Report. Further, the issuer would have been required to include in the Conflict Minerals Report a description of its products manufactured or contracted to be manufactured containing conflict minerals that it was unable to determine did not "directly or indirectly finance or benefit armed groups" in the Covered Countries. The issuer would identify such products by describing them in the Conflict Mineral Report as not "DRC conflict free." [31] If any of its products contained conflict minerals that did not "directly or indirectly finance or benefit" these armed groups, the issuer would be permitted to describe such products in the Conflict Mineral Report as "DRC conflict free" whether or not the minerals originated in the Covered Countries. In addition, the issuer would have been required to disclose in the Conflict Minerals Report the facilities used to process those conflict minerals, those conflict minerals' country of origin, and the efforts to determine the mine or location of origin with the greatest possible specificity.

The proposed rules would have allowed for different treatment of conflict minerals from recycled and scrap sources. An issuer with such conflict minerals would have been required to furnish a Conflict Minerals Report that described the measures taken to exercise due diligence in determining that its conflict minerals were from recycled or scrap sources and to provide the reasons for believing, based on its due diligence, that its conflict minerals were from recycled or scrap sources. Such an issuer would also have been required to obtain a certified independent private sector audit of the Conflict Minerals Report.

## C. Summary of Comments on the Proposed Rules

The Proposing Release requested comment on a variety of significant aspects of the proposed rules. The original comment period in the Proposing Release was to end on January 31, 2011. Prior to that date, however, we received requests for an extension of time for public comment on the proposal to allow for, among other matters, the collection of information and to improve the quality of responses.[32] On January 28, 2011, we extended the comment period for the proposal from January 31, 2011 to March 2, 2011.[33] Additionally, in response to suggestions from commentators,[34] we held a public roundtable on October 18, 2011 ("SEC Roundtable") at which invited participants, including investors, affected issuers, human rights organizations, and other stakeholders, discussed their views and provided input on issues related to our required rulemaking.[35] In conjunction with the SEC Roundtable, we requested further comment.[36] We received approximately 420 individual comment letters in response to the proposed rules, with approximately 145 of those letters being received after the SEC Roundtable, and over 40 letters regarding the Conflict Minerals Statutory Provision prior to the

---

[30] Exchange Act Section 13(p)(2).

[31] The definition of the term "DRC conflict free" in our proposed rules would be identical to the definition in Exchange Act Section 13(p)(1)(D).

[32] *See* letters from Advanced Medical Technology Association, Aerospace Industries Association, American Association of Exporters and Importers, American Automotive Policy Council, Business Alliance for Customs Modernization, IPC—Association Connecting Electronics Industries Joint Industry Group, National Association of Manufacturers, National Electrical Manufacturers Association, National Foreign Trade Council, National Retail Federation, Retail Industry Leaders Association, Semiconductor Equipment and Materials International, TechAmerica, USA*ENGAGE, and U.S. Chamber of Commerce (Dec. 16, 2010) ("Advanced Medical Technology Association *et al.*"); Jewelers Vigilance Committee, American Gem Society, Manufacturing Jewelers & Suppliers of America, Jewelers of America, and Fashion Jewelry & Accessories Trade Association (Jan. 10, 2011) ("JVC *et al.* I"); National Mining Association (Jan. 3, 2011) ("NMA I"); National Stone, Sand Gravel Association (Jan. 13, 2011) ("NSSGA"); Representative Spencer Bachus (Jan. 25, 2011) ("Rep. Bachus"); Robert D. Hormats, Under Secretary of State for Economic, Energy, and Agricultural Affairs, and Maria Otero, Democracy and Global Affairs (Jan. 25, 2011) ("State I"); and World Gold Council (Jan. 7, 2011) ("WGC I").

[33] Conflict Minerals, Release No. 34–63793 (Jan. 28, 2011) [76 FR 6110].

[34] *See, e.g.,* letter from United States Chamber of Commerce (Feb. 28, 2011) ("Chamber I").

[35] *See* Press Release, Securities and Exchange Commission, SEC Announces Agenda and Panelists for Roundtable on Conflict Minerals (Oct. 14, 2011), *available at http://www.sec.gov/news/press/2011/2011-210.htm.*

[36] Roundtable on Issues Relating to Conflict Minerals, Release No. 34–65508 (Oct. 7, 2011) [76 FR 63573].

proposed rules.[37] We also received approximately 13,400 form letters from those supporting "promptly" implementing a "strong" final rule regarding the Conflict Minerals Statutory Provision,[38] with approximately 9,700 of those letters requesting some specific requirements in the final rule,[39] and two petitions supporting the proposed amendments with an aggregate of over 25,000 signatures.

The comment letters came from corporations, professional associations, human rights and public policy groups, bar associations, auditors, institutional investors, investment firms, United States and foreign government

officials,[40] and other interested parties and stakeholders. In general, most commentators supported the human rights objectives of the Conflict Minerals Statutory Provision and the proposed rules.[41] As discussed in greater detail throughout this release, however, many of these commentators provided recommendations for revising the proposed rules and suggested modifications or alternatives to the proposal. Only a few commentators generally opposed the Conflict Minerals Statutory Provision and/or our adoption of any rule based on the provision.[42] One commentator recommended that the proposed rules be withdrawn entirely "and that the potential costs, supply chain complexities, and other practical obstacles to implementation be more fully analyzed before new rules are proposed." [43]

Also, although they may have offered their support of the human rights concerns underlying the Conflict Minerals Statutory Provision and the proposed rules, some commentators were concerned about potentially negative effects of the Conflict Minerals Statutory Provision and the resulting rule. In this regard, some of those commentators argued that the provision and/or rule could lead to a *de facto* boycott or embargo on conflict minerals from the Covered Countries,[44] other of these commentators suggested that the

---

[37] To facilitate public input on rulemaking required by the Act, the Commission provided a series of email links, organized by topic, on its Web site at *http://www.sec.gov/spotlight/ regreformcomments.shtml.* The comments relating to the Conflict Minerals Statutory Provision are located at *http://www.sec.gov/comments/df-title-xv/ specialized-disclosures/specialized-disclosures.shtml* ("Pre-Proposing Release Web site"). These comments were received before we made public the Proposing Release or proposed rules and are separate from the comments we received after we published the Proposing Release and proposed rules, which are located at *http:// www.sec.gov/comments/s7-40-10/s74010.shtml* ("Post-Proposing Release Web site"). Many commentators provided comments on both the pre- and post-Proposing Release Web sites. Generally, our references to comment letters refer to the comments on the post-Proposing Release Web site. When we refer to a comment letter from the Pre-Proposing Release Web site, however, we make that clear in the footnote.

[38] *See* form letters A (urging us to institute "strong rules"), B (urging that the final rule not allow the legislation's intent to be compromised and to keep the "LEGISLATION STRONG" (emphasis in original)), E (indicating "deep disappointment and concern" that the final rule had not been adopted, and urging us to "release a strong, final rule"), F (urging us to "promptly issue strong final regulations"), G (stating that delays in adopting a final rule will "significantly hinder progress toward a legitimate mining sector in eastern" DRC, and urging us to "urgently release final regulations on conflict minerals"), H (calling on us to "release a strong, final rule as soon as possible"), and I (urging us to "issue strong final rules as soon as possible").

[39] *See* form letters A (stating that the final rule should, among other requirements, include gold and metals mining companies, apply to all possible companies, require that conflict minerals disclosures be filed, include strong and defined due diligence, and define recycled metals as 100% post-consumer metals), G (stating that the final rule should "incorporate the UN Group of Experts and OECD due diligence guidelines' concept of mitigation"), H (stating that the final rule should, among other requirements, reject any delays or phased-in implementation, adopt the "OECD due diligence standard," have equal reporting for all conflict minerals, include all companies regardless of size, define terms narrowly, define the reasonable country of origin inquiry, have issuers file reports, and not include a *de minimis* category for conflict minerals), and I (stating that the final rule must, among other requirements, reject an indeterminate origin category, define the reasonable country of origin standard, and adopt the "OECD Due Diligence standard").

[40] Among the foreign officials to provide comment letters was the DRC's Minister of Mines. *See* letters from Martin Kabwelulu, Minister of Mines, Democratic Republic of the Congo (July 15, 2011) ("DRC Ministry of Mines I"); Martin Kabwelulu, Minister of Mines, Democratic Republic of the Congo (Oct. 15, 2011) ("DRC Ministry of Mines II"); and Martin Kabwelulu, Minister of Mines, Democratic Republic of the Congo (Nov. 8, 2011) ("DRC Ministry of Mines III").

[41] *See, e.g.,* letters from Advanced Medical Technology Association, American Apparel & Footwear Association, American Association of Exporters and Importers, Consumer Electronics Association, Consumer Electronics Retailers Coalition, Emergency Committee for American Trade, IPC-Association Connecting Electronics Industries, Joint Industry Group, National Association of Manufacturers, National Foreign Trade Council, National Retail Federation, Retail Industry Leaders Association, TechAmerica, and USA Engage (Mar. 2, 2011) ("Industry Group Coalition I") (stating its "support [for] the underlying goal of Sec. 1502 to prevent the atrocities occurring" in the Covered Countries); American Bar Association (Jun. 20, 2011) ("ABA") (stating that it "supports and endorses the humanitarian efforts to end the armed conflict in the eastern Democratic Republic of the Congo"); Chamber I (stating that it "supports the fundamental goal, as embodied in Section 1502 of the Dodd-Frank Wall Street Reform and Consumer Protection Act ('Dodd-Frank Act'), of preventing the exploitation of conflict minerals for the purpose of financing human rights violations within the Democratic Republic of Congo"); National Association of Manufacturers (Mar. 2, 2011) ("NAM I") (stating its "support the underlying goal of Sec. 1502 to address the atrocities occurring in the" Covered Countries); and World Gold Council (Feb. 28, 2011) ("WGC II") (stating that it "believes it is important to state [its] support for the humanitarian goals of Section 1502").

[42] *See, e.g.,* letters from Michael Beggs (Jan. 12, 2012) ("Beggs"), Charles Blakeman (Oct. 9, 2011) ("Blakeman I"), Gary P. Bradley (Sept. 19, 2011) ("Bradley"), Joseph Cummins (Dec. 20, 2011) ("Cummins"), Walter Grail (Oct. 1, 2011) ("Grail"), Kirtland C. Griffin (Jun. 16, 2011) ("Griffin"), Clark Grey Howell (Sep. 20, 2011) ("Howell"), Edward Lynch (Dec. 16, 2011) ("Lynch"), and Melanie Matthews (Sep. 19, 2011) ("Matthews").

[43] *See* letter from Chamber I. *See also* letters from Chamber II (reiterating the withdrawal request from its initial comment letter and requesting we open a second comment period regarding the proposed

rules), Chamber III (requesting that we allow companies additional time for commenting on the proposed rules), and United States Chamber of Commerce (Jul. 11, 2012) ("Chamber IV") (requesting that we re-propose the rule and re-open the comment period).

[44] *See, e.g.,* letters from AngloGold Ashanti Limited (Jan. 31, 2011) ("AngloGold"), Bureau d'Etudes Scientifiques et Techiques (Dec. 26, 2011) ("BEST II"), Competitive Enterprise Institute (Mar. 2, 2011) ("CEI I"), Competitive Enterprise Institute (Aug. 22, 2011) ("CEI II,"), Fédération des Enterprises du Congo (Oct. 28, 2011) ("FEC II"), Générale des Coopératives Minières du Sud Kivu (Apr. 8, 2011) ("Gecomiski"), IPC—Association Connecting Electronics Industries (Mar. 2, 2011) ("IPC I"), ITRI Ltd. (Feb. 25, 2011) ("ITRI I"), London Bullion Market Association (Mar. 2, 2011) ("LBMA I"), London Bullion Market Association (Aug. 5, 2011) ("LBMA II"), Minister of Energy and Minerals of the United Republic of Tanzania (May 23, 2011) ("Tanzania I"), Ministry of Mines and Energy of the Republic of Burundi (May 12, 2011) ("Burundi"), North Kivu Artisanal Mining Cooperatives Representative (Mar. 1, 2011) ("Comimpa"), Pact Inc. (Mar. 2, 2011) ("Pact I"), Pact Inc. (Oct. 13, 2011) ("Pact II"), Representative Christopher J. Lee (Feb. 3, 2011) ("Rep. Lee"), Société Minière du Maniéma SPRL (Mar. 21, 2012) ("Somima"), Verizon Communications (Jun. 24, 2011) ("Verizon"), and WGC II. *But see* letters from Enough Project (Mar. 2, 2011) ("Enough Project I") ("Enough notes that critics of the legislation are quick to predict that private sector investors and companies may walk away from the Congo if faced with meaningful due diligence and reporting requirements. On the contrary, Congo's mineral reserves are too great for world markets to ignore."), International Corporate Accountability Roundtable (Aug. 24, 2011) ("ICAR II") (recognizing that "[c]ritics of the law are arguing that whatever its intentions, it will in practice end the trade in minerals mined in the east of Congo," and that, although "mineral exports from the region have dropped significantly in recent months, and that this has forced many artisanal miners to seek alternative livelihoods," which "has serious implications for miners and their families," the "downturn stems from a six month suspension of mining and trading activities imposed by the Congolese government and an overly restrictive interpretation of Dodd Frank by industry associations" and the "idea that the current hiatus is a permanent shut-down of the trade is misplaced, however."), Andrew Matheson (Oct. 26, 2011) ("Matheson II") ("No such embargo exists, nor is an embargo contemplated by the multi-stakeholder group, the EICC/GeSI initiative, or ITRI. Import statistics show that minerals continue to be sourced in substantial volumes from the DRC, for example tantalum ores going into China."), and Sen. Durbin/ Rep. McDermott ("NGO experts in Congo note that only approximately one percent of the Congolese workforce depends on mining, so even if a de facto ban came to pass—which we doubt—the economic impact would not be as great as commonly assumed.").

provision and/or rule could compel speech in a manner that violates the First Amendment,[45] and at least one such commentator indicated that the final rule would adversely affect employment in the United States.[46] One commentator, however, suggested that there could be some "business benefits" from complying with the final rule beyond the humanitarian benefits discussed by Congress.[47] This commentator argued that such benefits could include eliminating any competitive disadvantage to companies already engaged in ensuring their conflict mineral purchases do not fund conflict in the DRC, providing an opportunity to improve a company's existing risk management and supply chain management, stimulating innovation, supporting companies' requests for conflict minerals information from suppliers through legal mandate, and preparing companies to meet a new generation of expectations for greater supply chain transparency and accountability.[48]

We have reviewed and considered all of the comments that we received relating to the rulemaking. The final rule reflects changes from the proposed rules made in response to many of these comments. As discussed throughout this release, we are adopting final rules designed to provide flexibility to issuers to reduce their compliance costs. At the same time, our final rules retain the requirements from our proposed rules that create the disclosure regime mandated by Congress by means of Exchange Act reporting requirements. We discuss our revisions with respect to each proposed rule amendment in more detail throughout this release.

### D. Summary of Changes to the Final Rule

We are adopting a three-step process, as proposed, but some of the mechanisms within the three steps have been modified in response to comments. We recognize that the final rule will impose significant compliance costs on companies who use or supply conflict minerals, and in modifying the rule we

tried to reduce the burden of compliance in areas in which we have discretion while remaining faithful to the language and intent of the Conflict Minerals Statutory Provision that Congress adopted. A flowchart presenting a general overview of the conflict minerals rule that we are adopting is included following the end of this section. The chart is intended merely as a guide, however, and issuers should refer to the rule text and the preamble's more complete narrative description for the requirements of the rule.

The first step continues to be for an issuer to determine whether it is subject to the requirements of the Conflict Minerals Statutory Provision. Pursuant to the Conflict Minerals Statutory Provision, the Commission is required to promulgate regulations requiring certain conflict minerals disclosures by any "person described," which, under the Conflict Minerals Statutory Provision, includes one for whom "conflict minerals are necessary to the functionality or production of a product manufactured by such person".[49] As in our proposal, under the final rule this includes issuers whose conflict minerals are necessary to the functionality or production of a product manufactured or contracted by that issuer to be manufactured.[50] If an issuer does not meet this definition, the issuer is not required to take any action, make any disclosures, or submit any reports under the final rule. If, however, an issuer meets this definition, that issuer moves to the second step.

In the final rule, some aspects of the first step differ from the proposed rules based on comments we received. Consistent with the proposal, the final rule does not define the phrases "contract to manufacture," "necessary to the functionality" of a product, and "necessary to the production" of a product. In response to comments, however, we provide additional guidance for issuers to consider regarding whether those phrases apply to them.[51] The guidance states that whether an issuer will be considered to "contract to manufacture" a product depends on the degree of influence it exercises over the materials, parts, ingredients, or components to be

included in any product that contains conflict minerals or their derivatives. An issuer will not be considered to "contract to manufacture" a product if it does no more than take the following actions: (1) The issuer specifies or negotiates contractual terms with a manufacturer that do not directly relate to the manufacturing of the product (unless it specifies or negotiates taking these actions so as to exercise a degree of influence over the manufacturing of the product that is practically equivalent to contracting on terms that directly relate to the manufacturing of the product); (2) the issuer affixes its brand, marks, logo, or label to a generic product manufactured by a third party; or (3) the issuer services, maintains, or repairs a product manufactured by a third party.

Similarly, the determination of whether a conflict mineral is deemed "necessary to the functionality" or "necessary to the production" of a product depends on the issuer's particular facts and circumstances, as discussed in more detail below. But to assist issuers in making their determination, we provide guidance for issuers. In determining whether a conflict mineral is "necessary to the functionality" of a product, an issuer should consider: (1) Whether the conflict mineral is intentionally added to the product or any component of the product and is not a naturally-occurring by-product; (2) whether the conflict mineral is necessary to the product's generally expected function, use, or purpose; and (3) if conflict mineral is incorporated for purposes of ornamentation, decoration or embellishment, whether the primary purpose of the product is ornamentation or decoration.

In determining whether a conflict mineral is "necessary to the production" of a product, an issuer should consider: (1) Whether the conflict mineral is intentionally included in the product's production process, other than if it is included in a tool, machine, or equipment used to produce the product (such as computers or power lines); (2) whether the conflict mineral is included in the product; and (3) whether the conflict mineral is necessary to produce the product. In this regard, we are modifying our guidance from the proposal such that, for a conflict mineral to be considered "necessary to the production" of a product, the mineral must be both contained in the product and necessary to the product's production. We do not consider a conflict mineral "necessary to the production" of a product if the conflict mineral is used as a catalyst, or

---

[45] *See, e.g.,* letters from Taiwan Semiconductor Manufacturing Company Ltd. (Jan. 27, 2011) ("Taiwan Semi"), Tiffany & Co. (Feb. 22, 2011) ("Tiffany"), and Washington Legal Fund (Mar. 30, 2011) ("WLF").

[46] *See* letter from Rep. Lee ("Ultimately, these new regulations may cost U.S. jobs and send them overseas.").

[47] *See* letter from Green Research (Jan. 27, 2012) ("Green II"). *See also* letter from Green Research (Oct. 29, 2011) ("Green I") (stating that, although "[i]t seems clear that, by most accounting, there are costs of compliance" with the Conflict Minerals Statutory Provision, "there are benefits as well").

[48] *See id.*

[49] Exchange Act Section 13(p)(2).

[50] *See* Exchange Act Section 13(p)(1)(A)(ii) (requiring a person described to include a description of certain of the person's products that were manufactured by the person, or were contracted by the person to be manufactured).

[51] In the Proposing Release, although we did not provide guidance for the other phrases, we provided some guidance for the phrase "necessary to the production" of a product. As discussed below, we are revising the guidance for this phrase.

in a similar manner in another process, that is necessary to produce the product but is not contained in that product.

Further, in a change from the proposal and in response to comments suggesting that including mining would expand the statutory mandate, the final rule does not treat an issuer that mines conflict minerals as manufacturing those minerals unless the issuer also engages in manufacturing. Additionally, the final rule exempts any conflict minerals that are "outside the supply chain" prior to January 31, 2013. Under the final rule, conflict minerals are "outside the supply chain" if they have been smelted or fully refined or, if they have not been smelted or fully refined, they are outside the Covered Countries. In response to comments, the final rule allows issuers that obtain control over a company that manufactures or contracts for the manufacturing of products with necessary conflict minerals that previously had not been obligated to provide a specialized disclosure report for those minerals to delay reporting on the acquired company's products until the end of the first reporting calendar year that begins no sooner than eight months after the effective date of the acquisition.

As suggested by commentators, the final rule modifies the proposal as to the location, timing, and status of any conflict minerals disclosures and any Conflict Minerals Report. The final rule requires an issuer to provide the conflict minerals disclosures that would have been in the body of the annual report in the body of a new specialized disclosure report on a new form, Form SD. An issuer required to provide a Conflict Minerals Report will provide that report as an exhibit to the specialized disclosure report. Additionally, based on comments that it will reduce the burdens on supply chain participants, the final rule requires that the conflict minerals information in the specialized disclosure report and/or in the Conflict Minerals Report cover the calendar year from January 1 to December 31 regardless of the issuer's fiscal year end, and the specialized disclosure report covering the prior year must be provided each year by May 31. Further, in a change from the proposal, urged by multiple commentators, the final rule requires Form SD, including the conflict minerals information therein and any Conflict Minerals Report submitted as an exhibit to the form, to be "filed" under the Exchange Act and thereby subject to potential Exchange Act Section 18 liability. The proposal would have required the information to be "furnished."

The second step continues to require an issuer to conduct a reasonable country of origin inquiry regarding the origin of its conflict minerals. Consistent with the proposal, and the position of certain commentators,[52] the final rule does not prescribe the actions for a reasonable country of origin inquiry that are required, as the required inquiry depends on each issuer's facts and circumstances. However, in a change from the proposed rules, to clarify the scope of the required inquiry as requested by certain other commentators,[53] the final rule provides general standards applicable to the inquiry. Specifically, the final rule provides that, to satisfy the reasonable country of origin inquiry requirement, an issuer must conduct an inquiry regarding the origin of its conflict minerals that is reasonably designed to determine whether any of its conflict minerals originated in the Covered Countries or are from recycled or scrap sources, and must perform the inquiry in good faith. The final rule requires an issuer that determines that its conflict

minerals did not originate in the Covered Countries or did come from recycled or scrap sources to disclose in its specialized disclosure report its determination and in its specialized disclosure report briefly describe the reasonable country of origin inquiry it used in reaching the determination and the results of the inquiry. The requirement for an issuer to briefly describe its inquiry and the results of the inquiry is a change from the disclosure required in the proposed rules.

Also, in a change from the proposal, the final rule modifies the trigger for determining whether or not an issuer is required to proceed to step three under the rule. The proposed rules would have required an issuer to conduct due diligence on the source and chain of custody of its conflict minerals and provide a Conflict Minerals Report if, based on its reasonable country of origin inquiry, it determined that its conflict minerals originated in the Covered Countries or was unable to determine that its conflict minerals did not originate in the Covered Countries, or if its conflict minerals came from recycled or scrap sources. Under the final rule, an issuer must exercise due diligence on the source and chain of custody of its conflict minerals and provide a Conflict Minerals Report if, based on its reasonable country of origin inquiry, the issuer knows that it has necessary conflict minerals that originated in the Covered Countries and did not come from recycled or scrap sources, or if the issuer has reason to believe that its necessary conflict minerals may have originated in the Covered Countries and may not have come from recycled or scrap sources.

As an exception to this requirement, however, an issuer that must conduct due diligence because, based on its reasonable country of origin inquiry, it has reason to believe that its necessary conflict minerals may have originated in the Covered Countries and may not have come from recycled or scrap sources is not required to submit a Conflict Minerals Report if, during the exercise of its due diligence, it determines that its conflict minerals did, in fact, originate in the Covered Countries, or it determines that its conflict minerals did, in fact, come from recycled or scrap sources. Such an issuer is still required to submit a specialized disclosure report disclosing its determination and briefly describing its inquiry and its due diligence efforts and the results of that inquiry and due diligence efforts, which should demonstrate why the issuer believes that the conflict minerals did not originate in the Covered Countries

---

[52] Some commentators agreed that, to allow for greater flexibility, the reasonable country of origin inquiry standard should either not be defined or that only general guidance should be provided. *See, e.g.*, letters from Apparel & Footwear Association (Mar. 2, 2011) ("AAFA"); AngloGold; ArcelorMittal (Oct. 31, 2011) ("ArcelorMittal"); Industry Group Coalition I; IPC I; Information Technology Industry Council (Feb. 24, 2011) ("ITIC I"); International Precious Metals Institute (Jan. 19, 2011) ("IPMI I"); Jewelers Vigilance Committee, American Gem Society, Manufacturing Jewelers & Suppliers of America, Jewelers of America, and Fashion Jewelry & Accessories Trade Association (Mar. 2, 2011) ("JVC *et al.* II"); NAM I, Retail Industry Leaders Association and Consumer Electronics Retailers Coalition (Mar. 2, 2011) ("RILA–CERC"); Semiconductor Industry Association (Mar. 2, 2011) ("Semiconductor"); SIF I; TriQuint Semiconductor, Inc. (Jan. 26, 2011) ("TriQuint I"); and WGC II.

[53] Some commentators argued that either the reasonable country of origin inquiry standard should be defined or that there should specific guidance regarding the standard. *See, e.g.*, letters from Business Roundtable (Mar. 2, 2011) ("Roundtable"), CRS I, Department of State (Mar. 24, 2011) ("State II"), EARTHWORKS' No Dirty Gold Campaign (Mar. 2, 2011) ("Earthworks"), Enough Project I, Ethical Metalsmiths (Feb. 28, 2011) ("Metalsmiths"), General Board of Church and Society of the United Methodist Church (Apr. 19, 2012) ("Methodist Board"), Global Witness (Feb. 28, 2011) ("Global Witness I"), Howland Greene Consultants LLC (Jan. 28, 2011) ("Howland"), International Conference of the Great Lakes Region (Jan. 31, 2011) ("ICGLR"), National Association of Evangelicals (Feb. 17, 2012) ("Evangelicals"), New York City Bar Association (Jan. 31, 2011) ("NYCBar I"), New York City Bar Association (Feb. 8, 2012) ("NYCBar II"), Personal Care Products Council (Mar. 1, 2011) ("PCP"), Presbyterian Church USA (Feb. 23, 2012) ("Presbyterian Church II"), Semiconductor Equipment and Materials International (Feb. 15, 2011) ("SEMI"), Sen. Durbin/Rep. McDermott, Tantalum-Niobium International Study Center (Jan. 27, 2011) ("TIC"), Twenty-four organizations of the Multi-Stakeholder Group (Mar. 2, 2011) ("MSG I"), and World Evangelical Alliance (Feb. 17, 2012) ("Evangelical Alliance").

or that they did come from recycled or scrap sources. On the other hand, if, based on its reasonable country of origin inquiry, an issuer has no reason to believe that its conflict minerals may have originated in the Covered Countries, or, based on its reasonable country of origin inquiry, an issuer reasonably believes that its conflict minerals are from recycled or scrap sources, the issuer is not required to move to step three. In another change from the proposal, the final rule does not require an issuer to retain reviewable business records to support its reasonable country of origin conclusion, although maintenance of appropriate records may be useful in demonstrating compliance with the final rule, and may be required by any nationally or internationally recognized due diligence framework applied by an issuer.

As noted above, if the issuer knows that it has necessary conflict minerals that originated in the Covered Countries, or if the issuer has reason to believe that its necessary conflict minerals may have originated in the Covered Countries and may not have come from recycled or scrap sources, the issuer must move to the third step. The third step, consistent with the proposal, requires such an issuer to exercise due diligence on the source and chain of custody of its conflict minerals and provide a Conflict Minerals Report describing its due diligence measures, among other matters. As noted above, however, the final rule requires an issuer to provide its Conflict Minerals Report as an exhibit to its specialized disclosure report on Form SD, instead of as an exhibit to its annual report on Form 10–K, Form 20–F, or Form 40–F, as proposed.

Generally, the content of the Conflict Minerals Report is substantially similar to the proposal. One modification from the proposal, based on comments we received, is that the final rule requires an issuer to use a nationally or internationally recognized due diligence framework, if such a framework is available for the specific conflict mineral. We are persuaded by commentators that doing so will enhance the quality of an issuer's due diligence, promote comparability of the Conflict Minerals Reports of different issuers, and provide a framework by which auditors can assess an issuer's due diligence.[54] This requirement

should make the rule more workable and less costly than if no framework was specified. Presently, it appears that the only nationally or internationally recognized due diligence framework available is the due diligence guidance approved by the Organisation for Economic Co-operation and Development ("OECD").[55]

As proposed, the final rule requires an independent private sector audit of an issuer's Conflict Minerals Report. However, in response to comments, we modified the proposal such that the final rule specifies an audit objective. The audit's objective is to express an opinion or conclusion as to whether the design of the issuer's due diligence measures as set forth in the Conflict Minerals Report, with respect to the period covered by the report, is in conformity with, in all material respects, the criteria set forth in the nationally or internationally recognized due diligence framework used by the issuer, and whether the issuer's description of the due diligence measures it performed as set forth in the Conflict Minerals Report, with respect to the period covered by the report, is consistent with the due diligence process that the issuer undertook. Also, consistent with the proposal, the final rule refers to the audit standards established by the GAO. The GAO staff has indicated to our staff that the GAO does not intend to establish new standards for the Conflict Minerals Report audit. Instead, the GAO plans to look to its existing Government Auditing Standards ("GAGAS"), which is commonly referred to as "the Yellow Book."[56]

Unlike the proposed rule, which would have required descriptions in the Conflict Minerals Report of an issuer's products that "are not 'DRC conflict free,'" where "DRC conflict free" means that they "do not contain minerals that directly or indirectly finance or benefit armed groups in the" Covered Countries, the final rule requires descriptions in the Conflict Minerals Report of an issuer's products "that have not been found to be 'DRC conflict

free.'" We believe this change will lead to more accurate disclosure.

As suggested by a number of commentators, the final rule also modifies the proposal by providing a temporary transition period for two years for all issuers and four years for smaller reporting companies.[57] During this period, issuers may describe their products as "DRC conflict undeterminable" if they are unable to determine that their minerals meet the statutory definition of "DRC conflict free" for either of two reasons: First, they proceeded to step three based upon the conclusion, after their reasonable country of origin inquiry, that they had conflict minerals that originated in the Covered Countries and, after the exercise of due diligence, they are unable to determine if their conflict minerals financed or benefited armed groups in the Covered Countries; or second, they proceeded to step three based upon the conclusion, after their reasonable country of origin inquiry, that they had a reason to believe that their necessary conflict minerals may have originated in the Covered Countries and may not have come from recycled or scrap sources and the information they gathered as a result of their subsequently required exercise of due diligence failed to clarify the conflict minerals' country of origin, whether the conflict minerals financed or benefited armed groups in those countries, or whether the conflict minerals came from recycled or scrap sources. These issuers will have already conducted a reasonable country of origin inquiry, and their undeterminable status would be based on the information they were able to gather from their exercise of due diligence. However, if these products also contain conflict minerals that the issuer knows directly or indirectly financed or benefited armed groups in the Covered Countries, the issuer may not describe those products as "DRC conflict undeterminable." Also, during the transition period, issuers with products that may be described as "DRC conflict undeterminable" are not required to have their Conflict Minerals Report audited. Such issuers, however, must still file a Conflict Minerals Report describing their due diligence, and must additionally describe the steps they have taken or will take, if any, since the end of the period covered in their most recent prior Conflict Minerals Report, to mitigate the risk that their necessary conflict minerals benefit armed groups,

---

[54] The proposed rules would not have required the use of a particular due diligence framework, but the Proposing Release indicated that an issuer whose conduct conformed to a nationally or internationally recognized set of standards of, or guidance for, due diligence regarding its conflict

minerals supply chain would provide evidence that the issuer used due diligence in its Conflict Minerals Report.

[55] See OECD, *OECD Due Diligence Guidance for Responsible Supply Chains of Minerals from Conflict-Affected and High-Risk Areas* (2011), *available at http://www.oecd.org/daf/internationalinvestment/guidelinesformultinationalenterprises/46740847.pdf.*

[56] See U.S. Gov't Accountability Office, GAO–12–331G, *Government Auditing Standards 2011 Revision* (Dec. 2011), *available at http://www.gao.gov/assets/590/587281.pdf.*

[57] "Smaller reporting company" is defined in Rule 12b-2 [17 CFR 240.12b-2] under the Exchange Act.

including any steps to improve their due diligence.

This temporary provision will apply for the first two reporting calendar years after effectiveness of the final rule for all issuers that are not smaller reporting companies, and for the first four reporting calendar years after effectiveness of the final rule for smaller reporting companies. We believe it is appropriate to allow a two-year temporary period, in recognition that, as commentators noted, the processes for tracing conflict minerals through the supply chain must develop further to make such determinations for the issuer community at large. Also, we believe it is appropriate to allow an additional two years to this temporary period for smaller reporting companies because, as commentators noted, smaller companies may face disproportionally higher burdens than larger companies and a longer temporary period may help alleviate some of those burdens. After the four-year period for smaller reporting companies and two-year period for all other issuers, issuers that have proceeded to step three but are unable to determine that their conflict minerals did not originate in the Covered Countries or are unable to determine that their conflict minerals that originated in the Covered Countries did not directly or indirectly finance or benefit armed groups must describe their products containing those conflict minerals as not having been found to be ''DRC conflict free.''

Unlike the proposed rules, the final rule requires issuers with necessary conflict minerals exercising due diligence regarding whether their conflict minerals are from recycled or scrap sources to conform the due diligence to a nationally or internationally recognized due diligence framework, if one is available for a particular recycled or scrap conflict mineral. A gold supplement to the OECD's due diligence guidance has been approved by the OECD.[58] This gold supplement is presently the only nationally or internationally recognized due diligence framework for any conflict mineral from recycled or scrap sources of which we are aware. Therefore, we anticipate that issuers will use the OECD gold supplement to conduct their due diligence for recycled or scrap gold. We are not aware that the OECD or any other body has a similar recycled or scrap due diligence framework for the other conflict minerals. Issuers with conflict minerals without a nationally or internationally recognized due diligence framework are still required to exercise due diligence in determining that their conflict minerals were from recycled or scrap sources. The due diligence that must be exercised regarding such conflict minerals focuses only on whether those conflict minerals are from recycled or scrap sources. In such circumstances where a nationally or internationally recognized due diligence framework becomes available for any such conflict mineral, issuers will be required to utilize that framework in exercising due diligence to determine that conflict minerals are from recycled or scrap sources.

*E. Flowchart Summary of the Final Rule*

BILLING CODE 8011–01–P

---

[58] *See OECD, Due Diligence Guidance for Responsible Supply Chains of Minerals from Conflict-Affected and High-Risk Areas: Supplement on Gold* (2012), *available at* http://www.oecd.org/corporate/guidelinesformultinationalenterprises/FINAL%20Supplement%20on%20Gold.pdf.



BILLING CODE 8011–01–C

## II. Discussion of the Final Rule

### A. "Conflict Minerals" Definition

#### 1. Proposed Rules

The Conflict Minerals Statutory Provision defines the term "conflict mineral" as cassiterite, columbite-tantalite, gold, wolframite, or their derivatives, or any other minerals or their derivatives determined by the Secretary of State to be financing conflict in the Covered Countries.[59] We

used the same definition of this term in the proposed rules. As we discussed in the Proposing Release, cassiterite is the metal ore that is most commonly used to produce tin, which is used in alloys, tin plating, and solders for joining pipes and electronic circuits.[60] Columbite-tantalite is the metal ore from which tantalum is extracted. Tantalum is used in electronic components, including

mobile telephones, computers, videogame consoles, and digital cameras, and as an alloy for making carbide tools and jet engine components.[61] Gold is used for making jewelry and is used in electronic, communications, and aerospace equipment.[62] Finally, wolframite is the metal ore that is used to produce

[59] Section 1502(e)(4) of the Act. Presently, the Secretary of State has not designated any other

mineral as a conflict mineral. Therefore, the conflict minerals include only cassiterite, columbite-tantalite, gold, wolframite, or their derivatives.

[60] Tin Statistics and Information, *U.S. Geological Survey, available at http://minerals.usgs.gov/minerals/pubs/commodity/tin/.*

[61] Niobium (Columbium) and Tantalum Statistics and Information, *U.S. Geological Survey, available at http://minerals.usgs.gov/minerals/pubs/commodity/niobium.*

[62] Gold Statistics and Information, *U.S. Geological Survey, available at http://minerals.usgs.gov/minerals/pubs/commodity/gold.*

tungsten, which is used for metal wires, electrodes, and contacts in lighting, electronic, electrical, heating, and welding applications.[63] Based on the many uses of these minerals, we expect the Conflict Minerals Statutory Provision to apply to many companies and industries and, thereby, the final rule to apply to many issuers.

## 2. Comments on the Proposed Rules

Several commentators requested that the final rule set forth the specific conflict derivatives that would trigger the rule's disclosure and reporting obligations.[64] Many of these commentators recommended that the final rule limit the derivatives of columbite-tantalite, cassiterite, and wolframite to tantalum, tin, and tungsten, respectively,[65] unless the State Department determines subsequently that additional specific minerals or their derivatives are financing or benefitting armed groups.[66] One of these commentators pointed out that such a limit is appropriate because, although conflict minerals have other derivatives, tantalum, tin, and tungsten are the only economically significant derivatives of the conflict minerals.[67] For example, one commentator noted that oxygen and iron are derivatives of wolframite that could be subject to the final rule, but wolframite is not currently a significant commercial source for oxygen or iron.[68] Another commentator noted that niobium is a derivative of columbite-tantalite that, absent clarification to the contrary, could be subject to the final rule as well.[69] Some commentators, however, asserted that the final rule should not solely be limited to tantalum, tin, tungsten, or gold.[70]

One commentator recommended that the definition of "conflict mineral" not include organic metal compounds formed from a conflict mineral metal derivative, such as tin and tungsten, because these substances are no longer metals or alloys and "use of these chemical compounds is too attenuated from the original source of the mineral." [71] According to the commentator, these organometallic compounds, which include catalysts, stabilizers, and polymerization aids, are commodity chemicals used in the production of raw materials such as silicones, polyurethanes, vinyls, and polyesters. For example, the commentator noted that tin is used in a reaction with chlorine gas, after which the intermediate tin tetrachloride compound undergoes further chemical reactions with any number of organic substrates to produce an organotin compound with the final compounds becoming substances such as stannous octoate, monobutyl tin trichloride, and dioctyltin dilaurate. These substances contain tin but have several organic groups chemically bound to the tin nucleus and are compounds that are materially and chemically distinct from metallic tin. According to the commentator, the use of organotin in many manufacturing sectors has not yet been recognized by manufacturers, supply chains, or regulators, which may increase costs of the final rule if organic tin compounds are included in the definition of "conflict minerals."

In addition, a number of commentators recommended that the final rule selectively use the term "conflict mineral" because not doing so would unfairly stigmatize the four minerals and unjustifiably hurt some companies' reputations.[72] These commentators noted that the term "conflict mineral" in the proposed rules

provides no clear distinction between the four named minerals and their derivatives that did not benefit or finance armed groups, and those that did finance or benefit armed groups. Specifically, one of these commentators noted, "refer[ring] to all cassiterite, wolframite, gold, and tantalum in the world, regardless of its origin and relationship to conflict actors" as "conflict minerals," imposes "a reputational taint on these entire industries," and "makes it highly challenging for companies in these industries to communicate effectively with investors and the public." [73] Commentators suggested that we limit the final rule's definition of "conflict minerals" only to minerals that financed or benefited armed groups and that the final rule use another name to describe minerals that did not finance or benefit armed groups, such as "potential conflict minerals," "suspect conflict minerals," "subject minerals," or "covered minerals." [74] Additionally, for the same reasons, some commentators indicated that the final rule should change the names of the required headings from "Conflict Minerals Disclosure" to "Country of Origin Disclosure" and change the name of the Conflict Minerals Report to "Report on Minerals Sourced from Central Africa." [75]

## 3. Final Rule

After considering the comments, we are revising the proposal in the final rule. We are clarifying our position as to which derivatives are conflict minerals, which appears consistent with the views of various stakeholders,[76]

---

[63] Tungsten Statistics and Information, *U.S. Geological Survey, available at http://minerals.usgs.gov/minerals/pubs/commodity/tungsten.*

[64] *See, e.g.,* letters from American AAFA, Global Tungsten & Powders Corp. (Mar. 1, 2011) ("Global Tungsten I"), Industry Group Coalition I, IPC I, IPC—Association Connecting Electronics Industries (Nov. 1, 2011) ("IPC II"), Materion Corporation (Nov. 1, 2011) ("Materion"), National Retail Federation (Nov. 1, 2011) ("NRF II"), PCP, Robert W. Row (Jan. 18, 2011) ("Row"), SEMI, and Society of the Plastics Industry Inc. (Nov. 9, 2011) ("SPI").

[65] Gold is produced in its metallic form and has no derivatives.

[66] *See, e.g.,* letters from AAFA, IPC II, NRF II, PCP, and SPI.

[67] *See* letters from IPC II and NRF II. *See also* Transcript of SEC Roundtable, Section 0039 Lines 9–10 ("MR. MATHESON: The economic interest is in the three Ts plus gold.").

[68] *See* letter from SEMI.

[69] *See* letter from Row.

[70] *See, e.g.,* letters from BC Investment Management Corporation (Mar. 28, 2011) ("BCIMC") and Save the Congo (Nov. 1, 2011) ("Save").

[71] *See* letter from SPI.

[72] *See, e.g.,* letters from Advanced Medical Technology Association (Feb. 28, 2011) ("AdvaMed I"), Barrick Gold Corporation (Feb. 28, 2011) ("Barrick Gold"), Cleary Gottlieb Steen & Hamilton LLP (Mar. 2, 2011) ("Cleary Gottlieb"), Global Tungsten I, JVC *et al.* II, Malaysia Smelting Corporation (Jan. 26, 2011) ("MSC I"), National Association of Manufacturers (Nov. 1, 2011) ("NAM III"), Niotan Inc. (Jan. 30, 2011) ("Niotan I"), Niotan Inc. (Mar. 21, 2011) ("Niotan II"), National Mining Association (Mar. 2, 2011) ("NMA II"), SEMI, Tanzania I, TIC, and WGC II. *See also* MJB Consulting (Apr. 28, 2011) ("MJB I") (arguing that the Conflict Minerals Statutory Provision is unclear as to whether the definition of "conflict minerals" refers to columbite-tantalite (coltan), cassiterite, gold, wolframite, or their derivatives, per se, originating from the Covered Countries, or columbite-tantalite (coltan), cassiterite, gold, wolframite, or their derivatives originating from the Covered Countries and that do not directly or indirectly finance or benefit armed groups in the Covered Countries).

[73] *See* letter from Niotan II.

[74] *See* letters from Cleary Gottlieb, Niotan II, SEMI, and TIC.

[75] *See* letters from Barrick Gold and Niotan I.

[76] *See, e.g.,* letter from H.E. Ambassador Liberata Mulamula, International Conference on the Great Lakes Region, Angel Gurría, Secretary-General, Organisation for Economic Co-operation and Development, and Fred Robarts, Coordinator, United Nations Group of Experts on the Democratic Republic of the Congo (Jul. 29, 2011) ("OECD I") ("We consider that the OECD and UN GoE due diligence recommendations, as integrated into the framework of the ICGLR Regional Initiative against the Illegal Exploitation of Natural Resources and the Regional Certification Mechanism, can be used by persons subject to Section 1502 of the Dodd-Frank Act ("issuers") to reliably determine whether the tin, tantalum, tungsten or gold in their products originate from the DRC or adjoining countries, and if so, to determine the facilities used to process those minerals, the country of origin, and the mine or location of origin with the greatest possible specificity, and describe the products manufactured or contracted to be manufactured that are not DRC conflict free."); *OECD, Due Diligence Guidance for Responsible Supply Chains of Minerals from Conflict-Affected and High-Risk Areas, 12 (2011), available at http://www.oecd.org/daf/internationalinvestment/*

including at least one co-sponsor of the legislation and other members of Congress.[77] As a commentator

---

*guidelinesformultinationalenterprises/46740847. pdf* (discussing due diligence as a basis for responsible global supply chain management of "tin, tantalum, tungsten, their ores and mineral derivates, and gold"); Final Report of the United Nations Group of Experts on the Democratic Republic of the Congo, Nov. 29, 2010 [S/2010/596] (stating that relevant individuals and entities should establish effective systems of control and transparency over the mineral supply chain, the nature of which will vary according to the mineral being traded, with the gold supply chain exhibiting characteristics different to those for tin, tantalum, and tungsten, and according to the position of the individual or entity in the supply chain); Enough Project, *From Mine to Mobile Phone: The Conflict Minerals Supply Chain* (Nov. 10, 2009) *available at http://www.enoughproject.org/files/publications/ minetomobile.pdf* (indicating its desire to increase transparency in the supply chains for tin, tantalum, and tungsten, or the 3Ts, as well as gold, which are key elements of electronics products including cell phones and personal computers and are the principal source of revenue for armed groups and military units that prey on civilians in eastern Congo, and the 3Ts are produced from mineral ores, including tin from cassiterite, tungsten from wolframite, and tantalum from columbite-tantalite, known throughout Congo as coltan); and Global Witness, *Do No Harm: Excluding conflict minerals from the supply chain*, 2 (July 2010), *available at http://www.globalwitness.org/sites/default/files/ pdfs/do_no_harm_global_witness.pdf* (stating that "the warring parties [in the DRC] finance themselves via control of most of the mines in [eastern DRC] that produce tin, tantalum and tungsten ores and gold"). *See also* State Department, *Statement Concerning Implementation of Section 1502 of the Dodd-Frank Legislation Concerning Conflict Minerals Due Diligence*, 1 (July 15, 2011), *available at http://www.state.gov/ documents/organization/168851.pdf* (noting that the State Department "is undertaking a number of actions to address the problem of conflict minerals—or the exploitation and trade of gold, columbite-tantalite (coltan), cassiterite (tin), wolframite (tungsten), or their derivatives—sourced from the eastern" DRC that have "helped to fuel the conflict in the eastern DRC").

[77] *See* letters from Representative Mark E. Amodei (Dec. 20, 2011) ("Rep. Amodei") (referring to "tungsten"); Representatives Howard L. Berman, Donald M. Payne, and Christopher H. Smith (Nov. 8, 2010) (Pre-Proposing Release Web site) ("Rep. Berman *et al.* pre-proposing") ("Section 1502 was designed to limit the ability of armed groups in the Democratic Republic of Congo (DRC) to profit from the illicit mining of tin ore, coltan, gold, and other mineral resources that eventually end up in computers, cell phones, and other products."); Representatives Howard L. Berman, Donald M. Payne, Jim McDermott, Karen Bass, and Barney Frank (Sep. 23, 2011) ("Rep. Berman *et al.*"); Representative Renee L. Ellmers (Dec. 13, 2011) ("Rep. Ellmers") (referring to "tungsten"); Rep. Lee (referring to gold, tin, tantalum, and tungsten as "conflict minerals," by stating that "[f]or years, minerals such as gold and other raw materials commonly used to produce tin, tantalum, and tungsten have been mined and sold illegally by rebel groups in parts of the Democratic Republic of the Congo (DRC) and neighboring countries," and that "[t]hese 'conflict minerals' have fueled decades of fighting in central Africa."); Representative Tim Murphy (Dec. 29, 2011) ("Rep. Murphy") (referring to "tungsten"); and Senator Barbara Boxer, Senator John Boozman, Senator Christopher A. Coons, Senator Patrick J. Leahy, Senator Frank R. Lautenberg, and Senator Jeff Merkley (Oct. 18, 201) ("Sen. Boxer *et al.* I") ("The purpose of Sec. 1502

is to create transparency and accountability in the mineral supply chain in the DRC. Minerals from the DRC—which include tin, tantalum, tungsten and gold—are commonly used in products such as cellphones, laptops and jewelry.").

[78] *See* letter from SEMI.

[79] *See* letters from IPC II and NRF II.

suggested, our failure in the proposal to specify the 3T minerals (tantalum, tin, and tungsten, which are known as the "3Ts") would have introduced too much ambiguity in our rule,[78] which would have expanded the Conflict Mineral Provision's reach, cost, and complexity without increasing its effectiveness.[79] The term "conflict mineral" in the final rule is defined to include cassiterite, columbite-tantalite, gold, wolframite, and their derivatives, which are limited to the 3Ts, unless the Secretary of State determines that additional derivatives are financing conflict in the Covered Countries, in which case they are also considered "conflict minerals;" or any other minerals or their derivatives determined by the Secretary of State to be financing conflict in the Covered Countries.

Additionally, despite the suggestion by certain commentators that we limit the definition of the term "conflict mineral" to minerals that financed or benefited armed groups, the final rule continues to use the term "conflict mineral" to refer to columbite-tantalite, cassiterite, gold, wolframite, and their derivatives, and any other mineral or its derivatives determined by the Secretary of State to be financing conflict in the Covered Countries whether or not they actually financed or benefited armed groups. We believe this approach is appropriate because it is consistent with the use of that term in the Conflict Minerals Statutory Provision and to change the definition of the term for the final rule could cause confusion among interested parties between the use of the term in the statutory provision and the use of the term in the final rule. However, issuers whose conflict minerals did not finance or benefit armed groups may describe their products containing those minerals as "DRC conflict free" in their specialized disclosure report, provided that the issuer is able to determine on the basis of due diligence conducted in accordance with a nationally or internationally recognized due diligence framework that such products are "DRC conflict free" as defined in the final rule.

## B. Step One—Issuers Covered by the Conflict Mineral Provision

### 1. Issuers That File Reports Under the Exchange Act

#### a. Proposed Rules

As we discussed in the Proposing Release, we recognize there is some ambiguity as to whom the Conflict Minerals Statutory Provision applies given that the provision states that the Commission shall promulgate regulations for any "person described"[80] and that a "person is described" if "conflict minerals are necessary to the functionality or production of a product manufactured by such person."[81] Therefore, the Conflict Minerals Statutory Provision could be interpreted to apply to a wide range of private companies not previously subject to our disclosure and reporting rules. Given the provision's legislative background, its statutory location, and the absence of Congressional direction to apply the provision to companies not previously subject to those rules,[82] however, we believe the more appropriate interpretation is that the rules apply only to issuers that file reports with the Commission under Section 13(a) or Section 15(d) of the Exchange Act, and that is what we proposed.[83] Also, consistent with the statutory language, our proposed rules would have applied equally to domestic companies, foreign private issuers, and smaller reporting companies.

---

[80] *See* Exchange Act Section 13(p)(1)(A).

[81] *See* Exchange Act Section 13(p)(2)(B).

[82] *See* H.R. Rep. No. 111–517, Joint Explanatory Statement of the Committee of Conference, Title XV, "Conflict Minerals," at 879 (Conf. Rep.) (June 29, 2010) ("The conference report requires disclosure to the SEC by all persons otherwise required to file with the SEC for whom minerals originating in the Democratic Republic of Congo and adjoining countries are necessary to the functionality or production of a product manufactured by such person.").

[83] Exchange Act Section 13(a) requires issuers with classes of securities registered under Exchange Act Section 12 [15 U.S.C. 78l] to file periodic and other reports. *See* 15 U.S.C. 78m. Exchange Act Section 15(d) requires issuers with effective registration statements under the Securities Act of 1933 (the "Securities Act") to file reports similar to Exchange Act Section 13(a) for the fiscal year within which such registration statement became effective. *See* 15 U.S.C. 78a. Therefore, if our proposed rules did not include issuers required to file reports under Exchange Act Section 15(d), some issuers who file annual reports may not otherwise be required to comply with our proposed conflict minerals rules.

b. Comments on the Proposed Rules

i. Issuers That File Reports Under Sections 13(a) and 15(d) of the Exchange Act

Many commentators addressing the issue agreed with the proposal that the final rule should apply to issuers that file reports under Sections 13(a) and 15(d) of the Exchange Act and not to private companies or individuals.[84] Some of these and other commentators acknowledged, however, that not including individuals and private companies in the final rule could unfairly burden Sections 13(a) and 15(d) issuers and put them at a competitive disadvantage by increasing their costs.[85] On the other hand, some of these commentators noted that not including private companies and individuals in the final rule may not unduly burden Sections 13(a) and 15(d) issuers because the commercial pressure on private companies by issuers that need this information for their reports and by the public in general demanding that issuers make this information available could be sufficient enough for the private companies to provide voluntarily their conflict minerals information as standard practice.[86] Another commentator argued that the effects of the final rule on competition ''are likely to be benign.'' [87] This commentator asserted that ''conflict minerals disclosure costs will not increase the cost of being a publicly traded company by a significant percentage'' and that being able to declare a company's products as ''DRC conflict free'' could become a competitive advantage.[88] Further, in response to our request for comment in the Proposing Release, all four commentators that discussed the issue agreed that an issuer with a class of securities exempt from Exchange Act registration pursuant to Exchange Act Rule 12g3–2(b) [89] should not be subject to the final rule.[90] One commentator recommended ''that entities with Over-The-Counter American Depository Receipts (OTC ADRS) that file an annual report with the SEC should also be required to file a 'Conflict Minerals Disclosure' report.'' [91]

Some commentators stated that the final rule should not necessarily require private companies to submit to us their conflict minerals information, but the final rule should provide mechanisms that allow private companies to report voluntarily on their conflict minerals in a manner similar to Sections 13(a) and 15(d) issuers,[92] which could include working with other agencies that regulate non-reporting companies to have those agencies require their filers to provide similar conflict minerals information.[93] Moreover, the State Department commented that it would encourage private companies not subject to the final rule to disclose voluntarily conflict minerals information.[94] Other commentators disagreed with the proposed rules and indicated that the final rule should apply to more than just issuers that file reports under Sections 13(a) and 15(d) of the Exchange Act.[95] A comment letter submitted jointly by two of the co-sponsors of the legislation stated that their ''intent was for the requirements of Section 1502 to apply to all companies that fall under the jurisdiction of the SEC, including those who issue classes of securities otherwise exempt from reporting.'' [96]

ii. Smaller Reporting Companies

Many commentators agreed that the final rule, as we proposed, should not exempt smaller reporting companies.[97] In this regard, one commentator noted that, although there would be additional costs for smaller reporting companies to comply with the rules, the increased costs will apply also to larger companies.[98] Another commentator asserted that compliance costs for small issuers ''will be relatively modest'' due to their smaller scale and lower complexity of their businesses.[99] One commentator did not believe that the proposed rules would impose higher costs on smaller companies significant enough to justify an exemption because smaller reporting companies would have fewer products to track than a larger company, which would decrease their compliance costs.[100] The commentator based its belief on the fact that, although it was a small human rights group with a modest budget, it regularly undertakes field investigations and supply chain research that is very similar to the due diligence measures it recommended the Commission adopt. According to this commentator, if it is able to perform due diligence with a small staff, so too can a smaller reporting company.

Some commentators noted that exempting smaller reporting companies from the final rule could increase the burdens on larger reporting companies because the larger reporting companies may be less able to require their smaller reporting company suppliers to provide the conflict minerals information needed by the larger reporting companies.[101] One of these commentators noted also that permitting limited disclosure and reporting obligations for smaller companies is unlikely to reduce significantly their burdens because larger companies would likely impose contractual obligations on them to track and provide their conflict minerals information for the larger companies.[102]

Other commentators supported exempting smaller reporting companies because these companies would be less

---

[84] See, e.g., letters from AngloGold; Arkema, Inc. (Mar. 1, 2011) (''Arkema''); Calvert; Cleary Gottlieb; Communications and Information Network Association of Japan, Japan Auto Parts Industries Association, Japan Business Machine and Information System Industries Association, Japan Electronics and Information Technology Industries Association, The Japan Electrical Manufacturers' Association, Japan Machinery Center for Trade and Investment (Mar. 2, 2011) (''Japanese Trade Associations''); CRS I; Earthworks; Howland; IPC I; JVC et al. II; KEMET Corporation (Nov. 1, 2011) (''Kemet''); PCP; Rockefeller Financial Asset Management (Mar. 1, 2011) (''Rockefeller''); SIF I; State II; TIC; and TriQuint I.

[85] See, e.g., letters from Howland, IPC I, ITIC I, NMA II, National Retail Federation (Mar. 2, 2011) (''NRF I''); TIC; and TriQuint I.

[86] Letter from Howland (noting that ''private companies (non reporters) will likely need to provide the same [conflict minerals] information to their customers who will need the information for their reports,'' and that providing conflict minerals information is ''likely'' to ''become a de facto standard similar to RoHS (EU Restriction of hazardous Substances) for electronics'') and TIC (''Further, provided that the regulations apply to large and small issuers, they will form a critical mass which will, in practice, create sufficient commercial pressure on private companies and individuals who manufacture products involving potential conflict materials. Noncompliant companies will be unable to withstand the political and consumer pressures. Accordingly, there is no need for the SEC to seek to expand its jurisdiction.'').

[87] See letter from Green II.

[88] Id.

[89] 17 CFR 240.12g3–2(b).

[90] See Cleary Gottlieb, JVC et al. II, New York State Bar Association (Mar. 1, 2011) (''NY State Bar''), and SIF I.

[91] See letter from Calvert.

[92] See letters from Earthworks and TriQuint I.

[93] See letter from TriQuint I.

[94] See letter from State II.

[95] See, e.g., letters from Catholic Charities Diocese of Houma-Thibodaux (Apr. 21, 2011) (''Catholic Charities''), International Corporate Accountability Roundtable and Global Witness (Nov. 1, 2011) (''ICAR et al. II''), ITIC I, NRF I, Sen. Durbin/Rep. McDermott, Sisters of Good Shepherd (Apr. 8, 2011) (''Good Shepherd''), TIC, and Tiffany.

[96] See letter from Sen. Durbin/Rep. McDermott.

[97] See, e.g., letters from BCIMC, Calvert, CRS I, Earthworks, Global Witness I, Howland, IPC I, JVC et al. II, Rockefeller, Sen. Durbin/Rep. McDermott, SIF I, State II, TIAA–CREF, TIC, and TriQuint I.

[98] See letter from Howland.

[99] See letter from Green II. See also letter from ICAR et al. II (stating that ''because these issuers are smaller, it stands to reason that they will have fewer products that contain conflict minerals, thus reducing the amount of products that must undergo a reasonable country of origin inquiry and supply chain due diligence'').

[100] See letter from Global Witness I.

[101] See, e.g., letters from IPC I and TriQuint I.

[102] See letters from IPC I.

able to compel their suppliers to provide conflict minerals information due to their lack of leverage,[103] and because it would be more expensive for smaller reporting companies to comply with the rule relative to their revenues than for other companies.[104] However, one commentator argued that, although such issuers may lack leverage, this disadvantage may be reduced through the influence exerted over their suppliers by larger issuers that use the same supplier base and that have more leverage to request such information.[105] Some commentators argued that smaller reporting companies should be allowed to phase-in the rules or that the implementation date of the final rule should be deferred for them.[106]

### iii. Foreign Private Issuers

A number of commentators believed that the final rule should not exempt foreign private issuers.[107] As one commentator noted,[108] exempting foreign private issuers from the final rule could increase domestic issuers' burdens by making it very difficult for them to compel their foreign private issuer suppliers to provide conflict minerals information. As another commentator noted,[109] exempting foreign private issuers from the final rule could also result in a competitive disadvantage for domestic issuers because foreign private issuers would not be subject to the final rule. Further, this commentator indicated that not exempting foreign private issuers could actually motivate foreign companies to advocate for similar conflict minerals regulations in their home jurisdictions to reduce any competitive disadvantages they may have with companies from their jurisdictions that do not register with us. Finally, the commentator suggested that exempting foreign private issuers may hurt conflict minerals supply chain transparency, which would be contrary to the intent of Congress.

Only one commentator, a foreign private issuer, stated specifically that foreign private issuers should be exempt from the final rule.[110] This commentator argued that any Congressional intent to give laws extraterritorial effect must be clearly expressed and stated, which the Conflict Minerals Statutory Provision fails to do. Also, the commentator noted that the proposed rules would violate international principles of diplomatic comity and could put diplomats from countries with foreign private issuers in jeopardy. Another commentator suggested that, if the final rule would cause "more than an insignificant number of foreign private issuers to leave the U.S. markets or not to enter the U.S. markets," we should consider exempting all or some foreign private issuers from the final rule.[111] A further commentator stated that, although it recommended that the final rule not exempt foreign private issuers, it expects that the final rule "will represent just one more strong disincentive for such issuers to access the U.S. markets." [112]

### c. Final Rule

After considering the comments, we are adopting the final rule as proposed. Therefore, the final rule applies to any issuer that files reports with the Commission under Section 13(a) or Section 15(d) of the Exchange Act, including domestic companies, foreign private issuers, and smaller reporting companies. We believe the statutory language is clear on this point and believe that it only applies to issuers that file reports with the Commission under Section 13(a) or Section 15(d) of the Exchange Act. There is no clear indication that Congress intended to cover issuers other than those that file such reports. Although we appreciate the views expressed in the comment letter submitted jointly by two of the co-sponsors of the legislation,[113] the legislative history only refers to companies that file with or report to the Commission or that are listed on a United States stock exchange.[114] The

location of the statute adopted by Congress in the section of the Exchange Act dealing with reporting issuers reflects a more limited scope, as well.[115]

The statute is silent with respect to any distinction among issuers based on the issuer's size or domesticity. Although not specifically in the context of smaller reporting companies or foreign private issuers, some commentators suggested that we use our general exemptive authority under Exchange Act Section 36(a) [116] to exempt certain classes of companies from full and immediate compliance with the disclosures required by the Conflict Minerals Statutory Provision.[117] The only limiting factor in the Conflict Minerals Statutory Provision itself as to the type of issuer to which it applies is based on whether conflict minerals are "necessary to the functionality or production" of products manufactured or contracted by the issuer to be manufactured.[118] Moreover, Congress included a specific provision for Commission revisions and waivers to the reporting obligation that requires the President to determine such waiver or revision to be in the national security interest and limits such a Commission exemption to two years. In our view, the high standard set for this statutory waiver, as well as its limited duration, evinces a congressional intent for the Conflict Minerals Statutory Provision to apply broadly and exempting large categories of issuers would be inconsistent with this intent. We also recognize that section 1502 is not simply a disclosure obligation for issuers, but a comprehensive legislative scheme that contemplates coordinated

---

[103] See, e.g., letters from ABA, JVC et al. II, and Society of Corporate Secretaries and Governance Professionals (Mar. 3, 2011) ("Corporate Secretaries I").

[104] See letter from Corporate Secretaries I and Howland.

[105] See letter from Green II.

[106] See, e.g., letters from ABA, Howland, and JVC et al. II.

[107] See, e.g., letters from AngloGold, BCIMC, Calvert, CRS I, Earthworks, Global Witness I, Howland, JVC et al. II, NEI Investments (Mar. 2, 2011) ("NEI"), NY State Bar, SIF I, State II, TIAA–CREF, TriQuint I, WGC II, and WLF.

[108] See letter from TriQuint I.

[109] See letter from NEI.

[110] See letter from Taiwan Semi.

[111] See letter from ABA.

[112] See letter from NY State Bar.

[113] See letter from Sen. Durbin/Rep. McDermott.

[114] See H.R. Rep. No. 111–517, Joint Explanatory Statement of the Committee of Conference, Title XV, "Conflict Minerals," at 879 (Conf. Rep.) (June 29, 2010) ("The conference report requires disclosure to the SEC by all persons otherwise required to file with the SEC for whom minerals originating in the Democratic Republic of Congo and adjoining countries are necessary to the functionality or production of a product manufactured by such person."); 156 Cong. Rec. S3976 (daily ed. May 19, 2010) (statement of Sen. Feingold) (stating that the "Brownback amendment was narrowly crafted" and, in discussing the provision, referring only to "companies on the U.S. stock exchanges"); 156 Cong. Rec. S3865–66 (daily ed. May 18, 2010) (stating that the Conflict Minerals

Statutory Provision "is a narrow SEC reporting requirement" and referring only to "SEC reporting requirements" in discussing the provision); and 156 Cong. Rec. S3816–17 (daily ed. May 17, 2010) (statement of Sen. Durbin) (stating that the provision "would require companies listed on the New York Stock Exchange to disclose in their SEC filings").

[115] See Exchange Act Section 13 entitled "Periodical and Other Reports."

[116] 15 U.S.C. 78mm(a) ("[T]he Commission, by rule, regulation, or order, may conditionally or unconditionally exempt any person, security, or transaction, or any class or classes of persons, securities, or transactions, from any provision or provisions of this chapter or of any rule or regulation thereunder, to the extent that such exemption is necessary or appropriate in the public interest, and is consistent with the protection of investors.").

[117] See, e.g., letters from Davis Polk & Wardwell LLP (Mar. 2, 2011) ("Davis Polk"); National Cable & Telecommunications Association (Oct. 31, 2011) ("NCTA"); Representatives Spencer Bachus, Gary G. Miller, Chairman, Robert J. Dold, and Steve Stivers (Jul. 28, 2011) ("Rep. Bachus et al.") Verizon; and Wilmer Cutler Pickering Hale and Dorr LLP Hale on behalf of IPC (Jun. 2, 2011) ("WilmerHale").

[118] Exchange Act Section 13(p)(2)(B).

action by a number of federal agencies aimed at making public information about conflict minerals from the Covered Countries.[119] We are concerned that any broad categories of exemptions would be inconsistent with this scheme and the statutory objective of reducing the use of conflict minerals from the Covered Countries that contribute to conflict.[120] Congress chose to pursue this goal through the implementation of a comprehensive disclosure regime. In order to allow the provision to have the effect we understand Congress intended, we believe our rules must be consistent with the statutory language and not exempt broad categories of issuers from its application. Thus, we are not exempting smaller reporting companies or foreign private issuers.

Additionally, it is unclear whether exempting smaller reporting companies in particular would significantly reduce their burdens because smaller reporting companies could still be required to track and provide their conflict minerals information for larger issuers.[121] Moreover, to the extent there are benefits to smaller companies from an exemption, such an exemption could increase the burden on larger companies that rely on smaller reporting company suppliers to provide conflict minerals information needed by the larger reporting companies.

Further, as discussed in greater detail below, the final rule temporarily will permit all issuers that are unable to determine that their conflict minerals did not originate in the Covered Countries or that are unable to determine that their conflict minerals that originated in the Covered Countries did not directly or indirectly finance or benefit armed groups to describe their products as "DRC conflict undeterminable," and temporarily will not require such issuers to obtain an independent private sector audit of their Conflict Minerals Report with respect to those minerals. This temporary accommodation will be available to all issuers for the first two years of reporting under the final rule. The final rule extends that period for smaller reporting companies for an additional two years, providing a temporary four-year provision for smaller reporting companies. This approach is consistent with some commentators' recommendations as to the applicability of the reporting requirement to smaller reporting companies.[122]

Similarly, we are not exempting foreign private issuers because we do not believe that it would give effect to Congressional intent of the provision. As commentators noted, exempting foreign private issuers could make it difficult for issuers to compel their foreign private issuer suppliers to provide conflict minerals information, result in a competitive disadvantage for domestic issuers, and hurt conflict minerals supply chain transparency.[123] Also, we note that including foreign private issuers in the final rule does not give the Conflict Minerals Statutory Provision an extraterritorial effect because it applies only to foreign private issuers that enter the securities markets of the United States.

### 2. "Manufacture" and "Contract to Manufacture" Products

#### a. Proposed Rules

The Conflict Minerals Statutory Provision applies to any person for whom conflict minerals are necessary to the functionality or production of a product manufactured by that person. The proposed rules would likewise have applied to reporting persons for whom conflict minerals are necessary to the functionality or production of products they manufacture. We did not define the term "manufacture" in the proposed rules, because we believed the term to be generally understood.[124]

In addition, based on the text of the Conflict Minerals Statutory Provision as well as statutory intent, the proposed rules would also have applied to issuers that contract to manufacture products. As discussed in the Proposing Release, one section of the Conflict Minerals Statutory Provision defines a "person described" as one for which conflict minerals are "necessary to the functionality or production of a product manufactured by such a person,"[125] while another section of the provision requires an issuer to describe "the products manufactured or *contracted to be manufactured* that are not DRC conflict free" [emphasis added] in its Conflict Mineral Report.[126] The absence of the phrase "contract to manufacture" from the "person described" definition raised some question as to whether the requirements apply equally to those who manufacture products themselves and those who contract to have their products manufactured by others. Based on the totality of the provision, however, we expressed in the Proposing Release our belief that the legislative intent was for the provision to apply both to issuers that directly manufacture products and to issuers that contract the manufacturing of their products for which conflict minerals are necessary to the functionality or production of those products. The proposed rules, therefore, would have applied equally to issuers that manufacture products and to issuers that "contract to manufacture" their products. We noted that this approach would allow the "contracted to be manufactured" language to have effect in the Conflict Minerals Report.

In the Proposing Release, we explained that the proposed rules would apply to issuers that contract for the manufacturing of products over which they had any influence regarding the manufacturing of those products. As proposed, they also would have applied to issuers selling generic products under their own brand name or a separate

---

[119] Sections 1502(c) and (d) of the Act. We recognize that Congress also required the Comptroller General to periodically report on, among other things, publicly available information regarding persons who are "not required to file reports * * * pursuant to Section 13(p)(1)(A)" and who manufacture products for which "conflict minerals are necessary to the functionality or production." Section 1502(d)(2)(C). We interpret this provision to require reporting by the Comptroller General on persons—such as private companies not subject to our disclosure and reporting rules—who are not subject to the requirements of the Conflict Minerals Statutory Provision even though conflict minerals may be necessary to the functionality or production of their products. Any issuers that receive waivers or revisions pursuant to Section 13(p)(3) would also be included.

[120] *See* letters from Global Witness I and State II and Transcript of SEC Roundtable on Conflict Minerals, Section 141 (Oct. 18, 2011) (Statement of Tim Mohin), *available at http://www.sec.gov/spotlight/conflictminerals/conflictmineralsroundtable101811-transcript.txt* (stating that although no single company working alone can determine whether minerals in its products supported armed groups, large and small companies working together can make such a determination), *id.* at 22 (Statement of Bennett Freeman) (arguing that all companies across the value and supply chain should be covered by the rule because disclosures by all companies are important to investors). *See also id.* at 62, 92, and 103 (Statements of Andrew Matheson, Benedict S. Cohen, and Representative James McDermott, respectively) (assuming that small issuers would be covered by the rule).

[121] *See* letters from IPC I.

[122] *See* letter from Howland (stating that, although "[t]here will be additional costs that may be proportionally higher for small companies, but increased costs will also apply to large firms," a way that the final rule can "mitigate the cost is to phase in the acceptable level of rigor for due diligence over several years and based on company size"). *See also* letter from JVC *et al.* II (stating that, "[w]ith respect to smaller reporting companies, it is reasonable to assume that the costs of compliance may disproportionately harm them by comparison with any concomitant benefit in achieving the statutory goals, since these companies lack the leverage to pressure suppliers and smelters to certify regarding the source of a particular conflict mineral," so "we believe it would be appropriate to allow smaller reporting companies even more time in which to adapt the results of these broader global initiatives to their individual facts and circumstances").

[123] *See* letters from NEI and TriQuint I.

[124] For example, the Second Edition of the Random House Webster's Dictionary defines the term to include the "making goods or wares by hand or machinery, esp. on a large scale." *Random House Webster's Dictionary 403* (2d ed. 1996).

[125] Exchange Act Section 13(p)(2)(B).

[126] Exchange Act Section 13(p)(1)(A)(ii).

brand name that they had established, regardless of whether those issuers had any influence over the manufacturing specifications of those products, as long as an issuer had contracted with another party to have the product manufactured specifically for that issuer. We did not, however, propose that the rules would apply to retail issuers that sell only the products of third parties if those retailers had no contract or other involvement regarding the manufacturing of those products, or if those retailers did not sell those products under their brand name or a separate brand they had established and did not have those products manufactured specifically for them.

b. Comments on the Proposed Rules

i. ''Manufacture''

Many commentators agreed with the proposed rules that the final rule should not define the term ''manufacture'' because that term is generally understood.[127] Many other commentators, however, believed that the final rule should define the term,[128] and most of these commentators provided their recommendations for the definition. A number of commentators indicated that the definition should mirror the North American Industry Classification System (''NAICS''),[129] which classifies entities as manufacturers if they engage in the mechanical, physical, or chemical transformation of materials, substances, or components into new products from raw materials that are products of agriculture, forestry, fishing, mining, or quarrying.

Some commentators stated that the final rule should define the term inclusively or broadly so as to include all steps in the supply chain, from mining to manufacturing the product, because otherwise it would become exponentially more difficult for

manufacturing issuers downstream in the supply chain to comply with the final rule.[130] One commentator indicated that the term should include all steps from mining, refining, and production to the importing, exporting, or sale of ingredients, materials, and/or processes.[131] A few commentators indicated that the final rule should provide a definition consistent with the U.S. Controlled Substances Act, which includes the production, preparation, assembling, propagation, combination, compounding, or processing of a drug or other substance, either directly or indirectly or by extraction from substances of natural origin.[132] One of these commentators stated that such a consistent definition would include the ''production, preparation, assembling, combination, compounding, or processing of ingredients, materials, and/or processes such that the final product has a name, character, and use, distinct from the original ingredients, materials, and/or processes.''[133] One commentator asserted that the definition should include any entity ''involved in the process of changing a product * * * from one form to another.''[134] One commentator suggested that the definition ''should be tailored only to include OEM's and those who design and specify bills of materials for products with control over the procurement or fabrication of the same products' bill of materials and specification of the constituent materials of the components.''[135] One commentator urged us to provide clear guidance indicating that real estate development does not constitute manufacturing.[136]

ii. ''Contract to Manufacture''

Not all commentators agreed on whether the final rule should include an issuer that contracts to manufacture a product. However, many commentators that agreed that the final rule should include an issuer that contracts to manufacture a product, or did not agree but argued in the alternative, recommended that an issuer should be required to have some amount of control or influence over the manufacturing

process before the final rule considers that issuer to be contracting to manufacture a product.[137] A number of commentators suggested the level of control necessary to be considered contracting to manufacture a product under the final rule. In this regard, some commentators suggested that only an issuer with direct, close, active, and/or substantial involvement or control in the sourcing of materials, parts, ingredients, or components to be included in its products or in the manufacturing of those products should meet the minimum control threshold necessary to be considered contracting to manufacture a product.[138] One commentator recommended that an issuer should be considered to be contracting to manufacture a product only if it exercises ''a sufficient level of influence, involvement or control over the process to be able to control, in a meaningful manner, the use of conflict minerals, or to evaluate and influence the use of conflict minerals.''[139] Some commentators asserted that the minimum control threshold should be met only if the issuer explicitly specifies the inclusion of conflict minerals in the product.[140] Another commentator advised that the contracting activities that should trigger conflict minerals reporting should include designing the product, controlling the approved materials or vendor lists for the product, and including the issuer's name on the product.[141]

Some of these commentators, as well as others, asserted that an issuer should not be considered to meet the control threshold to the extent that the product is not manufactured to meet an issuer's custom specifications, but rather is manufactured to meet industry-standard specifications common to the issuer's competitors generally.[142] For example, a group of jewelry industry commentators argued in one letter that a jewelry retail issuer ordering products from jewelry manufacturers should not be considered contracting to manufacture for those products if the retail issuer specifies only weight, karat, or other indicators of

---

[127] *See, e.g.,* letters from ABA, Global Witness I, Howland, NYCBar I, NYCBar II, State II, TIC, and United States Steel Corporation (Sep. 4, 2011) (''US Steel'').

[128] *See, e.g.,* letters from American Association of Exporters and Importers (Jan. 21, 2011) (''AAEI''); AngloGold; Columban Center for Advocacy and Outreach, Leadership Conference of Women Religious, Sisters of Mercy of the Americas—Institute Justice Team, Missionary Oblates, and Maryknoll Office for Global Concerns (Mar. 2, 2011) (''Columban Center *et al.*''); CTIA—The Wireless Association (Mar. 1, 2011) (''CTIA''); Earthworks; Enough Project I; International Corporate Accountability Roundtable, Enough Project, and Global Witness (Sep. 23, 2011) (''ICAR *et al.* I''); Metalsmiths; NAM I; NEI; NMA II; RILA–CERC; SIF I; TriQuint I; and WGC II.

[129] *See* letters from AAEI, AngloGold, BCE Inc. (Oct. 31, 2011) (''BCE''), Canadian Wireless Telecommunications Association (Oct. 28, 2011) (''CWTA''), CTIA, NAM I, NCTA, NMA II, RILA–CERC, and WGC II.

[130] *See* letters from Columban Center *et al.,* Metalsmiths, and TriQuint I.

[131] *See* letter from Earthworks.

[132] *See* letters from Enough Project I and SIF I.

[133] *See* letter from Enough Project I (citing to its earlier letter submitted Sep. 24, 2010 on the Pre-Proposing Release Web site).

[134] *See* letter from Jeffrey Trott (Jan. 31, 2011) (''Trott'').

[135] *See* letter from Retail Industry Leaders Association (Nov. 1, 2011) (''RILA'').

[136] *See* letter from National Association of Real Estate Investment Trusts (Nov. 23, 2011) (''NAREIT'').

[137] *See, e.g.,* letters from AdvaMed I, AT&T Inc. (Mar. 9, 2011) (''AT&T''), Chamber I, Cleary Gottlieb, Consumer Electronics Retailers Coalition (Nov. 1, 2011) (''CERC''), Industry Group Coalition I, IPC I, IPC II, JVC *et al.* II, NAM I, NCTA, Niotan I, NMA II, NRF I, NRF II, PCP, RILA, Roundtable, SEMI, TIAA–CREF, and TriQuint I.

[138] *See* letters from AT&T, CERC, Corporate Secretaries I, CTIA, JVC *et al.* II, NCTA, NRF I, RILA, and Verizon.

[139] *See* letter from ABA.

[140] *See* letters from NAM I and SEMI.

[141] *See* letter from TriQuint I.

[142] *See* letters from AngloGold, AT&T, BCE, JVC *et al.* II, NCTA, and RILA–CERC.

quality.[143] As another example, a mobile phone service provider asserted that it should not be considered contracting to manufacture its mobile phones even though it specifies to its manufacturers that the phones must be compatible with their networks and have certain cosmetic design requirements.[144]

Some commentators suggested that the final rule should not consider an issuer to be contracting to manufacture products if the issuer is selling products under its own brands, labels, trademarks, or licenses if it had little or no influence in manufacturing those products.[145] Other commentators recommended that the final rule should consider such issuers to be contracting to manufacture those products.[146] One commentator asserted that generic products should be held to the same standard as branded products and that the final rule should avoid using any definitions that create a perverse incentive for an issuer to work with special purpose entities designed to follow the technical requirements of the law but evade its intent.[147] Another commentator suggested that the final rule should apply to issuers selling generic products under their own name or a separate brand name, but not to retailers who do not do so and have no influence over the manufacturing of products they sell.[148]

Some commentators recommended that an issuer should be considered to be contracting to manufacture a product only if the issuer has a direct contractual relationship with the manufacturer of the product to be sold by the issuer, the issuer has substantial control over the manufacturer and the material specifications of the product and specifies the conflict minerals to be used in the product, the product will be manufactured exclusively for the issuer,

and the product will be sold by the issuer under its own brand name or a brand name owned by the issuer or exclusively licensed to the issuer by the owner of the brand.[149] One of these commentators went on to assert that an issuer should not be considered to be exerting "substantial control" over manufacturing by "merely attaching a brand label to a generic good, contracting for the exclusive distribution of goods, or specifying the form, fit or function of a product," and should not be considered to be contracting to manufacture a product solely by "attaching a brand label to a generic good, contracting for the exclusive distribution of goods, or specifying the form, fit or function of a product."[150]

Other commentators stressed that the final rule should not apply to any issuer contracting to manufacture its products.[151] These commentators argued generally that the statute does not include an issuer that contracts to manufacture its products because the phrase does not appear in the subsection of the Conflict Minerals Statutory Provision discussing a "person described." Instead, the phrase appears only in the subsection that describes the disclosures required in a Conflict Minerals Report. Therefore, Congress's intent in including the phrase was only to ensure that a manufacturer otherwise subject to the Conflict Minerals Statutory Provision could not intentionally evade its reporting obligation merely by distancing itself, through contracting, from the manufacturing process.[152]

### c. Final Rule

#### i. "Manufacture"

After considering the comments, we are modifying the proposed rules, in part. The final rule, as proposed, applies to any issuer for which conflict minerals are necessary to the functionality or production of a product manufactured or contracted by that issuer to be manufactured. The final rule does not define the term "manufacture" because we continue to believe, as discussed in the Proposing Release, that the term is generally understood. We note, however, that we do not consider an issuer that only services, maintains, or repairs a product containing conflict minerals to be "manufacturing" a

product;[153] this interpretation is not a change from the Proposing Release, but a clarification in response to comments.[154]

We believe narrowing or expanding the definition of "manufacture" as suggested by some commentators would be inconsistent with the language and framework of Section 1502. For example, the NAICS definition, which a number of commentators suggested, appears to exclude any issuer that manufactures a product by assembling that product out of materials, substances, or components that are not in raw material form. Such a definition would exclude large categories of issuers that manufacture products through assembly, such as certain auto and electronics manufacturers, whom we believe are intended to be covered by the Conflict Minerals Statutory Provision. As another example, the manufacturing definition put forth by one commentator appears to include "importing, exporting, or sale of conflict minerals,"[155] which would expand the definition to include issuers that clearly do not manufacture products. Also, many of the other suggested definitions simply expound upon the generally understood meaning of the term, which we do not believe we need to define.

#### ii. "Contract to Manufacture"

Consistent with the proposal, the final rule applies to any issuer for which conflict minerals are necessary to the functionality or production of a product contracted by that issuer to be manufactured, including conflict minerals in a component of a product. In general, the question of whether an issuer contracts to manufacture a product will depend on the degree of influence exercised by the issuer on the manufacturing of the product based on the individual facts and circumstances surrounding an issuer's business and industry. The final rule does not define when an issuer contracts to manufacture a product because, although we believe this concept is intuitive at a basic level, after considering comments and attempting to develop a precise definition, we concluded that, for "contract to manufacture" to cover issuers operating in the wide variety of the impacted industries and structured

---

[143] *See* letter from JVC *et al.* II.

[144] *See* letter from AT&T. *See also* letter from BCE (stating that the commentator, a distributor of a wide range of telecommunications and electronic products supplied by hundreds of manufacturers, "exerts no substantial control over the design or the technical features of those products or any control, direct or indirect, over the supply chains, which may be quite complex, of such manufacturers," and its "sole input into the manufacturing process relates to providing brand name manufacturers with certain technical specifications to ensure compliance with applicable Canadian regulatory standards or to requesting special product features, cosmetic in nature, to meet Canadian consumer market demands").

[145] *See* letters from AT&T, BCE, Cleary Gottlieb, CTIA, Industry Group Coalition I, JVC *et al.* II, NAM I, NCTA, and NRF I.

[146] *See* letters from Enough Project I, Howland, NEI, SIF I, State II, and TriQuint I.

[147] *See* letter from AxamTrade (Feb. 10, 2011) ("Axam").

[148] *See* letter from NYCBar II.

[149] *See* letters from CERC and RILA.

[150] *See* letter from RILA.

[151] *See, e.g.,* letters from BCE, CERC, CTIA, Davis Polk, NCTA, RILA–CERC, TIC, and United States Telecom Association (Mar. 2, 2011) ("US Telecom").

[152] *See* letters from AT&T, CTIA, and RILA–CERC.

[153] *See* letter from JVC *et al.* II (commenting that "certain assembly and repair functions commonly performed by jewelry retailers" should not be defined as manufacturing).

[154] *See, e.g.,* letter from ABA (commenting that the Commission "should, either in the final rule or in the corresponding adopting release, provide additional guidance as to activities that will not be considered to be the manufacturing of a product for the purposes of the rule").

[155] *See* letter from Earthworks.

in various manners, any definition of that term would be so complicated as to be unworkable. We do, however, provide guidance below on some general principles that we believe are relevant in determining whether an issuer should be considered to be contracting to manufacture a product.

As a threshold matter, consistent with the proposal, we believe the statutory intent to include issuers that contract to manufacture their products is clear based on the statutory obligation for issuers to describe in their Conflict Minerals Reports products that are manufactured and contracted to be manufactured that do not meet the definition of "DRC conflict free." [156] We recognize that commenters asserted that the statute does not include an issuer that contracts to manufacture its products and that the sole intent behind including the phrase in the provision was to keep manufacturers from intentionally evading reporting requirements by contracting the manufacturing of their products to third parties. Nonetheless, Exchange Act Section 13(p)(1)(A)(ii) requires issuers that must file a Conflict Minerals Report to describe their "products manufactured *or contracted to be manufactured* that are not DRC conflict free" (emphasis added). In our view, the inclusion of products that are "contracted to be manufactured" in this requirement indicates that Congress intended the Conflict Mineral Statutory Provision to apply to such products, and including issuers who contract to manufacture their products in the scope of the rule effectuates this intent. We believe our reading is more consistent with the statute than the alternative reading—that Congress required a description of products that were "contracted to be manufactured" and were not "DRC conflict free," but did not require issuers that contracted to manufacture products to determine whether a Conflict Minerals Report was required to be filed. This would be internally inconsistent. It would significantly undermine the purpose of the statutory provision to fail to apply it to issuers that contract to manufacture their products.

As another threshold matter, we believe the phrase "contract to manufacture" captures manufacturers that contract the manufacturing of components of their products. Generally, we believe that manufacturing issuers that contract the manufacturing of certain components of their products should, for purposes of the Conflict Minerals Statutory

Provision, be viewed as responsible for the conflict minerals in those products to the same extent as if they manufactured the components themselves. We believe it is inconsistent with the Conflict Minerals Statutory Provision to allow these manufacturers to avoid the final rule's requirements by contracting out the manufacture of components in their products that contain conflict minerals. As two of the co-sponsors of the Conflict Minerals Statutory Provision noted, "[m]any companies use component parts from any one of several suppliers when assembling their products" to "help drive down the parts through competition," but "[i]t is of paramount importance that this business model choice not be used as a rationale to avoid reporting and transparency." [157]

In the proposal, we expressed our belief that an issuer that does not manufacture a product itself but that has "any" influence over the product's manufacturing should be considered to be contracting to manufacture that product. Also, we expressed our belief that an issuer that offers a generic product under its own brand name or a separate brand name should be considered to be contracting to manufacture that product so long as the issuer had contracted to have the product manufactured specifically for itself. We had believed that these issuers should have been considered to be contracting those products to be manufactured because the issuers would implicitly influence the manufacturing of the products. However, we are persuaded by commenters that this level of control set forth in the Proposing Release was "overbroad" and "confusing" and would impose on such an issuer "significant," "unrealistic," and "costly" burdens.[158]

Consistent with our approach in the Proposing Release, we believe that "contract to manufacture" is intended to include issuers that have some actual influence over the manufacturing of their products. However, we have modified our view as to the circumstances under which an issuer is considered to be contracting to manufacture a product. An issuer is considered to be contracting to manufacture a product depending on the degree of influence it exercises over the materials, parts, ingredients, or

components to be included in any product that contains conflict minerals or their derivatives. The degree of influence necessary for an issuer to be considered to be contracting to manufacture a product is based on each issuer's individual facts and circumstances. However, based on comments we received, we believe an issuer should not be viewed for the purposes of the Conflict Minerals Statutory Provision as contracting to manufacture a product if its actions involve no more than:

(a) Specifying or negotiating contractual terms with a manufacturer that do not directly relate to the manufacturing of the product, such as training or technical support, price, insurance, indemnity, intellectual property rights, dispute resolution, or other like terms or conditions concerning the product, unless the issuer specifies or negotiates taking these actions so as to exercise a degree of influence over the manufacturing of the product that is practically equivalent to contracting on terms that directly relate to the manufacturing of the product; or

(b) Affixing its brand, marks, logo, or label to a generic product manufactured by a third party; or

(c) Servicing, maintaining, or repairing a product manufactured by a third party.

For example, we agree with commentators that an issuer that is a service provider that specifies to a manufacturer that a cell phone it will purchase from that manufacturer to sell at retail must be able to function on a certain network does not in-and-of-itself exert sufficient influence to "contract to manufacture" the phone for purposes of the final rule. Under the proposed rules, however, such an issuer may have reached the "any" influence threshold. Conversely, we do not agree with commentators that an issuer must have "substantial" influence or control over the manufacturing of a product before the issuer is considered to be contracting to manufacture that product.[159] Such a standard would significantly limit the coverage of the Conflict Minerals Statutory Provision for issuers that contract to manufacture products, and we do not believe that such a narrow scope is consistent with the intent of the Conflict Minerals Statutory Provision. For example, if there are specifications made by an issuer to a manufacturer that it contracts with for the inclusion of a particular conflict mineral in the product, the

---

[156] *See* Exchange Act Section 13(p)(1)(A)(ii).

[157] *See* letter from Senator Richard J. Durbin and Representative Jim McDermott (Oct. 4, 2010) (Pre-Proposing Release Web site) ("Sen. Durbin/Rep. McDermott pre-proposing").

[158] *See, e.g.,* letters from ABA, AT&T, Corporate Secretaries I, Davis Polk, and Verizon. *See also* letter from NRF I (stating that our proposed approach would be "draconian").

[159] *See, e.g.,* letters from AT&T, Corporate Secretaries I, CTIA, JVC *et al.* II, NRF I, and Verizon.

issuer might not be viewed as exerting "substantial" influence on the overall manufacturing of the product. However, we would view such an issuer as covered under the final rule as contracting to manufacture the product. In addition, we disagree with commentators that suggested that the final rule should apply only to issuers that explicitly specify that conflict minerals be included in their products.[160] We believe this is too narrow an interpretation of the statutory provision and, read in this manner, the statute would be illogical. For example, as commentators argued, Congress inserted "contract to manufacture" in the disclosure of products to prevent manufacturers from skirting the disclosure requirements by contracting to manufacture certain products. However, if "contract to manufacture" is not included in the definition of "person described," an issuer may evade the statute by contracting its manufacturing to a third party. Therefore, an issuer would never be required to disclose its minerals because the issuer would not qualify for steps two and three.

Moreover, in contrast to our approach in the Proposing Release, we do not consider an issuer to be contracting to manufacture a product for the purposes of our rule solely if it offers a generic product under its own brand name or a separate brand name without additional involvement by the issuer. We are persuaded by commentators that such an issuer would not necessarily exert a sufficient degree of influence on the manufacturer to be considered as contracting to manufacture the product for purposes of the Conflict Minerals Statutory Provision. As one commentator noted, it seems that such a relationship between an issuer and manufacturer is better characterized as one in which the manufacturer is using the issuer as a "sales channel" as opposed to one in which the issuer is "outsourcing manufacturing to" the manufacturer.[161] Such a relationship limits the issuer's influence on the product's manufacturing to the extent that it puts the issuer in a similar position to that of a pure retailer. One commentator noted that the purposes of the Conflict Minerals Statutory Provision are not served by classifying such an issuer as contracting to manufacture a product.[162] We agree. However, an issuer with generic products that include its brand name or a separate brand name and that has

involvement in the product's manufacturing beyond only including such brand name would need to consider all of the facts and circumstances in determining whether its influence reaches such a degree so as to be considered contracting to manufacture that product.

3. Mining Issuers as "Manufacturing" Issuers

a. Proposed Rules

Under the proposed rules, we would have considered an issuer that mines conflict minerals to be manufacturing those minerals and an issuer contracting for the mining of conflict minerals to be contracting for the manufacture of those minerals. In this regard, we proposed in an instruction to the rules that mining issuers be considered to be manufacturing conflict minerals when they extract those minerals.[163] We did, however, request comment on this point.

b. Comments on the Proposed Rules

A number of commentators stated specifically that the final rule should consider any issuer that mines conflict minerals as "manufacturing" those conflict minerals as "products."[164] A few commentators noted that mining issuers should be included as manufacturers because they begin the conflict minerals supply chain and other reporting issuers must rely on them for information.[165] As such, without the final rule including mining issuers, other issuers would have a very difficult time complying with the rules, which would eliminate transparency from the supply chain and undermine the provision.[166]

Other commentators indicated that the final rule should not treat mining issuers as manufacturers of the conflict minerals they extract.[167] Some of these

commentators argued that the final rule should incorporate the NAICS definition of "manufacturing," which they noted does not include mining as a type of manufacturing activity.[168] Certain commentators noted that mining of conflict minerals, especially gold, shares no characteristics with the manufacturing of products.[169] Finally, some commentators asserted that Congress did not intend to include mining issuers as manufacturers based on previous versions of the Conflict Minerals Statutory Provision, legislative statements, and a plain reading of the statute.[170] As some of these commentators noted, the Conflict Minerals Statutory Provision was preceded by other legislative proposals that were drafted to include mining issuers, but the Conflict Minerals Statutory Provision was not drafted in such a manner.[171] One such commentator indicated that these previous bills "explicitly applied not only to companies using covered minerals in their manufacturing processes, but also to persons engaged in 'the commercial exploration, extraction, importation, exportation, or sale' of the covered minerals."[172] According to the commentator, the fact that Congress chose not to include extraction activities in the Conflict Minerals Statutory Provision demonstrates that Congress's intent was not to have the Conflict Minerals Statutory Provision include mining as manufacturing.

c. Final Rule

After considering the comments, we are modifying the proposal. We do not consider an issuer that mines or contracts to mine conflict minerals to be manufacturing or contracting to manufacture those minerals unless the issuer also engages in manufacturing, whether directly or indirectly through contract, in addition to mining. In this regard, we do not believe that mining is "manufacturing" based on a plain reading of the provision. We agree with the commentators concerned that the statutory language does not explicitly include mining anywhere in the Conflict Minerals Statutory Provision and including mining would expand the statutory mandate. The Conflict Minerals Statutory Provision does not specifically refer to mining and, as one

---

[160] See, e.g., letters from NAM I and SEMI.

[161] See letter from AT&T.

[162] See letter from Cleary Gottlieb.

[163] See Industry Guide 7 [17 CFR 229.802(g)] (implying that companies may "produce" minerals from a mining reserve).

[164] See, e.g., letters from Bario-Neal Jewelry (Mar. 1, 2011) ("Bario-Neal"); Brilliant Earth, Inc. (Feb. 28, 2011) ("Brilliant Earth"); CRS I; Earthworks; Electronics TakeBack Coalition (Mar. 2, 2011) ("TakeBack"); Enough Project I; Enough Project (Nov. 2, 2011) ("Enough Project IV"); Global Tungsten I; Hacker Jewelers, Designers & Goldsmiths, Inc. (Mar. 1, 2011) ("Hacker Jewelers"); Hoover & Strong, Inc. (Mar. 1, 2011) ("Hoover & Strong"); ICAR et al. I; NEI; Niotan I; NYCBar I; SIF I; State II; TIAA–CREF; TriQuint I; and U.S. Steel.

[165] See letters from Global Witness I and TriQuint I (noting that mining companies do, in fact, engage in a transformative process such that they transform natural resources into ores, which should be considered "manufacturing").

[166] See letter from Enough Project I.

[167] See, e.g., letters from ABA, AngloGold, Barrick Gold, Cleary Gottlieb, ITRI Ltd. (Jan. 27, 2011) ("ITRI I"), NAM III, NMA II, Vale S.A. (Mar. 3, 2011) ("Vale"), and WGC II.

[168] See letters from AngloGold and WGC II.

[169] See letters from AngloGold and Barrick Gold.

[170] See letters from AngloGold, NMA II, National Mining Association (Nov. 1, 2011) ("NMA III"), and Vale.

[171] See, e.g., letters from AngloGold and NMA II.

[172] Letter from NMA II (referring to S. 891 and S.A. 2707 (2009)).

commentator noted, "[t]o extend the terms 'manufacture' of a 'product' to include the mining of conflict minerals contorts the plain meaning of those terms."[173]

As discussed by commentators, legislative history demonstrates that Congress did not intend to include issuers that solely mine conflict minerals in the Conflict Minerals provision because it removed references to such activities from prior versions of the provision. For example, one commentator in two comment letters noted that prior versions of the Conflict Minerals Statutory Provision explicitly applied to anyone either using covered minerals in their manufacturing processes or engaging in "the commercial exploration, extraction, importation, exportation or sale of the covered minerals."[174] However, the final version of the Conflict Minerals Statutory Provision omits any reference to extraction-related activities and refers solely to manufacturing.[175] As this commentator stated, Congress's omission of mining activities evidences its intent "to address the manufacturing of goods which use or contain, as opposed to the extracting and processing of, the covered minerals."[176] Therefore, based on both the plain reading of the provision and the legislative history of the provision, we are persuaded that it would be inconsistent with the language in the Conflict Minerals Statutory Provision to include mining issuers as manufacturing issuers under the final rule unless the mining issuer engages in manufacturing, either directly or through contract, in addition to mining.

4. When Conflict Minerals Are "Necessary" to a Product

The Conflict Minerals Statutory Provision requires us to promulgate regulations requiring that any "person described" disclose annually whether conflict minerals that are "necessary" originated in the Covered Countries and, if so, submit to us a Conflict Minerals Report.[177] The provision further states that a "person is described" if "conflict

minerals are necessary to the functionality or production of a product manufactured by such person."[178] The provision, however, provides no additional explanation or guidance as to the meaning of "necessary to the functionality or production of a product." Likewise, we did not propose to define when a conflict mineral is necessary to the functionality or production of a product. We did, however, request comment on whether and how our rules should define this phrase and we provided some guidance as to the meaning of "necessary to the production of a product."

a. Proposed Rules

Although we did not propose to define "necessary to the functionality or production" in the rules, we noted in the Proposing Release that, if a mineral is necessary, the product was included within the scope of the rules without regard to the amount of the mineral involved. Further, we indicated in the Proposing Release that a conflict mineral would be considered necessary to the production of a product if the conflict mineral was intentionally included in a product's production process and was necessary to that process, even if that conflict mineral was not ultimately included anywhere in the product. On the other hand, as proposed, a conflict mineral necessary to the functionality or production of a physical tool or machine used to produce a product would not be considered necessary to the production of that product, even if that tool or machine was necessary to producing the product. For example, if an automobile containing no conflict minerals was produced using a wrench that contains or was itself produced using conflict minerals necessary to the functionality or production of that wrench, the proposed rules would not consider the conflict minerals in that wrench necessary to the production of the automobile.

That the conflict minerals must be "necessary to the functionality or production" of an issuer's products is the only limiting factor in the Conflict Minerals Statutory Provision.[179] The provision has no materiality thresholds for disclosure based on the amount of conflict minerals an issuer uses in its manufacturing processes. Therefore, we did not propose to include a materiality threshold for the disclosure or reporting requirements in the proposed rules. We did, however, request comment in the Proposing Release as to whether there

should be a *de minimis* threshold in our rules based on the amount of conflict minerals used by an issuer in a particular product or in its overall enterprise and, if so, whether such a threshold would be consistent with the Conflict Minerals Statutory Provision.

b. Comments on the Proposed Rules

Many commentators suggested that the final rule explicitly define the phrase, "necessary to the functionality or production of a product,"[180] while other commentators indicated that the final rule should not define the phrase.[181] Several commentators suggested possible definitions.[182] One commentator noted that manufacturers make certain deliberate choices about products, such as how they look, function, perform, cost, or are supplied, so when there has been a choice to incorporate conflict minerals into a product, the final rule should consider the conflict minerals "necessary" to the product because the designer has deemed them to be so.[183] Another commentator was concerned that the proposed rules did not provide any guidance as to either the phrase "necessary to the functionality or production" or the term "product."[184] As such, this commentator noted that the proposed rules could apply to financial products that are backed by gold or other mineral commodities, such as futures contracts for gold bullion, shares in mutual funds that invest in gold mining stocks, or gold bullion storage agreements with vault services providers.

i. "Necessary to the Functionality"

A number of different commentators indicated that a conflict mineral should be considered "necessary to the functionality" of a product if that conflict mineral is intentionally added to the product.[185] Of these commentators, however, many were open to other potential requirements. For example, many commentators

---

[173] *See* letter from AngloGold.

[174] *See* letters from NMA II and NMA III. These letters discuss two legislative proposals introduced in the Senate in 2009 that were similar to the Conflict Minerals Statutory Provision. *See* Congo Conflict Minerals Act of 2009, S. 891, 111th Cong. (2009) and S.A. 2707, 111th Cong. (2009). Both of these earlier conflict minerals proposals explicitly applied to companies using conflict minerals in their manufacturing processes and also to persons engaged in "the commercial exploration, extraction, importation, exportation, or sale" of conflict minerals.

[175] *See* letters from NMA II.

[176] *Id.*

[177] Exchange Act Section 13(p)(1)(A).

[178] Exchange Act Section 13(p)(2)(B).

[179] Exchange Act Section 13(p)(2)(B).

[180] *See, e.g.,* letters from CRS I, Davis Polk, Earthworks, Enough Project I, FRS, Howland, ICAR *et al.* I, MSG I, NRF I, PCP, Give Peace A Deadline (Jan. 21, 2011) ("Peace"), SEMI, SIF I, TIC, Tiffany, TriQuint I, and US Steel.

[181] *See, e.g.,* letters from Cleary Gottlieb, Global Witness I, ITIC I, State II, and WGC II.

[182] *See, e.g.,* letters from AAEI, AAFA, Bario-Neal, Brilliant Earth, CRS I, Davis Polk, Earthworks, Enough Project I, Hacker Jewelers, Hoover & Strong, Howland, MSG I, NAM I, Niotan I, NMA II, NRF I, PCP, Peace, SEMI, Sen. Durbin/Rep. McDermott, SIF I, TIAA–CREF, TIC, TriQuint I, and US Steel.

[183] *See* letter from Matheson II.

[184] *See* letter from Tiffany.

[185] *See, e.g.,* letters from AAEI, Bario-Neal, Brilliant Earth, Hacker Jewelers, Hoover & Strong, Howland, ITIC I, NRF I, NYCBar II, SEMI, Sen. Durbin/Rep. McDermott, TIAA–CREF, and WGC II.

suggested further requirements in addition to, or instead of, being intentionally added before a conflict mineral should be considered "necessary to the functionality" of a product. Many of these commentators indicated that a conflict mineral must be intentionally added and/or necessary either for the product's use, purpose, or marketability, financial success, or some combination thereof.[186] A few commentators asserted that a conflict mineral must be intentionally added and essential to the product's function.[187] One commentator stated that a conflict mineral must be intentionally added and have a concentration in the product that exceeds 1,000 ppm per homogeneous material.[188]

Only a few commentators proposed guidance as to when a conflict mineral would be considered "intentionally added" to a product, and they differed on when a conflict mineral should be considered "intentionally added." One commentator stated that a conflict mineral should not be considered intentionally added if it was unilaterally included in a sub-component acquired by the issuer from a sub-contractor.[189] Two of the co-sponsors of the Conflict Minerals Statutory Provision, however, took the opposite position and stated that a conflict mineral should be considered intentionally added if it is intentionally added in sub-components that an issuer contracts to manufacture through third parties or subsidiaries.[190] Several commentators agreed that a conflict mineral occurring naturally in a product should not be considered intentionally added to that product.[191]

Instead of being intentionally added to a product, some commentators provided other bases for concluding that a conflict mineral is "necessary to the functionality" of a product. Some commentators indicated that a conflict mineral should be considered "necessary to the functionality" of a product if that conflict mineral is necessary for the product's basic function.[192] Other commentators stated

that the basic function test would be unworkable because there is no meaningful distinction between a product's basic and auxiliary functions.[193] Some commentators stated that a conflict mineral should be considered "necessary to the functionality" of a product if that conflict mineral is required either for the financial success or marketability of the product.[194] One commentator noted that "necessary to the functionality" should be defined broadly enough that it encompasses uses necessary to the product's economic utility,[195] while others disagreed due to the subjective nature of what provides economic utility to a product.[196] In this regard, one commentator asserted that a conflict mineral should be considered "necessary to the functionality" of a product if the issuer "uses" conflict minerals in any manner in a product, regardless of how those conflict minerals relate to the product's function, because any other test would be too subjective.[197]

ii. "Necessary to the Production"

Many commentators agreed that a conflict mineral should be considered "necessary to the production" of a product if it is intentionally added to the production process, and should not be considered "necessary to the production" of a product if it is unintentionally added to a product or naturally occurring in a product.[198] Some commentators agreed with the proposal to consider such conflict minerals "necessary to the production" of a product even if the minerals are washed away or consumed in the production process and do not end up in the product, such as with a catalyst.[199] As one of these commentators suggested as an example, a "catalyst used to make a substance or a die containing [conflict mineral] metals used to make a part" should be considered "necessary to the production" of the product using that part because the "part is made with

direct involvements of the [conflict mineral] metal and then the part/material is used in the product," even if the conflict mineral does not end up in the product.[200] Other commentators, however, did not believe that conflict minerals used in the production of a product should be considered necessary to that production process if they are washed away or consumed in the process.[201] As one of these commentators pointed out, it would be "impossible for a retailer to know whether his supplier's supplier's supplier used and washed away a conflict mineral" because "there is no meaningful measurement capability or audit trail, especially as a product moves through dozens of suppliers in a supply chain."[202]

A number of commentators addressed whether a conflict mineral necessary to the production of the tools, machines, or similar equipment that are used to produce an issuer's product should be considered "necessary to the production" of the issuer's product.[203] The large majority of these commentators, including those from industry associations,[204] a multi-stakeholder group representing both human rights organizations and industry,[205] and institutional investors,[206] agreed with the proposed rules that such tools, machines, and other production equipment should not be considered necessary to the production of the issuer's products.[207] A small number of commentators disagreed and stated that such tools, machines, or similar equipment should be considered necessary to the production of an issuer's product.[208] One of these commentators specified

---

[186] See, e.g., letters from AAEI, Bario-Neal, Brilliant Earth, Earthworks, Enough Project I, Hacker Jewelers, Hoover & Strong, MSG I, Peace, and SIF I, and TIAA–CREF.

[187] See, e.g., letters from Howland, NAM I, and NRF I.

[188] See letter from TriQuint I.

[189] See letter from SEMI.

[190] See letter from Sen. Durbin/Rep. McDermott.

[191] See letters from ITIC I, PCP, and Sen. Durbin/Rep. McDermott.

[192] See letters from AAFA, NYCBar I, and WGC II. See also letter from NYCBar II (stating that a "component in a product necessary to its functionality if it is needed for either its basic function or another commercially valuable function

of that product," and stating that it does not "believe that 'basic function' in this regard needs to be defined since it will differ for each product").

[193] See letters from NEI, SEMI, and TIC.

[194] See, e.g., letters from Enough Project I, MSG I, Peace, and TIAA–CREF.

[195] See letter from CRS I (suggesting "that 'necessary to the functionality or production of a product' be defined broadly enough that it encompasses uses necessary to the economic utility and/or marketability of that product").

[196] See, e.g., letters from NRF I and SEMI.

[197] See letter from Kemet.

[198] See, e.g., letters from ITIC I, Global Witness I, Japanese Trade Associations, NYCBar I, PCP, SEMI, Sen. Durbin/Rep. McDermott, and TIC.

[199] See, e.g., letters from Howland, MSG I, Niotan I, PCP, SEMI, and TriQuint I.

[200] See letter from Howland.

[201] See, e.g., letters from Industry Group Coalition I, IPC II, NAM I, Griffin Teggeman (Dec. 16, 2010) ("Teggeman"), and WGC II.

[202] See letter from Teggeman.

[203] See, e.g., letters from AAFA, Industry Group Coalition I, IPC I, ITIC I, Japanese Trade Associations, NAM I, NEI, Niotan I, Refractory Metals Association (Feb. 28, 2011) ("RMA"), SEMI, SIF I, TIAA–CREF, TIC, and TriQuint I.

[204] See, e.g., letters from AAFA, Industry Group Coalition I, IPC I, ITIC I, Japanese Trade Associations, NAM I, RMA, SEMI, and TIC.

[205] See letter from MSG I (stating that "when conflict minerals are present in tooling or other production machinery, they should not be considered to be necessary to production of the product"). The letter from MSG was signed by a number of human rights groups, including Enough Project, Free the Slaves, and Friends of the Congo, among others.

[206] See, e.g., letters from NEI, SIF I, and TIAA–CREF.

[207] See, e.g., letters from AAFA, Industry Group Coalition I, IPC I, ITIC I, Japanese Trade Associations, NAM I, NEI, RMA, SEMI, SIF I, TIAA–CREF, and TIC.

[208] See letters from Niotan I and TriQuint I.

that tools, machines, or similar equipment purchased going forward should be considered necessary to the production of the issuer's product, although an issuer's existing production equipment should not be deemed necessary to production.[209] Another commentator stated that production equipment should not be considered necessary to the production of an issuer's products unless the issuer intentionally and explicitly required the producer of the tools, machines, or other production equipment to include conflict minerals.[210]

In this regard, one commentator stated that the final rule should not consider any indirect equipment, such as computers or power lines, as necessary to production.[211] Another commentator indicated that conflict minerals used in products that are "not intended to be sold into commerce," such as those utilized solely for research and development purposes, components provided at cost on a business-to-business basis, or products or components used only for engineering or testing purposes, should not be considered necessary to the production of the product that is ultimately placed in the stream of commerce.[212]

iii. *De Minimis* Threshold

We received mixed comments regarding whether the final rule should have a *de minimis* threshold exception, with some commentators opposed to a *de minimis* exception,[213] and other commentators supporting it.[214] Some commentators provided a legal basis for including a *de minimis* exception despite the lack of a *de minimis* exception in the Conflict Minerals Statutory Provision.[215] Generally, these commentators asserted that, as long as legislation does not forbid establishing a *de minimis* threshold, an agency's regulations may allow for one. Also, one commentator noted that we have "inherent authority to employ *de minimis* exceptions to avoid

unreasonable and absurd results in crafting [the] final rule," which is "inherent and clearly established by precedent."[216]

Some commentators provided recommendations on possible *de minimis* thresholds. Two commentators suggested that there should be a *de minimis* exception if the cost of the conflict minerals in an issuer's products make up less than 1% of the issuer's consolidated total production costs.[217] Other commentators recommended a *de minimis* exception for trace, nominal, or insignificant amounts of conflict minerals in an issuer's products.[218] One commentator suggested a *de minimis* exception when the end product derived from conflict minerals reflects less than a certain percentage of the value of the product, such as if the value was 5% or less of the total manufacturing costs.[219] Another commentator recommended a *de minimis* exception relating to the inability of an issuer to determine the origin of its minerals, such as allowing that issuer's product to be considered "DRC conflict free" where the issuer is unable to determine the origin of only 5% of the product's minerals.[220] One commentator noted that the final rule should permit a *de minimis* exception, but indicated that the value used for the *de minimis* exception should be based on how the phrase "necessary to the functionality or production" of a product is to be defined in the final rule.[221] Another commentator recommended that the final rule permit a *de minimis* exception for products containing less than 0.1% by weight of a conflict mineral.[222] One commentator provided three possible *de minimis* scenarios in which an issuer would be excepted from reporting, specifically: If an issuer's conflict minerals comprised less than 0.1% of a component or product, if an issuer's global usage of conflict minerals comprised less than 0.01% of its materials, or if an issuer comprised the bottom 20% of its industry's conflict minerals use.[223]

c. Final Rule

After considering the comments, we are adopting a final rule that, like the proposed rules, does not define when a conflict mineral is "necessary to the functionality" of a product or when it is "necessary to the production" of a product.[224] However, as we did in the Proposing Release, we are providing guidance regarding the interpretation of these phrases. The guidance is modified to a degree from the guidance in the Proposing Release based on comments we received. Whether a conflict mineral is deemed "necessary to the functionality" of a product or "necessary to the production" of product depends on the issuer's particular facts and circumstances, but there are certain factors we believe issuers should consider in making their determinations.

As described below, in determining whether its conflict minerals are "necessary to the functionality" of a product, an issuer should consider: (a) Whether a conflict mineral is contained in and intentionally added to the product or any component of the product and is not a naturally-occurring by-product; (b) whether a conflict mineral is necessary to the product's generally expected function, use, or purpose; or (c) if a conflict mineral is incorporated for purposes of ornamentation, decoration or embellishment, whether the primary purpose of the product is ornamentation or decoration. Based on the applicable facts and circumstances, any of these factors, either individually or in the aggregate, may be determinative as to whether conflict minerals are "necessary to the functionality" of a given product. In determining whether its conflict minerals are "necessary to the production" of a product, an issuer should consider whether a conflict mineral is contained in the product and intentionally added in the product's production process, including the production process of any component of the product; and whether the conflict mineral is necessary to produce the product. We describe changes to our guidance regarding "necessary to the functionality" and "necessary to the production" below.

---

[209] *See* letter from TriQuint I.

[210] *See* letter from SEMI.

[211] *See* letter from Howland.

[212] *See* letter from ITIC I. *See also* letter from TechAmerica (Nov. 1, 2011) ("Industry Group Coalition II") (suggesting that the final rule should exclude "research and development equipment made available on a business-to-business basis from the scope of the rule").

[213] *See, e.g.,* letters from Calvert, Earthworks, Episcopal Conference of Catholic Bishops of the DRC (Nov. 8, 2011) ("CENCO II"), Global Witness I, Howland, Matheson II, NEI, NYCBar I, NYCBar II, Rep. Berman *et al.,* SIF I, State II, and Trott.

[214] *See, e.g.,* letters from AAFA, AdvaMed I, AngloGold, Chamber I, Davis Polk, IPC I, IPC II, IPMI I, NAM I, NRF I, PCP, Rep. Bachus *et al.,* Roundtable, SEMI, Teggeman, TIC, and WGC II.

[215] *See* letters from Materion, NAM I, and NRF I.

[216] *See* letter from Materion.

[217] *See* letters from AngloGold and WGC II.

[218] *See* letters from Davis Polk, NRF I, and Roundtable.

[219] *See* letter from TIC.

[220] *See* letter from IPMI I.

[221] *See* letter from SEMI (stating that, if the phrase was limited to materials explicitly or intentionally added to a product or caused to be added to a product, the *de minimis* threshold should be one gram per year of necessary minerals, but if the final rule included a "more conservative" meaning of the phrase, a higher *de minimis* should be used, such as 0.1% of the weight of any particular component acquired as a whole by the issuer).

[222] *See* letter from IPC I.

[223] *See* letter from NAM I.

[224] As a threshold matter, we believe that the Conflict Minerals Statutory Provision requires separate consideration as to whether a conflict mineral is "necessary to the production" of a product from whether a conflict mineral is "necessary to the functionality" of the product, because the Conflict Minerals Statutory Provision includes both phrases. *See infra* Part II.B.4.c.iii. *See also* Exchange Act Sections 13(p)(1)(A) and 13(p)(2).

i. Contained in the Product

After considering the comments and reviewing the Conflict Minerals Statutory Provision, as described below, we are persuaded that only a conflict mineral that is contained in the product should be considered "necessary to the functionality or production" of that product. We believe this approach is appropriate in light of the Conflict Minerals Statutory Provision's statutory construction. As discussed above, the Conflict Minerals Statutory Provision requires issuers with conflict minerals "necessary to the functionality or production" of a product manufactured or contracted by the issuer to be manufactured that originated in the Covered Countries to provide a Conflict Minerals Report.[225] The provision includes two distinct subsections, Exchange Act Section 13(p)(1)(A)(i) and Exchange Act Section 13(p)(1)(A)(ii), regarding the information required in that Conflict Minerals Report. Generally, Exchange Act Section 13(p)(1)(A)(i) deals with an issuer's description of its due diligence measures on the source and chain of custody of its conflict minerals, including the independent private sector audit, and Exchange Act Section 13(p)(1)(A)(ii) requires the issuer's description of its products that have not been found to be "DRC conflict free." The Conflict Minerals Statutory Provision defines "DRC conflict free" to mean "products that do not *contain* minerals that directly or indirectly finance or benefit armed groups" in the Covered Countries.[226] The use of the term "contain" indicates that the disclosures required under Exchange Act Section 13(p)(1)(A)(ii) are limited to issuers with conflict minerals actually contained in their products.[227] We believe it is appropriate to include this limitation in interpreting when a conflict mineral is necessary to the functionality or production of a product.

We note that Exchange Act Section 13(p)(1)(A)(i) does not include a similar limitation that the product must "contain" the necessary conflict minerals. As a result, it is possible to interpret the Conflict Minerals Statutory Provision such that the term "contain" in Exchange Act Section 13(p)(1)(A)(ii)

does not mean that a conflict mineral must be included in the product for it to be "necessary to the functionality or production" of the product. However, we do not believe that such an interpretation would be the proper construction. Following that approach, the provision could be interpreted to require issuers with conflict minerals that are "necessary to the functionality or production" of a product but are not included in that product to submit an audited Conflict Minerals Report describing their due diligence, as required under Exchange Act Section 13(p)(1)(A)(i), but not describing any products produced using those minerals that directly or indirectly financed or benefited armed groups in the Covered Countries as having not been found to be "DRC conflict free" because the conflict minerals are not "contained" in the product.

We do not believe, however, that such an interpretation is the better construction. It would mean that the Conflict Minerals Statutory Provision envisions a situation in which an issuer with a conflict mineral that is "necessary to the functionality or production" of its product originated in the Covered Countries and benefited armed groups in those countries would be required to submit a Conflict Minerals Report describing its due diligence on the source and chain of custody of that mineral but would not have to describe its products as having not been found to be "DRC conflict free." We believe the better interpretation that gives meaning to the term "contain" is that only conflict minerals contained in the product would be considered "necessary" to that product, so only those minerals trigger the requirement to conduct a reasonable country of origin inquiry.

Additionally, we do not believe the final rule should include conflict minerals "necessary to the functionality or production" of a product that are not contained in the product because we appreciate commentators' concerns that the application of the provision to minerals that do not end up in the product is especially challenging. As noted above, commentators were mixed in their views regarding how the rule should treat catalysts and other conflict minerals necessary to the production of a product that do not appear in the product. However, we note that there are products where a catalyst is used and is not completely washed away.[228]

In those situations, the product contains a necessary conflict mineral that is necessary to its production and is subject to the final rule.

ii. Intentionally Added

Although commentators did not agree on an exact definition, most commentators from across the spectrum agreed that a conflict mineral should be considered "necessary to the functionality or production" of a product for the purposes of the Conflict Minerals Statutory Provision if, at a minimum, it was intentionally added to the product or production process.[229] While we are not defining the phrase, we agree that being intentionally added, rather than being a naturally-occurring by-product, is a significant factor in determining whether a conflict mineral is "necessary to the functionality or production" of a product. This is true regardless of who intentionally added the conflict mineral to the product so long as it is contained in the product.

In this regard, we note that one commentator asserted that a conflict mineral should not be considered "intentionally added" by an issuer "if it is present in a sub-component acquired by the issuer based on a unilateral decision of the supplier or a sub-contractor, or a party further upstream in the supply chain." [230] We disagree. As two of the co-sponsors of the provision asserted, determining whether a conflict mineral is considered "necessary" to a product should not depend on whether the conflict mineral is added directly to the product by the issuer or whether it is added to a component of the product that the issuer receives from a third party. Instead, the issuer should "report on the totality of the product and work with suppliers to comply with the requirements." [231] Therefore, in determining whether a conflict mineral is "necessary" to a product, an issuer must consider any conflict mineral contained in its product, even if that conflict mineral is only in the product because it was included as part of a component of the product that was

---

[225] *See* Exchange Act Section 13(p)(1)(A).

[226] *Id.* (emphasis added). *See also* Section 1502(e)(4) of the Act (defining the phrase in the same manner as Exchange Act Section 13(p)(1)(A)(ii), except that Section 1502(e)(4) of the Act refers to "conflict minerals" instead of just "minerals").

[227] We note that the Second Edition of the Random House Webster's Dictionary defines "contain" to include the "to hold within a volume or area." *Random House Webster's Dictionary*, 142 (2d ed. 1996).

[228] *See* letters from Industry Group Coalition I and NAM I (referring specifically to situations in which catalysts are used to chemically react with and produce products, and trace levels of the

catalyst are found in the reacted manufactured product, but the catalysts do not contribute to the performance of the product).

[229] *See, e.g.,* letters from AAEI, Bario-Neal, Brilliant Earth, Earthworks, Enough Project I, Global Witness I, Hacker Jewelers, Hoover & Strong, Howland, ITIC I, Japanese Trade Associations, MSG I, Niotan I, NRF I, Peace, PCP, SEMI, Sen. Durbin/Rep. McDermott, SIF I, TIAA–CREF, TriQuint I, and WGC II.

[230] *See* letter from SEMI.

[231] *See* letter from Sen. Durbin/Rep. McDermott (indicating that a car manufacturer must report on any conflict minerals in the car's radio, even if there are no conflict minerals elsewhere in the car).

manufactured originally by a third party.

### iii. ''Necessary to the Functionality''

In addition to being contained in the product and intentionally added, another factor in determining whether its conflict minerals are ''necessary to the functionality'' of a product is whether the conflict mineral is necessary to the product's generally expected function, use, or purpose. Some commentators suggested that we limit an issuer's consideration of whether its conflict minerals are ''necessary to the functionality'' of a product to the ''basic function'' or ''economic utility'' tests. However, we believe limiting a determination to those tests would not provide greater certainty or clarity to issuers required to make such determinations. As one commentator noted, ''the distinction between a 'basic function' and an ancillary function is murky and undefinable.'' [232] Similarly, as another commentator noted, ''[e]conomic utility is very subjective and it can be the unforeseen consequence of a derivative buried deep within a sub-component.'' [233] Therefore, we believe these tests are so subjective as to be mostly unworkable. We believe it is more appropriate instead to focus on a product's generally expected function, use, or purpose, recognizing that there are situations in which a product has multiple generally expected functions, uses, and purposes. In such situations, a conflict mineral need only be necessary for one such function, use, or purpose to be necessary to the product as a whole. For example, a smart phone has multiple generally expected functions, uses, and purposes, such as making and receiving phone calls, accessing the internet, and listening to stored music. If a conflict mineral is necessary to the function, use, or purpose of any one of these, it is necessary to the functionality of the phone.

Another factor in determining whether its conflict minerals are ''necessary to the functionality'' of a product is whether the conflict mineral is incorporated for purposes of ornamentation, decoration, or embellishment. If a primary purpose of the product is mainly ornamentation or decoration, it is more likely that a conflict mineral added for purposes of ornamentation, decoration or embellishment is ''necessary to the functionality'' of the product. For example, the gold in a gold pendant

hanging on a necklace is necessary to the functionality of the pendant because it is incorporated for purposes of ornamentation, decoration, or embellishment, and a primary purpose of the pendant is ornamentation or decoration. Conversely, if a conflict mineral is incorporated into a product for purposes of ornamentation, decoration, or embellishment, and the primary purpose of the product is not ornamentation or decoration, it is less likely to be ''necessary to the functionality'' of the product. As one commentator noted, ''if, for example, gold is used in an article as an ancillary feature [of a product] strictly for purposes of ornamentation, then it is unrelated to the functionality of the product and would be exempt from the reporting requirements of the statute.'' [234] We would agree that these facts would tend to indicate that the conflict mineral is not necessary to the functionality of the product, provided that the primary purpose of the product is not for ornamentation or decoration. Even so, this would only be one factor among all the facts and circumstances in the issuer's overall determination as to whether the conflict mineral is necessary to the functionality of the product.

### iv. ''Necessary to the Production''

As with determining whether a conflict mineral is ''necessary to the functionality'' of a product, determining whether a conflict mineral is ''necessary to the production'' of a product involves consideration of an issuer's particular facts and circumstances. As noted above, the conflict mineral must be contained in the product to trigger the determination of whether the conflict mineral is ''necessary to the production'' of the product. Consistent with this approach, we do not consider a conflict mineral used as a catalyst or in another manner in the production process of a product to be ''necessary to the production'' of the product if that conflict mineral is not contained in the product, even though, based on the facts and circumstances, the conflict mineral would have otherwise been considered ''necessary to the production'' of the product had the conflict mineral been included in the product. As one commentator noted for gold, and we believe this is applicable for the other conflict minerals as well, the ''use of gold as a catalyst in producing products which do not in themselves contain gold will broaden the reach of the regulations beyond what Section 1502

envisaged.'' [235] We do, however, consider a conflict mineral used as a catalyst or in another manner in the production process of a product to be ''necessary to the production'' of the product if that conflict mineral otherwise is necessary to the production of the product and is contained in any amount, including trace amounts, in the product. [236]

As we indicated in the Proposing Release, we continue to believe that a conflict mineral in a physical tool or machine used to produce a product does not fall under the ''necessary to the production'' language in the Conflict Minerals Statutory Provision. [237] One commentator asserted that the language in the Conflict Minerals Statutory Provision is intended to cover conflict minerals in tools or machines that are necessary for the production of a product and, ''[i]n the absence of such specificity, the rule will fail to ensure reporting on the use of such tools or catalysts, thus leaving out a significant market for the minerals and undermining the purpose of the law.'' [238] We do not believe that a conflict mineral in a tool or machine is captured by the Conflict Minerals Statutory Provision because, although the conflict mineral may be included in the tool or machine, it is the tool or machine and not the conflict mineral that is necessary to the production. [239] Additionally, the tool or machine is

---

[235] See WGC II.

[236] We note that this interpretation continues to bring catalysts within the scope of the reporting requirements when they are necessary to the production of the product. We understand that not all catalysts are washed away in the production process, and the remaining minerals may not be ''necessary to the functionality'' of the product. *See* letters from Industry Group Coalition I and NAM I (referring specifically to situations in which catalysts are used to chemically react with and produce products, and trace levels of the catalyst are found in the reacted manufactured product, but the catalysts do not contribute to the performance of the product).

[237] However, the issuer that manufactures or contracts to manufacture the tool or machine would likely come within the ''necessary to the production'' or ''necessary to functionality'' language.

[238] *See* letter from Niotan I.

[239] As described above, we consider a conflict mineral that is ''necessary to the functionality'' of a component product also to be ''necessary to the functionality'' of any subsequent product that incorporates the component product. We recognize that this could be seen as a two-step analysis, and thus it could be asserted that the conflict mineral in the component product is not necessary to the functionality of the subsequent product. We disagree with this view, however, because a component added to a subsequent product becomes part of that subsequent product, which removes any segregation from the component and the subsequent product and makes the conflict mineral directly necessary to the functionality of the subsequent product.

---

[232] *See* letter from TIC.

[233] *See* letter from SEMI.

[234] *See* letter from NRF I.

unlikely to be contained in the final product.

Like tools and machines, indirect equipment used to produce a product, such as computers and power lines, does not bring the product that is produced with the equipment into the "necessary to the production" language.[240] We do not consider a conflict mineral necessary to the functionality or production of such indirect equipment to be necessary to the production of the product because that conflict mineral is only tangentially necessary for production of the product. Similarly, we do not require issuers to report on the conflict minerals in materials, prototypes, and other demonstration devices containing or produced using conflict minerals that are necessary to the functionality or production of those items because we do not consider those items to be products. Once an issuer enters those items in the stream of commerce by offering them to third parties for consideration, the issuer will be required to report on any conflict minerals necessary to the functionality or production of those products.

v. De Minimis Threshold

Finally, after considering the comments, the final rule does not include a *de minimis* exception. The statute itself does not contain a *de minimis* exception, and for several reasons we believe it would be contrary to the Conflict Minerals Statutory Provision and Congressional purpose to include one in the final rule. First, we note that the Conflict Minerals Statutory Provision does include an express limiting factor—namely that a conflict mineral must be "necessary to the functionality or production" of an issuer's product to trigger any disclosure regarding those conflict minerals.[241] As discussed above, this standard focuses on whether the conflict mineral is "necessary" to a product's functionality or production; it does not focus on the amount of a conflict mineral contained in the product. We believe that Congress understood, in selecting the standard it did, that a conflict mineral used in even a very small amount could be "necessary" to the product's functionality or production. If it had intended that the provision be limited further, so as not to apply to a *de minimis* use of conflict minerals, we

think Congress would have done so explicitly. In this regard, we note that in Section 1504 of the Act, which adds Exchange Act Section 13(q) as part of the same title (Title XV) of the Act ("Miscellaneous Provisions"), Congress did explicitly include a *de minimis* threshold for the requirement to disclose certain payments by resource extraction issuers.[242]

In addition, we believe that the purpose of the Conflict Minerals Statutory Provision would not be properly implemented if we included a *de minimis* exception in our final rule. As the State Department noted in its comment letter, "[i]n light of the nature" of the conflict minerals, they are often used in products "in very limited quantities," so including a *de minimis* threshold "could have a significant impact on" the final rule.[243] Consistent with the views of the State Department, we believe Congress intended the disclosure provisions to apply to the use of even small amounts of conflict minerals originating in the Covered Countries.

We are cognizant of the fact that, by not including a *de minimis* exception, even minute or trace amounts of a conflict mineral could trigger disclosure obligations.[244] However, a *de minimis* amount of conflict minerals triggers disclosure obligations only if those conflict minerals are necessary for the functionality or production of a product, and we understand that there are instances in which only a minute amount of conflict minerals is necessary for the functionality or production of a product. Therefore, consistent with the proposal, our final rule applies to issuers for which any conflict minerals are necessary to the functionality or production of a product manufactured or contracted by the issuer to be manufactured regardless of the amount of the conflict mineral.

We recognize that not including a *de minimis* exception in the final rule will be more costly for issuers than if we included one. As described above, however, we are of the view that Congress intended not to provide for a *de minimis* exception, and including one in the final rule would therefore

thwart, rather than advance, the provision's purpose. Further, we believe focusing on whether the mineral was intentionally added addresses some of the concerns regarding *de minimis* amounts of minerals. For example, according to one commentator, a number of metal alloys, including the high volume materials of cold rolled steel, hot rolled steel, and stainless steel, contain tin only as a contaminant, such that it is not part of the specification of these alloys.[245] Therefore, the tin in these alloys is not intentionally added, and we do not consider the tin "necessary to the functionality or production" of any product containing those alloys.

*C. Location, Status, and Timing of Conflict Minerals Information*

Once it is determined that conflict minerals are necessary to the functionality or production of a product manufactured or contracted by the issuer to be manufactured, the issuer will have to submit conflict minerals information in accordance with the final rule.

1. Location of Conflict Minerals Information

a. Proposed Rules

Our proposed rules would have required issuers to provide their disclosure about conflict minerals in their annual reports on Form 10–K for a domestic issuer,[246] Form 20–F for a foreign private issuer,[247] and Form 40–F for a Canadian issuer that files under the Multijurisdictional Disclosure System,[248] with their Conflict Minerals Reports as an exhibit to their annual report.[249] Section 1502 requires issuers to disclose information about their conflict minerals annually, but does not otherwise specify where this disclosure must be located, either in terms of which form or in terms of where within a particular form. Our proposed rules would have required this disclosure in the existing Form 10–K, Form 20–F, or Form 40–F annual report because issuers were already required to file these reports so we believed this approach would be less burdensome than requiring a separate annual report.

---

[240] However, the issuer that manufactures or contracts to manufacture the indirect equipment would likely come within the definition of either "necessary to the functionality" or "necessary to the production" for the indirect equipment.

[241] *See* Exchange Act Sections 13(p)(1)(A) and 13(p)(2)(B).

[242] *See* Section 1504 of the Act and Exchange Act Section 13(q). Exchange Act Section 13(q)(1)(C) states that "the term 'payment,' means a payment that is made to further the commercial development of oil, natural gas, or minerals; and not *de minimis.*"

[243] *See* State II ("In light of the nature in which the covered minerals are often used in products, i.e. often in very limited quantities, such a change could have a significant impact on the proposed regulations. A *de minimis* threshold should not be considered under current circumstances.").

[244] *See* letters from Chamber I and NRF I.

[245] *See* letter from Claigan Environmental Inc. (Dec. 16, 2011) ("Claigan III").

[246] 17 CFR 249.310.

[247] 17 CFR 249.220f.

[248] 17 CFR 249.240f.

[249] In the Proposing Release, we indicated that, by requiring an issuer to provide its Conflict Minerals Report as an exhibit to its annual report, the proposed rules would enable anyone accessing the Commission's Electronic Data Gathering, Analysis, and Retrieval system (the "EDGAR" system) to determine quickly whether an issuer furnished a Conflict Minerals Report with its annual report.

ADD-32

To facilitate locating the conflict minerals disclosure within the annual report without over-burdening investors with extensive information about conflict minerals in the body of the report, our proposed rules would have required issuers to include brief conflict minerals disclosure under a separate heading entitled "Conflict Minerals Disclosure" and more extensive information in a separate exhibit to the annual report.

We proposed to require that an issuer disclose in its annual report under a separate heading, entitled "Conflict Minerals Disclosure," its determination as to whether any of its conflict minerals originated in the Covered Countries, based on its reasonable country of origin inquiry, and, for its conflict minerals that did not originate in the Covered Countries, a brief description of the reasonable country of origin inquiry it conducted in making such a determination. The proposed rules would not have required an issuer that determined that its conflict minerals did not originate in the Covered Countries, based on its reasonable country of origin inquiry, to provide any further disclosures. We also proposed that an issuer include brief additional disclosure in the body of the annual report if the issuer's conflict minerals originated in the Covered Countries or if the issuer could not determine that its conflict minerals did not originate in the Covered Countries, based on its reasonable country of origin inquiry. As proposed, these rules would have required an issuer to disclose that its conflict minerals originated in the Covered Countries, or that it was unable to conclude that its conflict minerals did not originate in the Covered Countries, that its Conflict Minerals Report had been furnished as an exhibit to the annual report, that the Conflict Minerals Report, including the certified independent private sector audit, was publicly available on the issuer's Internet Web site, and the issuer's Internet address on which the Conflict Minerals Report and audit report were located.

The Conflict Minerals Statutory Provision requires that each issuer make its Conflict Minerals Report available to the public on the issuer's Internet Web site.[250] Consistent with the statute, we proposed rules to require an issuer to make such a report, including the certified audit report, available to the

public by posting the text of the report on its Internet Web site. As proposed, the rules would require that the text of the Conflict Minerals Report remain on the issuer's Web site at least until it filed its subsequent annual report. Although the proposed rules would have required an issuer that furnished a Conflict Minerals Report to provide some disclosures in the body of its annual report regarding that report, we would not have required that an issuer post this disclosure on its Web site. We believed this was appropriate because any information disclosed in the body of the annual report would also be included in the Conflict Minerals Report, which would have been required to be posted on the issuer's Internet Web site.

### b. Comments on the Proposed Rules

We received mixed comments on the proposal. While many commentators believed that the final rule should not require an issuer's conflict minerals information to be provided in that issuer's annual report,[251] other commentators believed that an issuer's conflict minerals information should be provided in that issuer's annual report, as proposed.[252] Commentators that did not want the conflict minerals information included in the annual report generally agreed that the information should be provided either in a newly created report or form, or in a current report on Form 8–K[253] or Form 6–K,[254] instead.[255] A small number of commentators stated that an issuer's conflict minerals information should be provided solely on its Internet Web site.[256] Some commentators suggested that the final rule should allow issuers to submit their conflict minerals information on a separate form or in a current report, noting that the Conflict Minerals Statutory Provision does not require explicitly that the information be submitted in a Form 10–K, Form 20–F, or Form 40–F annual

report.[257] As one commentator noted, this requirement contrasts with the one in Section 1503 of the Act,[258] which states that mine safety disclosure be provided in "each periodic report filed with the Commission under the securities laws." [259] Therefore, these commentators reasoned that if Congress intended the Conflict Minerals Statutory Provision to require an issuer to provide the conflict minerals information in the annual report on Forms 10–K, 20–F, or 40–F, Congress would have used language similar to that in Section 1503.

Certain commentators asserted that the subject matter underlying the conflict minerals information is both very specialized and substantively different from the financial and business information in the annual report on Forms 10–K, 20–F, or 40–F.[260] Some of these commentators stated that the existing Exchange Act reporting system is designed to provide investors with material information from a financial perspective, whereas the Conflict Minerals Statutory Provision uses the securities disclosure laws to provide conflict mineral supply chain information for the purpose of stopping the humanitarian crisis in the Covered Countries.[261] Commentators suggested that the processes with which to obtain and provide conflict minerals information should be different from those processes developed for current year-end reporting.[262]

Other commentators argued that the disclosures required by the final rule should be treated no differently than other disclosures required by the Exchange Act.[263] In this regard, one such commentator agreed that the final rule should require that an issuer's conflict minerals information be included in the issuer's annual report because such a requirement is inherent in the policy goals underlying the Conflict Minerals Statutory Provision and would foster consistency in the form, location, and timing of the information.[264] Similarly, another such commentator stated that not requiring

---

[250] *See* Exchange Act Section 13(p)(1)(E), which is entitled "Information Available to the Public" and states that "[e]ach person described under paragraph (2) shall make available to the public on the Internet Web site of such person the information disclosed by such person under subparagraph (A)."

[251] *See, e.g.,* letters from AdvaMed I, AngloGold, Barrick Gold, Cleary Gottlieb, Corporate Secretaries I, CTIA, Davis Polk, Ford Motor Company (Mar. 2, 2011) ("Ford"), Industry Group Coalition I, ITIC I, Japanese Trade Associations, JVC *et al.* II, NAM I, NAM III, NCTA, NMA II, NY State Bar, Roundtable, SEMI, Taiwan Semi, and Tiffany.

[252] *See, e.g.,* letters from Earthworks, Enough Project I, Global Witness I, Methodist Pension, Peace, and TIAA–CREF.

[253] 17 CFR 249.308.

[254] 17 CFR 249.306.

[255] *See, e.g.,* letters from AdvaMed I, AngloGold, Barrick Gold, Cleary Gottlieb, Davis Polk, Ford, ITIC I, JVC *et al.* II, NAM I, NMA II, NY State Bar, and Taiwan Semi.

[256] *See* letters from Corporate Secretaries I, CTIA, NCTA, and Tiffany.

[257] *See, e.g.,* letters from AngloGold, ITIC I, JVC *et al.* II, and NAM I. Exchange Act Section 13(p)(1)(A) requires only that issuers "disclose annually" their conflict minerals information.

[258] Section 1503 of the Act.

[259] *See* letter from AngloGold.

[260] *See, e.g.,* letters from Barrick Gold, CEI I, Cleary Gottlieb, Davis Polk, Ford, ITIC I, JVC *et al.* II, NAM I, NMA II, NY State Bar, PCP, Taiwan Semi, and SEMI.

[261] *See, e.g.,* letters from CEI I, NY State Bar, and Taiwan Semi.

[262] *See* letters from Davis Polk and NAM I.

[263] *See* letters from CRS I, Global Witness I, Methodist Pension, Sen. Durbin/Rep. McDermott, and SIF I.

[264] *See* letter from Global Witness I.

conflict minerals information in the annual report on Forms 10–K, 20–F, or 40–F would inhibit the public's ability to monitor an issuer's use of conflict minerals and allow issuers to hide their conflict minerals information.[265] In this regard, a number of commentators believed that there is little or no difference in the purposes of the Conflict Minerals Statutory Provision and the rest of the Exchange Act, in that both require the disclosure of meaningful supply chain and reputational information about an issuer for the benefit of investors.[266] For example, the co-sponsors of the legislation stated explicitly that the purposes of the Conflict Minerals Statutory Provision and the rest of the Exchange Act are ''very much the same'' because they both '''assure a stream of current information about an issuer for the benefit of purchasers * * * and for the public.''' [267] As another example, a commentator asserted that ''conflict minerals disclosures are material to investors and will inform and improve an investor's ability to assess social (i.e., human rights) and reputational risks in an issuer's supply chain.'' [268]

Some commentators were concerned about providing conflict minerals information in the annual report on Forms 10–K, 20–F, or 40–F due to the timing of filing an annual report.[269] These commentators noted that the increased burden on issuers in collecting and reporting conflict minerals information could cause those issuers to be unable to file their annual reports in a timely manner. Some commentators offered an alternative scheme in which an issuer would be permitted to provide its conflict mineral information on either a new report or form, an amended annual report, or a current report on Form 8–K or Form 6–K within a certain number of days following the end of the issuer's fiscal year.[270] A few commentators [271] pointed out that the Commission permits delays in providing certain information on an annual report, such as with prospective incorporation by reference of information from an issuer's proxy statement under General

Instruction G.(3) of Form 10–K [272] and prospective incorporation by reference of separate financial statements of unconsolidated entities under Item 3–09 of Regulation S–X.[273] Commentators proposed a variety of time periods, including 120, 150, and 180 days after an issuer's fiscal year-end, in which an issuer could be required to provide its conflict minerals information as part of its annual report.[274] Similarly, as discussed in greater detail below, some commentators suggested that the final rule should consider a single start and end date for the reporting period for all companies, regardless of their particular fiscal year,[275] and one of these commentators recommended that this one year period coincide with the calendar year.[276]

Additionally, some commentators were concerned about the liability of the principal executive offers, principal financial officers, and auditors who must certify an annual report under Sections 302 [277] and 906 [278] of the Sarbanes-Oxley Act if the rule requires that an issuer provide its conflict minerals information in its filed annual report.[279] In this regard, one commentator stated that, if the final rule requires an issuer to provide conflict minerals information in its annual report, the Commission should amend rules 13a–14(a) and (b) [280] and 15d–14(a) and (b) [281] under the Exchange Act

to acknowledge that the various officer certifications required by those rules do not extend to any conflict minerals information provided either in or as an exhibit to the annual report.[282] Another commentator stated that, if we required conflict minerals disclosure in the existing annual reports, we should include ''a clear statement in the rules or the adopting release that the officer certifications required to be included as exhibits to the existing annual reports would not apply to the conflict minerals disclosure.'' [283] Also, some commentators were concerned about the negative effects that providing the information in the annual report on Forms 10–K, 20–F, or 40–F would have on form or other eligibility, incorporation by reference into Securities Act filings, and home country reporting in the case of foreign private issuers.[284]

Some commentators indicated that, regardless of where the information was provided, they wanted the conflict minerals information in a location that was easily available to the public,[285] or on the Web sites of both the issuer and the Commission.[286] In this regard, certain commentators recommended that the final rule require an issuer to post its Conflict Minerals Reports and/or its audit reports on its Internet Web site, as we proposed.[287] However, some of these commentators suggested that the final rule should require an issuer to keep that information on its Internet Web site longer than until the issuer filed its subsequent annual report.[288] Other commentators noted that the final rule should not require an issuer to post its audit report online [289] because, as one of the commentators noted,[290] such

---

[265] See letter from Peace.

[266] See, e.g., letters from CRS I, FRS, Global Witness I, Methodist Pension, Sen. Durbin/Rep. McDermott, Sen. Leahy et al., SIF I, and SIF II.

[267] See letter from Sen. Durbin/Rep. McDermott.

[268] See letter from SIF I.

[269] See, e.g., letters from AngloGold, Cleary Gottlieb, CTIA, Ford, ITIC I, NAM I, NY State Bar, Roundtable, and SEMI.

[270] See letters from AngloGold, Cleary Gottlieb, CTIA, IPC I, ITIC I, JVC et al. II, NAM I, NY State Bar, Roundtable, and SEMI.

[271] See letters from Cleary Gottlieb and NY State Bar.

[272] General Instruction G.(3) of Form 10–K [17 CFR 249.310].

[273] Item 3–09 of Regulation S–X [17 CFR 210.3–09].

[274] See letters from AngloGold, CTIA, ITIC I, NAM I, Roundtable, and SEMI.

[275] See letters from Advanced Micro Devices, Inc., Africa Faith and Justice Network, Boston Common Asset Management, LLC, Calvert Asset Management Co., Inc., Congo Global Action, Enough Project, Falling Whistles, Free the Slaves, Future 500, General Electric Company, Global Witness, Hewlett-Packard Company, Interfaith Center on Corporate Responsibility, Jantzi-Sustainalytics, Jesuit Conference, Jewish World Watch, Mercy Investment Services, Inc., Microsoft Corporation, Royal Philips Electronics, Trillium Asset Management, Unity Minerals, US SIF: The Forum for Sustainable and Responsible Investment (Aug. 22, 2011) (''MSG II'') and State II.

[276] See letter from MSG II (''We respectfully request that the SEC rule synchronize the timing for the information contained in the Conflict Minerals Reports from all issuers on a calendar year basis. The MSG recommends that all issuers begin exercising and reporting due diligence on the source and chain of custody for the subject minerals used in their products on a common calendar date.'').

[277] Public Law 107–204, 116 Stat. 745, Sec. 302 (2002).

[278] Public Law 107–204, 116 Stat. 745, Sec. 906 (2002).

[279] See, e.g., letters from ITIC I, NMA II, and Taiwan Semi.

[280] Rule 13a–14(a) [17 CFR 240.13a–14(a)] and Rule 13a–14(b) [17 CFR 240.13a–14(b)].

[281] Rule 15d–14(a) [17 CFR 240.15d–14(a)] and Rule 15d–14(b) [17 CFR 240.15d–14(b)].

[282] See letter from NY State Bar.

[283] See letter from Cleary Gottlieb.

[284] See, e.g., letters from Barrick Gold, Cleary Gottlieb, Corporate Secretaries I, Davis Polk, ITIC I, NMA II, NY State Bar, and WGC II. But see letter from Global Witness I (stating that conflict minerals information should be incorporated by reference into Securities Act filings).

[285] See, e.g., letters from Episcopal Conference of Catholic Bishops of the DRC (Apr. 5, 2011) (''CENCO I'') and Good Shepherd.

[286] See, e.g., letter from Catholic Charities.

[287] See letters from CRS I, Douglas Hileman Consulting I (Oct. 31, 2011) (''Hileman Consulting''), Howland, NEI, SEMI, SIF I, and TriQuint I.

[288] See letters from Hileman Consulting (suggesting ''more than the proposed one year''), NEI (suggesting ''issuers to post several years worth of reports on their Web sites''), SIF I (suggesting that an ''issuer should be required to keep posted its Conflict Minerals Report and audit reports on its Internet Web site for five years''), and TriQuint I (suggesting that an issuer's Conflict Minerals Reports should be posted on its Web site ''for 10 years after the issuer's products were last sold on the open market'').

[289] See letters from AngloGold and NMA II.

[290] See letter from AngloGold.

a requirement would increase costs without increasing benefits.

Finally, some commentators suggested that the final rule should address how an issuer must handle a situation in which it acquires or otherwise obtains control over a company that manufactures or contracts to manufacture products with conflict minerals necessary to the functionality or production of products that previously had not been obligated to provide conflict minerals information to us.[291] These commentators noted that the acquired company may not have any processes in place to determine the origin of conflict minerals in its products and, therefore, the acquiring issuer would most likely need a "reasonable amount of time"[292] to establish those processes before it could provide an accurate specialized disclosure report that included the acquired company's supply chain. Some commentators recommended that the issuer not be required to report on the products manufactured by the acquired company until the end of the first reporting period that begins no sooner than eight months after the effective date of the acquisition.[293] One commentator suggested that the issuer not be required to report on the products manufactured by the acquired company until the end of the first reporting period that begins no sooner than 18 months from the date of the acquisition.[294] Another commentator recommended that the issuer not be obligated to report with respect to the products manufactured by or for the acquired entity "until the first fiscal year beginning after the fiscal year in which the acquisition is consummated."[295]

c. Final Rule

After considering the comments, we are revising the proposed rules to require that an issuer provide its conflict minerals information in a new report on a new Exchange Act form. As

proposed, however, the final rule requires an issuer to provide its Conflict Minerals Report as an exhibit, and not in the body of the new report. In this regard, we continue to believe that providing the Conflict Minerals Report as an exhibit to the specialized disclosure report would enable anyone accessing the EDGAR system to determine quickly whether an issuer provided a Conflict Minerals Report with its specialized disclosure report.

We proposed requiring disclosure regarding conflict minerals in an issuer's annual report because we believed that this approach would be less burdensome than requiring that an issuer provide a separate report. Based on the comments we received, however, it appears that issuers will find it less burdensome to provide their conflict minerals information on a new report that is separate from the annual report and due later than the annual report. For example, one commentator explained that "between an issuer's fiscal year end and the date the issuer is required to file its audited annual financial statements, the issuer's accounting and financial reporting teams focus their resources on preparing the issuer's annual report," so "[r]equiring the conflict minerals disclosure to be furnished at the same time as the issuer's Exchange Act annual report would put further strain on these resources at a time when they are likely already to be operating near full capacity."[296] Another commentator noted that issuers are going to be required to utilize "significantly different processes to comply with the new reporting requirement that are outside the scope of processes developed for regular year-end reporting, and it may be a burden to complete the necessary inquiry and due diligence pertaining to conflict minerals on the same timetable as" an annual report.[297]

We considered commentators' arguments that it would be easier for investors to locate the information in Forms 10–K, 20–F, and 40–F. We believe, however, that new Form SD should provide ready access to the information. Indeed, it may be easier for investors to find the information when it is included in the new Form SD, rather than as one of potentially dozens of exhibits in a voluminous Form 10–K, Form 20–F, or Form 40–K.[298] Therefore,

the final rule requires an issuer with conflict minerals necessary to the functionality or production of a product it manufactures or contracts to be manufactured to provide us a specialized disclosure report on Form SD by May 31 of each year, reporting on the preceding calendar year. The specialized disclosure report is due later than when an annual report is due for calendar year end issuers so as not to interfere with such issuer's preparation of its Exchange Act annual report, as requested by a number of commentators.[299] Also, as discussed in greater detail below, the final rule requires each issuer to provide its conflict minerals information for each calendar year, rather than its fiscal year.

We agree with the comments we received that a reasonable amount of additional time to submit the conflict minerals information is appropriate where an issuer acquires or otherwise obtains control over a company that manufactures or contracts to manufacture products with conflict minerals necessary to the functionality or production of those products that previously had not been obligated to provide conflict minerals information to us. We have added an instruction to the final rule to reflect this delay. Therefore, the final rule allows an issuer to delay the initial reporting period on the products manufactured by the acquired company until the first calendar year beginning no sooner than eight months after the effective date of the acquisition. This option appears to be a reasonable approach based on some of the comments we received.[300] We note that a shorter period, such as requiring an issuer to report with respect to the products manufactured by or for the acquired entity during the first fiscal year beginning after the fiscal year in which the acquisition is consummated, may leave an issuer that acquires a company late in the year with an insufficient amount of time to establish

---

[291] *See, e.g.,* letters from ABA, Industry Group Coalition I, Industry Group Coalition II, NAM I, and Semiconductor.

[292] Letter from Semiconductor.

[293] *See* letters from Industry Group Coalition I (suggesting an eight month lead-in period because it is similar to the time that will elapse between the adoption of final rules implementing the Act and the commencement of the reporting period applicable to calendar-year filers, and that time period is necessary to allow sufficient time for the acquiring issuer to implement its conflict minerals reasonable inquiry and due diligence processes throughout the supply chain of the acquired firm), NAM I (same), and Semiconductor (same).

[294] *See* letter from Industry Group Coalition II. *See also* letters from Industry Group Coalition I, NAM I, and Semiconductor.

[295] *See* letter from ABA.

[296] Letter from AngloGold.

[297] Letter from NAM I.

[298] Under the proposed rules, an issuer would have been required to furnish its conflict minerals information in its annual report on Form 10–K, Form 20–F or Form 40–F. As such, investment companies that are registered under the Investment

Company Act of 1940 [15 U.S.C. 80a *et seq.*] ("registered investment companies") would not have been subject to the disclosure requirement because those companies are not required to file Form 10–K, Form 20–F or Form 40–F. Our decision to require this disclosure in a new form is not intended to change the scope of companies subject to the disclosure requirement. Therefore, consistent with the proposal, registered investment companies that are required to file reports on Form N–CSR or Form N–SAR pursuant to Rule 30d–1 under the Investment Company Act (17 CFR 270.30d–1) will not be subject to the final rule.

[299] *See, e.g.,* letters from AngloGold, Cleary Gottlieb, CTIA, Ford, ITIC I, NAM I, NY State Bar, Roundtable, and SEMI.

[300] *See, e.g.,* letters from Industry Group Coalition I, Industry Group Coalition II, NAM I, and Semiconductor.

USCA Case #13-5252    Document #1455974    Filed: 09/11/2013    Page 112 of 198

systems to gather and report on the conflict minerals information.

Additionally, we are modifying the proposed rules regarding how long an issuer must keep its conflict minerals disclosure or its Conflict Minerals Report available on the issuer's Internet Web site to reflect that the information is not to be included in an issuer's annual report on Form 10–K, Form 20–F, or Form 40–K. The proposed rules would have required an issuer to keep its conflict minerals information on its Internet Web site until its subsequent annual report was filed. We intended this period to last only one year because, whether or not the issuer had any conflict minerals information to provide in its subsequent annual report, the issuer had to file the subsequent annual report one year after its prior annual report or cease to be a reporting issuer. However, with the final rule requiring an issuer to provide its conflict minerals information in a specialized disclosure report on Form SD, the period between specialized disclosure reports may be more than one year if an issuer has no reportable conflict minerals in its subsequent calendar year. If we did not modify the proposed rules, such an issuer may have been required to keep its conflict minerals information on its Internet Web site for more than one year, possibly indefinitely. Therefore, the final rule specifies that an issuer must make its conflict minerals disclosure or its Conflict Minerals Report available on the issuer's Internet Web site for one year. In response to concerns expressed by commentators that the information should be required to be mandated longer, we note that the issuer's Form SD with the Conflict Minerals Report will be available on EDGAR indefinitely, so the information will continue to be widely available.

In another release we are issuing today, we are requiring issuers to disclose certain resource extraction payment information on Form SD.[301] Because of the order of the releases, we are adopting the form in this release and amending it in the resource extraction release. We intend, however, for the form to be used equally for these two separate disclosure requirements.

### 2. "Filing" of Conflict Minerals Information

#### a. Proposed Rules

The proposed rules would have required an issuer's conflict minerals information to be provided in the issuer's annual report on Form 10–K,

Form 20–F, or Form 40–F, as applicable, and the Conflict Minerals Report to be included as an exhibit to the issuer's annual report. Certain proposed item requirements would have instructed an issuer to furnish its Conflict Minerals Report as an exhibit to its annual report. Additionally, as proposed, an issuer's Conflict Minerals Report, which would have included the independent private sector audit report, would not be "filed" for purposes of Section 18 of the Exchange Act and thus would not be subject to potential liability of that section of the Exchange Act, unless the issuer stated explicitly that the Conflict Minerals Report and the independent private sector audit report were filed under the Exchange Act. Instead, these documents would only have been furnished to the Commission. Similarly, as proposed, the rules would not have considered the Conflict Minerals Report and the independent private sector audit report to be incorporated by reference into any filing under the Securities Act or the Exchange Act, except to the extent that the issuer specifically incorporated them by reference into the documents. As noted above and in the Proposing Release, furnishing the Conflict Minerals Report would not have subjected the issuer to Section 18 liability,[302] but the issuer would still have had liability for its conflict minerals information. Under Exchange Act Section 13(p)(1)(C), a failure to comply with the Conflict Minerals Statutory Provision would have rendered the issuer's due diligence process "unreliable," and, therefore, the Conflict Minerals Report would "not satisfy" the proposed rules.[303] In this regard, as proposed, an issuer that failed to comply with the proposed rules would have been subject to liability for violations of Exchange Act Sections 13(a) or 15(d), as applicable.[304]

#### b. Comments on the Proposed Rules

A number of commentators stated specifically that the final rule should, as proposed, require an issuer to "furnish" rather than "file" its conflict minerals information.[305] Many of these commentators believed that the nature and purpose of the conflict minerals disclosure is qualitatively different from the other disclosure required under Exchange Act Section 13 and the conflict minerals information is not

material to investors.[306] As one commentator explained, "[n]othing in the statute itself suggests that the 'reasonable' investor would find this information to be important in deciding whether to buy or sell" an issuer's securities, which is "the touchstone of materiality under the federal securities laws."[307] However, this commentator acknowledged that "socially conscious investors might well factor this information into an investment decision."[308] Some commentators asserted that the conflict minerals information is different from other information in required filings, so the conflict minerals information should be "furnished."[309] Other commentators noted that, if the conflict minerals information is material to a reasonable person's investment decision, it would have to be disclosed in an issuer's filings even without the Conflict Minerals Statutory Provision, so any other information regarding conflict minerals should be "furnished."[310] Another commentator recommended that the conflict minerals information should be "furnished" because, whereas the data used to generate the financial statements in issuers' "filed" periodic reports are generally within their control and subject to internal controls, issuers would be required to rely on third parties (suppliers, smelters, etc.) for their conflict minerals data that are mostly beyond the issuer's control.[311]

Some commentators argued that the conflict minerals information should be "furnished" so that Exchange Act Section 18 liability would not attach to the conflict minerals information.[312] One of these commentators asserted that Section 18 liability should not be available because there is no indication that Congress intended for an issuer's conflict minerals information to be subject to such liability.[313] In this regard, some commentators contended that, if "furnished," issuers' conflict minerals information would still receive significant attention and scrutiny, and the issuers' disclosures regarding this information will still be subject to liability sufficient enough to deter

---

[301] Disclosure of Payments by Resource Extraction Issuers, Release No. 34–67717 (Aug. 22, 2012).

[302] 15 U.S.C. 78r.

[303] See Exchange Act Section 13(p)(1)(C).

[304] 15 U.S.C. 78m(a) and 15 U.S.C. 78o(d).

[305] See, e.g., letters from AngloGold, Barrick Gold, Cleary Gottlieb, Corporate Secretaries I, Deloitte & Touche LLP (Mar. 2, 2011) ("Deloitte"), Ford, ITIC I, JVC et al. II, NAM III, NMA II, NY State Bar, Taiwan Semi, and WGC II.

[306] See, e.g., letters from AngloGold, Barrick Gold, Cleary Gottlieb, Ford, ITIC I, JVC et al. II, NMA II, NY State Bar, and Taiwan Semi.

[307] See letter from JVC et al. II.

[308] See id.

[309] See, e.g., letters from AngloGold, Barrick Gold, Cleary Gottlieb, Ford, ITIC I, JVC et al. II, NMA II, NY State Bar, and Taiwan Semi.

[310] See letter from AngloGold and NMA II.

[311] See letter from Ford.

[312] See letters from Barrick Gold, Cleary Gottlieb, NMA II, Society of Corporate Secretaries and Governance Professionals (Aug. 16, 2011) ("Corporate Secretaries III"), and WGC II.

[313] See letter from the WGC II.

ADD-36

abuse.[314] The commentators pointed out that issuers would still be liable for any materially false or misleading statements under the antifraud provisions of the federal securities laws, including, Section 10(b) of the Exchange Act and Rule 10b–5 there under.[315] They indicated further that failure to comply with the Conflict Minerals Statutory Provision would render the issuer's due diligence "unreliable" and, therefore, the Conflict Minerals Report would not satisfy the final rule, which would subject the issuer to liability for violations of Exchange Act Sections 13(a) or 15(d), as applicable.[316]

Conversely, other commentators indicated that the final rule should require an issuer to "file" its conflict minerals information.[317] Two of the co-sponsors of the statutory provision noted that Congress intended for an issuer's conflict minerals information, particularly the Conflict Minerals Report, to be "filed" rather than "furnished" so that the information would be subject to the liability provisions in Section 18 of the Exchange Act and, thereby, allow for private sector remedies for false and misleading statements.[318] These co-sponsors asserted that, in the Proposing Release, we incorrectly reasoned that the Conflict Minerals Statutory Provision's requirement that an issuer "submit" its Conflict Minerals Report means that Congress intended that the information be "furnished" instead of "filed." They noted that the term "furnish" is included throughout the Act 41 times, but that term is "expressly not used in Section 1502," which demonstrates that "Congress intended for the word 'submit' to be synonymous with 'filed,' not 'furnished.'"[319]

Similarly, another comment letter written by other members of Congress also emphasized that it was Congress's legislative intent to the Conflict Minerals Report be "filed" not "furnished."[320] The letter stated that it was made clear "during the legislative process, meetings with the SEC, and in written comments to the Commission that Section 1502 was designed as a transparency measure to provide

investors and the public the information needed to make informed choices."[321] Therefore, according to the letter, "[p]rotecting investor interests by making companies liable for fraudulent or false reporting of conflict minerals is critical—so the reports must be 'filed,' not 'furnished.'"[322]

Further commentators asserted that a plain reading of the Conflict Minerals Statutory Provision demonstrates that Congress intended that the term "submit" to mean "file."[323] The commentators argued that "submit" means "file" in the provision because new Exchange Act Section 13(p)(2)(A) states that conflict minerals disclosure is required if conflict minerals are necessary to the functionality or production of a product manufactured by a person described and the person described is required to "file" reports with us pursuant to the Conflict Minerals Statutory Provision. Also, one of the commentators noted that the term "furnish" is not in the text of the provision.[324]

Additionally, some commentators asserted that requiring the conflict minerals information be "filed" would benefit investors by making an issuer's conflict minerals information more transparent, accessible, accurate, and complete. In this regard, one of these commentators suggested that requiring the conflict minerals information to be "filed" would allow for private rights of action, which would permit investors to seek remedies for material misstatements regarding conflict minerals disclosures, and provide an incentive for issuers and others to conduct an appropriate due diligence.[325] Another commentator noted that requiring issuers to "file" their conflict minerals information "promotes greater transparency, makes Section 1502 more effective," and helps "facilitate access to this information."[326] In a further comment letter, a group of investors indicated that requiring issuers to "file" their conflict minerals information would "allow investors greater assurance that conflict minerals disclosure is as comprehensive, transparent and accurate as possible."[327]

Finally, some commentators argued that the conflict minerals information is material and, therefore, should be

"filed."[328] A group of investors in one comment letter noted that the conflict minerals information is material to an investor in evaluating its investment decision, so the information should be "filed."[329] Specifically, the letter stated that "[g]iven the materiality of the data in evaluating a company's risk, we urge the Commission to require all information outlined in the proposed rule to be filed in the body of the annual report rather than furnished as an exhibit."[330] Also, in another comment letter, an institutional investor indicated that the conflict minerals information is material to an investment decision and, therefore, "as material information[,] this report should be filed, not furnished as proposed by the Commission."[331] Moreover, one commentator argued that allowing the conflict minerals information to be "furnished" instead of "filed" would "send a regrettable signal that the Commission believes these disclosures to be of lesser importance at the very moment that issuers, regulators, investors, and governments around the world are looking to the Commission to help establish the way forward," which would "scale back the vigor of issuer compliance and undermine the entire purpose of the statute" and "undermine the goals of ending the resource-related violence in the DRC and providing meaningful and reliable disclosures to the American consumer and investor."[332]

#### c. Final Rule

Although the proposal would have required the conflict minerals information to be "furnished," after considering the comments, the final rule we are adopting requires issuers with necessary conflict minerals to "file" the conflict minerals information provided in their specialized disclosure reports, including any Conflict Minerals Reports and independent private sector audit reports.[333] As discussed above, commentators disagreed as to whether the required information should be "furnished" or "filed,"[334] and in our

---

[314] *See* letters from Barrick Gold, Ford, and JVC *et al.* II.

[315] *See* letters from Barrick Gold and JVC *et al.* II.

[316] *See* letters from Ford and JVC *et al.* II.

[317] *See, e.g.,* letters from Bario-Neal, Brilliant Earth, Columban Center *et al.*, Earthworks, Enough Project I, Global Witness I, Hacker Jewelers, Hoover & Strong, Metalsmiths, Sen. Durbin/Rep. McDermott, SIF II, TakeBack, TIAA–CREF, and World Vision US and World Vision DRC (Feb. 21, 2012) ("World Vision II").

[318] *See* letter from Sen. Durbin/Rep. McDermott.

[319] *See id.*

[320] *See* letter from Sen. Leahy *et al.*

[321] *Id.*

[322] *Id.*

[323] *See* letters from Global Witness I and Enough Project I.

[324] *See* letter from Global Witness I.

[325] *See id.*

[326] *See* letter from Enough Project I.

[327] *See* letter from SIF II.

[328] *See* letters from Global Witness I, SIF II, and TIAA–CREFF.

[329] *See* letter from SIF II.

[330] *Id.*

[331] *See* letter from TIAA–CREF.

[332] *See* letter from Global Witness I.

[333] 15 U.S.C. 78r.

[334] *Compare* letters from AngloGold, Barrick Gold, Cleary Gottlieb, Corporate Secretaries I, Deloitte, Ford, ITIC I, JVC *et al.* II, NAM III, NMA II, NY State Bar, Taiwan Semi, and WGC II (supporting a requirement to "furnish" the disclose), *with* letters from Bario-Neal, Brilliant Earth, Columban Center *et al.*, Earthworks, Enough Project I, Global Witness I, Hacker Jewelers, Hoover

Continued

view the Conflict Minerals Provision is ambiguous on this question. In reaching our conclusion that the information should be "filed" instead of "furnished," we note particularly that although Section 13(p)(1)(a) states that a Conflict Minerals Report should be "submitted" to the Commission, the definition of a "person described," who is required to submit a report, uses the term "file." This reference in the statute indicates that the reports should be filed.

Additionally, commentators asserted that allowing the information to be "furnished" would diminish the importance of the information,[335] and that requiring the information to be "filed" would enhance the quality of the disclosures.[336] Some commentators argued that the conflict minerals information should not be treated as of lesser importance than other required disclosures,[337] and another commentator indicated specifically that the conflict minerals information is qualitatively similar to disclosures that are required to be "filed."[338]

Other commentators supporting the proposal that the disclosure be "furnished" argued that the information is not material to investors,[339] while some argued that it was.[340] Given the disagreement, and that materiality is a fact-specific inquiry, we are not persuaded that this is a reason to provide that the information should be "furnished." Additionally, we appreciate the comments that the conflict minerals information should be "furnished" because issuers should not be held liable for the information when they are required to rely on third parties for their conflict minerals data and direct knowledge of relevant facts may not be available to them.[341] We note, however, that section 18 does not create strict liability for filed information. Rather, it states that a person shall not be liable for misleading statements in a filed document if it can establish that it acted in good faith and had no

knowledge that the statement was false or misleading.[342]

Moreover, as discussed below, the final rule will include a transition period in which issuers that are required to perform due diligence and are unable to determine that their conflict minerals did not originate in the Covered Countries or unable to determine that their conflict minerals that originated in the Covered Countries did not directly or indirectly finance or benefit armed groups in the Covered Countries may describe their products with such conflict minerals as "DRC conflict undeterminable." We believe this period will allow issuers sufficient time to obtain more data on, and control over, their supply chain through revised contracts with suppliers and smelter verification confirmations, thereby mitigating this liability concern.[343]

### 3. Uniform Reporting Period

#### a. Proposed Rules

The Conflict Minerals Statutory Provision requires, and we proposed to require, that issuers provide their initial conflict minerals disclosure and, if necessary, their initial Conflict Minerals Report after their first full fiscal year following the adoption of our final

rule.[344] The report would be required to cover that first full fiscal year.

#### b. Comments on the Proposed Rules

We included a request for comment asking whether our rules should allow individual issuers to establish their own criteria for determining what reporting period to cover in any required conflict minerals disclosure or Conflict Minerals Report, provided that the issuers are consistent and clear with their criteria from year-to-year. Some commentators agreed that the final rule should allow individual issuers flexibility in choosing the appropriate criteria for determining the reporting period in which conflict minerals disclosures are made, provided that the issuer's methodology is clear.[345] Other commentators, however, asserted that the final rule should require that the conflict minerals reporting period correspond to the issuer's fiscal year in its annual report.[346]

We did not request comment specifically on whether an issuer's conflict minerals reporting period should correspond to an issuer's fiscal year. Even so, some commentators indicated that an issuer's annual reporting period for conflict minerals disclosure should not be based on its fiscal year but, instead, should be based on a one-year period that is the same for all issuers.[347] One of these commentators recognized that "synchronizing the timing for the information * * *from all issuers on a calendar year basis* * *would offer integrity and consistency throughout the various supply chains" and because "component manufacturers and others through the supply chain provide products for many customers who have different fiscal years, it would be more efficient and more accurate if the whole supply chain worked towards a common deadline."[348] Another commentator noted that a uniform calendar year reporting period "would clarify the reporting obligations, level the playing field among the various companies, and provide a clearer date of implementation for due diligence and related initiatives in the region."[349] A further commentator asserted that a "single reporting date will allow for

---

& Strong, Metalsmiths, Sen. Durbin/Rep. McDermott, SIF II, TakeBack, TIAA–CREF, and World Vision II (supporting a requirement to "file" the disclosure).

[335] See letters from Global Witness I.

[336] See letters from Enough Project I and SIF II.

[337] See letter from Global Witness I.

[338] See Sen. Durbin/Rep. McDermott.

[339] See letters from AngloGold, Barrick Gold, Cleary Gottlieb, Corporate Secretaries I, Deloitte, Ford, ITIC I, JVC et al. II, NAM III, NMA II, NY State Bar, Taiwan Semi, and WGC II.

[340] See letters from Sen. Leahy et al., SIF I, SIF II, and TIAA–CREF.

[341] See letter from Ford.

[342] Exchange Act Section 18(a) provides: "Any person who shall make or cause to be made any statement in any application, report, or document filed pursuant to this title or any rule or regulation thereunder or any undertaking contained in a registration statement as provided in subsection (d) of section 15 of this title, which statement was at the time and in the light of the circumstances under which it was made false or misleading with respect to any material fact, shall be liable to any person (not knowing that such statement was false or misleading) who, in reliance upon such statement shall have purchased or sold a security at a price which was affected by such statement, for damages caused by such reliance, unless the person sued shall prove that he acted in good faith and had no knowledge that such statement was false or misleading. A person seeking to enforce such liability may sue at law or in equity in any court of competent jurisdiction. In any such suit the court may, in its discretion, require an undertaking for the payment of the costs of such suit, and assess reasonable costs, including reasonable attorneys' fees, against either party litigant." A plaintiff asserting a claim under Section 18 would need to meet the elements of the statute to establish a claim, including reliance and damages. In addition, we note that issuers that fail to comply with the final rule could also be violating Exchange Act Sections 13(a) and (p) and 15(d), as applicable. Issuers would also be subject to potential liability under Exchange Act Section 10(b) [15 U.S.C. 78j] and Rule 10b–5 [17 CFR 240.10b–5], promulgated thereunder, for any false or misleading material statements in the information disclosed pursuant to the rule.

[343] As discussed above, requiring the disclosure in a new form, rather than in issuers' Exchange Act annual reports, should alleviate some commentators' concerns about the disclosure being subject to the officer certifications required by Rules 13a–14 and 15d–14 under the Exchange Act.

[344] See Exchange Act Section 13(p)(1)(A) (stating that an issuer must "disclose annually, beginning with the [issuer's] first full fiscal year that begins after the date of promulgation of [our] regulations").

[345] See letters from Howland, IPC I, and NMA II.

[346] See letters from AngloGold and TIC.

[347] See letters from IPC II; Matheson II; MSG II; Multi-Stakeholder Group comprised of 29 issuers, non-governmental organizations, and investors (Nov. 10, 2011) ("MSG III"); and State II.

[348] Letter from MSG II. See also letter from MSG III.

[349] Letter from State II.

increased efficiency and thus lower costs, without reducing the effectiveness of the regulations.'' [350]

c. Final Rule

After considering the comments, the final rule will require each issuer to provide its conflict minerals information on a calendar year basis regardless of any particular issuer's fiscal year end. [351] The final rule requires an issuer to provide its annual conflict minerals information in its specialized disclosure report on Form SD for every calendar year from January 1 to December 31 and the specialized disclosure report will be due to the Commission on May 31 of the following year. In this regard, the first reporting period for all issuers will be from January 1, 2013 to December 31, 2013, and the first specialized disclosure report must be filed on or before May 31, 2014.

We agree with the commentators that explained that burdens on participants in the supply chain could be reduced if our final rule adopted a uniform reporting period. This requirement allows component suppliers that are part of a manufacturer's supply chain to provide reports to their upstream purchasers regarding the conflict minerals in their components only once a year. Otherwise, if the due date of the Conflict Minerals Report was tied to an issuer's fiscal year end, as proposed, component suppliers could have to provide reports regarding the conflict minerals in their components on a continuous basis throughout the year because their customers may have different fiscal year ends. If a component supplier has numerous purchasers, it might have to provide separate reports regarding the conflict minerals in its components every month, or even more often, which could be very burdensome and costly. [352]

Additionally, requiring a uniform May 31 due date for the specialized disclosure report responds to concerns raised by certain industry commentators that there would not be sufficient time in the period between the end of an issuer's fiscal year until its annual report is due to gather, report on, and have audited their conflict minerals information, as discussed above. [353] The specialized disclosure report will be due later than an Exchange Act annual report is due for calendar year end issuers so as not to interfere with an issuer's preparation of its Exchange Act annual report, as requested by commentators. Also, the final rule will require each issuer to provide its conflict minerals information for each calendar year, rather than its fiscal year. The May 31 due date is approximately 150 days after the calendar year end, which is consistent with a commentator's suggested due date for an issuer to provide us with its conflict minerals information. [354]

4. Time Period for Providing Conflict Minerals Information

a. Proposed Rules

The Conflict Minerals Statutory Provision requires issuers to provide the specified disclosure with respect to necessary conflict minerals ''in the year for which such reporting is required.'' [355] We proposed that the date an issuer takes possession of a conflict mineral would determine which reporting year that issuer would have to provide its required conflict minerals information. Also, if an issuer contracted the manufacturing of a product in which a conflict mineral is necessary to the production of that product, but the conflict mineral would not be included in the product, the issuer would, under the proposal, have used the date it takes possession of the product to determine which reporting year the issuer would have to provide the required conflict minerals information.

b. Comments on the Proposed Rules

Some commentators suggested that, as proposed, an issuer should be required to provide its conflict minerals information in the reporting period during which the issuer took possession of its conflict minerals. [356] Other commentators recommended, however, that the final rule should use some other determining factor. [357] Some

commentators did not provide alternative factors to consider in determining for which annual reporting period an issuer must report its conflict minerals information, but stated only that an issuer should be allowed the flexibility to establish its own criteria for determining when an issuer would be required to provide information on the conflict minerals it obtained. [358] Other commentators provided alternative factors, such as the year in which the mineral is purchased, the year the issuer takes possession and ownership of the mineral, the year the mineral is processed, or the year the product containing conflict minerals is produced or placed on the market. [359]

c. Final Rule

After considering the comments, the final rule is revised from the proposal such that possession is not the determining factor for deciding for which reporting year an issuer has to provide its required conflict minerals information. We are making this revision because we agree, as one commentator noted, that the ''statutory requirement to report is triggered not by acquisition or possession of conflict minerals.'' [360] Instead, the final rule provides that an issuer must provide its required conflict minerals information for the calendar year in which the manufacture of a product that contains any conflict minerals is completed, irrespective of whether the issuer manufactures the product or contracts to have the product manufactured. [361] We believe this approach is appropriate because it should be relatively easy for an issuer to identify when the manufacture of a product is completed, as the issuer has a certain amount of control over this decision. Thus, this approach also allows issuers some flexibility in determining the reporting period. For example, if an issuer completes the manufacture of a product with conflict minerals necessary to the functionality or production of that product on December 30, 2018, the issuer must provide a specialized disclosure report regarding the conflict minerals in that product for the 2018 calendar year. However, if that issuer completes the manufacture of that same product on January 2, 2019, the issuer must provide a specialized disclosure

---

[350] Letter from IPC II.

[351] We are aware that Exchange Act Section 13(p)(1)(A) requires that we promulgate regulations requiring any ''person described'' to disclose annually its conflict minerals information, ''beginning with the person's first full fiscal year that begins after the date of promulgation of such regulations.'' The Conflict Minerals Statutory Provision does not tie any required conflict minerals information to an issuer's annual report or its audited financial statements. Therefore, although the provision requires an issuer to begin reporting after an issuer's full fiscal year has cycled through, there is no requirement for the final rule's reporting period to correspond to an issuer's fiscal year.

[352] See letter from MSG II.

[353] See, e.g., letters from AngloGold, Cleary Gottlieb, CTIA, Ford, ITIC I, NAM I, NY State Bar, Roundtable, and SEMI.

[354] See letter from AngloGold (suggesting that an issuer be required to provide its conflict minerals information on a Form 8–K or Form 6–K ''within 150 calendar days after the issuer's fiscal year-end'').

[355] Exchange Act Section 13(p)(1)(A).

[356] See, e.g., letters from Cleary Gottlieb, ITIC I, and WGC II.

[357] See, e.g., letters from AngloGold, NAM I, RJC, and TIC.

[358] See, e.g., letters from Howland, IPC I, and NMA II.

[359] See, e.g., letters from AngloGold, NAM I, RJC, and TIC.

[360] See letter from NAM I.

[361] See id. (recommending that, ''[i]f the rule specifies a reporting trigger, it should be producing or placing on the market a product containing conflict minerals'').

report regarding the conflict minerals in that product for the 2019 calendar year.

This timeframe is the same for an issuer that contracts the manufacturing of its products. An issuer that contracts the manufacturing of a product must provide its required conflict minerals information for the calendar year in which the issuer's contract manufacturer completes the manufacturing of product. For example, if an issuer's contractor completes the manufacturing of the product with conflict minerals necessary to the functionality or production of that product on December 30, 2018, the issuer must provide a specialized disclosure report regarding the conflict minerals in that product for the 2018 calendar year, even if the issuer does not receive the product until January 2, 2019. However, if that issuer's contractor completes the manufacturing of that same product on January 2, 2019, the issuer must provide a specialized disclosure report regarding the conflict minerals in that product for the 2019 calendar year.

This outcome is the same for an issuer that manufactures the product using a component product with conflict minerals necessary to the functionality of the product that is manufactured by an independent third party. If the manufacturer of the product completes the product that incorporates the component product with necessary conflict minerals on December 30, 2018, the issuer that manufactured the product must provide a specialized disclosure report regarding the conflict minerals in that product for the 2018 calendar year. However, the reporting period of the independent third party manufacturer of the component product, if it is a reporting issuer, is not determined by when the manufacturing of the subsequent product containing its component product is completed. Instead, the reporting period for that component product manufacturing issuer is determined by when it completes the manufacturing of the component product. Therefore, an issuer that completes the manufacture of a component product on December 30, 2018, must provide a specialized disclosure report regarding the conflict minerals in that completed component product for the 2018 calendar year.

5. Conflict Minerals Already in the Supply Chain

a. Proposed Rules

The proposed rules did not discuss specifically how an issuer would handle any conflict minerals already in the supply chain at the time our final rule takes effect, including existing stockpiles of conflict minerals. The Proposing Release, however, requested comment on this point.

b. Comments on the Proposed Rules

Almost all commentators that discussed the topic recommended that an issuer's existing stockpile of conflict minerals should be exempt from the final rule.[362] One commentator explained, that "[c]ategorizing existing stock as 'conflict' simply because the mineral was mined before SEC rules have been agreed and published serves no purpose in furthering the aims of the legislation and would cause serious financial loss to the holders of that stock[pile]."[363] In this regard, one commentator asserted that "[s]tockpiled minerals may have originated in mines that support the conflict; however, it would be impractical to ask companies to trace the origin of these minerals."[364] Another commentator argued specifically that, if the final rule causes owners to dispose of their existing conflict minerals inventory because they are unable to determine that they are "DCR conflict free," the cost of the rule would increase "dramatically."[365]

Panelists discussed this issue further at the SEC Roundtable. Some panelists explained that there are stocks of metals and other materials stored throughout the world in warehouses and vaults by many individuals and institutions that are already past the point in the supply chain at which they could contribute to conflict.[366] One panelist representing a human rights group appeared to acknowledge that stockpiled conflict

minerals stored outside the Covered Countries would not contribute to conflict in the Covered Countries.[367] Another panelist asserted that a stockpile "exemption is essential for both existing unsmelted mineral and refined metal stocks held by industry, metal warehouses, investors and even in US Government stockpile," because the "value of current tin stocks is probably around US$7billion, generally with non-specific mine origin," so not exempting such minerals would lead to "market disruption and financial losses on this potentially unsaleable material."[368]

Many commentators suggested different requirements for when a conflict mineral should be considered stockpiled and, therefore, excluded from the final rule. A number of commentators recommended that the final rule should exempt any conflict minerals mined prior to the adoption of the final rule.[369] One commentator noted, however, that "the date of extraction is not generally recorded or known for minerals purchased from artisanal miners."[370] Some commentators asserted that the final rule should exempt any conflict minerals smelted or refined by a certain date[371] because, as one of these commentators indicated, "[e]ach metal batch produced by a smelter will possess a dated certificate of analysis which may be considered as the production date."[372] Similarly, another commentator recommended that stockpiled gold that "has been fully refined before the effective date" of the final rule be exempted.[373] In this regard, one commentator suggested that the final rule exclude "inventory produced before the date on which Dodd-Frank 1502 will first apply to the issuer."[374] Another commentator "proposed that the effective date of disclosure requirement on metal should be for ingot produced [one] year after the effective date" of the final rule.[375]

A few commentators urged that the final rule exempt any conflict minerals outside the Covered Countries by July 15, 2010.[376] One commentator suggested

---

[362] *See, e.g.,* letters from AAEI; AngloGold; ArcelorMittal; Arkema; Cleary Gottlieb; CTIA; Davis Polk; Earthworks; Enough Project I; Enough Project IV; Global Tungsten I; Global Tungsten & Powders Corp. (Oct. 13, 2011) ("Global Tungsten II"); Howland; Industry Group Coalition I; ICAR *et al.* II; IPC I; IPMI I; ITIC I; ITRI I; ITRI Ltd. (Oct. 19, 2011) ("ITRI III"); ITRI Ltd. (Oct. 31, 2011) ("ITRI IV"); Japanese Trade Associations; Jean Goldschmidt International SA (Feb. 14, 2011) ("JGI"); JVC *et al.* II; Jewelers Vigilance Committee, American Gem Society, Manufacturing Jewelers & Suppliers of America, Jewelers of America, and Fashion Jewelry & Accessories Trade Association (Nov. 1, 2011) ("JVC *et al.* III"); Kemet; Kuala Lumpur Tin Market (Jan. 17, 2011) ("Kuala Tin"); LBMA I; Metal Solutions Corporation (Dec. 28, 2010) ("Solutions"); MSG III; NAM I; NEI; NMA II; NMA III; Pact II; PCP; Responsible Jewellery Council (Feb. 25, 2011) ("RJC I"); RMA; SEMI; Signet Jewelers Ltd. (Nov. 1, 2011) ("Signet"); Somima; TIAA–CREF; SIF I; and WGC II.

[363] Letter from ITRI I.

[364] Letter from Enough Project I.

[365] Letter from Claigan Environmental Inc. (Oct. 28, 2011) ("Claigan I").

[366] *See* Transcript of SEC Roundtable on Conflict Minerals, Sections 0171–0174 (Oct. 18, 2011), *available at*http://www.sec.gov/spotlight/conflictminerals/conflictmineralsroundtable101811-transcript.txt.

[367] *See id.* at Section 0172 lines 19–23 (stating that "there's a truth to the fact that if something is stockpiled out of the region, and it's being held somewhere else, does it really get at what the intent of the law is").

[368] *See id.* at Section 0118 lines 8–15. *See also* letter from ITRI III.

[369] *See, e.g.,* letters from AAEI, Davis Polk, ITIC I, Kemet, MSG III, RJC I, RMA, and WGC II.

[370] *See* letter from ITRI I.

[371] *See* letters from ITRI I, LBMA I, and Signet.

[372] *See* letter from ITRI I.

[373] *See* letter from LBMA I.

[374] *See* letter from ArcelorMittal.

[375] *See* letter from ITRI III.

[376] *See* letters from Earthworks and SIF I.

that conflict minerals should be exempt if, by January 1, 2013, those minerals are included in components or products already incorporated in finished goods in a supplier's inventory or are included in parts or components included in the repair or maintenance of products.[377] One commentator recommended that the final rule should exempt gold in the issuer's possession by, or extracted before, the effective date of the final rule.[378] Another commentator asserted that the final rule should exempt any conflict mineral that an issuer took possession of before the first full fiscal year following the adoption of the final rule.[379] This commentator suggested also that the final rule should not require reporting on conflict minerals in an issuer's supply chain that have been manufactured prior to the beginning of the issuer's first reporting year. One commentator asserted that the final rule should exclude, as of the date of the effectiveness of the final rule, "gold bars in storage at the central banks," "bars marked with the London Bullion Marketers association (LBMA) stamp," and "gold coins issued by governments or other entities."[380] One commentator recommended that the final rule include a 24-month "grace period" that would permit the "sale of existing stockpiles of minerals that have already been mined and have been sitting in warehouses" in the DRC.[381]

### c. Final Rule

After considering the comments, the final rule excludes any conflict minerals that are "outside the supply chain" prior to January 31, 2013. The final rule considers conflict minerals to be "outside the supply chain" only in the following instances: After any columbite-tantalite, cassiterite, and wolframite minerals have been smelted; after gold has been fully refined; or after any conflict mineral, or its derivatives, that have not been smelted or fully refined are located outside of the Covered Countries.

We are aware that these existing stockpiles could have financed or benefited armed groups in the Covered Countries. However, once those

minerals are smelted, refined, or outside of the Covered Countries, it appears unlikely that they could further finance or benefit armed groups. Therefore, applying the final rule to these already-stockpiled minerals would not further the purpose of the Conflict Minerals Statutory Provision because those minerals would not contribute to further conflict. Similarly, requiring issuers to determine the origin and chain of custody of these minerals that may have been extracted prior to the passage of the Conflict Minerals Statutory Provision, could result in undue costs if the minerals could not be sold, as suggested by one commentator.[382]

We considered exempting stockpiled conflict minerals that were extracted before a date certain, as one commentator recommended.[383] We decided not to do so, however, because, as another commentator noted, the date of extraction is not generally recorded or known for minerals from artisanal miners.[384] Further, if the final rule exempts conflict minerals extracted at a date certain, the rule would not necessarily account for payments illegally demanded by armed groups of those that transport conflict minerals through remote areas of the DRC. Instead, we believe that the proper point to use for ensuring that a conflict mineral is truly stockpiled is the smelting or primary refining date because the dates of these actions are more likely to be reliably recorded.[385] Similarly, as is true with smelted or refined conflict minerals, conflict minerals stockpiled outside the Covered Countries would not contribute to conflict in the Covered Countries.[386] Therefore, the final rule exempts any conflict minerals outside the Covered Countries as well.

We recognize that there may be situations in which conflict minerals are past the point in the supply chain where they are able to be used to finance or benefit armed groups, but these minerals have yet to be stored outside the Covered Countries,[387] smelted, or refined. Even so, we believe that smelting, refining, or being outside the Covered Countries marks the first opportunity in the supply chain that offers reliable proof that the conflict

minerals will no longer benefit or finance armed groups. We note, however, that market participants may need additional time to move their stockpiles outside the Covered Countries or have those stockpiles smelted or refined. Therefore, to accommodate this timing constraint, the final rule provides transition relief to permit market participants sometime after the final rule becomes effective to move, smelt, or refine any existing stocks of conflict minerals without having to comply with the rule's requirements.

### 6. Timing of Implementation

#### a. Proposed Rules

The Conflict Minerals Statutory Provision states that issuers must disclose their conflict minerals information annually beginning with the issuer's first full fiscal year that begins after the date of promulgation of our final rule.[388] Therefore, the proposed rules would have included neither a transition period for issuers unable to determine that their conflict minerals did not originate in the Covered Countries or unable to determine that their conflict minerals that originated in the Covered Countries did not directly or indirectly finance or benefit armed groups, nor a general delay of the rules. We requested comment, however, regarding whether we should provide a transition period or a delay.

#### b. Comments on the Proposed Rules

In response to our request for comment, a number of commentators stated that the final rule should not permit any general delay or specific phase-in period for issuers to provide their conflict minerals information.[389] A number of other commentators, however, indicated that the final rule should allow for some type of delay or

---

[377] See letter from NAM I.

[378] See letter from AngloGold.

[379] See letter from SEMI.

[380] See letter from NMA III.

[381] See letter from Charles F. Blakeman (Mar. 15, 2012) ("Blakeman III") (arguing overall that no final rule should be adopted, but seeking a 24-month grace period for the sale of existing stockpiles of conflict minerals, in the alternative, should the Commission adopt a final rule). See also letter from Charles Blakeman (Nov. 17, 2011) ("Blakeman II") (recommending a grace period for conflict minerals already, but not specifying a length of time for the grace period).

[382] See letter from Claigan I.

[383] See letter from ITIC I.

[384] See letter from ITRI I.

[385] Id.

[386] See Transcript of SEC Roundtable on Conflict Minerals, at Section 0172 lines 19–23.

[387] For example, a stockpile of conflict minerals could be stored in a warehouse in a DRC country that is insulated from and is beyond the reach of any armed group, so these conflict minerals would not contribute to conflict.

[388] Exchange Act Section 13(p)(1)(A).

[389] See, e.g., letters from Catholic Charities; Earthworks; Global Witness I; Good Shepherd; ICAR et al. II; Larry Cox of Amnesty International, Lisa Shannon of A Thousand Sisters, John Bradshaw of Enough Project, Karen Stauss of Free the Slaves, Corinna Gilfillan of Global Witness, Arvind Ganesan of Human Rights Watch, Tzivia Schwartz Getzug of Jewish World Watch, Morton Halperin of Open Society Policy Center, Rabbi David Saperstein of Religious Action Center of Reform Judaism, Kent Hill of World Vision (Mar. 1, 2011) ("Amnesty et al."); Rep. Berman et al.; Sen. Boxer et al. I; Senators Barbara Boxer, Frank R. Lautenberg, Barbara A. Mikulski, Sheldon Whitehouse and Ron Wyden (Feb. 16, 2012) ("Sen. Boxer et al. II"); Sen. Durbin/Rep. McDermott; Delly Mawazo Sesete (Dec. 19, 2011) ("Sesete"); State II; Synergie des Femmes Pour les Victimes des Violences Sexuelles (Mar. 7, 2011) ("Synergie"); World Vision US (Jul. 8, 2011) ("World Vision I"); and World Vision II.

phase-in period.[390] Some of the commentators specified that there should be a phase-in for only certain categories of issuers, such as foreign private issuers, accelerated filers, and smaller reporting companies.[391] Other commentators recommended that the final rule should include a phase-in period but did not provide any details for implementing such a mechanism.[392]

Some commentators asserted that the effectiveness of the final rule should be delayed for all issuers until either the Comptroller General has established auditing standards and/or the State Department has developed its conflict minerals map and its strategy to address linkages between human rights abuses and conflict minerals.[393] Other commentators stated that the final rule's effectiveness for all issuers should be delayed for two to five years after promulgation for issuers to set up traceability systems in the Covered Countries and clear mineral stockpiles from the supply chain.[394] One commentator stated that we should establish a general reporting delay for one year following promulgation of the final rule to allow issuers the opportunity to eliminate conflict minerals from their products and, during this time, issuers would not be required to provide conflict minerals information.[395] Another commentator recommended a one-year general phase-in of the final rule "so that a thorough and reliable traceability process can be

instituted." [396] In this regard, one commentator indicated that the "private sector is moving forward on this issue," and that one company "aims to have built the first verifiably conflict free microprocessor" by 2013.[397] Another commentator suggested that the final rule "set clear and specific dates for when company reporting will take effect," because "using benchmarks or trigger points will prolong the uncertainty that is causing so much trouble and suffering." [398]

A number of commentators recommended and described specific phase-in periods that focused on issuers unable to determine the origins of their conflict minerals.[399] Although each of these approaches varied to some degree, they all provided that, for a certain number of years after adoption of the final rule, an issuer unable to determine its conflict minerals' origins must disclose this fact, but would not be required to describe the products containing these conflict minerals as not "DRC conflict free." Some of these commentators recommended that we require an issuer, during a phase-in period, to describe its conflict minerals policy, its reasonable country of origin inquiry, the conflict minerals in its supply chains, and/or certain other information.[400] A few commentators indicated that we should phase-in the final rule for particular issuers based on the issuer's position in supply chain, so that an issuer closer in position to the mine or smelter would have to disclose more information regarding its conflict minerals.[401] One commentator recommended that the final rule permit a three-year phase-in period in which all issuers would be required only to receive certifications from their first-tier suppliers during the first year after promulgation, identify the smelters used to process their conflict minerals in the second year, and fully implement the rules in the third year.[402]

Many commentators, including industry associations, corporations, human rights groups, institutional

investors, members of Congress, and individuals, agreed that all conflict minerals should be treated equally, as proposed.[403] Some commentators asserted that gold should be treated differently than the other three conflict minerals because of its unique qualities, and the OECD had not approved the supplement to its due diligence guidance specifically for gold,[404] which at the time of the Proposing Release was scheduled to be published by the end of 2011. Subsequent commentators noted that the OECD's gold supplement would not be finalized until sometime in 2012,[405] and some commentators suggested that the final rule's application to gold be delayed until the OECD has adopted its gold supplement.[406] At present, the final gold supplement has been approved by the OECD.[407] One of the commentators suggested that the final rule be delayed for gold until the beginning of an issuer's first full fiscal year following adoption and issuance of the OECD's gold supplement.[408] Another one of the commentators argued that any "effort to establish credible and effective due diligence systems in the absence of OECD guidance will be stymied by the lack of a widely accepted base for responsible sourcing."[409] One commentator, however, asserted that the final rule should not be delayed for gold regardless of whether the OECD's gold supplement has been completed.[410] This commentator argued that, even if the OECD's gold supplement has not been completed when an issuer's reporting period begins, the issuer

---

[390] See, e.g., letters from AAEI; AAFA; AdvaMed I; AngloGold; Arkema; Barrick Gold; BEST II; Boeing Company (Oct. 18, 2011) ("Boeing"); Bureau d'Etudes Scientifiques et Techiques (Mar. 10, 2011) ("BEST I"); Chamber I; Corporate Secretaries I; CTIA; Davis Polk; Fédération des Enterprises du Congo (Feb. 25, 2011) ("FEC I"); Howland; Industry Group Coalition I; IPC I; ITIC I; ITRI I; ITRI II; ITRI IV; JGI; JVC et al. II; JVC et al. III; Medtronic, Inc. (Mar. 2, 2011) ("Medtronic"); Malaysia Smelting Corporation (Oct. 25, 2011) ("MSC II"); NAM I; National Association of Manufacturers (Jul. 26, 2011) ("NAM II"); NEI; NRF I; Pact I; PCP; Plexus (Feb. 25, 2011) ("Plexus"); Representative Mark S. Critz (Feb. 29, 2012) ("Rep. Critz"); RILA; RMA; Roundtable; Solutions; Somima; Taiwan Semi; TechAmerica, Professional Services Council, National Defense Industrial Association, American Council of Engineering Companies, Aerospace Industries Association, and U.S. Chamber of Commerce (Nov. 28, 2011) ("CODSIA"); TIC; TriQuint I; TriQuint Semiconductor Manufacturing Company, Ltd. (Mar. 2, 2011) ("TriQuint II"); and WGC II.

[391] See letters from AngloGold, Howland, and Taiwan Semi.

[392] See, e.g., letters from AAEI, AAFA, Arkema, BEST I, Chamber I, Davis Polk, FEC I, ITRI I, JGI, Medtronic, Solutions, MSC I, NEI, Pact I, Rep. Critz, and RMA.

[393] See letters from Barrick Gold, Corporate Secretaries I, NRF I, Roundtable, and WGC II.

[394] See, e.g., letters from AdvaMed I, Arkema, BEST II, FEC I, IPC I, ITRI I, ITRI II, ITRI IV, JVC et al. II, NAM I, Plexus, and TriQuint II.

[395] See letter from PCP.

[396] See also letter from Somima.

[397] See letter from Senator Jeff Merkley and Representatives Peter DeFazio, Earl Blumenauer, Kurt Schrader, and Suzanne Bonamici (May 17, 2012) ("Sen. Merkley et al."). See also letter from Enough Project (Aug. 10, 2011) ("Enough Project III") (providing a link to an article that "details current efforts on the ground in response to Section 1502").

[398] See letter from BEST II.

[399] See, e.g., letters from AdvaMed I, CTIA, Industry Group Coalition I, IPC I, ITIC I, JVC et al. II, and NAM I.

[400] See letters from AdvaMed I, Industry Group Coalition I, and NAM I.

[401] See letters from NRF I and Teggeman.

[402] See letter from TriQuint II.

[403] See, e.g., letters from Bario-Neal, Brilliant Earth, Calvert, Catholic Charities, CRS I, Earthworks, Enough Project I, Metalsmiths, Good Shepherd, Hacker Jewelers, Hoover & Strong, Howland, IPC I, ITRI I, NAM I, Niotan I, Peace, Rep. Berman et al., Sen. Durbin/Rep. McDermott, SIF I, State II, TakeBack, and TIAA–CREF.

[404] See, e.g., letters from AngloGold, IPMI I, JVC et al. II, LBMA II, NMA II, Tiffany, TriQuint I, and WGC II.

[405] See letters from Government of Canada, Foreign Affairs and International Trade (Dec. 23, 2011) ("Canada"); JVC et al. III; Signet; World Gold Council, London Bullion Market Association, and Responsible Jewellery Council (Oct. 28, 2011) ("WGC et al. I"); and World Gold Council, London Bullion Market Association, and Responsible Jewellery Council (Dec. 9, 2011) ("WGC et al. II").

[406] See, e.g., letters from Boeing, JVC et al. III, Signet, World Gold Council (Jun. 20, 2011) ("WGC III"), WGC et al. I, and WGC et al. II.

[407] See OECD, Due Diligence Guidance for Responsible Supply Chains of Minerals from Conflict-Affected and High-Risk Areas: Supplement on Gold (2012), available at http://www.oecd.org/corporate/guidelinesformultinationalenterprises/FINAL%20Supplement%20on%20Gold.pdf.

[408] See letter from WGC et al. II.

[409] See letter from JVC et al. III.

[410] See letter from ICAR et al. II.

USCA Case #13-5252    Document #1455974    Filed: 09/11/2013    Page 119 of 198

would still be able to apply the OECD's core due diligence framework to gold.

The commentators that advocated treating gold differently from the other conflict minerals comprise mostly gold, mining, and jewelry companies or associations. Of these commentators, only one indicated that the final rule should initially be more stringent with issuers using gold because 80% of the funds generated by conflict minerals for armed groups come from gold.[411] The other commentators indicated that the final rule should be more lenient for gold and that we should defer full incorporation of gold into the final rule because such a large percentage of gold coming from the DRC is illegally exported that it will require greater time and effort to make the gold supply chain transparent than it will for the other conflict minerals.[412] One commentator was concerned that, until a more transparent supply chain is developed, the final rule would stigmatize gold and thereby harm that mineral's ability to be used as a hedge and damage the global financial economy because so many companies would not be able to determine the origin of their gold.[413] Finally, a few commentators stated that the final rule should permit issuers to exclude certain information from public dissemination regarding the storage and transportation routes of gold for security reasons.[414]

### c. Final Rule

After considering the comments, the final rule will not provide a general delay of effectiveness, nor will the proposal be withdrawn and re-proposed. Although many commentators advocated that the final rule include an extended general delay of the rule's effectiveness, we do not believe this approach would appropriately implement Congress's directive in the Conflict Minerals Statutory Provision. The provision states when an issuer must begin to report on its conflict minerals. Congress directed us to promulgate regulations requiring any "person described" to disclose annually "beginning with the person's first full fiscal year that begins after the date of promulgation of such regulations."[415] Additionally, it is not clear that a general delay of the final rule is necessary or appropriate. As noted by two of the co-sponsors of the statutory provision, conflict minerals

legislation was first considered in 2008, the Conflict Minerals Statutory Provision was over a year old at the time of the letter, and many issuers have been working with various groups in developing supply chain tracing for years.[416] Therefore, under the final rule, most issuers with necessary conflict minerals will be required to file a specialized disclosure report on or before May 31, 2014 containing conflict minerals disclosure for the initial reporting period that will extend from January 1, 2013 to December 31, 2013.

Since Congress adopted the Conflict Minerals Statutory Provision in July 2010, we have sought comment on our implementation of the provision, including our proposal, and have provided opportunities for commentators to provide their input, both before and after the rules were proposed. As noted above, we extended the comment period for the rule proposal and convened an October 2011 roundtable at the request of commentators. We have continued to receive comment letters through August 2012, all of which we have considered. Some commentators have provided responses to other commentators, particularly on the Economic Analysis. This robust, public, and interactive debate has allowed us to more fully consider how to develop our final rule. Additionally, as discussed further in the Economic Analysis section, below, we have considered and analyzed the numerous comments received regarding the costs and complexities of the statute and proposed rule, and have taken them into account in the final rule. Overall, we believe interested parties have had sufficient opportunity to review the proposed rules, as well as the comment letters, and to provide views on the proposal, other comment letters, including data to inform our consideration of the final rule. Accordingly, we do not believe that withdrawal of the proposed rule and re-proposal is necessary.

While the final rule does not include a general delay for the reasons noted, we acknowledge that there are legitimate concerns about the feasibility of preparing the required disclosure in the near term because of the stage of development of the supply chain tracing mechanisms. In order to address these concerns, rather than providing an extended general delay of effectiveness, the final rule includes a targeted and temporary provision intended to help issuers address some of the burdens and costs of compliance with the final rule. For all issuers, this period will last two

years, including issuers' 2013 and 2014 reporting periods, but will not be permitted for the reporting period beginning January 1, 2015. For smaller reporting companies, this period will last four years, including issuers' 2013 through 2016 reporting periods, but will not be permitted for the reporting period beginning January 1, 2017. We note that, although some commentators recommended that there be no such transition period and other commentators recommended that such a transition period be permitted for either a shorter or longer amount of time, a number of commentators appeared to suggest that a transition period through 2014 would be appropriate to allow the necessary traceability systems in the Covered Countries to be established.[417] Issuers taking advantage of this temporary category are still be required to conduct due diligence and prepare and file a Conflict Minerals Report, and are required to disclose in their Conflict Mineral Report all steps taken by such issuer, if any, since the issuer's last such report to mitigate the risk that its necessary conflict minerals benefit armed groups, including any steps to improve its due diligence.

As discussed in greater detail below, the final rule provides a temporary "DRC conflict undeterminable" category for a two-year period for all issuers and a four-year period for smaller reporting companies. This category is available for issuers that proceed to step three but are unable to determine, after exercising their required due diligence,[418] whether

---

[411] See letter from TriQuint I.

[412] See letters from AngloGold, IPMI I, JVC et al. II, NMA II, and WGC II.

[413] See letter from WGC II.

[414] See letters from NMA II, NAM III, and WGC II.

[415] See Exchange Act Section 13(p)(1)(A).

[416] See letter from Sen. Durbin/Rep. McDermott.

[417] See, e.g., letters from AdvaMed I (recommending an "unknown determination" transition period at least through 2014), FEC I ("Disclosure of minerals mined could be mainly conflict free for 2014 and finally the companies could successfully report to the Securities and Exchange Commission in 2015."), JVC et al. II (urging "the Commission to adopt a calibrated 'phase-in' disclosure approach spanning the period from April 15, 2011 (the statutorily-prescribed effective date of the Commission's implementing rules) through at least early 2014, to afford all affected issuers a minimum two-year transition period before becoming obligated to furnish an audited CMR"), Plexus (suggesting that a "phase in compliance schedule of at least 2 years is needed in order to provide time for the due diligence systems to be set-up, most importantly on the ground in the DRC," but even "this would be a significant challenge"), Verizon (recommending "delaying the full applicability of the due diligence requirements of the Conflict Minerals Report until after fiscal 2014, to allow the DRC Zone countries to develop the traceability protocols and related infrastructure required in order to supply Conflict Free Smelters"), and WilmerHale ("After fiscal year 2014, when sufficient infrastructure is expected to have been developed to permit companies to determine the source of all their conflict minerals, the 'indeterminate source' category would no longer be available.").

[418] As discussed in greater detail below, issuers are required to exercise due diligence on the source
Continued

USCA Case #13-5252    Document #1455974    Filed: 09/11/2013    Page 120 of 198

their conflict minerals originated in the Covered Countries or whether their conflict minerals that originated in the Covered Countries directly or indirectly finance or benefit armed groups in the Covered Countries.

The final rule permits any such issuer for purposes of the conflict minerals disclosure to describe its products with such conflict minerals as "DRC conflict undeterminable," unless those products also include other conflict minerals that directly or indirectly financed or benefited armed groups in the Covered Countries. Further, although issuers with "DRC conflict undeterminable" products are required to provide a Conflict Minerals Report that describes, among other matters, the measures taken by the issuer to exercise due diligence on the source and chain of custody of the conflict minerals, during the temporary period they will not have to provide an independent private sector audit of that report. We believe that not requiring an independent private sector audit of the Conflict Minerals Report during the temporary period is appropriate because an audit of the design of an issuer's due diligence that results in an undeterminable conclusion would not appear to have a meaningful incremental benefit.

*D. Step Two—Determining Whether Conflict Minerals Originated in the Democratic Republic of the Congo or Adjoining Countries and the Resulting Disclosure*

Once an issuer determines that conflict minerals are necessary to the functionality or production of a product manufactured or contracted to be manufactured by the issuer, the Conflict Minerals Statutory Provision requires the issuer to determine whether those conflict minerals originated in the Covered Countries.[419] If so, the issuer must submit a Conflict Minerals Report concerning those conflict minerals that originated in the Covered Countries,[420] and make that report available on its Internet Web site.[421] To determine whether their conflict minerals originated in the Covered Countries, so as to determine whether they must exercise due diligence on the source and chain of custody of those minerals and provide a Conflict Minerals Report, the final rule requires issuers with necessary conflict minerals to conduct a reasonable country of origin inquiry.

1. Reasonable Country of Origin Inquiry

a. Proposed Rules

We proposed that an issuer would be required to disclose whether it has necessary conflict minerals that originated in the Covered Countries based on its "reasonable country of origin inquiry." Our proposed rules did not specify, however, what constituted a reasonable country of origin inquiry. Rather than describing what a reasonable country of origin inquiry would entail, we indicated that such a determination would depend on each issuer's particular facts and circumstances. In this regard, we noted that the reasonable country of origin inquiry requirement was not meant to suggest that issuers would have to determine with absolute certainty whether their conflict minerals originated in the Covered Countries as we have often stated that a reasonableness standard is not the same as an absolute standard.[422]

b. Comments on the Proposed Rules

One commentator indicated that the final rule should not include a reasonable country of origin inquiry for determining whether an issuer's conflict minerals originated in the Covered Countries.[423] This commentator objected to the use of a reasonable country of origin inquiry because it believed that the origin of a product should be determined based on where the product is produced rather than where the minerals in the product were mined. Another commentator recommended that the final rule not require issuers to make any reasonable country of origin inquiry at all if they determine, based on whatever means they believe appropriate, that their conflict minerals did not originate in the Covered Countries, provided they disclose this fact.[424] Many other commentators on this subject agreed that the proposed rules' reasonable country of origin inquiry approach is appropriate.[425] Some of these commentators disagreed, however, on the meaning and application of the standard. Some such commentators asserted that a reasonable country of origin standard should be equivalent to the due diligence standard required for the Conflict Minerals Report.[426] Others suggested that the reasonable country of origin standard should conform, at least in part, to international standards,[427] such as the "preliminary review" in the OECD guidance.[428]

Many commentators agreed that the final rule should not define the reasonable country of origin standard, or should provide only general guidance regarding the standard, so that the rules would allow for greater flexibility to evolve as processes improved.[429] Some of these commentators provided examples of the general guidance that

---

and chain of custody of their conflict minerals and potentially provide a Conflict Minerals Report if, following their reasonable country of origin inquiry, they know they have conflict minerals from the Covered Countries and not from recycled or scrap sources, or they have reason to believe that their conflict minerals may have originated in the Covered Countries and may not have come from recycled or scrap sources. Only after these issuers have exercised their required due diligence may they use the "DRC conflict undeterminable" alternative if they are still unable to determine that their conflict minerals originated in the Covered Countries or, if they determine that their minerals did originate in the Covered Countries, but they are unable to determine that their conflict minerals directly or indirectly financed or benefited armed groups in the Covered Countries.

[419] *See* Exchange Act Section 13(p)(1)(A).

[420] *See id.*

[421] *See* Exchange Act Section 13(p)(1)(D).

[422] *Cf.* Foreign Corrupt Practices Act (the "FCPA"), 15 U.S.C. 78m(b)(7) and Exchange Act Section 13(b)(7), which states that "the terms 'reasonable assurances' and 'reasonable detail' mean such level of detail and degree of assurance as would satisfy prudent officials in the conduct of their own affairs." The release further cites to the conference committee report on amendments to the *FCPA, Cong. Rec.* H2116 (daily ed. Apr. 20, 1988), which states the reasonableness "standard 'does not connote an unrealistic degree of exactitude or precision,'" but instead "'contemplates the weighing of a number of relevant factors, including the cost of compliance.'"

[423] *See* letter from Teggeman.

[424] *See* letter from Roundtable (stating that the "Conflict Minerals Statutory Provision requires issuers to disclose 'whether' their conflict minerals originated in the Covered Countries, and, in the case of a positive determination, to provide a Conflict Minerals Report," and it "does not impose any obligation on an issuer who determines that the conflict minerals did not originate in the Covered Countries to make any disclosure beyond that fact, nor does it specify how the issuer is to determine that the conflict minerals did not originate in the Covered Countries").

[425] *See, e.g.,* letters from AAFA, AngloGold, ArcelorMittal, Barrick Gold, Boeing, Chamber I, Cleary Gottlieb, CRS I, Enough Project I, Evangelical Alliance, Evangelicals, Global Witness I, Howland, ICGLR, Industry Group Coalition I, IPC I, IPMI I, ITIC I, JVC *et al.* II, LBMA I, Metalsmiths, Methodist Board, MSG I, NAM I, NEI, NMA II, NYCBar I, NYCBar II, RILA–CERC, SEMI, Semiconductor, SIF I, SIF II, PCP, Presbyterian Church II, Sen. Durbin/Rep. McDermott, State II, TIAA–CREF, TIC, TriQuint I, and WGC II.

[426] *See* letters from Metalsmiths and Sen. Durbin/Rep. McDermott.

[427] *See* letters from CRS I and IPMI I.

[428] *See* letter from IPMI I (stating that "the OECD advocates an initial determination of origin inquiry"). *See also* OECD, *OECD Due Diligence Guidance for Responsible Supply Chains of Minerals from Conflict-Affected and High-Risk Areas,* 33 (2011), *available at http://www.oecd.org/daf/internationalinvestment/guidelinesformultinationalenterprises/46740847.pdf.* ("This Guidance applies to actors operating in a conflict-affected and high-risk area, or potentially supplying or using tin (cassiterite), tantalum (tantalite) or tungsten (wolframite), or their smelted derivates, from a conflict-affected and high-risk area. Companies should preliminarily review their mineral or metal sourcing practices to determine if the Guidance applies to them.").

[429] *See, e.g.,* letters from AAFA, AngloGold, ArcelorMittal, Industry Group Coalition I, IPC I, IPMI I, ITIC I, JVC *et al.* II, NAM I, RILA–CERC, Semiconductor, SIF I, TriQuint I, and WGC II.

the final rule could include while still allowing flexibility.[430] For example, some commentators suggested that we indicate that the reasonable country of origin inquiry could differ among issuers based on their size, products, and relationships with suppliers.[431] In addition, one commentator recommended that the final rule should clarify that a "reasonable person" standard applies to the reasonable country of origin standard.[432] As a further example, some commentators sought flexibility for the reasonable country of origin standard that permits some combination of reasonable supplier declarations, contractual obligations, risk-based follow-up, and/or smelter validations.[433] One commentator asserted that an issuer's reasonable country of origin inquiry should be conducted under a reasonable care standard that requires "more than a passive acceptance by the filer of information provided by their suppliers," which does not "mandate that an issuer always reach the legally correct conclusion, but does require sufficient investigation by an issuer to support reasonable cause to believe in the conclusion." [434]

Some commentators asserted that the final rule should define or provide specific guidance on what constitutes a "reasonable country of origin inquiry," although many of these commentators did not provide suggested definitions or guidance.[435] A few commentators argued, however, that any definition or guidance in the final rule should make clear that a reasonable country of origin standard should not be an absolute standard.[436] One commentator suggested that the reasonable country of origin inquiry standard should require an issuer to take "sufficient steps to accurately determine and disclose whether its conflict minerals originate from the DRC," and the commentator, therefore, recommended that an issuer should disclose the steps it undertook to complete its inquiry.[437]

A large number of commentators suggested that, as part of a reasonable country of origin standard, the final rule should permit an issuer to rely on reasonable representations from suppliers and/or smelters.[438] Other commentators recommended, however, that written representations could provide only some evidence in making a reasonable country of origin inquiry but should not, by themselves, satisfy the reasonable country of origin inquiry standard.[439] Some of these commentators provided examples of other evidence an issuer could use in addition to written representations in satisfying a reasonable country of origin standard, including contractually obligating suppliers to source only from conflict-free smelters, conducting spot checks of suppliers and smelters to verify they are obtaining conflict minerals from only conflict-free sources, disclosing publicly the smelters used and the processes undertaken to ensure that only conflict-free minerals are used, and/or determining that there is no contrary evidence or "red flags" that would cast doubt on the minerals' origins.[440] Some commentators suggested that an issuer should be able to rely on representations from smelters only if the smelter was designated "compliant" by nationally or internationally recognized standards.[441] A few commentators, however, asserted that smelters and refiners are unable to verify the country of origin of the minerals they process at the present time.[442] One commentator argued that an issuer should be able to rely on reasonable representations "one or two

steps up the supply chain," but that these representations should be made public.[443]

Commentators were almost evenly split about whether the final rule should allow an issuer to use qualifying or explanatory language in concluding whether its conflict minerals originated in the Covered Countries.[444] Some of the commentators that believed the final rule should permit some qualification or explanation, however, qualified their recommendations.[445]

### c. Final Rule

After considering the comments, we are adopting the final rule regarding the reasonable country of origin inquiry substantially as proposed, but with some modification. The final rule does not specify what steps and outcomes are necessary to satisfy the reasonable country of origin inquiry requirement because, as stated in the Proposing Release, such a determination depends on each issuer's particular facts and circumstances. A reasonable country of origin inquiry can differ among issuers based on the issuer's size, products, relationships with suppliers, or other factors.[446] Further, as we stated in the Proposing Release, we continue to believe that the steps necessary to constitute a reasonable country of origin inquiry depend on the available infrastructure at a given time. As commentators noted, such an approach

---

[430] *See, e.g.,* letters from Industry Coalition I, IPC I, ITIC I, NAM I, RILA–CERC, and SIF I.

[431] *See* letters from IPC I and ITIC I.

[432] *See* letter from RILA–CERC.

[433] *See, e.g.,* letters from Industry Coalition I and NAM I.

[434] *See* letter from Enough Project IV.

[435] *See, e.g.,* letters from CRS I, Earthworks, Enough Project I, Evangelical Alliance, Evangelicals, Global Witness I, Howland, ICGLR, IPC I, IPMI I, Metalsmiths, Methodist Board, MSG I, NYCBar I, NYCBar II, PCP, Presbyterian Church II, Roundtable, SEMI, Sen. Durbin/Rep. McDermott, State II, and TIC.

[436] *See* letters from Chamber I, Cleary Gottlieb, and NAM I.

[437] *See* letter from SIF II.

[438] *See, e.g.,* letters from AngloGold, Arkema, Cleary Gottlieb, Global Tungsten I, Global Tungsten II, Howland, ICGLR, IPC I, IPC II, NAM I, NEI, NMA II, PCP, RILA, Roundtable, SEMI, Taiwan Semi, TIAA–CREF, TIC, TriQuint I, US Telecom, and WGC II.

[439] *See, e.g.,* letters from CTIA, Enough Project I, Global Witness I, Howland, IPMI I, ITIC I, MSG I, NYCBar II, Sen. Durbin/Rep. McDermott, SIF I, and TIC.

[440] *See, e.g.,* letters from Enough Project I, Global Witness I, IPMI I, and MSG I.

[441] *See* letters from Howland, Enough Project I, ITIC I, MJB Consulting (May 30, 2011) ("MJB III"), MSG III, NYCBar II, SIF I, and TIC.

[442] *See* letters from Nordic Sun Worldwide Ltd. (Mar. 17, 2012) ("Nordic Sun") (stating that, before smelter verification schemes can be relied upon, "a more scientific component must be added," and that only "the addition of a low acquisition cost mineral analyzer with a reasonably detailed geologic mineralization fingerprinting capability that include GPS location data and certification tag data in a tamper-proof format will add the necessary missing step to all the 3T minerals and smelter certification systems") and Southern Africa Resource Watch (Apr. 4, 2012) ("SARW") (stating that any scheme that "essentially depends on assurances from refining and smelting facilities will not be helpful"). *But see* letter from iTSCi Programme Governance Committee (Apr. 14, 2012) ("iTSCi") (refuting the letter from Nordic Sun).

[443] *See* letter from Hileman Consulting.

[444] Some commentators asserted that such language should be permitted. *See* letters from AngloGold, Cleary Gottlieb, Howland, NAM I, NMA II, and WGC II. Others took the opposite view. *See* letters from CRS I, Earthworks, Global Witness I, NEI, and State II.

[445] *See* letters from Howland (stating that an issuer should be able to use qualifying language only if it knows that 80% or more of its conflict minerals did not originate from the Covered Countries), MSG I (stating that qualifying language is not relevant as long as an issuer discloses the manner in which it determined its reasonable country of origin inquiry), NAM I (stating that qualifying language should be permitted only when there is appropriate information to support the conclusion), NMA II (same), and TriQuint I (stating that the final rule should allow qualifying language when an issuer concludes that its conflict minerals are not "DRC conflict free," but should not allow such a qualification if it states that its conflict minerals are, in fact, "DRC conflict free").

[446] As we indicated in the Proposing Release, although a reasonable country of origin inquiry may be based on a particular issuer's size, products, relationships with suppliers, or another factor, an issuer may not conclude that, because of the large (or small) amount of conflict minerals it uses in its products or the large (or small) number of products that include conflict minerals, it is unreasonable for that issuer to conduct any inquiry into the origin of its conflict minerals. Instead, that issuer must make some inquiry into the origin of its conflict minerals.

allows the final rule to be flexible and evolve with available tracing processes.

Even though the final rule does not specify the steps necessary to satisfy the reasonable country of origin inquiry requirement, the final rule includes general standards governing the inquiry and the steps required as a result of the inquiry. First, the final rule provides that, to satisfy the reasonable country of origin inquiry requirement, an issuer's reasonable country of origin inquiry must be reasonably designed to determine whether the issuer's conflict minerals did originate in the Covered Countries, or did come from recycled or scrap sources, and it must be performed in good faith. The proposed rules did not discuss the design of an issuer's reasonable country of origin inquiry or an issuer's performance in carrying out its reasonable country of origin inquiry. We believe providing these standards in the rule will facilitate compliance with the rule by providing guidance to issuers about what is required to satisfy the reasonable country of origin inquiry. In this regard, we note that one commentator stated that "[i]t is essential, in order to make the implementation of 1502 practical and cost effective, that the concept of reasonableness, and good faith efforts" be recognized in the final rule.[447] Further, we believe the notion of good faith performance is important so that an issuer will not be able to establish a reasonably designed inquiry but subsequently fail to undertake the steps necessary to carry out the actual inquiry.

Although we do not prescribe the steps constituting a reasonable country of origin inquiry, we do view an issuer as satisfying the reasonable country of origin inquiry standard if it seeks and obtains reasonably reliable representations indicating the facility at which its conflict minerals were processed and demonstrating that those conflict minerals did not originate in the Covered Countries or came from recycled or scrap sources. These representations could come either directly from that facility or indirectly through the issuer's immediate suppliers, but the issuer must have a reason to believe these representations are true given the facts and circumstances surrounding those representations. An issuer must also take into account any applicable warning signs or other circumstances indicating that its conflict minerals may have originated in the Covered Countries or did not come from recycled

or scrap sources.[448] An issuer would have reason to believe representations were true if a processing facility received a "conflict-free" designation by a recognized industry group that requires an independent private sector audit of the smelter, or an individual processing facility, while it may not be part of the industry group's "conflict-free" designation process, obtained an independent private sector audit that is made publicly available. An issuer's policies with respect to the sourcing of conflict minerals will generally form a part of the issuer's reasonable country of origin inquiry, and therefore would generally be required to be disclosed in the issuer's Form SD.

Moreover, the issuer is not required to receive representations from all of its suppliers. The standard focuses on reasonable design and good faith inquiry. Therefore, if an issuer reasonably designs an inquiry and performs the inquiry in good faith, and in doing so receives representations indicating that its conflict minerals did not originate in the Covered Countries, the issuer may conclude that its conflict minerals did not originate in the Covered Countries, even though it does not hear from all of its suppliers, as long as it does not ignore warning signs or other circumstances indicating that the remaining amount of its conflict minerals originated or may have originated in the Covered Countries. For example, we would agree that, "if reasonable inquiry has been made, and if no evidence of [Covered Country] origin has arisen, and if the origin of only a small amount of gold were still unknown, a manufacturer should be allowed to declare that its gold is not from the [Covered Countries] and is DRC conflict free." [449]

The reasonable country of origin inquiry is consistent with the supplier engagement approach in the OECD guidance where issuers use a range of tools and methods to engage with their suppliers.[450] The results of the inquiry may or may not trigger due diligence. This is the first step issuers take under the OECD guidance to determine if the further work outlined in the OECD guidance—due diligence—is necessary. The Conflict Minerals Statutory Provision specifically contemplates due diligence, which goes beyond inquiry and involves further steps to establish the truth or accuracy of relevant information, by requiring a description of the measures the issuer took to exercise due diligence on the source and chain of custody of the minerals. The Conflict Minerals Statutory Provision specifically notes that due diligence includes the audit discussed below.

Second, the final rule establishes a different standard from that included in the proposal for determining whether due diligence on the conflict minerals' source and chain of custody and a Conflict Minerals Report is required after the reasonable country of origin inquiry. The proposed rules would have required an issuer to conduct due diligence and provide a Conflict Minerals Report if, based on its reasonable country of origin inquiry, the issuer determined that its conflict minerals originated in the Covered Countries, the issuer was unable to determine that its conflict minerals did not originate in the Covered Countries, or the issuer determined that its conflict minerals came from recycled or scrap sources. Under the proposal, issuers could only avoid providing a Conflict Minerals Report if they could prove a negative—that their conflict minerals did not originate in the Covered Countries. This approach would arguably be more burdensome than necessary to accomplish the purpose of the statutory provision. The reasonable country of origin inquiry standard does not require an issuer to determine to a

---

[447] *See* letter from ITRI IV (emphasis in original).

[448] As discussed below, this approach is consistent with the OECD's due diligence guidance, which states that issuers should preliminarily review their sourcing practices to determine if their due diligence guidance applies, and provides non-exclusive examples of situations that it states should trigger the guidance. *See* OECD, *OECD Due Diligence Guidance for Responsible Supply Chains of Minerals from Conflict-Affected and High-Risk Areas* (2011), *available at http://www.oecd.org/daf/internationalinvestment/guidelinesformultinationalenterprises/46740847.pdf. See also* OECD, *Due Diligence Guidance for Responsible Supply Chains of Minerals from Conflict-Affected and High-Risk Areas: Supplement on Gold* (2012), *available at http://www.oecd.org/corporate/guidelinesformultinationalenterprises/FINAL%20Supplement%20on%20Gold.pdf.*

[449] *See* letter from IPMI I. Commentators opining on whether the statutory language requiring due diligence and a Conflict Minerals Report applies only to issuers that know that their conflict minerals originated in the Covered Countries or whether that statutory language applies also to issuers that are unable to determine that their conflict minerals did not originate in the Covered

Countries did not necessarily discuss this topic in relation to conflict minerals from recycled or scrap sources.

[450] In June 2012, the OECD issued a report regarding implementation of the OECD guidance. *See* OECD, *Downstream Implementation of the OECD Due Diligence Guidance for Responsible Supply Chains of Minerals from Conflict-Affected and High-Risk Areas, Cycle 2 Interim Progress Report on the Supplement on Tin, Tantalum, and Tungsten Final Draft* (June 2012), *available at http://www.oecd.org/investment/guidelinesformultinationalenterprises/Downstream%20cycle%202%20report%20-%20Edited%20Final%20-%201%20June.pdf.* This additional guidance includes sample letters to suppliers and customers regarding the use of conflict minerals.

certainty that all its conflict minerals did not originate in the Covered Countries because the standard required is a reasonable inquiry, and requiring a certainty in this setting would not be reasonable and may impose undue costs.[451]

Under the final rule, if (i) an issuer determines that, based on its reasonable country of origin inquiry, its necessary conflict minerals did not originate in the Covered Countries or did come from recycled or scrap sources, or (ii) based on its reasonable country of origin inquiry, the issuer has no reason to believe that its conflict minerals may have originated in the Covered Countries or the issuer reasonably believes that its conflict minerals are from recycled or scrap sources, the issuer is not required to exercise due diligence on its conflict minerals' source or chain of custody or file a Conflict Minerals Report with respect to such conflict minerals. Instead, the issuer only is required, in the body of its specialized disclosure report, to disclose its determination and briefly describe the reasonable country of origin inquiry it undertook in making its determination and the results of the inquiry it performed.

Conversely, an issuer must exercise due diligence on its conflict minerals' source and chain of custody and provide a Conflict Minerals Report if the issuer knows that it has necessary conflict minerals that originated in the Covered Countries and did not come from recycled or scrap sources. In addition, if, based on its reasonable country of origin inquiry, the issuer has reason to believe that its necessary conflict minerals may have originated in the Covered Countries (and may not have come from recycled or scrap sources), the issuer must also exercise due diligence on the source and chain of custody of its conflict minerals. If, however, as a result of that due diligence, such an issuer determines that its conflict minerals did not originate in the Covered Countries or that its conflict minerals did come from recycled or scrap sources, no Conflict Minerals Report is required, but the issuer is required, in the body of its specialized disclosure report, to disclose its determination and briefly describe its due diligence and the results of the due diligence. If, based on its due diligence, the issuer determines that its conflict minerals did originate in the Covered Countries, and did not come from recycled or scrap sources, the issuer is required to submit a Conflict Minerals

Report. If, based on its due diligence, the issue cannot determine the source of its conflict minerals, it is also required to submit a Conflict Minerals Report.

This revised approach does not require an issuer to prove a negative to avoid moving to step three, but it also does not allow an issuer to ignore or be willfully blind to warning signs or other circumstances indicating that its conflict minerals may have originated in the Covered Countries. This approach appears consistent with the ''reason-to-believe approach'' provided by one commentator.[452] Also, as some commentators noted,[453] this approach is consistent with the OECD's due diligence guidance, which states that issuers ''should preliminarily review their mineral or metal sourcing practices to determine if the [due diligence] Guidance applies to them.'' [454] In its due diligence guidance, the OECD provides non-exclusive examples of circumstances, or red flags, that it states should trigger its guidance.[455] One example of a circumstance that, absent other information, should provide an

issuer with reason to believe that its conflict minerals may have originated in the Covered Countries is if an issuer becomes aware that some of its conflict minerals were processed by smelters that sourced from many countries, including the Covered Countries, but the issuer is unable to determine whether the particular minerals it received from such a ''mixed smelter'' were from the Covered Countries.[456]

We appreciate that commentators differ in their views as to when due diligence and, potentially, a Conflict Minerals Report is required under the language of the Conflict Minerals Statutory Provision. The provision requires issuers to provide a Conflict Minerals Report if their conflict minerals ''did originate'' in the Covered Countries but does not address how to determine whether the minerals ''did originate'' in those countries.[457] The final rule adopts the reasonable country of origin inquiry as the procedure for making this determination. Some commentators argued that the statutory language should be read to require that only an issuer that knows, after conducting its reasonable country of origin inquiry, that its conflict minerals originated in the Covered Countries must perform due diligence and provide a Conflict Minerals Report.[458] Alternatively, other commentators argued that the provision should be read to require issuers that are unable to determine that their conflict minerals did *not* originate in the Covered Countries to perform due diligence and potentially submit a Conflict Minerals Report.[459] We believe the approach that is most consistent with the statutory language and its purposes, however, is to require any issuer that, after the reasonable country of origin inquiry, knows that its minerals originated in the Covered Countries and did not come from recycled or scrap sources to perform due diligence regarding those

---

[451] As discussed below, certainty also is not required for the due diligence inquiry.

[452] *See* letter from Tiffany (''A better way to address this issue would be to impose the obligation to submit a conflict minerals report on only those companies that actually have a reason to believe that they use gold (or some other 'conflict mineral') that does, in fact, originate in the DRC or surrounding countries (the 'reason-to-believe approach').'').

[453] *See* letters from Enough Project I (stating that, through its reasonable country of origin inquiry, ''an issuer should identify red flags that would alert it to the possibility that the minerals in its products support conflict in the DRC and adjoining countries,'' and citing to the OECD's due diligence guidance), Global Witness I (stating that an issuer should ''[r]eview for and consider 'red flags' indicating possible sourcing from Covered Countries,'' and citing to the OECD's due diligence guidance), and IPMI I (''The OECD's new international standard for an initial inquiry is a specific point where harmonization will be particularly advantageous, while conforming well to the direction of Congress for a reasonable country of origin inquiry. Like Congress, the OECD advocates an initial determination of origin inquiry: 'Companies should preliminarily review their mineral or metal sourcing practices to determine if the Guidance applies to them.''').

[454] *See OECD, OECD Due Diligence Guidance for Responsible Supply Chains of Minerals from Conflict-Affected and High-Risk Areas, 33* (2011), *available at* http://www.oecd.org/daf/internationalinvestment/guidelinesformultinationalenterprises/46740847.pdf.

[455] *See id.* (providing a number of examples, including whether conflict minerals are claimed to originate from a country that has limited known reserves of the conflict mineral in question) and *OECD, Due Diligence Guidance for Responsible Supply Chains of Minerals from Conflict-Affected and High-Risk Areas: Supplement on Gold* (2012), *available at* http://www.oecd.org/corporate/guidelinesformultinationalenterprises/FINAL%20Supplement%20on%20Gold.pdf. The gold supplement also addresses circumstances triggering due diligence for gold claimed to have come from recycled or scrap sources.

[456] This scenario is consistent with the OECD due diligence framework's statement that ''tracing minerals in a company's possession are generally unfeasible after smelting, with refined metals entering the consumer market as small parts of various components in end products.'' *See OECD, OECD Due Diligence Guidance for Responsible Supply Chains of Minerals from Conflict-Affected and High-Risk Areas,* 33 (2011), *available at* http://www.oecd.org/daf/internationalinvestment/guidelinesformultinationalenterprises/46740847.pdf.

[457] *See* Exchange Act Section 13(p)(1)(A) (stating that ''in cases in which such conflict minerals *did originate* in the'' Covered Countries (emphasis added), the issuer must ''submit to the Commission'' a Conflict Minerals Report).

[458] *See, e.g.,* letters from AngloGold, Clearly Gottlieb, NAM I, and Tiffany.

[459] *See, e.g.,* letters from NEI, NYCBar I, and NYCBar II.

minerals and submit a Conflict Minerals Report. In addition, any issuer that, after conducting its reasonable country of origin inquiry, has reason to believe that its minerals may have originated in the Covered Countries, and may not have come from recycled or scrap sources must perform due diligence. If, as a result of that due diligence, such an issuer determines that its conflict minerals did not originate in the Covered Countries or did come from recycled or scrap sources, no Conflict Minerals Report is required (although, as discussed below, such due diligence, and the results thereof, must be disclosed in the body of such issuer's specialized disclosure report, together with the description of such issuer's reasonable country of origin inquiry). Otherwise, such an issuer must submit a Conflict Minerals Report. We are adopting this approach in the final rule.

Interpreting the Conflict Minerals Statutory Provision to require due diligence only if an issuer has affirmatively determined that its conflict minerals originated in the Covered Countries and does not come from recycled or scrap sources would undermine the goals of the statute. For instance, if we allowed an issuer to stop its inquiry after learning that its necessary conflict minerals came from a smelter that includes minerals from the Covered Countries and other sources without knowing if its particular minerals came from the Covered Countries, there would be an incentive for issuers to avoid learning the ultimate source of the minerals. Thus, although we realize our approach will be more costly than only requiring due diligence and, potentially, a Conflict Minerals Report if the issuer has affirmative knowledge that its minerals came from the Covered Countries, in our view, requiring further steps by issuers that have reason to believe that they have necessary conflict minerals that may have originated in the Covered Countries is necessary to carry out the requirements contemplated by the statute. Moreover, this approach strikes a more appropriate balance than requiring an issuer to prove a negative— that their necessary conflict minerals did not originate in the Covered Countries—which would be even more costly.

Alternatively, the Conflict Minerals Statutory Provision could be interpreted to require all issuers to determine whether their conflict minerals originated in the Covered Countries through the exercise of due diligence. This inquiry could be quite costly, especially in a situation in which an issuer is unable to determine that a very

small amount of its overall conflict minerals did not originate in the Covered Countries or come from recycled or scrap sources. While such an interpretation of the provision is plausible and, in fact, was suggested by two of the co-sponsors of the provision as the accurate interpretation of the Conflict Minerals Statutory Provision,[460] we do not believe that approach is necessary to achieve Congress's goal. Instead, we believe the reasonable country of origin inquiry standard provides a clearer way for issuers to make the necessary determination and does so in a manner that significantly reduces burdens and is more cost-effective. Although the reasonable country of origin inquiry will impose costs on issuers, we believe the costs are lower than those that would be incurred if issuers were always required to perform due diligence.

Finally, we note that an issuer conducting an appropriate reasonable country of origin inquiry may not be able to determine to a certainty the origin of all its conflict minerals or whether they came from recycled or scrap sources. A certainty is not required to satisfy the reasonable country of origin inquiry standard. Disclosure indicating that the determination is uncertain is unnecessary. Consistent with this approach, issuers may explicitly state that, if true, their reasonable country of origin inquiry was reasonably designed to determine whether the conflict minerals did originate in the Covered Countries or did not come from recycled or scrap sources and was performed in good faith, and the issuer's conclusion that the conflict minerals did not originate in the Covered Countries or came from recycled or scrap sources was made at that reasonableness level.

### 2. Disclosures in the Body of the Specialized Disclosure Report

#### a. Proposed Rules

Under the proposed rules, an issuer would have been required to make a reasonable country of origin inquiry as to whether its conflict minerals originated in the Covered Countries. After the reasonable country of origin inquiry, if an issuer concluded that its conflict minerals did not originate in the Covered Countries, the issuer would have been required to disclose its

conclusion in the body of its annual report and on its Internet Web site.[461] Also, the proposed rules would have required that such an issuer disclose in the body of its annual report and on its Internet Web site the reasonable country of origin inquiry it used in making that determination. The proposed rules would not, however, have required an issuer that, after its reasonable country of origin inquiry, determined that its conflict minerals did not originate in the Covered Countries to disclose the actual countries from which the conflict minerals originated. The issuer would have been required to provide in the body of the annual report the Internet address on which the disclosure was posted and retain the information on the Web site at least until the issuer's subsequent annual report was filed. Finally, the issuer would have been required to maintain reviewable business records in support of its negative determination. The issuer, however, would not have been required to make any other disclosures with regard to the conflict minerals that did not originate in the Covered Countries.

Alternatively, if an issuer determined through its reasonable country of origin inquiry that any of its conflict minerals originated in the Covered Countries, or if the issuer was unable to determine after a reasonable country of origin inquiry that its conflict minerals did not originate in the Covered Countries, the proposed rules would have required the issuer to disclose this result in the body of its annual report and disclose that the Conflict Minerals Report was furnished as an exhibit to its annual report. Additionally, the issuer would have been required to make available its Conflict Minerals Report on its Internet Web site until its subsequent annual report was filed, disclose in the body of its annual report that the Conflict Minerals Report was posted on its Internet Web site, and provide the Internet address on which the Conflict Minerals Report was located.[462] Under the proposed rules, such an issuer would have been required to post the Conflict Minerals Report on its Internet Web site, but the issuer would not have had to post any of the disclosures it provided in the body of its annual report on its Web site.

#### b. Comments on the Proposed Rules

Almost all of those that commented on this point believed that the final rule should require some very brief

---

[460] See letter from Sen. Durbin/Rep. McDermott ("The proposed rule differentiates between the country of origin inquiry and the due diligence involved in determining the source and chain of custody of conflict minerals, indicating that the former could be 'less exhaustive.' This is a misreading of our intent—we see no difference in the effort that should be exercised in each case.").

[461] See Exchange Act Section 13(p)(1)(E). The issuer would be required to keep this information on its Internet Web site until it filed its subsequent annual report.

[462] See Exchange Act Section 13(p)(1)(E).

ADD-48

discussion of the conflict minerals information in the body of the annual report.[463] Some commentators indicated, however, that an issuer should not have to provide any disclosure in the body of the annual report,[464] and one commentator stated that an issuer should not have to describe the findings of its Conflict Minerals Report in the body of the annual report.[465] Other commentators remarked that the full text of the Conflict Minerals Report could be provided as an exhibit to an issuer's annual report.[466] In contrast, a few commentators asserted that an issuer should be required to include its full country of origin disclosure and the full text of its Conflict Minerals Report in the body of the annual report.[467]

A number of commentators agreed that, as proposed, an issuer with conflict minerals that did not originate in the Covered Countries should be required to disclose its reasonable country of inquiry because not requiring such disclosure would undercut the essential purpose of the Conflict Minerals Statutory Provision.[468] A number of other commentators, however, disagreed,[469] and some of these commentators justified their position by noting that the Conflict Minerals Statutory Provision does not require such disclosure and asserted that such disclosure would not serve any constructive purpose.[470] Also, of the many commentators that discussed this topic,[471] one asserted that an issuer with no conflict minerals from the Covered Countries should be required to disclose the name of the country from which its conflict minerals' originated so that investors could determine the veracity of the conclusion.[472]

Most of the commentators that discussed the topic agreed that, as proposed, an issuer should be required to maintain reviewable business records when it determines that its conflict minerals did not originate in the Covered Countries.[473] These commentators disagreed, however, about the length of time that the final rule should require the records be kept. The suggested durations ranged from one year to a period covering the duration of the law.[474] In addition, some commentators recommended that the final rule clarify the meaning of "reviewable business records."[475] There were a few commentators, however, that did not believe that the final rule should require an issuer to retain reviewable business records at all because such a requirement is not in the Conflict Minerals Statutory Provision, an issuer should be permitted to create its own records as it does for the financial and other information in its annual reports, and such a rule would provide an independent books and records requirement that goes beyond the Conflict Minerals Statutory Provision.[476]

### c. Final Rule

After considering the comments, we are modifying the proposal regarding the substantive disclosures in the body of the specialized disclosure report, in part. An issuer that determines that, following its reasonable country of origin inquiry, its conflict minerals did not originate in the Covered Countries or came from recycled or scrap sources or has no reason to believe that its necessary conflict minerals may have originated in the Covered Countries or may not be from recycled or scrap sources, is required to make certain disclosures in the body of its specialized disclosure report on Form SD,[477] under the "Conflict Minerals Disclosure" heading. This requirement is generally consistent with the proposal, except that the proposal required due diligence regarding conflict minerals from recycled or scrap sources. An issuer determining that its conflict minerals that did not originate in the Covered Countries or that came from recycled or scrap sources or that has no reason to believe that its necessary conflict minerals may have originated in the Covered Countries or may not be from recycled or scrap sources must disclose its determination and results and provide a brief description of the inquiry it undertook and the results and provide a link to its Internet Web site where the disclosure is publicly available. However, in a change from the proposal, the final rule requires such an issuer to provide a brief description of the results of the inquiry it performed to demonstrate the basis for concluding that it is not required to submit a Conflict Minerals Report.

As discussed above, we note that there may be instances in which an issuer determines, based on its reasonable country of origin inquiry, that it has reason to believe it has conflict minerals that may have originated in the Covered Countries and may not be from recycled or scrap sources and, therefore, must exercise due diligence on the source and chain of custody of the conflict minerals. If, at any point during the exercise of that due diligence, the issuer determines that its conflict minerals did not originate in the Covered Countries or came from recycled or scrap sources, the issuer is not required to submit a Conflict Minerals Report. The issuer, however, is still required to submit a specialized disclosure report disclosing its determination and briefly describing the reasonable country of origin inquiry and the due diligence efforts it exercised and the results of the inquiry and due diligence efforts to demonstrate why the issuer believes that the conflict minerals did not originate in the Covered Countries or came from recycled or scrap sources.

We note the views of some commentators that requiring issuers to describe their reasonable country of origin inquiry would impose costs neither justified nor required by the provision. Also, we note that the Conflict Minerals Statutory Provision requires only that a "person described" disclose annually "whether conflict minerals that are necessary * * * did originate in the Democratic Republic of the Congo or an adjoining country and, in cases in which such conflict minerals did originate in any such country,

---

[463] *See, e.g.,* letters from AngloGold, Howland, NEI, NY State Bar, SEMI, SIF I, and TriQuint I.

[464] *See* letters from ITIC I and WGC II.

[465] *See* letter from NY State Bar.

[466] *See* letters from Ford, NEI, and WGC II.

[467] *See* letters from CRS I and Earthworks.

[468] *See, e.g.,* letters from CRS I, Earthworks, Hileman Consulting, Methodist Pension, MSG I, NEI, TIC, Tiffany, and TriQuint I.

[469] *See, e.g.,* letters from AngloGold, Cleary Gottlieb, Howland, NMA II, NY State Bar, SEMI, and WGC II.

[470] *See* letters from Cleary Gottlieb, NY State Bar, and SEMI.

[471] *See, e.g.,* letters from AngloGold, Global Tungsten I, Howland, IPC I, ITRI I, JVC *et al.* II, NAM I, NEI, NMA II, RMA, SEMI, State II, TIC, TriQuint I, and WGC II.

[472] *See* letter from SIF I. *See also* letter from State II (noting that such a requirement would encourage issuers to establish due diligence procedures across their conflict mineral supply chains regardless of the minerals' country of origin).

[473] *See, e.g.,* letters from AngloGold, Columban Center *et al.,* CRS I, Hileman Consulting, Earthworks, Global Witness I, Howland, ICGLR, JVC *et al.* II, Kemet, MSG I, NEI, NMA II, Sen. Durbin/ Rep. McDermott, SIF I, State II, TIAA–CREF, TIC, TriQuint I, and WGC II.

[474] Suggested durations included, "multiple years," "a sufficiently long period of time," "as long as their home jurisdictions (of foreign private issuers) require," "for the duration of the law," one year, two years, three years, five years, seven years, and 10 years. *See, e.g.,* letters from AngloGold, Columban Center *et al.,* CRS I, Earthworks, Global Witness I, Hileman Consulting, Howland, ICGLR, Kemet, MSG I, NEI, NMA II, Sen. Durbin/Rep. McDermott, SIF I, State II, TIC, TriQuint I, Trott, and WGC II.

[475] *See* letters from JVC *et al.* II and TIC.

[476] *See* letters from Cleary Gottlieb, NAM I, SEMI, and Tiffany.

[477] As discussed above, the final rule will require that all disclosure be in the body of the issuer's specialized disclosure report on new Form SD instead of its annual report.

submit to the Commission a report.'' [478] Therefore, the Conflict Minerals Statutory Provision only explicitly requires an issuer to provide additional disclosure if the issuer determines that its conflict minerals did originate in the Covered Countries.[479]

We believe, however, that requiring an issuer to provide a brief description of the reasonable country of origin inquiry it undertook is appropriate despite the additional costs associated with providing such a description. As discussed above, the reasonable country of origin inquiry is not a prescriptive standard and does not require certainty. As a result, there will likely be variation in the approaches taken by issuers. Consequently, we believe it is appropriate to require disclosure regarding the reasonable country of origin inquiry so that interested parties can evaluate ''the degree of care'' the issuer used in making its negative determination,[480] and it will ''help ensure credibility of issuer disclosure.'' [481] Also, although the Conflict Minerals Statutory Provision does not explicitly require an issuer to provide further disclosure if the issuer determines that its conflict minerals did not originate in the Covered Countries, the provision does not provide that such disclosures cannot be required. Therefore, we believe that requiring this disclosure is permitted as well as appropriate.

As described above, the final rule does not prescribe particular steps or require an issuer to establish to a certainty that its minerals did not originate in the Covered Countries or come from recycled or scrap sources. Instead, the final rule relies on a reasonable design and good faith execution approach. Requiring an issuer to briefly describe the results of the inquiry it performed is intended to enable stakeholders to assess the issuer's reasonable country of origin design and its efforts in carrying out that design. Also, this disclosure is intended to allow stakeholders to form their own views on the reasonableness of the issuer's efforts. Based on this information, stakeholders could advocate for different processes for individual issuers if they believe it is necessary.[482] In addition, it is expected that reasonable country of origin inquiry processes will change over time based both on improved supply chain visibility and the results of an issuer's prior year inquiry. Requiring an issuer to provide a brief description of the results of its inquiry, therefore, will allow stakeholders to track that progress and advocate for different procedures if they think it is necessary.

We have decided, however, not to adopt the proposed requirement for an issuer to maintain reviewable business records supporting its conclusion that its conflict minerals did not originate in the Covered Countries based on its reasonable country of origin. The Conflict Minerals Statutory Provision does not require an issuer to maintain reviewable business records to support its determination of the source of its conflict minerals. In addition, there does not appear to be a need for the rule to require that an issuer maintain such records. As one commentator noted, issuers ''provide vast amounts of material information in, for example, Management's Discussion and Analysis in periodic reports, for which the SEC does not impose specific record retention requirements for maintaining the source materials used to generate the disclosures.'' [483] Therefore, we believe that it is unnecessary for us to require an issuer to maintain reviewable business records, although maintenance of appropriate records may be useful in demonstrating compliance with the final rule, and may be required by any nationally or internationally recognized due diligence framework applied by an issuer.

Also, in contrast to the proposal, we are not requiring an issuer to disclose in either its specialized disclosure report or its annual report, under a separate heading entitled ''Conflict Minerals Disclosure,'' whether any of its necessary conflict minerals originated in the Covered Countries or did not come from recycled or scrap sources or that the issuer was unable to determine that its conflict minerals did not originate in the Covered Countries or come from recycled or scrap sources. Under the proposal, an issuer required to provide a Conflict Minerals Report, including an issuer required to provide a Conflict Minerals Report because its conflict minerals came from the recycled or scrap sources, would have been required to disclose in the body of its annual report that it furnished a Conflict Minerals Report as an exhibit to its annual report, that the Conflict Minerals Report and certified independent private sector audit report were available on its Internet Web site, and the Internet address where the Conflict Minerals Report and audit report were located. Instead, to reduce some costs and burdens to issuers, the final rule only requires an issuer required to provide a Conflict Minerals Report to disclose in its specialized disclosure report, under a separate heading entitled ''Conflict Minerals Disclosure,'' that a Conflict Minerals Report is provided as an exhibit to its specialized disclosure report and to disclose a link to its Internet Web site where the Conflict Minerals Report is publicly available.

The final rule does not require an issuer to disclose in the body of its specialized disclosure report the reason that the issuer is providing a Conflict Minerals Report because that information will be disclosed by the issuer in the Conflict Minerals Report. Requiring that information also in the body of the specialized disclosure report would be redundant and unnecessary. Similarly, the final rule does not require an issuer to disclose in its specialized disclosure report that it has provided an audit report or a certification of the audit, if applicable, because the audit report and certification would be part of the Conflict Minerals Report already, so specifically mentioning the audit report or certification here is not necessary and may be confusing.

*E. Step Three—Conflict Minerals Report's Content and Supply Chain Due Diligence*

The Conflict Minerals Statutory Provision requires an issuer that determines that its necessary conflict minerals originated in the Covered Countries to submit a Conflict Minerals Report.[484] The Conflict Minerals Report must include, among other matters, a description of the measures taken by the issuer to exercise due diligence on the source and chain of custody of its conflict minerals, which measures ''shall include an independent private sector audit'' of the Conflict Minerals Report.[485] In this regard, the Conflict Minerals Statutory Provision states also

---

[478] *See* Exchange Act Section 13(p)(1)(A).

[479] *See, e.g.,* letter from Cleary Gottlieb. This commentator argued ''an issuer that concludes it has necessary conflict minerals that did *not* (emphasis in original) originate in the Covered Countries must only disclose that conclusion— there is no requirement in the Dodd-Frank Act for disclosure of the inquiry process the issuer undertook in coming to that conclusion,'' because the provision ''only provides for increased disclosure requirements * * * once an issuer has affirmatively determined that its necessary conflict minerals originated in a DRC country.'' *Id.*

[480] *See* letter from MSG I.

[481] *See* letter from NEI.

[482] In this regard, an issuer's description of the results of the reasonable country of origin inquiry should make clear why it determined that its conflict minerals did not originate in the Covered Countries. This is also the case for issuers that must disclose their reasonable country of origin inquiry and due diligence efforts if they determine, following their due diligence, that their conflict minerals did not originate in the Covered Countries or did come from recycled or scrap sources.

[483] *See* letter from NAM I.

[484] *See* Exchange Act Section 13(p)(1)(A).

[485] *See* Exchange Act Section 13(p)(1)(A)(i).

that the issuer submitting the Conflict Minerals Report ''shall certify the audit * * * that is included in such report'' and such a certified audit ''shall constitute a critical component of due diligence in establishing the source and chain of custody of such minerals.''[486] Also, the Conflict Minerals Statutory Provision requires that the Conflict Minerals Report must provide a description of the products ''manufactured or contracted to be manufactured that are not 'DRC conflict free,' '' the entity that conducted the independent private sector audit, the facilities used to process the conflict minerals, the country of origin of the conflict minerals, and the efforts to determine the mine or location of origin with the greatest possible specificity.[487]

### 1. Content of the Conflict Minerals Report

#### a. Proposed Rules

The proposed rules would have required an issuer to exercise due diligence on the source and chain of custody of its conflict minerals that it was unable to determine, based on its reasonable country of origin inquiry, did not originate in the Covered Countries and to describe those due diligence measures in its Conflict Minerals Report. Consistent with the Conflict Minerals Statutory Provision,[488] we proposed to require that the description of the measures taken by an issuer to exercise due diligence on the source and chain of custody of its conflict minerals would include a certified independent private sector audit conducted in accordance with the standards established by the Comptroller General of the United States.[489] The proposed rules also stated that the audit would constitute a critical component of due diligence.[490] To implement the Conflict Minerals Statutory Provision's requirement that an issuer ''certify the audit,''[491] we proposed that an issuer would be required to certify that it obtained an independent private sector audit of its Conflict Minerals Report,[492] and we proposed that an issuer would provide this certification in that report.

Further, as required by the Conflict Minerals Statutory Provision,[493] we proposed that the rules would require descriptions, in the Conflict Minerals Report, of an issuer's products that are not ''DRC conflict free,'' the facilities used to process those conflict minerals, the country of origin of those conflict minerals, and the efforts to determine the mine or location of origin with the greatest possible specificity.

The Conflict Minerals Statutory Provision uses the phrase ''facilities used to process the conflict minerals,'' which we noted in the Proposing Release would appear to refer to the smelter or refinery through which the issuer's minerals passed. We noted also that the Conflict Minerals Statutory Provision states that products are ''DRC conflict free'' when those products do not contain conflict minerals that directly or indirectly finance or benefit armed groups.[494] The Proposing Release also noted that Section 1502(e)(3) of the Act defines the term ''armed group'' as ''an armed group that is identified as perpetrators of serious human rights abuses in the annual Country Reports on Human Rights Practices under sections 116(d) and 502B(b) of the Foreign Assistance Act of 1961,''[495] as they relate to the Covered Countries (''Country Reports'').[496] Our proposed rules included a cross reference to that definition to provide guidance.

Under the proposed rules, an issuer that was unable to determine that its conflict minerals did not originate in the Covered Countries would have been required to furnish a Conflict Minerals Report to the same extent as an issuer with conflict minerals that originated in the Covered Countries. We recognized that an issuer unable to determine that its conflict minerals did not originate in the Covered Countries may not be able to determine to a certainty whether any of its products are or are not ''DRC conflict free,'' insofar as its initial effort to determine the origin of the conflict minerals in those products under the reasonable country of origin inquiry was inconclusive and its subsequent due diligence on the source and chain of custody of such minerals was also inconclusive. Consistent with Exchange Act Section 13(p)(1)(A)(ii), we proposed that an issuer unable to determine that its conflict minerals did not originate in the Covered Countries would be required to describe all of its products that contain such conflict minerals and

identify these products as ''not DRC conflict free''[497] because the issuer would not have determined that the products satisfied the statutory definition of ''DRC conflict free''—that the products do ''not contain conflict minerals that directly or indirectly finance or benefit armed groups in the'' Covered Countries. The proposed rules would have allowed an issuer to provide additional disclosure explaining, for example, that although these products were categorized as not ''DRC conflict free'' in compliance with the proposed rules implementing the Conflict Minerals Statutory Provision and the statutory definition of ''DRC conflict free,'' the issuer had been unable to determine the source of the conflict minerals, including whether the conflict minerals in these products actually benefited or financed armed groups in the Covered Countries. Also, such an issuer would have been required to describe, to the extent known after conducting due diligence, the facilities used to process those conflict minerals and the efforts to determine the mine or location of origin with the greatest possible specificity.[498]

Any issuer with products considered not ''DRC conflict free'' would have been required to provide a description of those products in its Conflict Minerals Report. That description would have been based on the issuer's individual facts and circumstances so that the description sufficiently identified the products or categories of products. For example, an issuer could disclose each model of a product containing conflict minerals that directly or indirectly financed or benefited armed groups in the Covered Countries, each category of a product containing such conflict minerals, the specific products containing such conflict minerals that were produced during a specific time period, that all its

---

[486] See Exchange Act Section 13(p)(1)(B).

[487] See Exchange Act Section 13(p)(1)(A)(ii).

[488] See Exchange Act Sections 13(p)(1)(A)(i) and 13(p)(1)(B).

[489] See Exchange Act Section 13(p)(1)(A).

[490] See Exchange Act Section 13(p)(1)(B).

[491] See id.

[492] As discussed in the Proposing Release, alternatively, one could interpret this language to mean that an issuer must ensure that the audit it obtained is accurate, but such an interpretation would appear to mean that an issuer must review the audit of its Conflict Minerals Report, which the issuer created originally. We did not propose this approach.

[493] See Exchange Act Section 13(p)(1)(A)(ii).

[494] See Exchange Act Sections 13(p)(1)(A)(ii) and 13(p)(1)(D).

[495] 22 U.S.C. 2151n(d) and 2304(b).

[496] Section 1502(e)(3) of the Act.

[497] If any products contained both conflict minerals that did not originate in the Covered Countries and conflict minerals that the issuer was unable to determine did not originate in the Covered Countries, the issuer, under the proposal, would be required to classify those products as not ''DRC conflict free.'' Similarly, if any of an issuer's products contained conflict minerals that did not originate in the Covered Countries, that the issuer was unable to determine did not originate in the Covered Countries, or that originated in the Covered Countries but did not directly or indirectly finance or benefit armed groups in the Covered Countries, and also contained conflict minerals that originated in the Covered Countries and that directly or indirectly financed or benefited armed groups in the Covered Countries, the issuer would be required to classify those products as not ''DRC conflict free.''

[498] We recognized that such an issuer would not be able to provide the country of origin of those minerals, so the proposed rules would not require this information.

products contain such conflict minerals, or another such description depending on the issuer's facts and circumstances.

As proposed, our rules would have required an issuer to furnish, as part of its Conflict Minerals Report, the audit report prepared by the independent private sector auditor and the identity of the auditor.[499] We noted that, while one might read the statutory language to suggest that only the issuer's certification of the audit, and not the audit report itself, is required to be submitted, we preliminarily believed that approach was not the better reading of the Conflict Minerals Statutory Provision. As noted above, the Conflict Minerals Statutory Provision emphasizes that the independent audit is a "critical component of due diligence." In light of the importance of this audit report to the proposed reporting requirements and the statutory language, we proposed to require that the audit report be furnished with the Conflict Minerals Report.

Proposed Item 4(a) of Form 10–K (referring to proposed Instruction 2 to Item 104 of Regulation S–K), proposed Instruction 3 to Item 16 of Form 20–F, and proposed Instruction 3 to General Instruction B(16) of Form 40–F would have provided that the Conflict Minerals Report, which would include the audit report, would not be deemed to be incorporated by reference into any filing under the Securities Act or the Exchange Act, except to the extent that the issuer specifically incorporated it by reference. For example, if an issuer incorporated by reference its annual report into a Securities Act registration statement, that issuer would not also automatically incorporate the Conflict Minerals Report into that Securities Act document. Also, in such a situation, the independent private sector auditor would not have assumed expert liability and the issuer would not,[500] therefore, have been required to file a consent from that auditor unless the issuer specifically incorporated by reference the Conflict Minerals Report into the Securities Act registration statement.

b. Comments on the Proposed Rules

A number of commentators agreed with the proposed rules' requirement that an issuer unable to determine that its conflict minerals did not originate in

the Covered Countries be required to describe its products as not "DRC conflict free" in its Conflict Minerals Report.[501] In one comment letter, five senators stated that Congress did not intend for the Conflict Minerals Statutory Provision to allow issuers to report that the origins of their conflict minerals was undeterminable.[502] Instead, the letter argued that Congress "intended and directed" the final rule to require that, if an issuer "cannot affirm that the minerals are 'conflict-free,' the only other conclusion that could be reported would be that the product may contain materials that directly or indirectly finance armed groups in the DRC." [503] In another comment letter, members of Congress asserted that conflict minerals information that does "not clearly list a company's activities and rules allowing a category of 'indeterminate' would undermine congressional intent." [504]

Other commentators indicated, however, that the final rule should not require an issuer unable to determine that its conflict minerals did not originate in the Covered Countries to state that its conflict minerals are not "DRC conflict free" either on a temporary or permanent basis.[505] Some commentators who are members of Congress requested that we consider, as an alternative to the proposed rules, "phasing-in implementation to allow for materials of indeterminate origin currently in the supply chain to be properly classified." [506] In another letter, members of Congress suggested that the final rule create a temporary classification for minerals of an indeterminate origin that would exempt companies with such minerals from the requirement to provide a Conflict Minerals Report.[507] Some commentators suggested that such issuers should be required to state that its products with such conflict minerals are not "DRC conflict free" after a certain number of years.[508] Some commentators asserted that the proposed rules would violate

the First Amendment because, among other reasons, the rules would compel speech that is not of a commercial nature, which is different from other corporate disclosures, and would require some issuers, such as those unable to determine that their conflict minerals did not originate in the Covered Countries, to provide false, stigmatizing information.[509]

Some commentators urged that an issuer unable to determine that its conflict minerals did not originate in the Covered Countries should not be required to submit a Conflict Minerals Report that is audited by an independent private sector auditor.[510] As one commentator asserted, the provision "does not require an issuer that has been unable to determine (after proper inquiry) the source of its conflict minerals * * * to provide a Conflict Minerals Report," because the "statute uses the phrase 'in cases in which such conflict minerals *did originate* in [a DRC country],' as the trigger for providing a Conflict Minerals Report" (emphasis and bracket in original).[511]

One commentator, in two separate letters, disagreed with this position, however, and stated that any issuer that is unable to determine that its conflict minerals did not originate in the Covered Countries must be required to submit an audited Conflict Minerals Report to support its conclusion.[512] Another commentator recommended that the final rule allow issuers to provide annual, unaudited conflict minerals disclosure that would identify the issuer's products that the issuer "reasonably believes may contain 'conflict minerals;'" indicate that the origin of these minerals is indeterminate and explain why the minerals origin is indeterminate; identify and disclose the issuer's involvement in any governmental, semi-governmental, and private sector diligence initiatives; and describe the measures the issuer has undertaken to develop a management

---

[499] Our proposal to require the issuer to identify the certified independent private sector auditor would satisfy Exchange Act Section 13(p)(1)(A)(ii), which states that the issuer must provide a description of "the entity that conducted the independent private sector audit in accordance with clause (i)."

[500] See Rule 436 of Regulation C [17 CFR 230.436].

[501] See, e.g., letters from CRS I, Earthworks, Evangelical Alliance, Evangelicals, Howland, Methodist Board, NEI, Presbyterian Church II, Rep. Berman *et al.*, Sen. Boxer *et al.* II, Sen. Durbin/Rep. McDermott, State II, and World Vision II.

[502] See letter from Sen. Boxer *et al.* II.

[503] *Id.*

[504] See letter from Sen. Leahy *et al.*

[505] See, e.g., letters from AdvaMed I, Cleary Gottlieb, IPC I, ITRI I, JVC *et al.* II, NAM I, NAM III, Rep. Bachus *et al.*, Rep. Critz, Rep. Ellmers, Rep. Murphy, TIAA–CREF, Tiffany, TriQuint I, and WGC II.

[506] See letters from Rep. Critz, Rep. Ellmers, and Rep. Murphy.

[507] See letter from Rep. Bachus *et al.*

[508] See letters from IPC I, SIF I, TIAA–CREF, and TriQuint I.

[509] See letters from Taiwan Semi, Tiffany, and WLF.

[510] See, e.g., letters from AngloGold, Cleary Gottlieb, NAM I, and Tiffany.

[511] See letter from Cleary Gottlieb.

[512] See letters from NYCBar I ("We also believe the rules should require reporting firms that cannot, after due diligence, determine the origin of the materials used in their products to submit a Conflict Minerals Report and an independent audit of such report to ensure such issuers cannot easily avoid their obligations and disclosure requirements prescribed by these rules.") and NYCBar II ("The rules should require reporting firms that cannot, after due diligence, determine the origin of the materials used in their products to submit a Conflict Minerals Report and an independent audit of such report to ensure such issuers cannot easily avoid their obligations and disclosure requirements prescribed by the rules.").

due diligence system covering its supply chain for each conflict mineral.[513] One commentator asserted that investors would have "insufficient material information to evaluate a company's supply chain risk" if the final rule allowed issuers to declare their conflict minerals from an indeterminate origin "without describing the steps they have taken to make their determination," and recommended that the final rule "require reporting to be sufficiently detailed to inform investors of the steps an issuer has taken to determine whether the minerals the issuer purchases come from the DRC or an adjoining country." [514]

Although we did not propose to require any type of physical label on a product, one commentator stated that it is essential for the final rule to mandate that an issuer with products containing conflict minerals that did not finance or benefit an armed group label those products as "DRC conflict free." [515] Many commentators, however, remarked that an issuer should not be required to physically label its products.[516] Some commentators asserted that an issuer should be permitted to describe its products as "DRC conflict free" only if the issuer sources its conflict minerals in those products from the Covered Countries and those conflict minerals did not finance or benefit armed groups.[517] Another commentator added specifically that products should be labeled as "DRC conflict free" only if either they are not from the Covered Countries or do not directly or indirectly support armed groups in the Covered Countries.[518] Also, all commentators that discussed the subject agreed that the final rule should, as proposed, allow issuers to provide additional disclosure in describing any of their products that have not been found to be "DRC conflict free" [519]

A number of commentators mentioned that the final rule should, as proposed, require an issuer to disclose the facilities, countries of origin, and efforts to determine the mine or location of origin only for its conflict minerals that directly or indirectly financed or benefited armed groups in the Covered Countries.[520] A few commentators suggested that all issuers with conflict minerals originating in the Covered Countries, including issuers with conflict minerals that did not directly or indirectly finance or benefit armed groups in the Covered Countries and issuers with conflict minerals that did directly or indirectly finance or benefit armed groups in the Covered Countries, should be required to disclose the facilities, countries of origin, and efforts to determine the mine or location of origin of those conflict minerals.[521] Two commentators further recommended that all issuers with conflict minerals, regardless of whether the minerals originated within or without of the Covered Countries, should be required to disclose the facilities, countries of origin, and efforts to determine the mine or location of origin of those conflict minerals.[522]

Some commentators agreed that the final rule should, as proposed, require an issuer to disclose only the efforts to determine the conflict minerals' mine or location of origin with the greatest possible specificity.[523] Other commentators suggested going further and requiring an issuer to disclose the actual mine or location of origin with the greatest possible specificity.[524] Still other commentators argued that the final rule should not require issuers to include specific supply chain information, such as conflict mineral sources, quantities, transit routes, or store houses because such disclosures could hurt an issuer's competitive advantage or subject the issuer or its employees to violence.[525] Alternatively, these commentators recommended that the rule allow for generic descriptions or approximate geographic locations or permit an issuer to redact sensitive or secure information.[526]

A number of commentators indicated that an issuer should, as proposed, "certify the audit" by certifying that it obtained an independent private sector audit.[527] Many of these commentators, plus some others, remarked that these certifications should either not be signed or, if they are required to be signed, be signed by the issuer or by an individual on behalf of the issuer and not in any individual capacity.[528] In contrast, one commentator recommended that an issuer's senior management or executive officers in some manner certify the independent private sector audit,[529] another commentator asserted that it is "essential that there be CEO level involvement in the filing of the disclosures in order to make sure that companies do not simply 'game the system,' " [530] and a further commentator argued that the "certification of an audit will make little sense unless the signatories verify on a quarterly basis that certain minimal standards have been maintained by the auditors." [531] One commentator asserted that certifying the audit is unnecessary because the audit report will be submitted to the Commission in the Conflict Minerals Report.[532] This commentator and another stated that requiring an issuer to certify the audit would prevent an issuer from stating that its products are "DRC conflict free" because no issuer could be so certain of that conclusion that its officers would certify the audit.[533] One commentator suggested that no liability should be assigned to individuals that may sign the certifications "unless the situation involves a knowing and willful intent to mislead." [534]

Some commentators agreed that the audit report should, as proposed, be included as part of the Conflict Minerals Report.[535] Other commentators recommended that an issuer's audit report should not be submitted as part of the Conflict Minerals Report because such a requirement would increase audit costs without providing comparable benefits.[536] Certain commentators opposed having to make the audit report public and suggested instead that issuers provide the audit

---

[513] *See* letter from Signet.

[514] *See* letter from SIF II.

[515] *See, e.g.,* letter from Catholic Relief Services of St. Cloud, Minnesota (Apr. 14, 2011) ("CRS I—St. Cloud").

[516] *See, e.g.,* letters from Columban Center *et al.,* Howland, Industry Group Coalition I, ITIC I, Japanese Trade Associations, MSG I, NAM I, and SIF I.

[517] *See* letters from ITRI III, MSG I, and SIF I.

[518] *See* letter from State II.

[519] *See* letters from Howland, IPC I, NMA II, SEMI, TriQuint I, and WGC II.

[520] *See, e.g.,* letter from AngloGold, Barrick Gold, Cleary Gottlieb, Howland, IPC I, JVC *et al.* II, NAM I, NMA II, and WGC II.

[521] *See* letters from MSG I, NEI, SIF I, and TriQuint I.

[522] *See* letters from Earthworks and Trott.

[523] *See, e.g.,* letters from AngloGold, Barrick Gold, JVC *et al.* II, NAM I, TriQuint I, and WGC II.

[524] *See, e.g.,* letters from CRS I, Howland, ICGLR, NEI, State II (acknowledging that, as a best practices approach, an issuer should make every effort to include specific information regarding the mine), TakeBack, and Trott (stating that the final rule should require an issuer to provide as much information as possible regarding its conflict minerals' mine or location of origin).

[525] *See* letters from Barrick Gold, Global Tungsten II, IPMI I, NMA II, NMA III, and TIC.

[526] *See* letters from Barrick Gold, NMA II, and TIC.

[527] *See, e.g.,* letters from Barrick Gold, Cleary Gottlieb, Ford, ICGLR, ITIC I, NAM I, NY State Bar, and WGC II.

[528] *See, e.g.,* letters from AngloGold, Barrick Gold, Cleary Gottlieb, Ford, Howland, JVC *et al.* II, NAM I, NEI, and WGC II.

[529] *See* letter from Grant Thornton LLP (Mar. 2, 2011) ("Grant Thornton").

[530] *See* letter from TakeBack.

[531] *See* letter from SARW.

[532] *See* letter from TIC.

[533] *See* letters from Teggeman and TIC.

[534] *See* letters from Cleary Gottlieb and NMA II.

[535] *See, e.g.,* letters from Howland, NEI, and Sen. Durbin/Rep. McDermott.

[536] *See* letters from AngloGold and WGC II.

report to the Commission confidentially, allow for sensitive portions to be redacted, or provide it to the Commission with the Commission making it available to the public only in hardcopy form at the Commission's headquarters.[537] Similarly, one commentator objected to requiring an issuer to post the audit report on the issuer's Internet Web site as long as the Conflict Minerals Report describes the audit report,[538] whereas another commentator argued that the final rule should require an issuer to post the audit report on an issuer's Web site.[539]

Some commentators indicated that, as proposed, an audit report should not be deemed incorporated by reference into any filing under the Securities Act or Exchange Act unless the issuer specifically incorporates the audit into such a filing.[540] A few commentators further suggested that an auditor should not be considered an "expert" under Rule 436 of the Securities Act and recommended that audit reports submitted in subsequent years be able to build off prior audit reports to eliminate duplicative work and, thereby, reduce costs.[541] One commentator went further and suggested that any issuer with a recognized supply chain tracking process should not be required to obtain an audit of its Conflict Minerals Report.[542]

Some commentators requested that the final rule define how an issuer would "directly or indirectly finance or benefit an armed group."[543] Some of these commentators and others recommended that the Country Reports not be the basis for the Commission's final rule because those reports are not sufficiently specific with respect to which groups it labels as "armed groups" such that it is unclear whether the DRC army would be considered an "armed group."[544] For example, one commentator submitted an article arguing that the Conflict Minerals Statutory Provision "targets units of the Congolese army as much as it does militias precisely because the army is comprised largely of ex-rebels, is the major player in the conflict minerals trade and regularly commits appalling crimes against the civilian population."[545] Another commentator, however, stated that if the final rule defined "armed group" using the Country Reports, it would exclude the ex-militia groups that joined the DRC armed forces but continue to contribute to conflict and commit human rights violations.[546] One commentator recommended that the final rule define "armed group" using the OECD's definition for that term.[547] Another commentator suggested that the final rule apply only to issuers that are "directly funding the conflict (or who knowingly indirectly fund the conflict)."[548] One commentator recommended that the final rule define "indirect financing" of an armed group to include "[a]ny way in which an illegitimate armed group profits from the mining, sale, transportation or taxation of minerals or mineral derivatives."[549] Some commentators asserted that the final rule should clarify the definition of an "armed group" or disclose the steps issuers must take to verify whether their conflict minerals benefited armed groups.[550] Other commentators suggested that the definition of "armed group" in the final rule should not refer to the "most recently issued" version of the Country Reports "for the year the annual report is due" because the most recently issued version of the Country Reports may not be published for the year the annual report is due.[551]

c. Final Rule

The final rule requires any issuer that, after its reasonable country of origin inquiry, knows that its conflict minerals originated in the Covered Countries and did not come from recycled or scrap sources to provide a Conflict Minerals Report that includes a description of the measures the issuer has taken to exercise due diligence on the source and chain of custody of those conflict minerals. It also requires an issuer that, after its reasonable country of origin inquiry, had reason to believe that its minerals may have originated in the Covered Countries and may not have come from recycled or scrap sources and, after the exercise of due diligence, still has reason to believe that its minerals may have originated in the Covered Countries and may not have come from recycled or scrap sources, to provide a Conflict Minerals Report that includes a description of the measures the issuer has taken to exercise due diligence on the source and chain of custody of those conflict minerals.

Additionally, in circumstances in which an independent private sector audit is required, the final rule requires, as proposed, that an issuer include a certified independent private sector audit conducted in accordance with the standards established by the Comptroller General of the United States as part of its due diligence on the source and chain of custody of its conflict minerals. Further, the final rule states that, as proposed, the audit constitutes a critical component of due diligence. To implement the Conflict Minerals Statutory Provision's requirement that issuers "certify the audit,"[552] as proposed, an issuer must certify that it obtained an independent private sector audit of its Conflict Minerals Report and include that certification in the Conflict Minerals Report.[553] While we did not specify this in the Proposing Release or proposed rules, in response to commentators' concerns, the final rule clarifies that the issuer's audit certification need not be signed by an officer. Instead, the certification takes the form of a statement in the Conflict Minerals Report that the issuer obtained an independent private sector audit.

The final rule also requires, unless an issuer's products are "DRC conflict free," the Conflict Minerals Report to include a description of the facilities used to process those conflict minerals, the country of origin of those conflict minerals, and the efforts to determine the mine or location of origin with the greatest possible specificity. As noted in the Proposing Release, we believe that the phrase in the Conflict Minerals Statutory Provision, "facilities used to process the conflict minerals," refers to the smelter or refinery through which the issuer's minerals pass. One commentator pointed out that smelting and refining processes are not similar.[554] Smelting refers to the

---

[537] *See, e.g.*, letters from Barrick Gold, Materials Management Corporation (Jan. 13, 2011) ("Materials I"), NAM I, and NMA II.

[538] *See* letter from ITIC I.

[539] *See* letter from Columban Center *et al.*

[540] *See, e.g.*, letters from Barrick Gold, Cleary Gottlieb, Corporate Secretaries I, NY State Bar, and WGC II.

[541] *See* letters from NY State Bar and WGC II.

[542] *See* letter from TIC.

[543] *See, e.g.*, letters from NMA II, Peace, and WGC II.

[544] *See* letters from ITRI I, NMA II, NYCBar I, and Peace. *See also* letter from NYCBar II (stating specifically that the final rule should include "the Congolese military (FARDC) in its definition of 'armed group'").

[545] *See* letter from ICAR II.

[546] *See* letter from Save.

[547] *See* letter from Pact II.

[548] *See* letter from CEI I.

[549] *See* letter from Peace.

[550] *See, e.g.*, letters from CRS I—St. Cloud, ITRI I, NMA II, NYCBar I, Peace, and TIC.

[551] *See, e.g.*, letters from ITRI I and TIC.

[552] Exchange Act Section 13(p)(1)(B).

[553] We are not adopting the alternative interpretation of the Conflict Minerals Statutory Provision that an issuer must ensure that the audit it obtained is accurate. The Conflict Minerals Report contains management's assertions related to compliance with this rule; the third-party audit is designed to attest to certain of those assertions. Given this relationship, there does not appear to be a need to have management assert to the accuracy of the audit.

[554] Letter from ITRI I. In the Proposing Release, we stated that columbite-tantalite, cassiterite, and

conversion of the mineral ore into its metal form, but the metal still contains many impurities that must be removed by refining the metal. Columbite-tantalite, cassiterite, and wolframite are mined only as ores and are smelted into their metal derivatives. Gold, however, is mined in its metallic form because it is found that way naturally. Therefore, gold does not have to be smelted into a metal, but does have to be refined to remove any impurities. In both instances, however, we recognize that as a practical matter it is very difficult, if not impossible, to trace conflict minerals to their mine or other location of origin after columbite-tantalite, cassiterite, and wolframite have been smelted initially and after gold has been refined initially other than through the smelter or refinery.

Exchange Act Section 13(p)(1)(A)(ii) also requires an issuer with conflict minerals originating in the Covered Countries to submit a Conflict Minerals Report that includes a description of the issuer's products ''that are not DRC conflict free.'' [555] The Conflict Minerals Statutory Provision does not define ''not DRC conflict free,'' but instead defines ''DRC conflict free.'' [556] Products are considered ''DRC conflict free'' under Exchange Act Section 13(p)(1)(A)(ii) if they ''*do not* contain minerals that directly or indirectly finance or benefit armed groups in the'' Covered Countries. (Emphasis added).[557] As discussed above, under the proposed rules' approach, an issuer with a product containing conflict minerals of an undeterminable origin cannot know that its product is ''DRC conflict free;'' that is, the issuer cannot know that its product ''do[es] not contain conflict minerals that directly or indirectly finance or benefit armed groups in the'' Covered Countries, so the issuer would have to describe the product as ''not 'DRC conflict free.' ''

A commentator raised concerns that this approach could lead to incorrect and misleading disclosures and could unfairly punish companies that lack complete visibility into their supply chains.[558] The commentator noted that it could turn out that, upon further investigation of the minerals' origins, the minerals were not from the Covered Countries or did not finance or benefit armed groups, in which case the products made with solely those minerals would be ''DRC conflict free.'' Of course, we are concerned that any disclosure requirement results in accurate disclosure. At the same time, we are cognizant of our responsibility to fulfill Congress's directive in Section 1502 and to remain faithful to the language of the statute, and promulgating rules that provide an incentive for issuers to avoid determining the origins of the conflict minerals that they use could undermine the reporting system that Congress has established in Section 13(p) of the Exchange Act. Accordingly, we have modified the final rule to address the commentator's concerns while remaining faithful to the language and intent of the statute.

As described above, during a temporary period, instead of requiring issuers that have proceeded to step three that are unable to determine that their conflict minerals did not originate in the Covered Countries, that their conflict minerals that originated in the Covered Countries did not directly or indirectly finance or benefit armed groups, or that their conflict minerals came from recycled or scrap sources to describe their products as ''not 'DRC conflict free,' '' the final rule permits such issuers to describe products containing those conflict minerals as ''DRC conflict undeterminable.'' An issuer with products that are ''DRC conflict undeterminable'' is required to exercise due diligence on the source and chain of custody of its conflict minerals and submit a Conflict Minerals Report describing its due diligence; the steps it has taken or will take, if any, since the end of the period covered in its most recent prior Conflict Minerals Report to mitigate the risk that its necessary conflict minerals benefit armed groups, including any steps to improve its due diligence; the country of origin of the conflict minerals, if known; the facilities used to process the conflict minerals, if known; and the efforts to determine the mine or location of origin with the greatest possible specificity, if applicable.[559] Such an issuer is not,

however, required to obtain an independent private sector audit of that Conflict Minerals Report. We are permitting this temporary category to address concerns of many industry commentators that supply chain due diligence mechanisms have not yet been established;[560] and, therefore, many issuers will not be able to readily determine whether their conflict minerals did not originate in the Covered Countries, did not finance or benefit armed groups, or did come from recycled or scrap sources. This temporary category should allow issuers time to establish supply chain due diligence mechanisms to determine whether their minerals originated in the Covered Countries, directly or indirectly financed or benefited armed groups in the Covered Countries, or came from recycled or scrap sources.

This additional time should also decrease the possibility that issuers that might ultimately be able to determine that their necessary minerals did not originate in the Covered Countries, did not finance or benefit armed groups, or came from recycled or scrap sources would initially be required to report that their products have not been found to be ''DRC conflict free'' simply because they had not yet been able to determine the minerals' origins or whether they were from recycled or scrap sources. By decreasing this possibility, the temporary category will lead to more accurate disclosure. We believe this approach will allow the final rule to more appropriately target the population of issuers from which Congress intended to require this disclosure and will allow time for processes to be put in place so that issuers may be able to determine the origin of their conflict minerals.

The ''undeterminable'' reporting alternative, however, is only permitted temporarily. For all issuers, this alternative will be permitted during the first two reporting cycles following the effectiveness of the final rule, which includes the specialized disclosure reports for 2013 through 2014. For smaller reporting companies, this alternative will be permitted during the first four reporting cycles following the

---

wolframite are smelted into their component metals whereas gold is refined, and we indicated that both processes are substantially similar such that, when we would refer to smelting a conflict mineral, those references were intended to include the refining of gold.

[555] *See* Exchange Act Section 13(p)(1)(A)(ii).

[556] *See id.* and Exchange Act Section 13(p)(1)(D).

[557] Exchange Act Section 13(p)(1)(A)(ii). Also, although similar, the definition of ''DRC conflict free'' under Exchange Act Section 13(p)(1)(D) is slightly different than the definition under Exchange Act Section 13(p)(1)(A)(ii). Exchange Act Section 13(p)(1)(D) states that ''a product may be labeled as 'DRC conflict free' if the product does not contain minerals that directly or indirectly finance or benefit armed groups in the'' Covered Countries.

[558] *See* letter from Tiffany.

[559] We recognize that an issuer that is unable to determine the origin of its conflict minerals, or unable to determine whether its conflict minerals came from recycled or scrap sources, may not also be able to determine the processing facility of those conflict minerals and will not be able to determine the minerals' country of origin. Therefore, these

issuers only have to describe the processing facilities if they are known to the issuer and do not have to disclose the country of origin. Also, an issuer that is unable to determine whether its conflict minerals came from recycled or scrap sources does not have to describe its efforts to determine the mine or location of origin with the greatest possible specificity because issuers with conflict minerals from recycled or scrap sources are not required to determine the mine or location of origin.

[560] *See, e.g.,* letters from CTIA, FEC I, JVC *et al.* II, NAM III, NRF I, Roundtable, and WilmerHale.

USCA Case #13-5252    Document #1455974    Filed: 09/11/2013    Page 132 of 198

effectiveness of the final rule, which includes the specialized disclosure reports for 2013 through 2016. Beginning with the third reporting period, from January 1, 2015 to December 31, 2015, for all issuers and the fifth reporting period, from January 1, 2017 to December 31, 2017, for smaller reporting companies, every such issuer will have to describe products in its Conflict Minerals Report as having ''not been found to be 'DRC conflict free.''' Also, issuers will be required to make such a disclosure even if they proceed to step three and are unable to determine that their conflict minerals did not originate in the Covered Countries, that their conflict minerals that originated in the Covered Countries did not directly or indirectly finance or benefit armed groups, or that their conflict minerals came from recycled or scrap sources. These issuers will also be required to provide an independent private sector audit of their Conflict Minerals Report.[561]

While this disclosure is required after the temporary period, even when issuers are unable to determine the origin of their conflict minerals, we have changed the language of the disclosure from the proposal to address concerns raised about the accuracy of the disclosure required in these circumstances. In our view, it is accurate to describe such products as having ''not been found to be 'DRC conflict free.''' ''DRC conflict free'' is a defined term in the statute, meaning that the product ''do[es] not contain conflict minerals that directly or indirectly finance or benefit armed groups in the'' Covered Countries. An issuer that does not know that its conflict minerals did not originate in the Covered Countries, that its conflict minerals that originated in the Covered Countries did not finance or benefit armed groups, or that the minerals came from recycled or scrap sources cannot accurately state that its conflict minerals have been found to meet this definition; therefore, its products have not been found to be ''DRC conflict free'' as defined in the statute.

Additionally, under the final rule, as proposed, issuers can add disclosure or clarification. This allows issuers to include the statutory definition of ''DRC conflict free'' in the disclosure to make clear that ''DRC conflict free'' has a very

specific meaning, or to otherwise address their particular situation.[562] We also believe that the revised disclosure that the products ''have not been found to be 'DRC conflict free' '' mitigates concerns expressed by some commentators that the Proposing Release's specific required language, ''are not 'DRC conflict free,' '' would impose an unfair stigma, particularly on issuers that did not know whether their minerals directly or indirectly financed or benefited armed groups in the Covered Countries.

Although it does not appear that any individual commentator suggested the exact approach we are adopting, this approach incorporates suggestions from various commentators. One commentator recommended that we adopt a ''phase-in or transitional approach in order to address the substantial practical difficulties issuers currently face in seeking to trace the origins of conflict minerals included in their products and to determine if these minerals are or are not 'DRC conflict free.' '' [563] This commentator's recommendation was for the final rule to include a phase-in period through 2014 in which any issuer with conflict minerals for which the issuer was unable to determine their origin would describe the conflict minerals as from an ''indeterminate source'' and would be permitted, instead of providing a Conflict Minerals Report, to disclose its conflict minerals policy and provide a statement that, due to the lack of current infrastructure, it is not possible to determine the origin of its conflict minerals. The commentator recommended that the ''indeterminate source'' category would be available only through 2014. Another commentator recommended that the final rule allow a similar phase-in

period through 2014 in which issuers would be permitted to use an ''unknown determination'' category in which such issuers would be required only to disclose their conflict minerals policy, reasonable country of origin inquiry, and the conflict minerals used in their supply chain.[564]

Other commentators recommended similar temporary approaches for conflict minerals when an issuer could not determine the origin of its conflict minerals.[565] In this regard, one commentator noted that, ''requiring issuers that are unable to determine that the conflict mineral in their products did not originate in the Covered Countries to submit a Conflict Minerals Report providing the required information that is available to them, is reasonable.'' [566] Also, one commentator recognized that, during the initial period after the rule is finalized, it expected that some conflict minerals would be of unknown origin, and issuers with those conflict minerals should, among other information, disclose ''any progress made in the reporting year toward determination of origin.'' [567] Finally, some commentators suggested that smaller reporting companies should be allowed to phase-in or that the implementation of the final rule should be deferred for them.[568]

Based on the comments we have received, we believe that permitting all issuers to describe their products as ''DRC conflict undeterminable'' for a two-year period is appropriate to allow viable tracking systems to be put in place in the Covered Countries and throughout supply chains and avoid a *de-facto* embargo on conflict minerals from the Covered Countries. We also believe that allowing this category for a two-year period will avoid a situation in which virtually all issuers would describe their products as having not

---

[561] As noted below, an issuer exercising due diligence to determine whether a conflict mineral is from a recycled or scrap source is not required to obtain an independent private sector audit of its Conflict Minerals Report, regarding that conflict mineral, if there is no nationally or internationally recognized due diligence framework for that recycled or scrap conflict mineral.

[562] For example, in addition to the disclosure in the Conflict Minerals Report, the issuer could state: ''The following is a description of our products that have not been found to be ''DRC conflict free'' (where 'DRC conflict free' is defined under the federal securities laws to mean that a product does not contain conflict minerals necessary to the functionality or production of that product that directly or indirectly finance or benefit armed groups in the Democratic Republic of the Congo or an adjoining country).'' Alternatively, an issuer that is still unable to determine the origin of some of its conflict minerals after the two-year or four-year period, might state: ''We have been unable to determine the origins of some of our conflict minerals. Because we cannot determine the origins of the minerals, we are not able to state that products containing such minerals do not contain conflict minerals that directly or indirectly finance or benefit armed groups in the Democratic Republic of the Congo or an adjoining country. Therefore, under the federal securities laws we must describe the products containing such minerals as having not been found to be 'DRC conflict free.' Those products are listed below.''

[563] See letter from WilmerHale.

[564] See letter from AdvaMed I.

[565] See, e.g., letters from TIAA–CREF (''Where the source of minerals cannot be confirmed, we believe it would be most accurate to allow companies to use indeterminate language such as 'may not be DRC conflict free,' but not language that would suggest a presumption that minerals would be conflict free absent specific evidence to the contrary. Moreover, over time the information systems necessary to trace these minerals will likely improve. We suggest that, after a reasonable time interval, the SEC consider reviewing whether a higher standard might be warranted.'') and TriQuint I (recommending that the final rule ''allow companies to label their products as 'May Not Be DRC Conflict Free' until such a time when it is expected that companies will be able to purchase processed conflict minerals from smelters that have been validated as 'DRC conflict free' '').

[566] See letter from ABA.

[567] See letter from SIF I.

[568] See, e.g., letters from Howland and JVC et al. II.

ADD-56

been found to be "DRC conflict free," simply because they could not determine the origin of their conflict minerals, which would render that disclosure less meaningful.[569] Similarly, we believe that allowing smaller reporting companies four years to describe their products as "DRC conflict undeterminable" is appropriate because these issuers may lack the leverage to obtain detailed information regarding the source of a particular conflict mineral.[570]

We do not, however, believe that a permanent "DRC conflict undeterminable" category would be consistent with the language in the statute, and we believe it would undermine the overall goals of Section 1502. Such an approach might create incentives for issuers not to exercise care in identifying the origins of their necessary conflict minerals. Also, we do not believe that, after the temporary reporting period, the number of issuers that would describe their products as having not been found to be "DRC conflict free" would be so substantial as to render the disclosure meaningless because, based on our review of the comments, it appears that there should be systems in place at that time on which issuers could rely to determine whether their conflict minerals originated in the Covered Countries and, if so, whether they contributed to conflict. Overall, we believe that the change from "not 'DRC conflict free'" to having "not been found to be 'DRC conflict free,'" the ability to add additional explanation and disclosure, and the periods for the "DRC conflict undeterminable" category will provide issuers who are initially unable to determine that their conflict minerals did not originate in the Covered Countries or unable to determine that their conflict minerals that originated in the Covered Countries did not directly or indirectly finance or benefit armed groups in the Covered Countries means to make their disclosure while still accomplishing the goals that Congress intended when it required the disclosure of products that are not "DRC conflict free."

We believe that this approach also responds to the First Amendment concerns raised by the commentators.

As to the concern that the rule impermissibly compels speech that is not of a commercial nature, we presume that Congress acted constitutionally when it passed the statute.[571] And, as discussed above, we believe that the changes made in the final rule mitigate the concern that the rule compels speech that may be false or unfairly stigmatizing for some issuers. The requirement that issuers that know or have reason to believe that their conflict minerals may have originated in the Covered Countries but that cannot determine the origin or cannot determine whether they financed or benefited armed groups state that their products have not been found to be "DRC conflict free" compels an accurate disclosure in light of the statutory definition of "DRC conflict free." Moreover, the use of this revised language, the ability of issuers to add additional explanation and disclosure, and the provision of a temporary "undeterminable" period all represent accommodations to ensure that the rule is appropriately tailored to lessen the impact on First Amendment interests while still accomplishing Congress's objective.

We note that many commentators appeared to believe that the proposed rules would require that an issuer physically label its products as "DRC conflict free" or not "DRC conflict free."[572] Although we used the term "label" in the Proposing Release, we did so in the context of the disclosure required in the annual report. The final rule does not require a physical label on any product. Instead, the final rule requires that an issuer describe in its Conflict Minerals Reports any products that have not been found to be "DRC conflict free," as defined in the final rule. Also, consistent with the proposal, the final rule permits issuers the flexibility to describe their products based on each issuer's individual facts and circumstances. We believe this flexibility is important because, as one commentator noted, an issuer is in the best position to know its products and to describe them in terms commonly

understood within its industry.[573] Also, to remedy any confusion in the Proposing Release, an issuer with products that are "DRC conflict free" does not have to describe those products in the Conflict Minerals Report in any manner. An issuer with such products may describe them in its specialized disclosure report as "DRC conflict free" if it chooses to do so, provided, the products do not contain any conflict minerals that directly or indirectly financed or benefited armed groups in the Covered Countries.

The Conflict Minerals Statutory Provision requires the State Department to "produce a map of mineral-rich zones, trade routes, and areas under the control of armed groups" in the Covered Countries.[574] Also, the Conflict Minerals Statutory Provision requires the State Department to submit to Congress a strategy to address the linkages between human rights abuses, armed groups, mining of conflict minerals, and commercial products that contains a "plan to provide guidance to commercial entities seeking to exercise due diligence on and formalize the origin and chain of custody of conflict minerals used in their products and on their suppliers to ensure that conflict minerals used in the products of such suppliers do not directly or indirectly finance armed conflict or result in labor or human rights violations."[575] Some commentators have suggested that we delay the implementation of the final rule until the State Department's map and/or strategy have been published,[576] or that we should allow an issuer to rely on the State Department's map for its conflict minerals information.[577]

The State Department has published a conflict minerals map already.[578] Also, we understand that the State Department has developed guidance for commercial entities seeking to exercise due diligence on and formalize the origin and chain of custody of conflict minerals used in their products and on their suppliers.[579] Even so, it does not

[569] See, e.g., letters from AdvaMed I, ITIC I, and ITRI II.

[570] See letters from ABA, Corporate Secretaries I, and JVC et al. II. But see letter from Green II (arguing that, although smaller reporting companies may lack leverage, this disadvantage may be reduced through the influence exerted over their suppliers by larger issuers that use the same supplier base and that have more leverage to request such information.).

[571] See Nebraska v. EPA, 331 F.3d 995, 997 (DC Cir. 2003) ("Agencies do not ordinarily have jurisdiction to pass on the constitutionality of federal statutes.") (citing Thunder Basin Coal Co. v. Reich, 510 U.S. 200, 215 (1994)); Todd v. SEC, 137 F.2d 475, 478 (6th Cir. 1943) (same); William J. Haberman, 53 SEC. 1024, 1029 n.14 (1998) ("[W]e have no power to invalidate the very statutes that Congress has directed us to enforce.") (citing Milton J. Wallace, 45 SEC. 694, 697 (1975); Walston & Co., 5 SEC. 112, 113 (1939)).

[572] See, e.g., letters from Howland, Industry Group Coalition I, Japanese Trade Associations, MSG I, NAM I, and SIF I.

[573] See letter from WGC II.

[574] Section 1502(c)(2) of the Act.

[575] Section 1502(c)(1) of the Act.

[576] See, e.g., letters from Barrick Gold, Corporate Secretaries I, NRF I, and WGC II.

[577] See, e.g., letters from AngloGold and NRF I.

[578] See State Department, Humanitarian Information Unit, Democratic Republic of the Congo Mineral Exploitation by Armed Groups Map (Jun. 14, 2011), available at https://hiu.state.gov/Products/DRC_MineralExploitation_2010Jun28_HIU_U182.pdf.

[579] See State Department, Bureau of Economic, Energy, and Business Affairs, Statement Concerning Implementation of Section 1502 of the Dodd-Frank Legislation Concerning Conflict Minerals Due Diligence (July 15, 2011), available at http://www.state.gov/e/eb/diamonds/docs/168632.htm.

appear that either the State Department's map or guidance is necessary for complying with the final rule. First, it does not appear that Congress intended that they be necessary to comply with our rule. The map and guidance requirements are located in a part of Section 1502 that is not incorporated into the Exchange Act and that part of Section 1502 is directed solely to agencies other than the Commission.[580] Therefore, although they may be related to our final rule, it does not appear that the map and guidance were intended to have direct impact on the rule.

Also, we do not believe that an issuer must rely solely on the State Department's map or guidance for determining whether its conflict minerals contributed to conflict in the Covered Countries because other resources are available. For example, as discussed above, the OECD has developed an internationally recognized system of due diligence that an issuer can use as guidance in exercising its due diligence. The OECD's due diligence guidance does not rely on or incorporate the State Department map and guidance referenced in the Conflict Minerals Statutory Provision in determining the steps an issuer must take to exercise due diligence. However, as discussed above, due to the stage of development of the supply chain tracing mechanisms, we recognize that there are concerns about obtaining this information reliably in the near term. Therefore, we are providing this targeted and temporary period in the final rule.

The final rule requires, as proposed, an issuer with conflict minerals that originated in the Covered Countries to determine whether those minerals directly or indirectly financed or benefited armed groups in the Covered Countries. The Conflict Minerals Statutory Provision states that products are "DRC conflict free" when those products do not contain conflict minerals that "directly or indirectly finance or benefit armed groups" in the Covered Countries.[581] Section 1502(e)(3) of the Act defines the term "armed group" as "an armed group that is identified as perpetrators of serious human rights abuses in the annual Country Reports on Human Rights Practices under sections 116(d) and 502B(b) of the Foreign Assistance Act of 1961," [582] as they relate to the Covered

Countries.[583] The final rule includes, as proposed, a cross reference to that definition to provide guidance to issuers. This cross reference, however, removes the phrases "most recently issued" and "for the year the annual report is due" to address the concerns of commentators.[584] The final rule mirrors the Conflict Minerals Statutory Provision in its definition of "armed group" and does not include any extraneous phrases that were included in the proposal.

The Conflict Minerals Statutory Provision assigns to the State Department the authority to identify perpetrators of serious human rights abuses in that agency's annual Country Reports, and we lack the authority and expertise to provide further guidance or qualify the State Department's conclusions in this area. We note that some commentators indicated that we should consider products containing conflict minerals obtained from mines not controlled by armed groups when purchased to be considered "DRC conflict free" even if those mines subsequently come under the control of armed groups.[585] We agree and consider products "DRC conflict free" if, when the conflict minerals contained in those products are purchased and transported through the supply chain from the mine to the issuer, those conflict minerals do not directly or indirectly finance or benefit armed groups in the Covered Countries, even if some point in that supply chain subsequently becomes controlled by an armed group. For example, if an issuer's conflict minerals are purchased from a mine that does not directly or indirectly finance or benefit armed groups in the Covered Countries when they are purchased, but the next day that mine is taken over by an armed group and the armed group takes the money previously provided to the miner from the issuer to purchase the conflict minerals that already left the mine, the products containing those conflict minerals may be considered "DRC conflict free," even though the money used to purchase the conflict minerals does, in fact, benefit that armed group subsequently.

### 2. Due Diligence Standard in the Conflict Minerals Report

We have interpreted the Conflict Minerals Statutory Provision as requiring an issuer to exercise due diligence based on the provision's requirement that an issuer describe the due diligence it exercised on the source

and chain of custody of its conflict minerals.[586] In addition, the provision requires that an issuer include an independent private sector audit of the Conflict Minerals Report as a "critical component of due diligence." [587] Under Exchange Act Section 13(p)(1)(C), the Commission may determine an issuer's independent private sector audit or other due diligence processes to be unreliable and any Conflict Minerals Report that relies on such unreliable due diligence process would not satisfy the statute's reporting requirement.[588]

#### a. Proposed Rules

The proposed rules would have required an issuer to use due diligence regarding the supply chain determinations [589] in its Conflict Minerals Report. Other than requiring that the due diligence be reliable, the proposed rules would not have dictated the standard for, or otherwise provided guidance concerning, the due diligence that an issuer would be required to use in making such determinations. Instead, the proposed rules would have required an issuer to disclose the due diligence it used in making its determinations, such as whether it used any nationally or internationally recognized standards or guidance for supply chain due diligence.

In the Proposing Release, we noted our belief that the statutory provision contemplates that an issuer must use due diligence in its supply chain determinations. Although we did not propose to establish any particular conduct requirements, we believed that due diligence would be required to be exercised and information about what conduct the issuer exercised in its due diligence regarding its supply chain determinations was relevant to determine the extent of the issuer's due diligence. As proposed, the rules, therefore, would require issuers to describe the due diligence used in making these determinations. In particular, we noted that we would have expected that an issuer whose conduct conformed to a nationally or internationally recognized set of standards of, or guidance for, due diligence regarding its conflict minerals supply chain determinations would provide evidence that it used due

---

[580] The map and guidance requirements are in Section 1502(c) of the Act, but only Section 1502(b) of the Act actually amends the Exchange Act and directs the Commission to promulgate rules.

[581] See Exchange Act Sections 13(p)(1)(A)(ii) and 13(p)(1)(D).

[582] 22 U.S.C. 2151n(d) and 2304(b).

[583] Section 1502(e)(3) of the Act.

[584] See, e.g., letters from ITRI I and TIC.

[585] See, e.g., letters from AAEI, IPC I, and NRF I.

[586] Exchange Act Section 13(p)(1)(A)(i).

[587] Exchange Act Section 13(p)(1)(B).

[588] Exchange Act Section 13(p)(1)(C).

[589] We refer to the "supply chain determinations" as an issuer's determinations regarding the source and chain of custody of its conflict minerals, the facilities used to process those minerals, the country of origin of those minerals, and the efforts to determine the mine or location of origin with the greatest possible specificity.

diligence in making those determinations.

b. Comments on the Proposed Rules

Some commentators believed that the Conflict Minerals Statutory Provision expressly requires an issuer to exercise due diligence on the source and chain of custody of its conflict minerals.[590] One commentator noted that nothing in the statute gives us explicit authority to develop due diligence guidance.[591] Another commentator asserted that Congress intended the Conflict Minerals Statutory Provision to require due diligence only on the source and chain of custody of conflict minerals mined in the DRC and on the transportation routes through which such minerals pass in countries adjoining the DRC.[592] This commentator claimed that Congress did not intend for the Conflict Minerals Statutory Provision to require due diligence on the source and chain of custody of minerals mined in the adjoining countries and recommended that the final rule not require such due diligence.

Many commentators supported our proposal to not prescribe any specific due diligence requirements and allow an issuer to have flexibility in developing its due diligence measures based on the issuer's own facts and circumstances.[593] A number of these commentators, however, suggested that the final rule provide guidance as to what would be considered acceptable due diligence.[594] Many other commentators recommended that the final rule provide a definition of or prescribe specific guidance for any

required due diligence.[595] Some of these commentators reasoned that the final rule should prescribe a specific due diligence standard so that an issuer will be unable to "engage in a type of 'forum shopping'" for the least burdensome standard and so that each issuer's due diligence measures will be consistent, accurate, and reliable.[596] Other commentators suggested that the final rule should prescribe a safe harbor for an issuer's conduct allowing an issuer to avoid any undue or impractical requirements set forth by independent private sector auditors.[597] While we did not propose to require satisfaction of a particular set of standards, we requested comment on whether we should.

A number of commentators suggested that the final rule should refer to, incorporate, or require the use of national or international standards or guidance in some manner, such as accepting an issuer's due diligence as reliable if that issuer used a national or international standard or guidance, considering national or international due diligence standards or guidance when developing the final rule, or requiring an issuer to use a national or international due diligence framework for that due diligence to be considered reliable.[598] Some commentators did not believe the final rule should require that an issuer use any particular national or international due diligence standard.[599] Other commentators recommended against incorporating voluntary international standards, such as the OECD due diligence framework, into the final rule or suggested that we identify and assess the potential latent risks and/or impacts to industry and auditors related to codifying voluntary industry standards, such as the OECD due diligence framework, into the final rule.[600] Some commentators specifically referenced the due diligence framework developed by the OECD in discussing

what they believed the final rule should consider as acceptable due diligence.[601] One commentator recommended that the final rule not only refer to the OECD due diligence framework, but also should require issuers to disclose the steps that they took to complete the OECD due diligence.[602]

Some commentators recommended that a due diligence standard should not require an absolute standard of care.[603] Instead, these commentators suggested either a "reasonable care" or a "commercially practicable efforts" standard that would encompass contractual obligations, risk-based programs, and industry-wide processes, but not necessarily include the identification of all the parties in the supply chain or the determination of every mineral used for manufactured items. Some commentators recommended that an issuer's due diligence should be presumed reliable if the issuer performs some or all of the following steps: uses information from an industry-wide process, creates a conflict minerals policy that requires conflict-mineral free provisions in all contracts, conducts supply chain risk assessments, requires suppliers to push policies upstream and transmit information downstream, establishes policies and procedures to remediate instances of non-conformity of policy, obtains independent third party audits, and publishes its supply chain findings.[604] Similarly, other commentators indicated that due diligence should be presumed reliable if these conditions are met, but only if the issuer requires upstream and downstream due diligence and describes that due diligence.[605] Other commentators suggested that the due diligence standard in the final rule should be commensurate with the issuer's position in the supply chain such that the due diligence requirement for an issuer would be less rigorous the

---

[590] See, e.g., letters from NEI ("We agree that issuers should be required to use due diligence, as proposed."), Presbyterian Church USA (Feb. 15, 2012) ("Presbyterian Church I") (stating that the Conflict Minerals Statutory Provision "requires due diligence"), Sen. Durbin/Rep. McDermott (stating that "Section 1502 requires companies to exercise strict due diligence to determine the source of conflict minerals in their products"), and State II ("It is unclear how a reasonable conflict minerals determination can be made without due diligence given the complexity of the region and the risk of fraud.").

[591] See letter from TriQuint I. This commentator suggested that the Commission work with other government agencies to establish rules that govern what due diligence processes are reliable.

[592] See letter from Minister of Energy and Minerals of the United Republic of Tanzania (May 23, 2011) ("Tanzania II").

[593] See, e.g., letters from AAEI, AngloGold, Cleary Gottlieb, Industry Group Coalition Group I, IPC I, ITIC I, ITRI I, Japanese Trade Associations, NAM I, NEI, Niotan II, NMA II, NRF I, RILA, RILA–CERC, RMA, Roundtable, Sen. Durbin/Rep. McDermott, TriQuint I, and WGC II.

[594] See, e.g., letters from AAEI, Cleary Gottlieb, Earthworks, Howland, IPC I, ITIC I, ITRI I, NAM I, NEI, NMA II, NRF I, RILA, Sen. Durbin/Rep. McDermott, and WGC II.

[595] See, e.g., letters from Arkema, Earthworks, Enough Project I, CENCO I, CODSIA, Global Witness I, Howland, ICAR et al. II, Materials I, Andrew Matheson (Mar. 2, 2011) ("Matheson I"), MSG I, NYCBar I, Rep. Berman et al., SEMI, SIF I, State I, State II, and WGC et al. I.

[596] See letters from Global Witness I and ICAR et al. II.

[597] See, e.g., letters from ArcelorMittal, Chamber I, ITIC I, Materials I, NAM I, NRF I, and RILA.

[598] See, e.g., letters from Arkema, CODSIA, Earthworks, Enough Project I, Global Witness I, Howland, ICAR et al. II, IPC I, ITIC I, ITRI I, Matheson I, MSG I, NEI, NYCBar I, Rep. Berman et al., SEMI, Sen. Durbin/Rep. McDermott, SIF I, State I, State II, WGC II, and WGC et al. I.

[599] See, e.g., letters from Cleary Gottlieb, NAM I, NMA II, and WGC II.

[600] See letters from Auditing Roundtable, Inc. (Oct. 31, 2011) ("ARI") and Board of Environmental, Health & Safety Auditor Certifications (Oct. 31, 2011) ("BEAC").

[601] See, e.g., letters from Arkema, Boeing, CODSIA, Earthworks, Enough Project I, Evangelical Alliance, Evangelicals, Global Witness I, ICAR et al. II, ITRI I, ITRI IV, Matheson I, Methodist Board, MSG I, NEI, NYCBar I, NYCBar II, Presbyterian Church II, Rep. Berman et al., Sen. Durbin/Rep. McDermott, SEMI, SIF I, SIF II, State I, State II, and WGC II, and WGC et al. I.

[602] See letter from SIF II.

[603] See, e.g., letters from AAEI, Chamber I, CRS I, Industry Group Coalition I, ITIC I, and NAM I.

[604] See, e.g., letters from AAEI, Global Witness I, Industry Coalition Group II, NAM I, and NRF I. These steps are similar to the steps in the Annex I of the OECD's due diligence guidance.

[605] See, e.g., letters from Earthworks, Enough Project I, MSG I, and SIF I. The upstream and downstream due diligence that would be required by these commentators is similar to the upstream and downstream due diligence described in the Supplement on Tin, Tantalum, and Tungsten to the OECD's due diligence guidance.

farther that issuer's position in the supply chain is from the mine or other location of origin.[606]

In the Proposing Release, we requested comment as to whether the final rule should prescribe different due diligence measures for gold because of any unique characteristics of the gold supply chain. In response, most commentators that discussed this point agreed that the due diligence required for gold should be the same as the due diligence required for the other three conflict minerals.[607] Two commentators, however, stated that gold is unique among the four conflict minerals so the due diligence requirements for it should be different than for the other minerals.[608] As discussed above, a few commentators further recommended that the final rule permit issuers to exclude certain information from public dissemination regarding the storage and transportation routes of gold for security reasons.[609]

In the Proposing Release, we also requested comment as to whether the final rule should state that an issuer is permitted to rely on the reasonable representations of its smelters or any other actor in the supply chain, provided there is a reasonable basis to believe the representations of the smelters or other parities. A number of commentators suggested, in response, that the final rule should allow an issuer to rely on reasonable representations from suppliers and/or smelters in satisfying their due diligence requirement.[610] Some of these commentators, however, explained that such written representations must be accompanied by additional processes, such as industry-wide smelter verification programs, before they could be relied upon.[611] One commentator recommended that the final rule should allow due diligence to be satisfied if an issuer includes obligations in its supply contracts and receives reasonable representations from its suppliers

regarding the conflict-free nature of the minerals.[612]

c. Final Rule

After considering the comments, we are revising the final rule. The final rule requires that an issuer describe the due diligence it exercised in determining the source and chain of custody of its conflict minerals. The final rule requires that an issuer's due diligence follow a nationally or internationally recognized due diligence framework. We are persuaded by commentators that requiring an issuer to use a nationally or internationally recognized due diligence framework that is relevant to the audit objectives and permits consistent assessment of the subject matter will provide an independent private sector auditor with a structure by which to assess an issuer's due diligence, which we believe should make the rule more workable and less costly than if no framework was specified. We are also persuaded by commentators that requiring the use of nationally or internationally recognized due diligence framework will enhance the quality of an issuer's due diligence and will promote comparability of the Conflict Minerals Reports of different issuers. Also, we believe that requiring such due diligence will provide issuers with a degree of certainty and, as one commentator noted, "ameliorate the risk that a due diligence process will later be judged to be unreliable." [613]

The OECD's "Due Diligence Guidance for Responsible Supply Chains of Minerals from Conflict-Affected and High-Risk Areas" [614] satisfies our criteria and may be used as a framework for purposes of satisfying the final rule's requirement that an issuer exercise due diligence in determining the source and chain of custody of its conflict minerals. As one commentator noted, the OECD is an international organization with 34 member countries, including the United States, that works internationally with governments and businesses and approved its due diligence guidance as the "the result of a collaborative initiative among governments, international organizations, civil society organizations, and industry participants to promote accountability and transparency in the supply chain of minerals from conflict-affected and

high-risk areas." [615] A comment letter submitted by the OECD in conjunction with the United Nations Group of Experts on the Democratic Republic of the Congo ("Group of Experts") and the International Conference on the Great Lakes Region ("ICGLR") indicated that the OECD due diligence guidance was "adopted as an OECD Recommendation by forty one OECD and non-OECD countries meeting at ministerial level on 25 May 2011 under the chairmanship of U.S. Secretary of State Hillary Rodham Clinton." [616] The final rule does not mandate that an issuer use any particular nationally or internationally recognized due diligence framework, such as the OECD's due diligence guidance, in recognition of the fact that other evaluation standards may develop that satisfy the intent of the Conflict Minerals Statutory Provision. However, to satisfy the requirements of the final rule, the nationally or internationally recognized due diligence framework used by the issuer must have been established by a body or group that has followed due-process procedures, including the broad distribution of the framework for public comment, and be consistent with the criteria standards in GAGAS established by the GAO.

As a related matter, one commentator stated that the final rule should clarify whether an issuer has to describe generally its due diligence processes or whether issuers have to describe specifically purchase contracts associated with particular conflict minerals in their products.[617] We believe an issuer's description of its due diligence should be based on the individual issuer's facts and circumstances. In this regard, if an issuer's due diligence process is relatively consistent throughout its supply chain, the issuer could satisfy the requirements by generally describing its due diligence. We recognize, however, that an issuer may use different due diligence processes for different aspects of its supply chain. For example, an issuer using the OECD due diligence guidance may use different due diligence processes for tin, tantalum, and tungsten as compared with that for gold. If an issuer exercises significantly different due diligence processes for different aspects of its supply chain, such as with separate conflict minerals or products, that issuer should describe how they are different.

As we note above, a number of commentators recommended that the final rule allow an issuer to rely on

---

[606] *See* letters from CERC, Chamber I, ITIC I, NRF I, and RILA.

[607] *See, e.g.,* letters from Earthworks, Global Witness I, ITRI I, SIF I, and State II.

[608] *See* letters from AngloGold and WGC II.

[609] *See* letters from NMA II, NAM III, and WGC II.

[610] *See, e.g.,* letters from AngloGold, Global Witness I, Howland, IPC I, ITIC I, Japanese Trade Associations, JVC *et al.* II, Kemet, NEI, NMA II, RILA–CERC, RMA, Roundtable, SEMI, Sen. Durbin/ Rep. McDermott, State II, Taiwan Semi, and WGC II.

[611] *See* letters from Global Witness I, Howland, ITIC I, JVC *et al.* II (stating that written representations would not have to be accompanied by additional processes "until such time as reliable smelter/refiner certification and due diligence systems can be implemented"), Kemet, NMA II, RMA, Sen. Durbin/Rep. McDermott, and State II.

[612] *See* letter from Roundtable.

[613] *See* letter from NAM I.

[614] *OECD, Due Diligence Guidance for Responsible Supply Chains of Minerals from Conflict-Affected and High-Risk Areas* (2011), *available at http://www.oecd.org/daf/ internationalinvestment/ guidelinesformultinationalenterprises/46740847. pdf.*

[615] *See* letter from Global Witness I.

[616] *See* letter from OECD I.

[617] *See* letter from ITIC I.

reasonable representations from suppliers and/or smelters in satisfying their due diligence requirement,[618] whereas other commentators argued that written representations should not be able to satisfy due diligence by themselves.[619] The final rule requires that an issuer's due diligence follow a nationally or internationally recognized due diligence framework. Therefore, whether an issuer may rely on reasonable representations from suppliers and/or smelters in satisfying its due diligence requirement will be dependent on the nationally or internationally recognized due diligence framework.

3. Independent Private Sector Audit Requirements

a. Proposed Rules

Consistent with the Conflict Minerals Statutory Provision, we proposed that the description of the measures taken by an issuer to exercise due diligence on the source and chain of custody of its conflict minerals include a certified independent private sector audit conducted in accordance with the standards established by the Comptroller General of the United States.[620] Under the Conflict Minerals Statutory Provision, the GAO is to establish the appropriate standards for the independent private sector audit. Therefore, we did not include any auditing standards in the proposed rules or discuss such standards in the Proposing Release.

b. Comments on the Proposed Rules

A number of commentators indicated that the final rule must clarify the independent private sector audit's criteria, objectives, and standards.[621] One commentator was concerned that, if neither the Comptroller General nor the Commission required uniform

objectives and standards, the audits would not be useful because they would lack any comparability.[622] Some commentators remarked that the Comptroller General or the Commission must delineate suitable criteria for the measurement and presentation of the information in the Conflict Minerals Report, including the elements of the Conflict Minerals Report subject to the audit, so as to provide an audit framework that would aid both issuers and auditors.[623] Such criteria would provide the basis for the auditor to measure the information provided by the issuer, and this criteria should be objective, measurable, complete, and relevant.[624] Commentators noted, however, that the criteria would differ based on the objective of the audit. For example, the criteria for evaluating whether an issuer is correct in concluding that its products are "DRC conflict free" are different from the criteria for determining whether the issuer's process for determining whether its products are "DRC conflict free" is sufficient.[625]

Commentators from the accounting profession and others recommended that the final rule clearly state the objective of the audit and the subject matter to be audited.[626] Some of these commentators identified possible audit objectives, including: whether management's description of the procedures and controls performed in an issuer's due diligence process are fairly described in the Conflict Minerals Report;[627] whether the design of an issuer's due diligence process described in the Conflict Minerals Report conforms to a recognized standard of due diligence;[628] whether management's description of an issuer's due diligence process in its Conflict Minerals Report is accurate, the results of that process are fairly stated, and the issuer has evaluated/identified the upstream and downstream due diligence processes;[629] whether the

design of the due diligence process described in the Conflict Minerals Report conforms to a recognized standard and whether the process was sufficiently effective;[630] whether the issuer's conclusion regarding the source and chain of custody of its conflict minerals is accurate;[631] and whether the issuer appropriately included in the report all its products described as not "DRC conflict free."[632] Generally, commentators recommended that the final rule not require an audit objective to include a determination as to whether an issuer's due diligence process was effective or that any conclusion based on that due diligence process was accurate, because that would be very challenging and expensive to undertake.[633]

Additionally, some commentators indicated that the Comptroller General or the Commission must identify the acceptable auditing standards for firms to use when auditing an issuer's Conflict Minerals Report.[634] In this regard, as some commentators noted,[635] the Proposing Release stated that the staff of the GAO informed our staff of its preliminary view that no new audit standards need to be promulgated. Therefore, the audit of the Conflict Minerals Report would be performed under GAGAS, and auditors could use either the provisions for Attestation Engagements or Performance Audits in GAGAS.[636] However, as commentators noted, in addition to certain substantive differences between the two standards in GAGAS, only a licensed certified public accountant or person working with a certified public accounting firm or governmental auditing organization may perform an Attestation Engagement.[637] Similarly, commentators noted that Performance Audits are not required to be conducted by certified public accountants, but auditors using the Performance Audit standard would still need to satisfy certain qualification requirements under GAGAS, such as continuing professional education requirements, quality control measures, and

[618] *See, e.g.,* letters from AngloGold, Global Witness I, Howland, IPC I, ITIC I, Japanese Trade Associations, JVC *et al.* II, NEI, NMA II, RILA–CERC, RMA, SEMI, State II, Taiwan Semi, and WGC II.

[619] *See* letters from Global Witness I, Howland, ITIC I, and RMA.

[620] *See* Exchange Act Section 13(p)(1)(A)(i).

[621] *See, e.g.,* letters from American Institute of Certified Public Accountants (Mar. 1, 2011) ("AICPA I"), American Institute of Certified Public Accountants (Nov. 17, 2011) ("AICPA II"), Barrick Gold, BEAC, Calvert, Deloitte, The Elm Consulting Group International LLC (Mar. 1, 2011) ("Elm"), Ernst & Young LLP (Mar. 2, 2011) ("E&Y"), Grant Thornton (recommending that the Commission establish a "working group to support the Comptroller General in the development of the appropriate form of engagement, including the criteria to be used to evaluate the subject matter and the opinion (or conclusion) to be expressed thereon"), Hitlemann Consulting, ICGLR, IPC II, KPMG LLP (Mar. 2, 2011) ("KPMG"), MSG III, NEI, NYCBar I, WGC II.

[622] *See* letter from WGC II.

[623] *See, e.g.,* letters from Deloitte and KPMG.

[624] *See* letters from Deloitte and Grant Thornton.

[625] *See* letters from AICPA I and Grant Thornton.

[626] *See* letters from AICPA I, AICPA II, Barrick Gold, Grant Thornton, IPC II, KPMG, MSG III, and SIF II.

[627] *See* letters from AICPA I, AICPA II, Grant Thornton, and KPMG.

[628] *See* letters from AICPA I, AICPA II, IPC II, and KPMG. Commentators also observed that this second objective would require the final rule to provide a clear due diligence standard against which an auditor could compare the issuer's due diligence process.

[629] *See* letter from MSG III (noting, however, that the audit scope should not include verification of the ultimate conclusions of the Conflict Minerals Report, only that the process was applied as described). *See also* letter from SIF II (stating that

the audit of the Conflict Minerals Report should include a "review of management systems and processes, and of conclusions reached").

[630] *See* letter from AICPA I.

[631] *See* letters from AICPA I and KPMG.

[632] *See id.*

[633] *See, e.g.,* letters from AICPA I, AICPA II, Deloitte, ITIC I, KPMG, MSG III, and Roundtable.

[634] *See* letters from AICPA I, Deloitte, E&Y, Elm, and KPMG.

[635] *See, e.g.,* letters from Barrick Gold and E&Y.

[636] *See* letters from AICPA I, AICPA II, BEAC, Deloitte, E&Y, Elm, Grant Thornton, and MSG III.

[637] *See, e.g.,* letters from AICPA I and BEAC.

independent peer reviews.[638] In this regard, to increase the pool of auditors and thereby reduce costs, some commenters recommended that the final rule allow auditors to use the Performance Audit standard under GAGAS.[639] Some of these commenters recommended that auditors that are not certified public accountants could satisfy GAGAS's Performance Audit qualification requirements by receiving a professional certification relating to environmental, health, and safety auditing from organizations that certify auditors by requiring that an auditor meet certain standards, such as having a code of conduct, committing to a code of ethics and rigorous practices, engaging in continuing professional development and education, being subjected to review, and other provisions to maintain a high caliber of expertise.[640] One commenter suggested that the final rule should allow any auditor to perform the audit as long as it was knowledgeable and able to meet the requirements of the OECD's criteria for the competence of auditors.[641] Other commenters noted, however, that the OECD's criteria for the competence of auditors are inadequate because they fail to provide any guidance as to how this would be assured.[642] Another commenter recommended that the final rule should delineate specific requirements for the accreditation and selection of auditors but did not provide any suggested requirements.[643]

Several commenters asserted that the final rule should clarify the independence standards for auditors.[644] Some of these commenters[645] recommended that the final rule state that performing the independent private sector audit of the Conflict Minerals Report is not inconsistent with the Commission's auditor independence requirements in Rule 2–01 of Regulation S–X.[646] One commentator noted, however, that the OECD's independence requirements prohibit a Conflict Minerals Report auditor from having provided any other service for the issuer within a 24-month period.[647] Similarly, two other commentators asserted that

the statement in the proposed rules and the Conflict Minerals Statutory Provision that the independent private sector audit would be considered a "critical component of due diligence" could create confusion regarding the application of our auditor independence requirements in Rule 2–01 of Regulation S–X.[648]

c. Final Rule

i. Auditing Standards

As noted above, the GAO staff has indicated to our staff that the GAO does not intend to develop new standards for the independent private sector audit of the Conflict Minerals Report. As we noted in the Proposing Release, GAO staff informed our staff that existing GAGAS standards,[649] such as the standards for Attestation Engagements or the standards for Performance Audits will be applicable.[650] The GAO staff has also indicated to our staff that the GAGAS Performance Standards could be used by the auditor to express a conclusion as to whether the design of the issuer's due diligence measures are in conformity with the criteria set forth in a nationally or internationally recognized due diligence framework used by the issuer, such as the OECD's "Due Diligence Guidance for Responsible Supply Chains of Minerals from Conflict-Affected and High-Risk Areas," and whether the issuer's description of the due diligence measures it performed, as set forth in the Conflict Minerals Report, with respect to the period covered by the report, is consistent with the due diligence process that the issuer undertook. Therefore, unless the GAO makes some formal pronouncement, it appears that any auditor of the Conflict Minerals Report will need to conduct the audit using the standards set forth in GAGAS. Because the Conflict Minerals Statutory Provision provides that the audit standards are to be established by the GAO, the GAO is responsible for matters pertaining to the audit standards, including questions or

concerns about the application of such standards.

ii. Auditor Independence

Similarly, entities performing an independent private sector audit of the Conflict Minerals Report must comply with any independence standards established by the GAO, and any questions regarding applicability of GAGAS on this point should be directed to the GAO. We are not adopting any additional independence requirements. Also, the independence required for the independent private sector audit of the Conflict Minerals Report is not the same as the OECD's independence requirement for auditors conducting audits of conflict mineral smelters.

We acknowledge commentators' requests to clarify how our own independence requirements would apply to an accountant that performed both the independent private sector audit of the Conflict Minerals Report and an engagement (e.g., the audit of the financial statements of an issuer) subject to the independence requirements in Rule 2–01 of Regulation S–X.[651] The independent private sector audit of the Conflict Minerals Report is specifically described in the Act as constituting a "critical component" of the registrant's due diligence process,[652] which commentators were concerned may suggest the auditor would perform work that would impair independence. Despite this language, the Conflict Minerals Statutory Provision only requires an audit and no other functions that may imperil independence, such as "management functions" described in Rule 2–01(c)(4)(vi) of Regulation S–X. Therefore, we do not believe that it would be inconsistent with the independence requirements in Rule 2–01 of Regulation S–X if the independent public accountant also performs the independent private sector audit of the Conflict Minerals Report. The engagement to perform the independent private sector audit of the Conflict Minerals Report would nevertheless be considered a "non-audit service" subject to the pre-approval requirements

---

[638] See letter from Deloitte and BEAC.

[639] See, e.g., letters from ArcelorMittal, ARI, BEAC, Hileman Consulting, IPC II, and MSG III.

[640] See letters from BEAC and Hileman Consulting.

[641] See letter from NYCBar I.

[642] See letter from ARI and BEAC.

[643] See letter from ICGLR.

[644] See, e.g., letters from AICPA I, Deloitte, E&Y, Grant Thornton, Hileman Consulting, and KPMG.

[645] See letters from AICPA I, Deloitte, and E&Y.

[646] 17 CFR 210.2–01.

[647] See letter from KPMG.

[648] See letters from E&Y and Grant Thornton.

[649] See U.S. Gov't Accountability Office, GAO–12–331G, Government Auditing Standards 2011 Revision (Dec. 2011), available at http://www.gao.gov/assets/590/587281.pdf.

[650] The GAGAS Attestation Engagement standards, in Chapter 3.75, require that auditors be "licensed certified public accountants, persons working for a licensed certified public accounting firm or for a government auditing organization, or licensed accountants in states that have multi-class licensing systems that recognize licensed accountants other than certified public accountants." Unlike the GAGAS Attestation Engagement standards, the GAGAS Performance Audit standards allow auditors other than certified public accountants to perform a Performance Audit.

[651] Rule 2–01 of Regulation S–X [17 CFR 210.2–01].

[652] Exchange Act Section 13(p)(1)(A)(i), as added by Section 1502 of the Act, states that the independent private sector audit of the conflict minerals report is included in the "measures taken by the [issuer] to exercise due diligence on the source and chain of custody of such minerals." Exchange Act Section 13(p)(1)(B) further provides that the audit must be certified by the issuer and states that the certified audit "is a critical component of due diligence in establishing the source and chain of custody of such minerals." These provisions make clear that the independent private sector audit is one step in *management's* due diligence process.

of Rule 2–01(c)(7) of Regulation S–X. In addition, the fees related to the independent private sector audit of the Conflict Minerals Report would need to be included in the "All Other Fees" category of the principal accountant fee disclosures.[653] If the accountant were to provide services that extended beyond the scope of the independent private sector audit of the Conflict Minerals Report, the accountant would need to consider whether those services were inconsistent with Rule 2–01 of Regulation S–X.

### iii. Audit Objective

We agree with commentators that the final rule should clearly state the objective of the Conflict Minerals Statutory Provision's independent private sector audit and the subject matter to be audited to provide a basis for the auditor to measure the information provided by the issuer. Therefore, the final rule specifies an audit objective. The final rule states that the audit's objective is to express an opinion or conclusion as to whether the design of the issuer's due diligence framework as set forth in the Conflict Minerals Report, with respect to the period covered by the report, is in conformity with, in all material respects, the criteria set forth in the nationally or internationally recognized due diligence framework used by the issuer, and whether the issuer's description of the due diligence measures it performed as set forth in the Conflict Minerals Report, with respect to the period covered by the report, is consistent with the due diligence process that the issuer undertook.

The Conflict Minerals Statutory Provision requires an issuer to submit a Conflict Mineral Report that includes "a description of the measures taken by the [issuer] to exercise due diligence on the source and chain of custody of its conflict minerals, which measurers shall include an independent private sector audit of such report,"[654] and "a description of the products manufactured or contracted to be manufactured that are not DRC conflict free."[655] We recognize that the final rule does not require an audit of the entire Conflict Minerals Report. We believe, however, that it is appropriate for the final rule to limit the audit only

to the sections of the Conflict Minerals Report that discuss the design of the issuer's due diligence framework and the due diligence measures the issuer performed because the provision's requirement for an issuer to obtain an independent private sector audit is located in the provision's subsection relating to due diligence.[656]

The audit requirement is not discussed in the subsequent subsection that requires a description in the Conflict Minerals Report of the issuer's products manufactured or contracted to be manufactured that are "not DRC conflict free,"[657] and the final rule does not require an audit of that information. We note that the objective we are adopting differs significantly from the objectives of other audits required by our rules.[658] Nonetheless, in light of the statutory structure, as well as concerns about the costs that could arise from a requirement to audit the conclusion about the conflict minerals' status or take other approaches,[659] we have concluded that the audit objective should be limited in this manner. We recognize that an audit objective requiring an auditor to express an opinion or conclusion as to whether the design of the issuer's due diligence measures as set forth in the Conflict Minerals Report, with respect to the period covered by the report, is in conformity with, in all material respects, the criteria set forth in the nationally or internationally recognized due diligence framework used by the issuer, and whether the issuer's description of the due diligence measures it performed as set forth in the Conflict Minerals Report, with respect to the period covered by the report, is consistent with the due diligence process that the issuer undertook, is not as comprehensive as an audit objective requiring an auditor to express an opinion or conclusion as to whether the due diligence measures were effective,

or to express an opinion or conclusion as to whether or not the issuer's necessary conflict minerals are "DRC conflict free," which are more similar to audit objectives in our other rules. However, we believe that the audit is still meaningful because investors and other users will have some assurance from an independent third party that the issuer's due diligence framework, as set forth in the Conflict Minerals Report, is designed in conformity with the relevant nationally or internationally recognized due diligence framework. Further, we believe it is necessary and appropriate to require the audit to address whether the issuer actually performed the due diligence measures that it represents that it performed in the Conflict Minerals Report, so that the audit also addresses, in a cost efficient manner, the actual performance of the due diligence and not just the design, as well as provides independent third party confirmation that the work described was performed.

### 4. Recycled and Scrap Minerals

#### a. Proposed Rules

As proposed, the rules would allow for different treatment of conflict minerals from recycled and scrap sources than from original sources due to the difficulty of looking through the recycling or scrap process to determine the mine or other location of origin of the minerals. Given this difficulty, we expected that an issuer generally would not know the origins of its recycled or scrap conflict minerals, so we believed it would be appropriate for the proposed rules to require that an issuer using recycled or scrap conflict minerals furnish a Conflict Minerals Report subject to special rules. Under the proposed rules, if an issuer obtained conflict minerals from a recycled or scrap source, it would have been required to consider the products containing or produced with those conflict minerals to be "DRC conflict free."[660]

As proposed, an issuer with conflict minerals that originated from recycled or scrap sources would have been required to disclose in its annual report, under the "Conflict Minerals Disclosure" heading, that its conflict minerals were obtained from recycled or

---

[653] See Item 9(e)(4) of Schedule 14A [17 CFR 240.14a–101]. Registrants also are required to describe the nature of the services comprising the fees disclosed under the "All Other Fees" category. As such, the independent private sector audit of the Conflict Mineral Report should be included in that description.

[654] Exchange Act Section 13(p)(1)(A)(i).

[655] Exchange Act Section 13(p)(1)(A)(ii).

[656] See Exchange Act Section 13(p)(1)(A)(i).

[657] See Exchange Act Section 13(p)(1)(A)(ii).

[658] The objective of the ordinary audit of financial statements by the independent auditor is the expression of an opinion on the fairness with which they present, in all material respects, financial position, results of operations, and its cash flows in conformity with generally accepted accounting principles. See paragraph .01 of AU sec. 110, Responsibilities and Functions of the Independent Auditor. The auditor's objective in an audit of internal control over financial reporting is to express an opinion on the effectiveness of the company's internal control over financial reporting, as a part of which the auditor should test the design effectiveness of controls, as well as the operating effectiveness of controls. See paragraphs 3, 42, and 44 of Auditing Standard No. 5, An Audit of Internal Control over Financial Reporting That Is Integrated With An Audit of Financial Statements.

[659] See, e.g., letters from AICPA I, Deloitte, and KPMG.

[660] Because the proposed rules would have automatically classified recycled or scrap conflict minerals as "DRC conflict free," issuers with products containing such minerals would not have needed to provide in the Conflict Minerals Report a description of the recycled or scrap conflict minerals' processing facilities or country of origin, nor would they have been required to describe their efforts to determine the mine or location of origin with the greatest possible specificity.

scrap sources and that it furnished a Conflict Minerals Report regarding those recycled or scrap minerals. Also, under the proposed rules, an issuer would have been required to state that its products containing or produced with recycled or scrap minerals in the Conflict Minerals Report were considered "DRC conflict free." In addition, such an issuer would have described the measures taken to exercise due diligence in determining that its conflict minerals were recycled or scrap and obtain an independent private sector audit of that report.

We did not propose to define when a conflict mineral is from recycled or scrap sources. Instead, any issuer seeking to use this alternative approach would describe the measures it took to exercise due diligence in determining that the conflict minerals came from recycled or scrap sources. The Proposing Release stated, however, that we would consider conflict minerals to be "recycled" if they are reclaimed end-user or post-consumer products, but we would not consider those minerals "recycled" if they are partially processed, unprocessed, or a byproduct from another ore.[661]

b. Comments on the Proposed Rules

Commentators offered a wide variety of views on the appropriate approach to conflict minerals from recycled or scrap sources. A number of commentators stated that they either agreed with the recycled and scrap alternative reporting requirements, as proposed, or agreed with some type of recycled and scrap alternative reporting requirements or exemption, although some of these commentators did not necessarily discuss the mechanics of such reporting alternatives.[662] Some commentators

indicated that they supported, as proposed, alternative recycled or scrap reporting that requires an issuer to perform due diligence in determining that the conflict minerals were, in fact, from recycled and scrap sources and to submit a Conflict Minerals Report describing the due diligence exercised that includes an audit of the report.[663] A number of commentators believed that the final rule should require that an issuer only conduct the equivalent of a reasonable country of origin inquiry, instead of due diligence, to determine whether its conflict minerals were from recycled or scrap sources.[664] Also, some of these and other commentators stated explicitly that an issuer should not be required to submit a Conflict Minerals Report and/or an audit of its recycled or scrap conflict minerals.[665] Other commentators, including a number of members of Congress, recommended that the final rule exempt conflict minerals from recycled or scrap sources.[666]

Other commentators stated that the final rule should require due diligence but not a Conflict Minerals Report, not require a Conflict Minerals Report but require an audit of the inquiry into whether the conflict minerals are from recycled or scrap sources, require a "reliable process" to determine whether

the conflict minerals are from recycled or scrap sources, or not require that an issuer provide any information other than a statement that the conflict minerals are from recycled or scrap sources.[667] Some commentators agreed that products with conflict minerals from recycled and scrap sources should be considered "DRC conflict free," as proposed.[668] Other commentators indicated that the final rule should require an issuer with products containing conflict minerals from recycled or scrap sources to label those products with a name other than "DRC conflict free," such as "recycled" or "scrap" products.[669]

Some commentators stated that the more the alternative reporting approach for conflict minerals from recycled or scrap sources resembles our approach for newly mined conflict minerals the greater the risk of creating a disincentive for a manufacturers to use conflict minerals from recycled or scrap sources.[670] As one of these commentators asserted, without certain alternative reporting requirements for issuers with conflict minerals from recycled or scrap sources, such minerals "would be doomed for burial in a land fill until mined anew under a different authority having jurisdiction," which would be a "clear waste" of conflict minerals that "cannot contribute to new suffering in the DRC even though its disposition regarding past suffering may not be clear."[671] According to this commentator, "it is possible that dishonest people may find a way to pass new material off as recycled," but this possibility "does not outweigh the very obvious benefit of using recycled products and materials."[672] In this regard, other commentators argued that requiring issuers to provide the reason they determined that their conflict minerals came from recycled or scrap sources, including the due diligence processes they used in making their determination, would offset the reduced burden provided by the exemption.[673]

One commentator suggested that an issuer should be able to describe a product as using recycled or scrap minerals if a majority of the minerals used in the product are from recycled or

---

[661] As we noted in the Proposing Release, the proposed rules regarding recycled and scrap conflict minerals would apply to all conflict minerals equally. If recycled or scrap minerals were mixed with new minerals, the recycled and scrap alternative approach would apply to only the portion of the minerals that were recycled or scrap and the issuer would be required to furnish a Conflict Minerals Report regarding at least the recycled or scrap minerals. If the issuer's new conflict minerals did not originate in the Covered Countries, that Conflict Minerals Report would contain only information regarding the recycled or scrap minerals. If, however, the new conflict minerals originated in the Covered Countries, or the issuer was unable to determine that its new conflict minerals did not originate in the Covered Countries, the Conflict Minerals Report would include information regarding both the new conflict minerals and the recycled or scrap conflict minerals.

[662] See, e.g., letters from AAEI, AAFA, CRS I, Global Tungsten I, Global Witness I, Japanese Trade Associations, MSC I, NRF I, Ohio Precious Metals (Mar. 2, 2011) ("OPM"), PCP, Representative Jason Altmire (Mar. 23, 2012) ("Rep. Altmire"), Rep. Amodei, Rep. Bachus et al., Rep. Critz, Rep.

Ellmers, Representative Steven LaTourette (Jun. 13, 2012) ("Rep. LaTourette"), Representative Robert E. Latta (May 16, 2012) ("Rep. Latta"), Rep. Murphy, Representatives Tim Murphy and Peter J. Visclosky (Aug. 2, 2012) ("Reps. Murphy and Visclosky"), Representative James B. Renacci (Mar. 6, 2012) ("Rep. Renacci"), Representative Bill Shuster (Mar. 12, 2012) ("Rep. Shuster"), Representative Patrick J. Toomey (Apr. 12, 2012) ("Rep. Toomey"), Representative Stephen A. Womack (Dec. 23, 2011) ("Rep. Womack"), RMA, SEMI, Senator Mark Pryor (Mar. 19, 2012) ("Sen. Pryor"), and US Steel.

[663] See, e.g., letters from Bario-Neal, Brilliant Earth, Earthworks, Enough Project I, Enough Project IV, Hacker Jewelers, ICAR et al. II, Howland, SIF I, and TIAA–CREF.

[664] See, e.g., letters from AdvaMed I, Advanced Medical Technology Association (Nov. 1, 2011) ("AdvaMed II"), AngloGold, Global Tungsten II, Industry Group Coalition I, ITIC I, ITRI I, ITRI IV, JVC et al. II, LBMA I, Metalor Technologies USA (Feb. 25, 2011) ("Metalor"), NMA I, RJC I, United States Chamber of Commerce (Nov. 29, 2011) ("Chamber III"), and WGC II.

[665] See, e.g., letters from AdvaMed I, AdvaMed II, ArcelorMittal, Copper & Brass Fabricators Council, Inc. (Mar. 2, 2011) ("Copper & Brass"), Global Tungsten II, IPC I, IPC II, ITIC I, ITRI I, ITRI III, ITRI IV, JVC et al. II, JVC et al. III, Materials I, NAM I, Rep. Altmire, Rep. Amodei, Rep. Bachus et al., Rep. Ellmers, Rep. Murphy, Rep. Shuster, Sen. Pryor, Specialty Steel Industry of North America (Mar. 2, 2011) ("SSINA"), Tiffany, and WGC II. See also letter from Rep. Critz (stating that we should consider "reconfiguring the auditing requirement as it relates to recycled scrap materials").

[666] See, e.g., letters from Rep. Altmire, Rep. Murphy, Reps. Murphy and Visclosky (recommending exempting recycled or scrap steel that contains conflict minerals), Rep. Renacci, Rep. Shuster, Rep. Toomey, Rep. Womack, and Sen. Pryor.

[667] See, e.g., letters from Cleary Gottlieb, JVC et al. II, MSG I, and NEI.

[668] See, e.g., letters from Copper & Brass, JVC et al. II, MSG I, NEI, NMA II, SIF I, SSINA, TIAA–CREF, and WGC II.

[669] See, e.g., letters from CRS I, Global Witness I, and State II.

[670] See, e.g., letters from Copper & Bass, Global Tungsten I, RMA, SEMI, and SSINA.

[671] See letter from SEMI.

[672] See id.

[673] See letters from Rep. LaTourette and Rep. Latta.

scrap sources or a combination of recycled, scrap, and newly mined conflict minerals because it would be impossible to determine whether all the minerals in a product were from recycled or scrap sources.[674] Another commentator recommended that the final rule should allow an issuer to describe its products as "DRC conflict free" if a majority of the conflict minerals in those products are from recycled or scrap sources.[675] One commentator asserted that tolled material (scrap, second life-cycle materials, or ores processed into raw materials suitable for use in the manufacture of products) received from processing facilities or suppliers should be treated as conflict free if the original material supplied was conflict free.[676] A number of other commentators suggested that the final rule allow an issuer to designate the origin of any recycled or scrap conflict minerals as the country in which those minerals were generated and collected or otherwise initially submitted into the recycling or scrap supply chain, which is consistent with the United States customs law.[677] Also, commentators agreed that the alternative reporting requirements for recycled and scrap minerals should apply to all conflict minerals and issuers equally.[678]

Many commentators discussed the Proposing Release's statement that we would consider conflict minerals to be from a recycled or scrap sources if those minerals are reclaimed end-user or post-consumer products but would not consider those minerals "recycled" if they are partially processed, unprocessed, or a byproduct from another ore. Some of these commentators recommended that the final rule expand this statement to match the OECD's definition of recycled and scrap minerals or explicitly adopt the OECD's definition in the final rule.[679] Likewise, certain commentators recommended that the final rule clarify that we would consider conflict minerals from recycled or scrap sources to include scrap processed metals created during product manufacturing, which is part of the OECD definition.[680] These commentators, however, were concerned that the Proposing Release

did not consider partially processed materials as being recycled, because they believed that such a definition would exclude industrial scrap, sometimes referred to as "new" scrap, generated by downstream manufacturers from the treatment given to recycled minerals.[681]

Some commentators provided alternative definitions for recycled and scrap minerals. One commentator stated that the final rule should define a recycled or scrap conflict mineral as "a conflict mineral or a conflict mineral derivative that is within, or has been reclaimed from, a used product that was collected directly from the last product end user, or that was collected from a municipal waste stream." [682] Other commentators indicated that conflict minerals should be considered recycled or scrap only if they have been through a cycle of production and application.[683] A further commentator suggested that the final rule adopt, in substantial part, the Environmental Protection Agency's definition of solid waste for our definition of conflict minerals from recycled or scrap sources, with the related exclusions and definitions of various scrap materials.[684] One commentator recommended that we incorporate the Electronic Industry Citizenship Coalition's ("EICC") definition of "scrap" for tantalum as the definition for scrap in the final rule.[685] Certain commentators sought to limit the definition of recycled and scrap minerals to 100% post-consumer metals.[686] Some commentators suggested a definition that would include reclaimed materials from the manufacture of downstream products that incorporate those metals, processes utilizing those metals, or end-user or post-consumer products, which would not include minerals partially processed, materials from the partially processed minerals, or materials from intermediate stages of the smelting and refining process.[687] One commentator recommended that the final rule consider as conflict minerals from recycled or scrap sources, "not only * * * post-consumer scrap, but also

* * * scrap that is the result of an industrial process." [688]

Additionally, some commentators provided recommendations specifically for treating conflict minerals in jewelry, coins, and bars as recycled or scrap. One such commentator stated that conflict minerals from discarded consumer jewelry should be considered recycled or scrap.[689] Another commentator argued that any definition of recycled and scrap gold should grandfather gold bars and gold coins produced before the effective date of the final rule and exclude sludges, slimes, flue dust, carbon fines, slag, and other by-products from consideration as conflict minerals.[690] Conversely, other commentators stated that the definition of conflict minerals from recycled or scrap sources should include only those conflict minerals from post-consumer products and not include any jewelry unsold or not previously owned as end-use products by consumers.[691] Also, some of these commentators indicated that gold coins and bars should not be classified as recycled or scrap[692] because, as some of these commentators stated, they do not represent a clear consumer end-of-life product and are less identifiable as not newly-mined gold.[693]

### c. Final Rule

We are revising the proposal's treatment of conflict minerals from recycled and scrap sources in the final rule. We agree with commentators that it is appropriate to provide alternative treatment for such conflict minerals so that the final rule does not provide a disincentive for using conflict minerals from recycled and scrap sources. However, we also want to include safeguards to prevent issuers from claiming to use conflict minerals from recycled and scrap sources when that is not the case. We believe, as certain commentators noted,[694] requiring an issuer with necessary conflict minerals to conduct an inquiry similar to the reasonable country of origin inquiry to determine whether its minerals are from

---

[674] See letter from AngloGold.

[675] See letter from WGC II.

[676] See letter from Global Tungsten II.

[677] See, e.g., letters from IPMI I, LBMA I, Metalor, NMA II, and RJC I.

[678] See, e.g., letters from Howland, IPC I, ITRI I, and NEI.

[679] See, e.g., letters from Global Witness I, MSG I, and SIF I.

[680] See, e.g., letters from Copper & Brass and SSINA.

[681] Id.

[682] See letter from SEMI (defining a "used product" as "a product that, prior to recycling or disposal, is commercially sold or otherwise distributed to a buyer not in the commercial chain of distribution and used for some period of time").

[683] See letters from Global Tungsten I and RMA.

[684] See letter from Elm.

[685] See letter from H.C. Starck GmbH (Jul. 27, 2011) ("Starck").

[686] See, e.g., letters from Bario-Neal, Brilliant Earth, Earthworks, Metalsmiths, Hacker Jewelers, and TakeBack.

[687] See letters from ITRI I, JGI, and Solutions.

[688] See letter from ArcelorMittal.

[689] See letter from JVC et al. II.

[690] See letter from NMA II.

[691] See, e.g., letters from Brilliant Earth, Bario-Neal, Earthworks, Enough Project I, Hacker Jewelers, ICAR et al. II, and TakeBack

[692] See, e.g., letters from Brilliant Earth, Bario-Neal, Enough Project I, Hacker Jewelers, ICAR et al. II, and TakeBack.

[693] See letter from Enough Project I and ICAR et al. II.

[694] See, e.g., letters from AdvaMed I, AdvaMed II, AngloGold, Global Tungsten II, Industry Group Coalition I, ITIC I, ITRI I, ITRI IV, JVC et al. II, LBMA I, Metalor, NMA I, RJC I, Chamber III, and WGC II.

recycled or scrap sources is an appropriate way to balance these concerns.[695] Under the final rule, if an issuer has reason to believe, as a result of its reasonable country of origin inquiry, that its conflict minerals may *not* have been from recycled or scrap sources, it must exercise due diligence. The issuer would then be required to provide a Conflict Minerals Report if it is unable to determine that the conflict minerals came from recycled or scrap sources.

We believe this approach for any issuer with conflict minerals from recycled or scrap sources is consistent with the Conflict Minerals Statutory Provision. The provision was intended to affect the "exploitation and trade of conflict minerals originating in the Democratic Republic of the Congo [that] is helping to finance conflict characterized by extreme levels of violence in the eastern Democratic Republic of the Congo." [696] As noted by some commentators, however, armed groups in the Covered Countries are financed and benefit from the extraction and illegal taxation of newly mined conflict minerals and their transport, not the use of recycled or scrap conflict minerals.[697] No further revenue or other benefit will be provided to the armed groups from any transaction involving the conflict minerals from recycled or scrap sources because the armed groups "have already extracted their revenue and do not stand to gain with [their] use or sale." [698]

In this regard, we believe it is appropriate, as proposed, to allow an issuer, if it wishes, to describe its products containing conflict minerals from recycled or scrap sources as "DRC conflict free." As one commentator

explained, the "intent of the statute is to provide investors with information about whether minerals used in manufacturing processes may contribute to the ongoing conflict in the DRC," [699] and it is "comfortable that legitimate recycled post-consumer or scrap minerals do not contribute to the crisis and can be therefore identified as 'DRC conflict free.' " [700] We are aware that the underlying conflict minerals that were recycled or from scrap sources may have once directly or indirectly financed or benefited armed groups in the Covered Countries. However, because the purpose of the provision is to provide information about whether minerals used in manufacturing directly or indirectly financed or benefited armed groups in the Covered Countries, and conflict minerals from recycled or scrap sources no longer do so, we believe it is appropriate to deem all products with conflict minerals from recycled or scrap source as "DRC conflict free." [701] This prevents the final rule from providing a disincentive to use conflict minerals from recycled or scrap sources.

i. Definition of "Recycled and Scrap Sources"

We are revising the proposed rules to adopt a definition of conflict minerals from recycled or scrap sources, which mirrors the OECD definition of recycled metals.[702] We are persuaded by commentators that argued that it is important for us to prescribe clear definitions regarding conflict minerals from recycled or scrap sources so that an issuer does not use this alternative reporting scheme as a means to avoid the requirement to exercise due diligence on the source and chain of custody of its conflict minerals in order to describe its products as "DRC conflict free." [703] Also, we agree with one of these commentators that the definition should be included in the body of the

final rule and not just included as guidance in the release.[704]

Further, we are persuaded by commentators that we should use the OECD definition to provide certainty and prevent an issuer from using an alternative definition that would allow the issuer to classify it minerals as recycled or scrap when they were not.[705] Therefore, the final rule states that conflict minerals are considered to be from recycled or scrap sources if they are from recycled metals, which are reclaimed end-user or post-consumer products, or scrap processed metals created during product manufacturing. Also, based on the OECD definition, the final rule states that recycled metal includes excess, obsolete, defective, and scrap metal materials that contain refined or processed metals that are appropriate to recycle in the production of tin, tantalum, tungsten and/or gold. The final rule states further, however, that minerals partially processed, unprocessed, or a byproduct from another ore will not be included in the definition of recycled metal.

The definition included in the final rule should alleviate certain commentators' concern that the Proposing Release would limit the definition of conflict minerals from recycled or scrap sources to only end-user or post-consumer scrap and not include scrap processed metals created during product manufacturing.[706] The final rule's definition, which is consistent with the OECD definition, includes scrap processed metals created during product manufacturing.

ii. Due Diligence for Conflict Minerals That May Not Be From "Recycled and Scrap Sources"

In a change from the proposal, the final rule only requires an issuer with conflict minerals from recycled or scrap sources to exercise due diligence if it has reason to believe, following its reasonable country of origin inquiry, that its conflict minerals that it thought were from recycled or scrap sources may not be from such sources. If so, as is true for issuers with conflict minerals from newly mined sources, the issuer must exercise due diligence that conforms to a nationally or internationally recognized due diligence framework, if such a framework is available. The proposed rules would have required issuers with conflict minerals from recycled or scrap sources to exercise due diligence in determining

---

[695] Because we envision these inquiries to be similar, we use the term "reasonable country of origin inquiry" to refer to an issuer's inquiry into both the conflict minerals' country of origin and whether the minerals are from recycled or scrap sources.

[696] *See* Section 1502(a) of the Act.

[697] *See* letters from AAEI and Global Tungsten I.

[698] *See* letter from AAEI. *See also* OECD, *OECD Due Diligence Guidance for Responsible Supply Chains of Minerals from Conflict-Affected and High-Risk Areas,* 7 n.2 (2011), *available at http:// www.oecd.org/daf/internationalinvestment/ guidelinesformultinationalenterprises/ 46740847.pdf* (stating that metals "reasonably assumed to be recycled are excluded from the scope of this" guidance) and *OECD, Due Diligence Guidance for Responsible Supply Chains of Minerals from Conflict-Affected and High-Risk Areas: Supplement on Gold,* 28 n.34 (2012), *available at http://www.oecd.org/corporate/ guidelinesformultinationalenterprises/ FINAL%20Supplement%20on%20Gold.pdf* (stating that "[r]ecycled material is not itself a concern for contributing to conflict, however, recycled material is a potential means of laundering gold that has been mined in conflict-affected and high-risk areas in order to hide its origin").

[699] *See* letter from TIAA–CREF.

[700] *See id.*

[701] We also note that, going forward, newly mined minerals, even if they are eventually recycled, will be covered under the final rule when they are first used.

[702] *See* OECD, *Due Diligence Guidance for Responsible Supply Chains of Minerals from Conflict-Affected and High-Risk Areas,* 12 n.2 (2011), *available at http://www.oecd.org/dataoecd/ 62/30/46740847.pdf* ("Recycled metals are reclaimed end-user or post-consumer products, or scrap processed metals created during product manufacturing. Recycled metal includes excess, obsolete, defective, and scrap metal materials which contain refined or processed metals that are appropriate to recycle in the production of tin, tantalum, tungsten and/or gold. Minerals partially processed, unprocessed or a bi-product from another ore are not recycled metals.").

[703] *See, e.g.,* letters from Global Witness I, MSG I, and SIF I.

[704] *See* letter from Global Witness I.

[705] *See, e.g.,* letters from Global Witness I, MSG I, and SIF I.

[706] *See* letters from Copper & Brass and SSINA.

that their conflict minerals were from recycled or scrap sources without requiring adherence to any due diligence framework. Presently, it appears that the OECD's supplement for gold is the only nationally or internationally recognized due diligence framework for any conflict mineral from recycled or scrap sources. Therefore, we anticipate that issuers would use the gold supplement to conduct their due diligence for gold that issuer has reason to believe may not come from recycled or scrap sources.

However, neither the OECD nor any other body has a similar due diligence framework for cassiterite, columbite-tantalite, or wolframite. Therefore, until such a framework is developed, the required due diligence for issuers who may have those recycled or scrap conflict minerals is the same as proposed. Those issuers are required to exercise due diligence in determining that their conflict minerals were from recycled or scrap sources without the benefit of a due diligence framework. If, however, a nationally or internationally recognized due diligence framework becomes available for any of the remaining conflict minerals, issuers will be required to utilize that framework for that mineral. Specifically, if due diligence guidance for a particular conflict mineral under a nationally or internationally recognized due diligence framework becomes available prior to June 30 of a calendar year, the first reporting period in which issuers must use the framework for that conflict mineral will be the subsequent calendar year. However, if the due diligence guidance is not approved until after June 30 of a calendar year, issuers are not required to use that framework for that conflict mineral until the second calendar year after approval to provide a full year before implementation.

For example, if the OECD or another body adopts a nationally or internationally recognized due diligence framework for cassiterite, columbite-tantalite, or wolframite from recycled or scrap sources prior to June 30, 2013, the initial reporting period in which issuers with those conflict minerals from recycled or scrap sources must use the due diligence framework will begin on January 1, 2014 and their specialized disclosure reports that discuss their exercise of such due diligence will be due on May 31, 2015. If, however, the OECD or another body adopts such a due diligence framework on or after July 1, 2013, but before June 30, 2014, the initial reporting period for issuers with those conflict minerals to use the framework will begin on January 1, 2015 and their specialized disclosure reports

with respect to those minerals will be due on May 31, 2016. Issuers with gold from recycled or scrap sources, however, are required to submit a specialized disclosure report for that mineral using the OECD's due diligence for recycled or scrap gold for the reporting period beginning January 1, 2013, which will be due on May 31, 2014.

Further, consistent with the proposal, because our final rule considers products with conflict minerals from recycled or scrap sources to be "DRC conflict free," the final rule does not require a discussion of processing facilities, countries of origin, or efforts to determine the mine or location of origin with the greatest possible specificity. Therefore, we believe that our approach is consistent with comments that indicated that the final rule should not require an issuer with conflict minerals from recycled or scrap sources to provide a Conflict Minerals Report, but should require such issuers to "disclose how they have determined that sources are genuine scrap recycled." [707] Without this disclosure, such issuers "might otherwise be encouraged to 'launder' new DRC conflict minerals through their operations—misleading consumers and other stakeholders, and undermining the value of the disclosure exercise." [708]

*F. Other Matters*

If any provision of this rule, or the application thereof to any person or circumstance, is held to be invalid, such invalidity shall not affect other provisions or application of such provisions to other persons or circumstances that can be given effect without the invalid provision or application. Moreover, if any portion of Form SD not related to conflict minerals disclosure is held to be invalid, such invalidity shall not affect the use of the form for purposes of disclosure pursuant to Exchange Act Section 13(p).

### III. Economic Analysis

*A. Introduction*

As discussed in greater detail above,[709] Section 1502 amended the Exchange Act by adding new Section 13(p), which requires us to promulgate disclosure and reporting regulations

---

[707] *See* letter from NEI.

[708] *See id.* (recommending also that "[i]ssuers should use due diligence in determining whether conflict minerals are from scrap/recycled sources").

[709] We are incorporating Sections I and II of this release, which fully describe the statutory requirements of Section 1502 of the Act and the final rule in detail, into Section III of the release and providing only a short summary of the statutory requirements and final rule in this section.

regarding the use of conflict minerals from the Covered Countries. Section 13(p) mandates that the Commission promulgate regulations requiring that a person described disclose annually whether any conflict minerals that are necessary to the functionality or production of a product manufactured by such person originated in the Covered Countries, and make that disclosure publicly available on the issuer's Internet Web site. If a person concludes that the person's conflict minerals originated in the Covered Countries, that person must submit a Conflict Minerals Report, which must be posted on the person's Internet Web site, that includes a description of the measures taken by the person to exercise due diligence on the minerals' source and chain of custody, which must include an independent private sector audit of the Conflict Minerals Report that is conducted according to standards established by the GAO. The person submitting the Conflict Minerals Report must also identify the independent private sector auditor and certify the independent private sector audit. Further, the report must include a description of the products manufactured or contracted to be manufactured that are not DRC conflict free, the facilities used to process the conflict minerals, the country of origin of the conflict minerals, and the efforts to determine the mine or location of origin with the greatest possible specificity.

We are adopting amendments to our rules to implement the Conflict Minerals Statutory Provision. The final rule requires any reporting issuer for which conflict minerals are necessary to the functionality or production of a product manufactured or contracted to be manufactured by that issuer to disclose annually in a separate specialized disclosure report on a new form the results of its reasonable inquiry into whether its conflict minerals originated in the Covered Countries or came from recycled or scrap sources. Under the final rule, following its reasonable country of origin inquiry, if (a) The issuer knows that its conflict minerals did not originate in the Covered Countries or knows that they came from recycled or scrap sources, or (b) the issuer has no reason to believe its conflict minerals may have originated in the Covered Countries, or (c) the issuer reasonably believes its conflict minerals came from recycled or scrap sources, then in all such cases the issuer must, in the body of Form SD, disclose its determination and describe briefly the reasonable country of origin

inquiry it undertook and the results of the inquiry. On the other hand, following its reasonable country of origin inquiry, if (a) the issuer knows that its conflict minerals originated in the Covered Countries and knows that they did not come from recycled or scrap sources, or the issuer has reason to believe that its conflict minerals may have originated in the Covered Countries, *and* (b) the issuer knows that its conflict minerals did not come from recycled or scrap sources or has reason to believe that its conflict minerals may not have come from recycled or scrap sources, then the issuer must exercise due diligence on the source and chain of custody of its conflict minerals that conforms to a nationally or internationally recognized due diligence framework, if one is available. Following that due diligence, unless the issuer determines, based on that due diligence, that its conflict minerals did not originate in the Covered Countries or that its conflict minerals did come from recycled or scrap sources, the issuer must file a Conflict Minerals Report.

In most circumstances, the issuer must obtain an independent private sector audit of its Conflict Minerals Report. The issuer must also describe in its Conflict Minerals Report, among other information, its products manufactured or contracted to be manufactured that have not been found to be "DRC conflict free." For a temporary two-year period for all issuers, and for a temporary four-year period for smaller reporting issuers, an issuer that must perform due diligence and is unable to determine that the conflict minerals in its products originated in the Covered Countries or came from recycled or scrap sources, or unable to determine that the conflict minerals in those products financed or benefited armed groups, may consider those products "DRC conflict undeterminable." In that case, the issuer must describe, among other information, its products manufactured or contracted to be manufactured that are "DRC conflict undeterminable" and the steps it has taken or will take, if any, since the end of the period covered in its most recent prior Conflict Minerals Report to mitigate the risk that its necessary conflict minerals benefit armed groups, including any steps to improve its due diligence. An issuer with products that are "DRC conflict undeterminable" is not required to obtain an independent private sector audit of the Conflict Minerals Report

regarding the conflict minerals in those products.

Finally, after its reasonable country of origin inquiry, an issuer that determines that its conflict minerals it thought were from recycled or scrap sources might instead be from newly mined sources must exercise due diligence that conforms to a nationally or internationally recognized due diligence framework developed specifically for conflict minerals from recycled sources to determine that its conflict minerals are from recycled or scrap sources. The issuer must also describe its due diligence in its Conflict Minerals Report. Currently, gold is the only conflict mineral with a nationally or internationally recognized due diligence framework for recycled or scrap conflict minerals. If no nationally or internationally recognized due diligence framework for a particular recycled or scrap conflict mineral is available, which is the case for the other three minerals, until such a framework is developed, the issuer must exercise due diligence in determining that its conflict minerals are from recycled or scrap sources and describe the due diligence measures it exercised in its Conflict Minerals Report.

As we considered how to implement the requirements of Section 1502, we considered the costs and benefits imposed by the new rule and form we are adopting, as well as their effects on efficiency, competition, and capital formation. Many of the economic effects of the rule stem from the statutory mandate, and the discussion below addresses the costs and benefits resulting from both the statute and from our exercise of discretion, and the comments we received about these matters.

The Proposing Release cited some pre-proposal letters we received from commentators indicating the potential impact of the proposed rules on competition and capital formation. In addition to requesting comment throughout the release on the proposal and on potential alternatives to the proposal, we also solicited comment in the Proposing Release on whether the proposal, if adopted, would promote efficiency, competition, or capital formation, or have an impact or burden on competition. We also requested comment on the potential effect on efficiency, competition, or capital formation should we not adopt certain exceptions or accommodations. As discussed throughout this release, we received many comments addressing the potential economic and competitive impact of the proposed rules.

We note, however, that one commentator recommended that the proposed rules be withdrawn because the commentator did not believe we fully analyzed the potential costs, supply chain complexities, and other practical obstacles to implementing the final rule.[710] We disagree. As discussed above, members of the public interested in making their views known were invited to submit comment letters in advance of the official comment period for the proposed rules. In addition, in response to the suggestion by some commentators that we extend the comment period to allow the public additional time to thoroughly consider the matters addressed in the Proposing Release and to submit comprehensive responses, we extended the comment period for an additional 30 days and have continued to receive comment letters through August 2012, which we have considered. In addition, we convened an October 2011 roundtable at the request of commentators. Some commentators have provided responses to other commentators, particularly on the Economic Analysis. This robust, public, and interactive debate has allowed us to more fully consider how to develop our final rules. Additionally, as discussed further in the Economic Analysis section, below, we have considered and analyzed the numerous comments received regarding the costs and complexities of the statute and proposed rule, and have taken them into account in the final rule. Overall, we believe interested parties have had sufficient opportunity to review the proposed rules, as well as the comment letters, and to provide views on the proposals and on the other comment letters and data to inform our consideration of the final rules. Accordingly, we do not believe that withdrawal of the proposed rule and re-proposal is necessary.

After analyzing the comments and taking into account additional data and information, we believe it is likely that the initial cost of compliance is approximately $3 billion to $4 billion, while the annual cost of ongoing compliance will be between $207 million and $609 million. As discussed in detail below, we reach this estimate by taking into account the many comments we received on potential costs, relying particularly on those comment letters that provided quantification and were transparent about their methodologies. As will be discussed in more detail below, after thoroughly considering each comment letter, we determined that it was

---

[710] *See* letter from Chamber I.

appropriate to modify and/or expand upon some of the submitted estimates and methodologies to reflect data and information submitted by other commentators, as well as our own judgment and experience. Our considered estimate of the total costs thus reflects these synthesized data and analyses. We consider the full range of these costs in the following sections, although where it is possible to discuss separately the costs and benefits related to our discretionary choices in the rule, we attempt to do so.[711]

Exchange Act Section 23(a)(2)[712] also requires us, when adopting rules under the Exchange Act, to consider the impact that any new rule would have on competition, and Exchange Act Section 23(a)(2) prohibits us from adopting any rule that would impose a burden on competition not necessary or appropriate in furtherance of the purposes of the Exchange Act. In addition, Exchange Act Section 3(f)[713] requires us, when engaging in rulemaking where we are required to consider or determine whether an action is necessary or appropriate in the public interest, to also consider whether the action will promote efficiency, competition, and capital formation. Accordingly, as we considered how to implement the requirements of Section 1502, we considered the impact on the economy, burden on competition, and promotion of efficiency, competition, and capital formation.

Given the specific language of the statute and our understanding of Congress's objectives, we believe it is appropriate for the final rule generally to track the statutory provision. Our discretionary authority to implement Section 13(p) is limited, and we are committed to executing the Congressional mandate. Throughout this release, and in the following Economic Analysis, we discuss the benefits and costs arising from the new mandatory reporting requirement, those choices in which we have exercised our discretion, and the comments we received about these matters. Sections III.B and III.C below provide a narrative discussion of the costs and benefits resulting from the mandatory reporting requirement and our exercise of discretion, respectively. In Section III.D below, based on commentators' estimates and our estimates, we provide a quantitative

discussion of the costs associated with the final rule as adopted.[714]

*B. Benefits and Costs Resulting From the Mandatory Reporting Requirement*

1. Benefits

Congress intended for the rule issued pursuant to Section 1502 to decrease the conflict and violence in the DRC, particularly sexual- and gender-based violence.[715] We note also that the Congressional object is to promote peace and security in the Covered Countries.[716] As a means to address the humanitarian situation in the DRC, new Section 13(p) requires issuers to understand and report on their use and source of certain minerals from the Covered Countries. By mandating the additional disclosure requirements of Exchange Act Section 13(p), we understand that Congress likely sought to reduce the amount of money provided to armed groups engaged in conflict in the DRC,[717] thereby achieving the stated objective of the statute.[718] Some commentators have

argued that the Conflict Minerals Statutory Provision has already made progress in this area.[719] For example, some commentators have argued that the Conflict Minerals Statutory Provision has already pressured DRC authorities to begin to demilitarize some mining areas and to increase mining oversight.[720] Congress provided that the disclosure requirements of Exchange Act Section 13(p) shall remain in effect until the President determines and certifies that "no armed groups continue to be directly involved in and benefitting from commercial activity involving conflict minerals."[721]

The statute therefore aims to achieve compelling social benefits, which we are unable to readily quantify with any precision, both because we do not have the data to quantify the benefits and because we are not able to assess how effective Section 1502 will be in achieving those benefits. Additionally, the social benefits are quite different from the economic or investor protection benefits that our rules ordinarily strive to achieve.

We also note that these objectives of Section 1502 do not appear to be those that will necessarily generate measurable, direct economic benefits to investors or issuers. Some commentators urged, however, that conflict minerals information is material

---

[711] As discussed above, our discretionary choices are informed by the statutory mandate and thus, discussion of the benefits and costs of those choices will necessarily involve the benefits and costs of the underlying statute.

[712] 15 U.S.C. 78w(a)(2).

[713] 15 U.S.C. 78c(f).

[714] As noted below, Congress's goals of reducing violence and promoting peace and security in the Covered Countries, as well as enhanced transparency through Section 13(p) and this rulemaking is intended to result in benefits that cannot be readily quantified with any precision, and therefore, our quantitative analysis focuses on the costs.

[715] Section 1502(a) of the Act ("It is the sense of the Congress that the exploitation and trade of conflict minerals originating in the Democratic Republic of the Congo is helping to finance conflict characterized by extreme levels of violence in the eastern Democratic Republic of the Congo, particularly sexual- and gender-based violence, and contributing to an emergency humanitarian situation therein, warranting the provisions of section 13(p) of the Securities Exchange Act of 1934, as added by subsection (b).").

[716] *See* Exchange Act Section 1502(c)(1)(B)(i) (stating that the Secretary of State, in consultation with the Administrator of the United States Agency for International Development, shall submit to Congress a plan to "promote peace and security" in the Covered Countries). *See also* Section 1502(d)(2)(A) of the Act (directing the GAO to assess the effectiveness of Exchange Act Section 13(p) in promoting peace and security in the Covered Countries).

[717] *Cf.* Exchange Act Section 1502(c)(1) requiring the Secretary of State in consultation with the Administrator of the United States Agency for International Development to submit a report to Congress discussing a strategy to address the linkages between human rights abuses, armed groups, mining of conflict minerals, and commercial products that includes a plan to promote peace, a plan to provide guidance to commercial entities seeking to exercise due diligence, and a description of possible punitive measures.

[718] As discussed above, some commentators, including co-sponsors of the legislation and other members of Congress, indicated that the Conflict Minerals Statutory Provision also materially informs an investor's understanding of the risks in an issuer's reputation and supply chain. *See, e.g.,* letters from CRS I, FRS, Global Witness I, Methodist Pension, Sen. Durbin/Rep. McDermott, Sen. Leahy *et al.,* SIF I, and SIF II.

[719] *See, e.g.,* letters from International Corporate Accountability Roundtable (Jul. 29, 2011) ("ICAR I"), Sen. Boxer *et al.* I, Sen. Leahy *et al.,* and United Nations Group of Experts on the Democratic Republic of Congo (Oct. 21, 2011) ("UN Group of Experts"). Other commentators, however, have argued that the Conflict Minerals Statutory Provision has hurt the general economy and population of the DRC. *See, e.g.,* letters from BEST II ("Though [the Conflict Minerals Statutory Provision] seeks to provide a mechanism for combating the corruption and violence crippling the DRC, its impact on the upstream mining industry has been devastating to the mining communities and the broader economy of Eastern DRC."), CEI II ("There are already indications that Dodd-Frank has had damaging consequences for the artisanal miners. In a recently published New York Times op-ed, freelance reporter David Aronson observed that the law is harming the very people it is aimed at protecting, and that the sole beneficiaries are those perpetrating the violence."), and FEC II (stating that, "we can confirm today that as expected there is more smuggling activities, very big decrease in revenue of the Government of DRC, huge impact on the live hoods of thousands of Congolese, there is no more formal business in the Kivus due to this interpretation of consumers which is far more than the requirements of the law and does not give chance for the improvements that had already begun to work").

[720] *See, e.g.,* Sen. Boxer *et al.* I, Sen. Leahy *et al.,* and United Nations Group of Experts on the Democratic Republic of Congo (Oct. 21, 2011) ("UN Group of Experts"). Other commentators, however, have argued that the Conflict Minerals Statutory Provision has hurt the general economy and population of the DRC. *See, e.g.,* letters from BEST II, CEI II, and FEC II.

[721] Exchange Act Section 13(p)(4).

ADD-69

to an investment decision and, therefore, similar to other disclosures required to be filed by issuers.[722] For example, one commentator noted that, "[a]s a sustainable and responsible investor," this commentator "values companies' prudent management of risk in their global supply chains and has been particularly concerned in recent years by the use of certain minerals to fund the continuing bloody conflict in the" DRC.[723] As another example, a different commentator stated that, "[a]s sustainable and responsible investors, we carefully assess the prudent management of risk in companies' global supply chains and we have been particularly concerned in recent years by the use of certain minerals, namely tin, tantalum, tungsten and gold, to fund the continuing bloody conflict in the" DRC.[724]

## 2. Cost Estimates in the Comment Letters

In the Proposing Release, we included our estimates of the costs of the disclosure requirements.[725] A number of commentators indicated that we underestimated the costs.[726] One commentator, however, asserted that Economic Analysis was both "thorough and accurate." [727] In this regard, another commentator stated that the cost estimates in comment letters from industry "seem[ed] significantly inflated." [728] Some commentators discussed the costs in a more specific manner. In the Specific Comments

section below, we discuss the comments we consider to be the most useful regarding the costs of the disclosure requirements. In both the general and specific comments, commentators did not typically distinguish between the costs and benefits of the statutory mandate and the costs and benefits of the specific aspects of the rule for which we exercised discretion. The overall specific cost range provided by commentators, as discussed in greater detail below, was between $387,650,000 [729] and $16 billion.[730] In analyzing the comments, we believe it is more likely that the initial cost of complying with the statutory requirement is approximately $3 billion to $4 billion. We explain why as we consider and describe the full range of these costs below, although where it is possible to discuss separately the costs and benefits related to our discretionary choices in the rule, we attempt to do so.

### a. General Comments

Most commentators stated that they fully support the humanitarian goals of the Conflict Minerals Statutory Provision of reducing the levels of violence in the DRC,[731] but some commentators argued that the Proposing Release did not adequately demonstrate any benefits to investors.[732] As noted above, the purpose of Section 1502 is furthering the humanitarian goals of reducing violence and advancing peace and security in the DRC and the benefits Congress intended are derived directly from the statute. Other commentators, including two of the co-sponsors of the provision and other members of Congress, have indicated in comment letters that the provision also serves important investor protection objectives, such as additional disclosure on a company's supply chain,[733] although the legislative history and statutory language do not generally reference investor protection. Therefore, we have designed a final rule to help achieve the intended humanitarian benefits in the way that Congress directed, even though we recognize that the final rule will impose significant compliance costs on

companies who use or supply conflict minerals. Although, as one commentator noted, it would be difficult to determine a realistic cost approximation,[734] most of these commentators believed that compliance costs would be high.

### b. Specific Comments

Four commentators in particular attempted to catalogue the expense of complying with the new reporting requirements. The commentators generally focused on three categories of costs as the most significant: Due diligence for both suppliers and issuers, information technology ("IT") costs, and audit costs. Although there is a general consensus among these four commentators as to the broadest categories of significant costs, in several cases they provided divergent cost estimates as well as supplying differing levels of detail as to how they developed these estimates. The following section is intended to lay out the cost estimates as submitted by the commentators.

### i. Manufacturing Industry Association Comments

In its comment letter, a manufacturing industry association [735] stated that, based on its research, of the 5,994 issuers that the Proposing Release stated could be affected by the final rule, the average issuer would have between 2,000 and 10,000 first-tier suppliers, which would result in the total initial costs to issuers of complying with the final rule being anywhere from approximately $8 billion to $16 billion.[736]

The industry association noted that "a large portion of America's 278 thousand small and medium-sized manufacturers could be affected by the requirement to provide information on the origin of the minerals in the parts and components they supply to companies subject to the SEC." It estimated, however, that "only one in five smaller companies would be in one or more issuer's supply

[722] See letters from Calvert, Global Witness I, Sen. Durbin/Rep. McDermott Sen. Leahy et al., SIF I, SIF II, and TIAA–CREFF. But see letters from AngloGold, Barrick Gold, Cleary Gottlieb, Corporate Secretaries I, Deloitte, Ford, ITIC I, JVC et al. II, NAM III, NMA II, NY State Bar, Taiwan Semi, and WGC II.

[723] See letter from Calvert.

[724] See letter from SIF II.

[725] In the Proposing Release, we estimated solely for the purposes of the Paperwork Reduction Act the total annual increase in the paperwork burden for all affected companies to comply with our proposed collection of information requirements to be approximately 153,864 hours of company personnel time and to be approximately $71,243,000 for the services of outside professionals. Also, we estimated that the PRA burden for the audit and due diligence requirements to the industry would be approximately $46,475,000. These cost estimates were calculated based on the effect that the proposed rules and form amendments, if adopted, would have on those collections of information as a result of the required due diligence process and independent private sector audit of the Conflict Minerals Report.

[726] See, e.g., letters from Barrick Gold, CEI II, Chamber I, Ford, Howland, IPC I, ITRI I, ITRI II, NAM I, NRF I, PCP, Rep. Lee, RILA, TriQuint I, Tulane University Payson Center for International Development (Oct. 25, 2011) ("Tulane"), and WGC II.

[727] See letter from ICAR et al. I.

[728] See letter from Enough Project IV.

[729] See letter from Claigan III.

[730] See letter from NAM I.

[731] See, e.g., letters from ABA, Chamber I, Industry Group Coalition I, NAM I, and WGC II.

[732] See, e.g., letters from Chamber I and PCP. These commentators stated also that the Proposing Release did not demonstrate adequately the proposed rules' efficiencies for the market place or any promotion of capital formation, as discussed below.

[733] See, e.g., letter from Senator Leahy et al. ("[I]t seems abundantly clear that when a publicly traded company relies on an unstable black market for inputs essential to manufacturing its products it is of deep material interest to investors.").

[734] See letter from Howland.

[735] See letter from NAM I. The manufacturing industry association indicated that, in developing its cost estimates, it consulted with its manufacturing members and relied on research by The Global Research Center for Strategic Supply Management at the W.P. Carey School of Business at Arizona State University.

[736] But see letter from the Fafo Institute for Applied International Studies (Oct. 17, 2011) ("Fafo"). This commentator asserted that the manufacturing industry association's cost estimate was too high because of some incorrect assumptions regarding an issuer's costs of changing legal obligations, obtaining an independent private sector audit, monitoring of the supply chain, administering procurement and contracts, implementing remediation recommendations, conducting internal audits of its due diligence system, and reporting to the Commission.

chains,''[737] and these smaller companies' only costs regarding the proposed rules would be a $25,000 audit cost. Therefore, the proposed rules would cost smaller companies, which are not required to report with us under Exchange Act Sections 13(a) or 15(d), approximately $1.4 billion.[738]

Further, the commentator remarked that our $25,000 estimate[739] of the cost of the independent private sector audit ''would only cover the initiation of an audit for a small company with a simple supply chain,'' and argued that, at a minimum, an independent private sector audit of a company with a more complex supply chain would cost at least $100,000.[740] Additionally, the manufacturing industry association ''conservatively estimate[d]'' that approximately 75% of the issuers that

would be required to provide conflict minerals information also would be required to provide a Conflict Minerals Report and an audit rather than the 20% that we estimated in the Proposing Release, which would equate to approximately 4,500 issuers out of the 5,994 issuers we estimated to be affect by the final rule.[741] Taking into consideration the higher estimated number of affected issuers, the industry association estimated that the total cost to all affected issuers to obtain an independent private sector audit of their Conflict Minerals Report would be $450 million.

In addition, the commentator estimated that, to implement their new due diligence policies, it would cost $1.2 billion for the 5,994 affected issuers to change their legal obligations with

each issuer's estimated 2,000 first-tier suppliers, and an additional $300 million for issuers to implement risk-based programs that use control processes to verify that suppliers are providing them with credible information and pushing legal obligations upstream. Also, the commentator estimated that affected issuers would need to expend a collective total of $6 billion to develop new information technology systems to collect information on each issuer's first-tier suppliers.[742] Therefore, the sum of the costs to affected issuers would total approximately $8 billion. Below is a summary of the manufacturing industry association's cost estimates in tabular form:

|  |  | Calculation |
|---|---|---|
| **Manufacturing Industry Association Commentator Estimate** |  |  |
| Issuers affected | 5,994 |  |
| Average Number of 1st tier suppliers | 2,000 |  |
| **Issuer Due Diligence Reform [743]** |  |  |
| Number of compliance hours per issuer | 2 |  |
| Cost per hour | $50 |  |
| Total compliance cost | $1,198,800,000 | 5,994*2000*2*$50 |
| **IT Systems Modification [744]** |  |  |
| Cost per issuer | $1,000,000 |  |
| Total cost | $5,994,000,000 | 5,994*$1,000,000 |
| **Conflict Minerals Report Audits** |  |  |
| Issuers affected [745] | 4,500 | 5,994*75% |
| Audit cost | $100,000 |  |
| Total cost | $450,000,000 | 4,500*100,000 |
| **Issuer Verification of Supplier Information** |  |  |
| Number of hours | 0.5 |  |
| Cost per hour | $50 |  |
| Total cost | $299,700,000 | 5,994*2000*0.5*$50 |
| **Smaller Supplier Due Diligence [746]** |  |  |
| Suppliers affected (only 20% to conduct) [747] | 55,600 | 278,000 * .2 |
| Due diligence cost | $25,000 |  |
| Total cost | $1,390,000,000 | 278,000*.2*$25,000 |
| Total | $9,332,500,000 |  |
| Total for affected issuers | $7,942,500,000 | $9,332,500,000 − $1,390,000,000 |

---

[737] 278,000 ×.20 = 55,600.

[738] 278,000 ×.20 × $25,000 = $1,390,000,000.

[739] As discussed in the Proposing Release, we indicated that each independent private sector audit of the Conflict Minerals Report would cost approximately $25,000 on average based on the preliminarily estimates of one industry group.

[740] See letter from NAM I.

[741] See id. The manufacturing industry association commentator estimated that 75% of affected issuers would be required to submit a Conflict Minerals Report because, according to the

commentator, the majority of issuers would not be able to determine the origin of their conflict minerals.

[742] See letter from NAM I.

[743] The manufacturing industry association commentator refers to this as ''changes to corporate compliance policies.''

[744] The manufacturing industry association commentator refers to this as IT system development or revision.

[745] We are using the rounded estimate (4,500) that was used by the university group and

manufacturing industry association commentators in their calculations even though a more exact number of issuers would be 4,496 (.75 × 5,994 = 4,495.5). See infra note 869.

[746] The manufacturing industry association commentator refers to this as the cost of ''provid[ing] proper information regarding the source of minerals.''

[747] Supplier compliance cost in the manufacturing industry association commentator's proposal is considered an audit cost and is not limited to smaller suppliers that are issuers.

Additionally, this commentator calculated that the costs of the final rule could be "as high as $16 billion" by "extrapolating from the recent experience of company costs in complying with the European Union's hazardous waste directive ("RoHS"), and estimated on that basis the economic impact of the SEC's proposed regulations." [748] In fact, this commentator postulated that "Section 1502 may be broader in scope because" it "covers more products and sectors than RoHS," it "discriminates against origin," and it "does not include a *de minimis* or weight-based exception." [749] The commentator stated that, according to Technology Forecasters, Inc., the RoHS directive cost the electronics industry $2,640,000 per company to achieve initial RoHS compliance and another $482,000 annually to maintain compliance. Therefore, based on these per company figures, the commentator calculated that initial compliance of all 5,994 issuers would be approximately $16 billion.

ii. Electronic Interconnect Industry Association Comments

Another commentator, an electronic interconnect industry association,[750] estimated that the electronic interconnection industry suppliers would incur compliance costs of approximately $279 million in the first year and approximately $165 million in ongoing annual costs.[751] Additionally, this commentator stated that there could be additional hidden costs for companies that varied widely from no additional costs to more than $2 million in such costs.[752] This commentator did

not provide an estimate of the costs to all potentially affected issuers, but focused on the electronic interconnect industry.

The electronic interconnect industry association also argued that more than 20% of the 5,994 affected issuers would have to conduct an independent private sector audit.[753] The commentator noted that, although the Covered Countries may, at most, supply 20% of the world's supply of conflict minerals, this 20% could be distributed to 100% of the issuers. Therefore, all issuers could be required to file a Conflict Minerals Report and obtain an independent private sector audit, and the electronic interconnect industry group "expected that nearly 100% of affected issuers will need to complete a [Conflict Minerals Report], especially in the initial years of the regulation." [754] In this regard, the commentator noted that respondents to its survey stated that "[s]upplier verification and auditing was a frequently cited anticipated cost," and the respondents "estimated direct costs of [$]10,000 to [$]100,000 for the third party due diligence audits." [755] The commentator also indicated that the average number of suppliers in the supply chain for those companies responding to their survey was 163.

iii. University Group Comments

Another commentator, a university group, provided its own cost figures regarding the proposed rules in its comment letter.[756] The university group contended that our model underestimated the costs of the proposed rules due to, among other reasons, our failure to consider the costs incurred by all actors, especially first-tier private company suppliers, that are required to modify their management systems to provide critical information to its customers that are the issuers. In contrast, the university group found that the manufacturing industry group's economic model overstated the costs by overestimating the number of suppliers and failing to account for cost efficiencies.

The university group contended that all affected companies, both issuers and

private companies, would need to carry out three principal actions to implement Section 1502. These actions consisted of strengthening internal management systems in view of performing due diligence, instituting necessary information technology systems, and obtaining independent private sector audits. The university group's model indicated that the largest driving cost factor was strengthening companies' management systems, which would total approximately $5.17 billion for both issuers and private companies, with issuers' costs being approximately $26 million and private companies' costs being approximately $5.14 billion. The other costs would be borne only by issuers. These other costs included instituting the necessary information technology systems, which would cost approximately $2.56 billion, and obtaining an independent private sector audit, which would cost companies approximately $207 million. Ultimately, according to the university group, the proposed rules would cost all affected companies, both issuers and private companies involved in the conflict minerals supply chain, approximately $7.93 billion initially and approximately $207 million annually thereafter.

As noted, the university group commentator estimated the due diligence costs to both issuers and their private company suppliers. The total initial labor costs, including both laborers and consultants, to all 5,994 issuers would be approximately $26 million. For the costs to private company suppliers, the university group estimated the total number of small private company suppliers to be 148,459, and the number of large private company suppliers to be 711,607.[757] The total initial labor costs, including both laborers and consultants, to all 860,066 private company suppliers would be approximately $5.14 billion. In sum, the total initial labor costs for due diligence to both the 5,994 issuers and the 860,066 private company suppliers would be approximately $5.17 billion.

Also, the university group disagreed with the manufacturing industry group's estimate that the costs for modifying

---

[748] See letter from NAM I. This commentator estimated that each issuer affected by RoHS had an initial compliance cost of $2,640,000. For the 5,994 issuers that we estimate may be affected by the final rule, the estimated total cost to comply with RoHS would be $15,824,160,000 ($2,640,000 × 5,994 = $15,824,160,000).

[749] See id.

[750] See letter from IPC I.

[751] See id. The letter includes an Appendix A, which consists of a published survey produced by Market Research Service of the electronic interconnect industry association commentator entitled, "Results of an IPC Survey on the Impact of U.S. Conflict Minerals Reporting Requirements" (Feb. 2011) ("electronic interconnect industry group survey"). Much of the information cited from this commentator is located in the published survey. For the survey, the commentator surveyed 3,839 of its members in the electronic interconnection industry with a total of 60 separate companies actually participating in the survey. Of these 60 companies, 30% were public issuers while the remaining 70% were private companies. Despite acknowledging that the survey was not intended "to produce statistical significant data," the commentator argued that the survey respondents do "make up a representative sample of the U.S. electronic interconnect supply chain." See id.

[752] See id.

[753] Id.

[754] See id. This commentator noted as well that "the vast majority of users will be unable to identify the origin of their conflict minerals * * * and therefore will need to complete" a Conflict Minerals Report.

[755] See id.

[756] See letter from Tulane. The staff of Senator Richard J. Durbin, one of the co-sponsors of the Conflict Minerals Statutory Provision, contacted this commentator "with a specific request for help in providing a detailed estimate of what it would cost companies to implement the Congo Conflict Mineral Act." See id.

[757] The university group commentator developed these estimates by multiplying the number of issuers by the company size factor (large or small) and multiplying the number of relevant first tier supplier contracts by an overlap factor of 0.40. This factor attempts to differentiate and correct for the number of estimated material supply contracts versus the number of unique businesses impacted. Tulane estimated a 60% overlap factor meaning that only 40% (100% − 60% = 40%) of the supply contracts corresponded to non-overlapping suppliers. See letter from Tulane.

ADD-72

each issuer's information technology systems would be $1 million. The university group agreed that these costs would be borne solely by issuers because they would be responsible for creating tracking systems for the supplier-furnished supply chain information, and that large issuers that use complex information technology systems to manage their supply chains would have costs of $1 million per company. However, the university group argued that the unit costs for small companies, based on the data from the 2011 electronic interconnect industry association commentator survey, would be $205,000 per company. The university group estimated that the information technology costs for the affected small issuers would be approximately $885 million, and the cost for the affected large issuers would be approximately

$1.68 billion. Therefore, the total costs to the 5,994 affected issuers of changing information technology systems would be approximately $2.56 billion.

Finally, the university group discussed the costs associated with the independent private sector audit. The university group disagreed with the manufacturing industry group's assertion that private company suppliers would be required to obtain a private sector audit to demonstrate to their issuer customers that they performed sufficient due diligence. The university group noted that there is no requirement that private company suppliers obtain such an audit, so the burden and cost for a private company supplier to obtain an audit is voluntary in the context of the proposed rules. Further, the university group noted that the impetus for issuers to demand such audits would be reduced if issuers are

allowed to use "reasonably reliable representations" from suppliers. For these reasons, the university group excluded any costs for independent private sector audits for private company suppliers from their cost estimates. The university group, however, agreed with the manufacturing industry group's cost estimates and indicated that the cost for an audit of a small issuer would be $25,000 and the cost to a large issuer would be $100,000. Based on these assumptions, the university group estimated that the audit costs for small issuers would be $81 million,[758] and those costs for large issuers would be approximately $126 million.[759] Therefore, the total audit cost for all issuers would be approximately $207 million per year.[760] Below is a summary of the university group commentator's estimates in tabular form:

|  |  | Calculation |
| --- | --- | --- |
| University Group Commentator Estimate: |  |  |
| Issuers affected .................................................................................................. | 5,994 |  |
| Large issuer (28% of issuers) ............................................................................. | 1,678 | 5,994*0.28 |
| Small issuer (72% of issuers) ............................................................................. | 4,316 | 5,994*0.72 |
| Average number of 1st tier suppliers (53% of manufacturing industry association commentator) ............................................................................................................... | 1,060 | 2,000*0.53 |
| Issuer Due Diligence Reform: |  |  |
| Number of compliance hours for large issuer ..................................................... | 100 |  |
| Number of compliance hours for small issuer ..................................................... | 40 |  |
| Internal cost per hour ......................................................................................... | $50 |  |
| Internal costs for large issuer (90% of total work load) ...................................... | $7,551,000 | 1,678*0.9*100*$50 |
| Internal costs for small issuer (75% of total work load) ...................................... | $6,473,520 | 4,316*0.75*40*$50 |
| Consulting cost per hour ...................................................................................... | $200 |  |
| Consulting costs for large issuer (10% of total work load) .................................. | $3,356,000 | 1,678*0.1*100*$200 |
| Consulting costs for small issuer (25% of total work load) ................................. | $8,632,000 | 4,316*0.25*40*$200 |
| Total cost .............................................................................................. | $26,013,000 |  |
| IT Systems Modification: |  |  |
| Cost per large issuer ........................................................................................... | $1,000,000 |  |
| Cost per small issuer ........................................................................................... | $205,000 |  |
| Total large issuer cost ......................................................................................... | $1,678,000,000 | 1,678*$1,000,000 |
| Total small issuer cost ......................................................................................... | $884,780,000 | 4,316*$205,000 |
| Total costs ............................................................................................ | $2,562,780,000 |  |
| Conflict Minerals Report Audits: |  |  |
| Issuers affected[761] .............................................................................................. | 4,500 |  |
| Number of large issuers ....................................................................................... | 1,260 | 4,500*0.72 |
| Number of small issuers ....................................................................................... | 3,240 | 4,500*0.28 |
| Large issuer cost .................................................................................................. | $100,000 |  |
| Small issuer cost .................................................................................................. | $25,000 |  |
| Total costs for large issuers ................................................................................ | $126,000,000 | 1,260*$100,000 |
| Total costs for small issuers ................................................................................ | $81,000,000 | 3,240*$25,000 |
| Total costs ............................................................................................ | $207,000,000 |  |
| Supplier Due Diligence Reform: |  |  |
| Average number of 1st tier supply contracts per large issuer ............................. | 1,060 |  |
| Average number of 1st tier supply contracts per small issuer ............................. | 86 |  |
| Overlap factor (percent of suppliers affected) ..................................................... | 0.4 |  |
| Total large suppliers ............................................................................................. | 711,472 | 1,678*1,060*0.4 |
| Total small suppliers ............................................................................................ | 148,470 | 4,316*86*0.4 |
| Number of compliance hours for large supplier ................................................... | 100 |  |

---

[758] 5,994 issuers × 75% of issuers requiring an audit × 72% for number of small issuers × $25,000 per audit = $80,919,000.

[759] 5,994 issuers × 75% of issuers requiring an audit × 28% for number of large issuers × $100,000 per audit = $125,874,000.

[760] $80,919,000 + $125,874,000 = $206,793,000.

|  |  | Calculation |
|---|---|---|
| Number of compliance hours for small supplier | 40 |  |
| Internal cost per hour | $50 |  |
| Internal costs for large supplier (90% of total work load) | $3,201,624,000 | 711,472*100*0.9*$50 |
| Internal costs for small supplier (75% of total work load) | $222,705,000 | 148,470*40*0.75*$50 |
| Consulting cost per hour | $200 |  |
| Consulting costs for large supplier (10% of total work load) | $1,422,944,000 | 711,472*100*0.1*$200 |
| Consulting costs for small supplier (25% of total work load) | $296,940,000 | 148,470*40*0.25*$200 |
| Total cost | $5,144,213,000 |  |
| Total | $7,940,006,000 |  |

iv. Environmental Consultancy Company Comments

An additional commentator, an environmental consultancy company, provided cost figures regarding the proposed rules.[762] The environmental consultancy company asserted that the models provided by the manufacturing industry group and the university group significantly overestimated the costs of the proposed rules, whereas our PRA section underestimated the paperwork costs. Specifically, the commentator stated that the manufacturing industry association group's and the university group's ''estimates provide cost projections that do not reflect current industry practice in compliance programs by the vast majority of affected issuers,'' so it ''would be inadvisable to use'' their ''data as the basis for an accurate cost estimate for implementation of Section 1502.'' [763]

Also, the environmental consultancy company argued that we underestimated the costs of the proposed rules primarily because we overestimated issuers' knowledge of the origin of materials in their products. According to the commentator, most of the compliance costs for the proposed rules would be derived from identifying where an issuer's materials are sourced. Further, the commentator suggested that our estimate of the percentage of affected issuers was too low, we did not recognize that issuers needed to expend greater internal efforts in

communicating requirements throughout their companies, we failed to account for the costs of issuers' software changes, and we did not acknowledge that ''many companies'' may work to a higher standard than the rules would require due to public sensitivity of this issue.

Conversely, the commentator asserted that the manufacturing industry group's $8 billion and the university group's $7.93 billion cost estimates were too high. The environmental consultancy company argued that the manufacturing industry group's estimate regarding the cost for issuers to modify legal responsibilities should be only $300 million, instead of the manufacturing industry group's estimated $1.2 billion.[764] Similarly, the environmental consultancy company maintained that the university group's $5.17 billion estimate to strengthen internal management systems was too high because of incorrect assumptions, and that the actual cost should be only $600 million.[765]

---

[761] We are using the rounded estimate (4,500) that was used by the university group and manufacturing industry association commentators in their calculations even though a more exact number of issuers would be 4,496 (.75 × 5,994 = 4,495.5). See infra note 869.

[762] See letter from Claigan I. In this letter, the commentator stated that it submitted its letter because it was asked ''by Congress and others'' to comment on the potential costs of implementing the final rule.

[763] See letter from Claigan Environmental Inc. (Jan. 17, 2012) (''Claigan IV''). But see letters from IPC—Association Connecting Electronics Industries (Feb. 14, 2012) (''IPC III'') and National Association of Manufacturers (Feb. 10, 2012) (''NAM IV'') (challenging certain of the assumptions made by the environmental consultancy company in its comment letters).

[764] According to the environmental consultancy company, the manufacturing industry group's assumption that every issuer would have to amend every legal obligation with its suppliers was incorrect because ''[a]ll standard contracts with suppliers of public companies contain standard provisions requiring suppliers to comply with relevant laws.'' Letter from Claigan I. As a result, it would be unlikely that many contracts would need to be modified to enable compliance. Also, the environmental consultancy company asserted that the manufacturing industry group overestimated the cost of modifying legal responsibilities because the manufacturing industry group assumed that every supplier supplies components or products containing conflict minerals to an issuer, which the environmental consultancy company claimed was ''very unlikely.'' Instead, a more reasonable estimate of the numbers of suppliers affected that would require a modification to its legal obligations ''would be closer to 50% of suppliers.'' This commentator asserted that number, however, should be further reduced by an additional 50% due to duplicative and overlapping relationships within and among suppliers.

[765] The environmental consultancy company commentator noted that the university group commentator estimated that there were 860,066 first tier suppliers. However, a 2008 study by the Consumer Electronics Association (''CEA'') on RoHS that identified only 90,000 total electronic suppliers. In this regard, the environmental consultancy company noted that, although conflict

Further, the environmental consultancy company suggested that the manufacturing industry group's cost estimate regarding issuers' information technology systems should be adjusted from $6 billion to $350 million and that the university group's estimate should be adjusted from $2.56 billion to $360 million.[766] Additionally, the environmental consultancy company asserted that the $100,000 per company audit costs provided by both the manufacturing industry group and the university group were too high because companies' financial statement audits represent only 0.2 to 0.25% of a company's annual revenue, which would mean that a $100,000 cost for a Conflict Minerals Report audit would represent 5% of the total audit costs for a company with a $1 billion per year revenue. Instead, the commentator argued that it would be more accurate to assume that the Conflict Minerals Report audit would represent 1% to 2% of the total audit costs for such a company.[767] Also, the environmental consultancy company contended that only 50% of all reporting issuers would be required to provide a Conflict Minerals Report because the ''majority of Energy sector, finance and utilities

---

minerals disclosure is required by more than just electronics industry issuers, ''the total number of affected first-tier suppliers being over 100,000 seems unrealistic based on this more substantiated information.'' Also, the environmental consultancy company noted that, in many cases, first-tier suppliers may not be supplying products or components containing conflict minerals, or these products or components will represent only a small fraction of their business.

[766] The environmental consultancy company commentator noted that the CEA study found that the average cost for information technology systems changes for RoHS was $120,000 per company, and it discovered that the most expensive conflict minerals software was $40,000 by conferring with a provider of conflict minerals compliance software to confirm that their most expensive software for conflict minerals compliance was $40,000 for the first year.

[767] In its second letter, however, the environmental consultancy company commentator acknowledged that it had limited expertise regarding estimates of the cost of third party audits. See letter from Claigan Environmental Inc. (Dec. 1, 2011) (''Claigan II'').

will not have to create'' a Conflict Minerals Report, and ''[n]o more than half of the consumer discretionary, consumer staples, and materials sectors is expected'' to provide a Conflict Minerals Report.[768]

Finally, the environmental consultancy company developed its own cost model,[769] which was based on current service quotations in the industry and past costs for RoHS compliance based on the 2008 CEA study. In this regard, the commentator provided its estimate of the typical initial costs for affected issuers with revenue of $1 billion per year. Initially, in its first comment letter, the environmental consultancy company concluded that the proposal's compliance cost for a typical affected issuer with $1 billion of revenue would be approximately $315,000 per year.[770]

In a subsequent letter to us, the environmental consultancy company lowered its cost estimate.[771] Instead of the $315,000 per issuer estimate in its initial letter, the environmental consultancy company argued that the cost per issuer for compliance would be closer to $213,000 per issuer because of ''more recent information on corporate budgeting and expenditures'' that ''better reflect current corporate implementation strategies.''[772] Further, in another letter, the environmental consultancy company lowered its cost

estimate again to approximately $64,673 per issuer.[773]

### v. Other Specific Comments

One commentator, an environmental research company, discussed some of the specific cost estimates above and discussed some cost estimates it gathered through interviews with potentially affected issuers.[774] This commentator conducted a study, sponsored by Global Witness, based on interviews with executives at more than 20 global companies that ranged in size from $500 million per year in revenue to over $120 billion in annual revenue, including companies engaged in electronic components, computers, consumer health care, automotive, and retail. Also, the commentator spoke with industry associations, consulting firms, and software providers.

Generally, the commentator found that, based on its interviews, costs for complying with the provision ''will vary widely with the size and complexity of companies' supply chains but seem to be manageable for all company sizes.''[775] In this regard, the commentator also found that the better informed executives were regarding the Conflict Minerals Statutory Provision and its impacts on their company, the more likely they thought the costs of compliance would be manageable. The commentator stated that the largest companies with annual revenues over $50 billion would have one-time costs ranging from $500,000 to $2 million, but the companies with well-developed responsible sourcing systems may only need to spend half as much. Also, the commentator found that many smaller companies ''should be able to meet their obligations for less than the cost of a

full-time employee in the first year with costs declining over time.''[776]

Regarding the above cost estimates by other commentators, the commentator argued that the manufacturing industry association commentator's cost estimate ''significantly overstates the costs most companies will incur, especially those of updating IT systems.''[777] Also, the commentator noted that the electronic interconnect industry commentator's cost estimate was overstated because the estimate included electronics manufacturing services companies, and that industry is ''dominated by very large companies,'' which ''probably account[ed] for the higher median cost estimates.''[778] Further, the commentator noted of the environmental consultancy company commentator's letter that the ''relative magnitude of the costs shown by the [environmental consultancy company commentator] estimate are aligned with what [environmental research company commentator] found in [its] interviews: that the effort to gather reliable data from supply chain partners is likely to be more costly initially than any systems changes required.''[779]

Another commentator that is attempting to establish a due diligence ''bag-and-tag'' monitoring system in the Covered Countries asserted that the total costs incurred by local governments and industry as a whole just for the on-the-ground set-up and implementation of this system in the Covered Countries would be $52 million for the first year.[780] This commentator noted that this $52 million estimate is much higher than our $8 to $10 million estimated cost for setting up a mineral source validation scheme in the Proposing Release. Similarly, another commentator provided the February 2011 five-year plan of the organization that administers the bag-and-tag scheme.[781] The commentator noted that, according to the five-year plan, ''the cost of cleanly bagged-and-tagged minerals, including taxes, will remain below the world market price.''[782] Also, according to the document provided, it appears that the funding requirements for the bag-and-tag scheme, including a 10% contingency, in Eastern DRC and

---

[768] See letter from Claigan I.

[769] Id.

[770] The environmental consultancy company commentator noted that the $315,000 per year cost would equate to approximately 0.03% of an issuer's revenue, but argued that, based on certain variations, the cost range could be anywhere between 0.02% and 0.05% of revenue. Id. The commentator stated further that the average cost of initial compliance with RoHS for a company with annual revenue of $1 billion was close to 0.8% of revenue. However, the commentator indicated that the data gathering and the software costs for RoHS was approximately 0.08% of the initial RoHS compliance costs, which the commentator argued was ''the same order of magnitude'' of its 0.03% calculation. This commentator suggested that its ''slightly lower'' cost projections were due to less expensive conflict minerals software packages, as compared to RoHS, and the large data gathering cost for RoHS, the need to gather data for every part and create new part numbers for compliant parts, are not required for conflict minerals. The commentator noted also that, if the final rule would cause issuers to dispose of their current conflict mineral inventories because the conflict minerals were of indeterminate origin or our rule would not exempt conflict minerals from recycled or scrap sources, the expected costs of compliance would be closer to 0.5% of revenue.[1] Finally, the commentator claimed that this initial cost of compliance is expected to increase by a factor of 2.5 for an issuer having ten times the annual revenue ($10 billion) and decrease by a factor of 2.5 for an issuer with 10% of revenue ($100 million). Id.

[771] See letter from Claigan II.

[772] Id.

[773] See letter from Claigan III. In this letter, the environmental consultancy group commentator broke down the number of affected issuers by size and cost per issuer based on that size. The commentator determined that the total cost to 6,000 affected issuers would be $387,650,000, which would be $64,608 per issuer. However, because we estimated that there would be 5,994 affected issuers, we divided the $387,650,000 by 5,994 issuer to come up with $64,673 per issuer. See also letter from Assent Compliance (Dec. 19, 2011) (''Assent'') (discussing the software costs to issuers for implementing Section 1502, which apparently was included as part of the overall cost calculation in the letter from Claigan III). Further, the environmental consultancy company commentator provided an additional comment letter that did not revise its cost estimate, but expanded upon differences between costing estimates it submitted and previous costing estimates submitted by the manufacturing industry association and university group commentators. See letter from Claigan IV.

[774] See letter from Green II. At the end of the letter, the commentator describes itself as a ''research, advisory and consulting firm focusing on clean tech, alternative energy and corporate sustainability.''

[775] See id.

[776] See id.

[777] See id.

[778] See id.

[779] See id.

[780] See letter from ITRI II.

[781] Representative Jim McDermott (Oct. 12, 2011) (''Rep. McDermott'') (providing the five-year plan authored by iTSCi, the International Tin Research Institute's Tin Supply Chain Initiative, in February 2011).

[782] Id.

USCA Case #13-5252    Document #1455974    Filed: 09/11/2013    Page 152 of 198

Rwanda will be approximately $38,971,000 from 2011 through 2015.

Also, this commentator stated that trading companies, transporters, and concentrate treatment facilities that continue to trade with the Covered Countries would incur additional costs in relation to the greatly increased levels of administration and auditing that "may amount to an additional man year," which is "approximately US$100,000 per year" per trading company, transporter, and concentrate treatment facility going forward.[783] The costs to trading companies, transporters, and concentrate treatment facilities that stop treating minerals from the Covered Countries would be less "but still of significance." The commentator estimated that these companies' costs could "perhaps be an additional half a man year," which would be approximately $50,000 per year per company. Further, this commentator indicated that smelters and processing facilities may be requested to perform an independent audit every six months or every year, which would cost these smelters and processing facilities approximately $60,000 per audit. Finally, the commentator argued that the "sum cost of new auditing requirements and increasing burden of documentation in the international supply chain may amount to a total of US$7 million per year."

A few commentators provided other, less specific cost estimates. One commentator indicated that it would require 1,400 hours in the first year working with its suppliers to implement the proposed rules and an additional 700 hours in each subsequent year to comply with the proposed rules.[784] The commentator calculated this figure by using the 450 different materials the commentator would have to research, and estimated that it would require three hours per material, which would equate to approximately 1,400 hours.[785] The commentator stated that this estimate did "not take into account the days and weeks that will be required to write any required reports and work with auditors." Although the commentator provided an estimate of the number of hours required to comply with the rules, it did not disclose the costs associated with its number of estimated hours. The commentator noted, however, that it is "a relatively small company, [and] these costs will be

multiplied many times throughout the entire economy."

Another commentator indicated that "the initial cost for establishing record keeping processes, staffing, and identifying the contacts throughout the supply chain will run approximately [four times] the on-going annual staffing [and] cost for certification."[786] In addition, this commentator asserted that the "software to track and retain these records for [five to ten] years could add another [two times] the annual cost for certification."[787] Ultimately, although the commentator did not disclose the actual costs associated with its estimates, it concluded that complying with the proposed rules would be "very expensive" for even one year.

Another commentator argued that the costs of the proposed rules to implement the statute would be expensive even for an issuer with existing systems in place to track inputs in the supply chain because such an issuer would still have to add capability to its existing systems, provide additional supplier training, and revise its existing information technology systems.[788] A few commentators noted Apple Inc.'s Supplier Responsibility 2011 Progress Report.[789] As one of these commentators noted, Apple investigated the use of extractives at all levels of its supply base and mapped its supply chain to the smelter level to know which of its suppliers are using tantalum, tin, tungsten, or gold and from where they are receiving the metal.[790] Accordingly, Apple determined that it has a total of 142 suppliers of conflict minerals.[791] Some commentators asserted that the costs of the proposed rules could be disproportionately higher to smaller issuers.[792] Other commentators asserted that the Proposing Release failed to account for the costs to non-issuers, which would be significant.[793]

Other commentators asserted also that the $25,000 estimated audit cost is not the correct cost for the type of audit that would be required.[794] One such commentator noted that the "cost of an

independent audit [sic] of $25,000 is also not specifically for the type of audits that would be required either on the upstream supply chain, or at the smelters."[795] Another commentator stated that we "did not specify the scope of the independent private sector audit of the Conflict Minerals Report" in the Proposing Release, and our $25,000 estimate would correspond only to an audit of whether the issuer's Conflict Minerals Report accurately describes the due diligence the issuer exercised.[796] According to this commentator, this cost estimate, however, could be far higher depending on the audit scope to be outlined in the final rule. A further commentator indicated that our assumptions about the scope and objective of the audit in the Proposing Release were not clear, but it appeared that the estimate "may depend on a company relying on an industry-wide due diligence process and that company being able to conclude that its conflict minerals did not originate in a DRC country."[797] This commentator stated that it was not aware of any such industry-wide due diligence process in place.

## C. Benefits and Costs Resulting From Commission's Exercise of Discretion

As discussed in detail in Section II, we have revised the rules from the Proposing Release to address comments we received while remaining faithful to the language and intent of the statute as adopted by Congress. In addition to the statutory benefits and costs noted above, we believe that the use of our discretion in implementing the statutory requirements will result in a number of benefits and costs to issuers and users of the conflict minerals information. Below, we discuss the most significant choices we made in implementing the statute and the associated benefits and costs. We are unable to quantify the impact of each of the decisions we discuss below with any precision because reliable, empirical evidence regarding the effects is not readily available to the Commission, and commentators did not provide sufficient information to allow us to do so. Thus, in this section, our discussion on the costs and benefits of our individual discretionary choices is qualitative. Later in the release, we present a quantified analysis on the overall costs and benefits of the final rule that includes all aspects of the implementation of the statute.

---

[783] See letter from ITRI II.

[784] See letter from TriQuint I.

[785] Id. The commentator did not provide a similar breakdown of its calculation regarding its 700 hour per subsequent year estimate.

[786] See letter from Teggeman.

[787] See id.

[788] See letter from Ford.

[789] See, e.g., letters from Enough Project I (citing to Apple Inc.'s Supplier Responsibility 2011 Progress Report at http://images.apple.com/supplierresponsibility/pdf/Apple_SR_2011_Progress_Report.pdf), Enough Project IV, and Fafo (citing to http://images.apple.com/supplierresponsibility/pdf/Apple_SR_2011_Progress_Report.pdf).

[790] See letter from Enough Project I.

[791] See letters from Enough Project IV and Fafo.

[792] See letter from Howland.

[793] See letters from NAM I and WGC II.

[794] See letters from CTIA, ITRI I, and KPMG.

[795] See letter from ITRI I.

[796] See letter from CTIA.

[797] See letter from KPMG.

1. Reasonable Country of Origin Inquiry

The Conflict Minerals Statutory Provision requires any issuer with necessary conflict minerals that "did originate" in the Covered Countries to provide a Conflict Minerals Report.[798] The provision, however, does not specify how an issuer is to determine whether its conflict minerals originated in the Covered Countries. The provision states only that any issuer with such conflict minerals must submit a report to us that describes, among other matters, the measures taken by the issuer to determine the source and chain of custody of those conflict minerals.

We used our discretion in the final rule to require that issuers covered by Section 1502 of the Act conduct a good faith "reasonable country of origin inquiry" that is reasonably designed to determine whether their conflict minerals originated in the Covered Countries or are from recycled or scrap sources. We do not specify what would constitute a "reasonable country of origin inquiry." We believe that this decision to employ a performance standard rather than a design standard should benefit issuers by allowing them the flexibility to use the reasonable country of origin inquiry standard that is best suited to their circumstances.

Although the final rule does not specify what would constitute a reasonable country of origin inquiry, it requires that the issuer conduct in good faith an inquiry that is reasonably designed to determine whether any of its conflict minerals originated in the Covered Countries or came from recycled or scrap sources. Although the proposal did not state explicitly that an issuer must reasonably design its inquiry and conduct it in good faith, we believe that this is not a change from the proposal, but a clarification of the proposal's intent. We believe providing this clarification will facilitate compliance with the rule by providing further guidance to issuers about what is required to satisfy the reasonable country of origin inquiry. Other than being reasonably designed and performed in good faith, however, the final rule does not require issuers to conduct an exhaustive inquiry to establish to a certainty whether their conflict minerals originated in Covered Countries or came from recycled or scrap sources. We believe this is appropriate because, under the Conflict Minerals Statutory Provision, issuers are required to ascertain whether their conflict minerals did originate in the Covered Countries to know whether they must submit a Conflict Minerals Report. Therefore, some inquiry is necessary.

We could have required an issuer to exercise due diligence in determining whether its conflict minerals originated in the Covered Countries or came from recycled or scrap sources. We also could have required an exhaustive inquiry in which an issuer would be required to determine to a certainty whether each mineral originated in the Covered Countries. However, while these would be plausible alternatives, such inquiries likely would be more costly, and we do not believe those approaches are necessary. Instead, we believe the reasonable country of origin inquiry standard provides a clear way for issuers to make the necessary determination and does so in a more cost-effective manner. The reasonable country of origin inquiry is consistent with the supplier engagement approach in the OECD guidance where issuers use a range of tools and methods to engage with their suppliers.[799] The results of the inquiry may or may not trigger due diligence. This is the first step issuers take under the OECD guidance to determine if the further work outlined in the OECD guidance—due diligence—is necessary. The Conflict Minerals Statutory Provision specifically contemplates due diligence, which goes beyond inquiry and involves further steps to establish the truth or accuracy of relevant information, by requiring a description of the measures the issuer took to exercise due diligence on the source and chain of custody of the minerals. The Conflict Minerals Statutory Provision specifically notes that due diligence includes the audit discussed below.

We recognize that our reasonable country of origin approach is broad enough that some issuers might perform an insufficiently rigorous inquiry and some issuers might perform an overly rigorous inquiry. An insufficiently rigorous inquiry could result in an erroneous determination that the issuer is not required to submit a Conflict Minerals Report, thus reducing the utility of the disclosure with respect to the issuer's use of conflict minerals. An overly rigorous inquiry, on the other hand, could cause issuers to incur greater costs than they would otherwise. We believe, however, that the requirement that issuers make certain disclosures about the particular reasonable country of origin inquiry they undertook mitigates concerns about an insufficiently rigorous inquiry. Similarly, we believe our guidance that issuers need only conduct an inquiry reasonably designed to determine whether conflict minerals originated in the Covered Countries mitigates concerns about an overly rigorous inquiry. Overall, we believe that the benefit of mitigating issuer compliance costs justifies the "reasonable country of origin" approach we have chosen.

Also, in a change from the proposal, the final rule establishes a different standard for the issuer in determining, based on its reasonable country of origin inquiry, whether due diligence on the conflict minerals' source and chain of custody and a Conflict Minerals Report is required. The proposed rules would have required an issuer to conduct due diligence and provide a Conflict Minerals Report, based on its reasonable country of origin inquiry, if, among other conclusions, the issuer was unable to determine that its conflict minerals did not originate in the Covered Countries or came from recycled or scrap sources. Under the proposal, issuers could only avoid providing a Conflict Minerals Report if they could prove a negative—that their conflict minerals did not originate in the Covered Countries. That approach would arguably have been more burdensome than necessary to accomplish the purpose of the statutory provision.

Under the final rule, however, an issuer must exercise due diligence on its conflict minerals' source and chain of custody and potentially provide a Conflict Minerals Report if the issuer knows that its necessary conflict minerals originated in the Covered Countries and did not come from recycled or scrap sources, or has reason to believe that its necessary conflict minerals may have originated in the Covered Countries and may not have come from recycled or scrap sources. This new approach does not require an issuer to prove a negative to avoid performing due diligence, but it also does not allow an issuer to ignore warning signs or circumstances reasonably indicating that its conflict minerals may have originated in the Covered Countries or may not have been from recycled or scrap sources. This approach should reduce the total costs

---

[798] Exchange Act Section 13(p)(1)(A).

[799] In June 2012, the OECD issued a report regarding implementation of the OECD guidance. *See OECD, Downstream Implementation of the OECD Due Diligence Guidance for Responsible Supply Chains of Minerals from Conflict-Affected and High-Risk Areas, Cycle 2 Interim Progress Report on the Supplement on Tin, Tantalum, and Tungsten Final Draft* (June 2012), *available at* http://www.oecd.org/investment/guidelinesformultinationalenterprises/Downstream%20cycle%202%20report%20-%20Edited%20Final%20-%201%20June.pdf. This additional guidance includes sample letters to suppliers and customers regarding the use of conflict minerals.

of the final rule, by enabling an issuer that, following a reasonable country of origin inquiry, is unable to determine that its conflict minerals did not originate in the Covered Countries or come from recycled or scrap sources, but has no reason to believe that its necessary conflict minerals may have originated in the Covered Countries or do not come from recycled or scrap sources, to fully comply with the rule without conducting due diligence, obtaining an audit, or preparing and filing a Conflicts Mineral Report.

We realize that requiring a Conflict Minerals Report if, after exercising a reasonable country of origin inquiry, the issuer has reason to believe that it has necessary conflict minerals that may have originated in the Covered Countries and may not have come from recycled or scrap sources will be more costly than only requiring a report if the issuer has affirmatively determined that its minerals did come from the Covered Countries. However, as already discussed, we believe that such an approach is required to achieve the benefits intended by the statute. Moreover, this approach provides an appropriate balance compared to the more costly possible approach of requiring an issuer to submit a Conflict Minerals Report unless it determines to a certainty that its necessary conflict minerals did not originate in the Covered Countries.

This approach regarding when an issuer must exercise due diligence as to the source and chain of custody of its conflict minerals and provide a Conflict Minerals Report could increase costs of the final rule. Some issuers may expend more resources than necessary to satisfy the standard in order to assure themselves that their minerals did not originate in the Covered Countries. On the other hand, other issuers may expend insufficient resources which could lead to inadequate inquiries. However, we anticipate that overall this approach will result in fewer issuers engaging in due diligence and providing a Conflict Minerals Report because, although an issuer may not be able to determine to a certainty, even after a reasonable country of origin inquiry, that its conflict minerals did not originate in the Covered Countries or are from recycled and scrap sources, that issuer may have no reason to believe that its necessary conflict minerals may have originated in the Covered Countries and not come from recycled or scrap sources. This situation will reduce costs to such issuers because those issuers are not required to exercise due diligence and provide a Conflict Minerals Report.

In a further change from the proposal, the final rule requires an issuer that determines that, following its reasonable country of origin inquiry, its conflict minerals did not originate in the Covered Countries or come from recycled or scrap sources or has no reason to believe that its necessary conflict minerals may have originated in the Covered Countries or did not come from recycled or scrap sources to provide a brief description of the results of that inquiry. The proposal required issuers to disclose their reasonable country of origin inquiry and their determination based on that inquiry. Compared to an alternative that does not require such description, this requirement will increase the disclosure costs to issuers. However, the disclosure will enable users of the information to assess more thoroughly the issuer's reasonable country of origin design and its efforts in carrying out that design. This information will allow stakeholders to form their own views on the reasonableness of the issuer's efforts and track those efforts over a number of years. Based on this information, stakeholders could advocate for different processes for individual issuers if they believe it is necessary, thereby maximizing the potential benefits of the performance-based approach we are adopting.

Additionally, we revised the final rule from the proposal so that, following its reasonable country of origin inquiry, an issuer that determines its conflict mineral did not originate in the Covered Countries is not required to keep reviewable records for five years. We believe this decision should benefit issuers by allowing them greater flexibility and by reducing their compliance costs because they no longer have a record retention cost, which should reduce the overall costs involved as compared to the other possible methods of implementing the statute.

## 2. Information in the Specialized Disclosure Report

We revised the final rule from the proposal so that an issuer that must file a Conflict Minerals Report is not required to disclose, in its specialized disclosure report under a separate "Conflict Minerals Disclosure" heading, the reason it is filing its Conflict Minerals Report. Similarly, the final rule does not require an issuer to disclose in its specialized disclosure report that it has provided an audit report or a certification of the audit because the audit report and certification are part of the Conflict Minerals Report already, so specifically mentioning the audit report or

certification here is not necessary and may be confusing. Instead, the issuer must only disclose that a Conflict Minerals Report is provided as an exhibit to its specialized disclosure report and a link to its Internet Web site where the Conflict Minerals Report is publicly available. We believe these decisions should benefit issuers by not requiring them to provide as much disclosure in the specialized disclosure report, which should reduce the costs involved as compared to the other possible methods of implementing the statute. However, we do not believe that such decisions will reduce the benefits to be achieved by the final rule, because the information that the proposal required to be disclosed in the specialized disclosure report is already provided in the Conflict Minerals Report, which is required to be filed as an exhibit to Form SD.

## 3. "DRC Conflict Undeterminable" Determination

The final rule temporarily permits issuers to describe their products as "DRC conflict undeterminable" if they are required to file a Conflict Minerals Report and are either unable to determine that their conflict minerals did not originate in the Covered Countries or are unable to determine that their conflict minerals that originated or may have originated in the Covered Countries did not directly or indirectly benefit or finance armed groups in the Covered Countries. An issuer with products that are "DRC conflict undeterminable" is required to exercise due diligence on the source and chain of custody of its conflict minerals and submit a Conflict Minerals Report describing the due diligence, the country of origin of the conflict minerals, if known, the facilities used to process the conflict minerals, if known, and the efforts to determine the mine or location of origin with the greatest possible specificity. Also, such an issuer is required to describe its products containing these conflict minerals as "DRC conflict undeterminable," rather than stating that they have not been found to be "DRC conflict free." An issuer with such conflict minerals, however, is not required to obtain an independent private sector audit of that Conflict Minerals Report. This reporting alternative is temporary and will be available only during the first two reporting cycles following the effectiveness of the final rule for all issuers, which includes the specialized disclosure reports for 2013 and 2014, and the first four reporting cycles following the effectiveness of the final rule for smaller reporting companies,

which includes the specialized disclosure reports for 2013 through 2016. After these times, an issuer unable to determine that its conflict minerals did not originate in the Covered Countries or unable to determine that its conflict minerals that originated or may have originated in the Covered Countries did not directly or indirectly finance or benefit armed groups in the Covered Countries must describe its products containing those minerals as having not been found to be "DRC conflict free" and provide an independent private sector audit of its Conflict Minerals Report.

This temporary provision will have the benefit of lowering the initial costs of the rule both because an audit will not be required and because, to the extent issuers suffer negative consequences from disclosure that their products have not been found to be "DRC conflict free," those consequences would likely not be as significant for an issuer that is able to disclose that it has conducted due diligence on its conflict minerals and not found a connection to armed groups. We believe that not requiring an independent private sector audit of the Conflict Minerals Report during this temporary period is appropriate because an audit of the design of an issuer's due diligence that results in an undeterminable conclusion would not appear to have a meaningful incremental benefit. Also, we recognize the concerns about the feasibility of preparing the required disclosure in the near term because of the stage of development of the supply chain tracing mechanisms. We adopted this temporary provision to allow sufficient time for more comprehensive tracking systems to be developed by industry and trade groups. The development and use of such comprehensive tracking systems should improve due diligence performance and lower the cost of compliance with the statute by reducing duplication and taking advantage of economies of scale. We believe that a two-year period for issuers with an indeterminate conclusion is appropriate because this appeared to be the approximate amount of time that many commentators stated would be necessary to establish traceability systems in the Covered Countries.[800] Also, we believe that a four-year period for smaller reporting companies with an indeterminate conclusion is appropriate because they may have fewer resources to implement the final rule and may lack the leverage to obtain detailed

information regarding the source of a particular conflict mineral.[801]

Issuers that are unable to determine, following their exercise of due diligence, that their conflict minerals did not originate in the Covered Countries; that their conflict minerals that originated in the Covered Countries did not directly or indirectly finance or benefit armed groups in the Covered Countries; or, after their exercise of due diligence, are unable to determine that their conflict minerals came from recycled or scrap sources are required to file a Conflicts Minerals Report describing, among other matters, the due diligence they exercised and the steps they have taken or will take, if any, since the end of the period covered in their most recent prior Conflict Minerals Report to mitigate the risk that their necessary conflict minerals benefit armed groups, including any steps to improve their due diligence. After the transition period, such issuers will be required to include an independent private sector audit of their Conflict Minerals Reports with respect to those minerals, which is likely to increase costs for those issuers. One commentator argued that "Section 1502 does not require an issuer that has been unable to determine (after a proper inquiry) the source of its conflict minerals * * * to provide a Conflict Minerals Report."[802] As discussed above, we believe the process that better reflects the statutory intent is as follows:

• An issuer that, following a reasonable country of origin inquiry, has reason to believe that its necessary conflict minerals may have originated in the Covered Countries, and may not be from recycled or scrap sources, must conduct due diligence on the source and custody of such conflict minerals, in accordance with a nationally or internationally recognized due diligence framework, and

• If, following such due diligence, such issuer is unable to determine that such conflict minerals did not originate in the Covered Countries (and is unable to determine that such conflict minerals are from recycled or scrap sources), then such issuer is required to submit a Conflict Minerals Report.

While this approach may add to the overall costs of compliance, we do not

believe the alternative reading suggested by commentators is consistent with the purposes of the statute. The final rule's temporary provision for "DRC conflict undeterminable" products, however, is designed to reduce compliance costs during the transition period.

#### 4. "Contract To Manufacture"

As discussed above, the final rule applies to issuers that contract to manufacture products. This requirement is based on our interpretation of the statute in light of our understanding of the statutory intent and a reading of the statute's text. We recognize that this approach affects the overall compliance costs and burdens, in particular, on the subset of issuers that contract to manufacture products. However, we have sought to mitigate these costs by not defining the term "contract to manufacture" in the final rule, and instead letting issuers determine based on their own facts and circumstances which of their products have conflict minerals that may trigger a reporting obligation.

Compared to the alternative approach of defining this term, our decision not to define the term provides issuers with significant flexibility to use a definition that applies best to their particular circumstances. Such flexibility may lower issuers' compliance costs to the extent any definition could have been overbroad. But, we also recognize that our decision not to define this phrase could increase uncertainty for issuers on how the phrase should be implemented and may result in additional costs to some issuers. For example, the uncertainty associated with leaving the phrase undefined could lead some issuers to interpret the definitions in a manner that is more expansive than if the phrase was defined, thus incurring a higher compliance cost than is necessary. In this regard, some issuers may decide to use more internal or external resources than if this phrase was defined to make sure they are compliant with the rule, which would also increase compliance costs. The lack of a clear definition could also result in a diminishment of the benefit if some issuers are less rigorous in determining and reporting on their products that have conflict minerals, which would reduce the utility of their disclosure. Overall, however, we believe the potential benefit of flexibility outweighs the potential increases in costs.

In the proposal, we expressed our view that an issuer that does not manufacture a product itself but that has "any" influence over the product's manufacturing should be considered to be contracting to manufacture that

---

[800] *See, e.g.,* letters from AdvaMed I, FEC I, JVC *et al.* II, Plexus, Verizon, and WilmerHale.

[801] Using the cost of audit estimates provided by the university group and the manufacturing industry group commentators, which we also use below, we estimate that this exercise of discretion by the Commission would reduce the initial compliance cost of a small issuer by approximately $25,000 and the initial compliance cost of a large issuer by approximately $100,000 per year for each year of the applicable temporary period based upon the analysis of the university group commentator.

[802] *See* letter from Cleary Gottlieb.

product. Also, we expressed our view that an issuer that offers a generic product under its own brand name or a separate brand name should be considered to be contracting to manufacture that product so long as the issuer had contracted to have the product manufactured specifically for itself. As noted in the Proposing Release, we had believed that these issuers should have been considered to be contracting those products to be manufactured because the issuers would implicitly influence the manufacturing of the products. However, we are persuaded by commentators that this level of control set forth in the Proposing Release was ''overbroad'' and ''confusing'' and would impose on such an issuer ''significant,'' ''unrealistic,'' and ''costly'' burdens.[803] Therefore, we provide guidance indicating that an issuer is considered to be contracting to manufacture a product depending on the degree of influence it exercises over the materials, parts, ingredients, or components to be included in any product as well as examples. We believe that this guidance may decrease issuers' flexibility for some issuers, but it will provide more certainty for others.

### 5. Nationally or Internationally Recognized Due Diligence Framework (Including Gold)

Although Exchange Act Section 13(p)(1)(A)(i) requires issuers to describe the measures taken to exercise due diligence, the provision does not indicate the due diligence required. The final rule's requirement that issuers use a nationally or internationally recognized due diligence framework in their Conflict Minerals Reports may result in a certain degree of standardization in the preparation of the disclosure and may reduce audit costs by focusing the audit. To the extent issuers tend to use the same due diligence framework, this standardization will benefit users of the information by making the Conflict Minerals Reports easier to compare, thus reducing costs for users of comparing information across issuers.

Also, requiring a nationally or internationally recognized due diligence framework allows us to provide a clear audit objective that includes whether the design of an issuer's due diligence measures is in conformity with the criteria set forth in the nationally or internationally recognized due diligence framework and whether an issuer's

description of the due diligence measures it performed is consistent with the due diligence process it undertook. As discussed below, having a clear audit objective based on the design of an issuer's due diligence framework lowers audit costs compared with a rule that does not require a specified framework because it focuses the scope of the audit that must be performed and, therefore, makes the audit less time-consuming and less costly.

Further, the final rule requires that an issuer's due diligence follow a nationally or internationally recognized due diligence framework that is established by a body or group that has followed due-process procedures, including the broad distribution of the framework for public comment, and is consistent with the criteria standards in GAGAS established by the GAO. This requirement improves the credibility and usefulness of the reports. Also, requiring adherence to a nationally or internationally recognized due diligence framework will provide issuers with a degree of certainty that their due diligence process is reliable and will pass a regulatory review. However, this requirement also will limit the issuer's flexibility in determining the source of origin and chain of custody of their conflict minerals. If the established requirement is more burdensome than what the issuer might have otherwise considered sufficient due diligence, it might make it more costly for issuers compared to using a due diligence process based on their own facts and circumstances.

### 6. Liability for the Audit and Audit Certifications

Exchange Act Section 13(p)(1)(A)(i) requires the independent private sector audit to be conducted in accordance with the standards established by the GAO. Exchange Act Section 13(p)(1)(B) states that the issuer must certify the audit and that certified audit constitutes a critical component of due diligence.[804]

Under the final rule, an issuer's audit certification is in the form of a statement in the Conflict Minerals Report that the issuer obtained an independent private sector audit. This should benefit issuers by not subjecting individuals employed by the issuer to liability for the information in the Conflict Minerals Report or the audit. Additionally, the final rule does not require an auditor to assume expert liability regarding the audit because the audit report would not be incorporated by reference or otherwise included in Securities Act filings. Therefore, depending on the state of competition in the market for independent private sector audits, not requiring the assumption of such liability may result in lower audit fees, which in turn should decrease conflict minerals-reporting companies' cost of compliance with the statute. However, not requiring the certification to be signed by an officer and not requiring an auditor to assume expert liability could decrease the benefits of the rule if it results in issuers taking less care in their certifications and auditors conducting less thorough audits.

### 7. Audit Objective

The final rule provides a clear audit objective. We believe that the audit is meaningful because investors and other users will have some assurance from an independent third party that the issuer's due diligence framework, as set forth in the Conflict Minerals Report, is designed in conformity with the relevant nationally or internationally recognized due diligence framework, and that the issuer actually performed the due diligence measures that it represents that it performed in the Conflict Minerals Report. We recognize that an audit objective requiring an auditor to express an opinion or conclusion as to the design and description of an issuer's due diligence measures is not as comprehensive as an audit objective requiring an auditor to express an opinion or conclusion as to the effectiveness of due diligence measures or the accuracy of conclusions in the Conflict Minerals Report. However, we believe that the audit will

---

[803] See, e.g., letters from ABA, AT&T, Corporate Secretaries I, Davis Polk, and Verizon. See also letter from NRF I (stating that our proposed approach would be ''draconian'').

[804] As noted elsewhere in this release, the staff of the GAO has indicated to our staff that the GAO does not intend to publish standards for the independent private sector audit and that GAGAS' Performance Audit or Attestation Engagement standards can be used for those audits. See U.S. Gov't Accountability Office, GAO–12–331G, Government Auditing Standards 2011 Revision (Dec. 2011), available at http://www.gao.gov/assets/590/587281.pdf. Therefore, to conduct an independent private sector audit, an auditor must comply with certain quality control procedures and peer reviews, which are required under the GAGAS Performance Audit and Attestation Engagement standards. The GAGAS Attestation Engagement standards, in Chapter 3.75, require that auditors be ''licensed certified public accountants, persons working for a licensed certified public accounting firm or for a government auditing organization, or

licensed accountants in states that have multi-class licensing systems that recognize licensed accountants other than certified public accountants.'' Unlike the GAGAS Attestation Engagement standard, the GAGAS Performance Audit standard allows auditors other than certified public accountants to perform a Performance Audit, provided the auditor complies with the applicable qualification requirements under GAGAS, which will increase the number of firms eligible to conduct the private sector audits. Increasing the number of firms that are eligible to conduct the independent private sector audits should increase competition, which should make it less costly for an issuer to obtain such an audit.

still be meaningful because it will provide some assurance from an independent third party that the issuer's due diligence framework is designed in conformity with the relevant nationally or internationally recognized due diligence framework and that the issuer actually performed the due diligence measures as they were described.

With respect to what audit objective is appropriate, we considered the following possible audit objective alternatives from commentators: whether management's description of procedures and controls performed in their due diligence process are fairly described in the report; whether an issuer's design of its due diligence process described in the report conformed to a recognized standard of due diligence; whether management's description of an issuer's due diligence process in its report is accurate, the results of that process are fairly stated, and the issuer has evaluated/identified the upstream and downstream due diligence processes; whether the design of the due diligence process described in the report conformed to a recognized standard and whether the process was effective; whether the issuer's conclusion regarding the source and chain of custody of its conflict minerals is accurate; and whether the issuer appropriately included in the report all its products described as having not been found to be "DRC conflict free." We used our discretion to make the audit objective in the final rule similar to the first and second alternatives with some modification. The final rule states that the objective of the independent private sector audit is for the auditor to express an opinion or conclusion as to whether the design of the issuer's due diligence measures as set forth in the Conflict Minerals Report, with respect to the period covered by the report, is in conformity with, in all material respects, the criteria set forth in the nationally or internationally recognized due diligence framework used by the issuer, and whether the issuer's description of the due diligence measures it performed as set forth in the Conflict Minerals Report, with respect to the period covered by the report, is consistent with the due diligence process that the issuer undertook.

We believe that our choice of audit objective in the final rule will reduce the costs and burdens more than certain other alternatives. However, we recognize that the audit objective will not reduce the costs and burdens as much as if the audit objective required only an opinion or conclusion as to whether the design of the issuer's due diligence measures is in conformity

with the criteria set forth in the nationally or internationally recognized due diligence framework. We believe an audit related to whether the issuer actually performed the due diligence measures that it represents that it performed in the Conflict Minerals Report is necessary and appropriate so that the audit also addresses, in a cost effective manner, the actual performance of the due diligence and not just the design as well as provide independent third party confirmation that the work described was performed. Based on the comments we received, however, an audit objective based on any of the alternatives other than just the design of the issuer's due diligence measures and the issuer's description of the due diligence measures it performed would be very costly and burdensome to undertake due to the breadth of those alternatives and the fact that most of the evidence required for those alternatives would be held by third party suppliers and smelters.

### 8. Conflict Minerals From Recycled or Scrap Sources

The Conflict Minerals Statutory Provision is silent as to the treatment of conflict minerals from recycled or scrap sources. In the final rule, however, we provided for alternative treatment for conflict minerals from recycled or scrap sources. The alternative reporting requirements for conflict minerals from recycled or scrap sources should benefit issuers by reducing issuers' compliance costs with the disclosure requirements in Section 1502 because those issuers will conduct a reasonable inquiry regarding whether those minerals are from recycled or scrap sources instead of having to exercise due diligence and provide a Conflict Minerals Report in all cases. Also, issuers that, following a reasonable inquiry conducted in good faith, reasonably believe their minerals are from recycled or scrap sources will not have to obtain an independent private sector audit. A reduction in costs of not having to exercise due to diligence or obtain an independent private sector audit is likely to be significant for those industries that use a high concentration of conflict minerals that are from recycled or scrap sources.[805]

The final rule requires issuers with conflict minerals that have reason to believe their conflict minerals may not come from recycled or scrap sources to

exercise due diligence in determining whether the minerals are, in fact, from recycled or scrap sources. That due diligence must follow a nationally or internationally recognized due diligence framework, if such framework is available. While providing a higher degree of certainty that those conflict minerals came from recycled or scrap sources, the requirement will also increase the costs to issuers, compared to an alternative that would allow issuers to rely on their own due diligence approach to verify that these minerals are from recycled or scrap sources. Eliminating the requirement of an independent private sector audit of their Conflict Minerals Report, however, could potentially decrease costs to issuers.

We believe that the magnitude of the cost savings for issuers with conflict minerals from recycle or scrap sources will be greatest for companies that use exclusively scrap and recycled materials. Although we did not receive any information from commentators as to the number of companies that may fall into this category, a number of commentators stated that the use of conflict minerals from recycled or scrap sources is significant. For example, some commentators noted that China controls approximately 85% of the world's tungsten supply, but China is cutting back on tungsten exports, which is causing the price of tungsten to increase by 130%.[806] According to these commentators, this development has caused American manufactures to move to recycled tungsten, which represented approximately 55% of apparent consumption of tungsten in all forms. Also, as another example, one commentator noted that up to 40% of the world's gold supply is from recycled or scrap sources.[807] Even so, issuers that use both conflict minerals from recycled or scrap sources and newly mined minerals may still need to exercise due diligence and obtain an audit regarding the conflict minerals that are not from recycled or scrap sources and thus, may not have significant additional cost savings. Overall, however, even with these requirements, we believe that providing an alternative treatment for conflict minerals from recycled or scrap sources should benefit issuers by reducing their compliance costs for those minerals as compared with the costs applicable to newly mined conflict minerals. Moreover, an indirect consequence of our differential

---

[805] We are unable to estimate the total magnitude of these cost savings because we do not have empirical evidence regarding the scope of the use of conflict minerals that are from recycled or scrap sources. See below Section D for a further analysis of the potential costs of this provision.

[806] *See, e.g.,* letters from Rep. Altmire, Rep. Murphy, Rep. Renacci, Rep. Shuster, Rep. Toomey, Rep. Womack, and Sen. Pryor.

[807] *See* letter from WGC II.

treatment of scrap and recycling materials may be to increase the extent to which these materials are recycled. Finally, the reasonable country of origin inquiry requirements are likely to improve the disclosures regarding conflict materials from recycled or scrap sources.

9. Conflict Minerals "Outside the Supply Chain"

Like conflict minerals from recycled and scrap sources, the Conflict Minerals Statutory Provision is silent as to the treatment of conflict minerals "outside the supply chain" at the time our final rule takes effect, including existing stockpiles of conflict minerals. However, in the final rule we have determined to exclude any conflict minerals that are "outside the supply chain" prior to January 31, 2013. The final rule considers conflict minerals to be "outside the supply chain" after such conflict minerals have been smelted (in the case of tantalum, tin, or tungsten) or refined (in the case of gold), or, if not smelted or refined, are physically located outside of the Covered Countries.

We are aware of the concern that these existing stockpiles could have come from activities that financed or benefited armed groups in the Covered Countries. However, once those minerals have been smelted, refined, or transported out of the Covered Countries, it seems unlikely that they could further finance or benefit armed groups. Therefore, we believe excluding these stockpiled minerals would be consistent with the statutory intent of the Conflict Minerals Statutory Provision and does not significantly impair the benefits sought by the statute. Moreover, the approach we have chosen may substantially reduce compliance costs for some issuers by not requiring them to determine the origin and chain of custody of these stockpiled minerals. An alternative approach that requires issuers to determine the origin and chain of custody of their stockpiled minerals would greatly increase costs, particularly for conflict minerals that were extracted prior to the contemplation of the Conflict Minerals Statutory Provision because issuers would not have known they were expected to determine the origin of those minerals at the time of their extraction. Further, if stockpiled minerals were not excluded, issuers might not be able to sell those minerals and could be forced to dispose of their existing conflict minerals inventory at below market prices, or at a loss. If such a situation occurred, as one

commentator noted, the cost of the final rule would increase "dramatically." [808]

10. Conflict Mineral Derivatives

The Conflict Minerals Statutory Provision defines the term "conflict mineral" as cassiterite, columbite-tantalite, gold, wolframite, or their derivatives, or any other minerals or their derivatives determined by the Secretary of State to be financing conflict in the Covered Countries.[809] The Proposing Release provided the same definition of the term "conflict mineral" as well. In the final rule, however, we used our discretion to limit the term "conflict mineral" to include only cassiterite, columbite-tantalite, gold, wolframite, and their derivatives, which are limited to only the 3Ts, unless the Secretary of State determines that additional derivatives are financing conflict in the Covered Countries, in which case they are also considered "conflict minerals." By using our discretion to limit the covered mineral derivatives, we could be limiting the usefulness of the information of the conflict minerals disclosure. This potential disadvantage is mitigated, however, by the fact that tantalum, tin, and tungsten are by far the most common derivatives of these minerals.[810] A different approach would increase costs to issuers by increasing the number of derivatives that they would have to determine are in their products.

11. Method and Timing of Disclosure on Form SD

Exchange Act Section 13(p)(1)(A) requires issuers to "disclose annually" their conflict minerals information, but does not specify how issuers should disclose this information or at what time during the year the disclosure must be provided. The final rule requires issuers to provide this information annually in a new specialized disclosure report on new Form SD that covers a calendar year, regardless of the issuer's fiscal year end, and is due on May 31 of the subsequent year. Our decision to provide through rulemaking that issuers use the new form for the disclosure of conflict minerals' origin and the Conflict Minerals Report makes it easier for those interested in the disclosed information to locate the form. In addition, the final rule requires that issuers present the information in a

standardized manner. Users that find the information about an issuer's conflict minerals relevant to their decision making will benefit from the standardization and simplification of the disclosure.

Further, requiring issuers to use a new form with a uniform filing date rather than submitting conflict minerals information in their annual reports would benefit most issuers by allowing them to have sufficient time to prepare and file their conflict minerals information independent from the due dates for annual reports.[811] Moreover, we believe that this staggered filing date will benefit issuers because they could, if they choose to do so, use the same personnel to handle this filing as their annual reports. Another benefit for issuers of requiring issuers to provide their conflict minerals information on a new form, instead of an annual report on Form 10–K, Form 20–F, or Form 40–F, is to remove the conflict minerals information from the disclosure that principal executive and financial officers must certify under Sections 302 and 906 of Sarbanes-Oxley, which could reduce costs to issuers. Also, requiring a uniform reporting period for all issuers will benefit companies that supply products or components with conflict minerals by allowing them to provide reports once per year for all their customers, rather than having to prepare reports throughout the year for customers with different reporting periods, which will reduce such companies' costs.

Our decision to require a new form will result in costs related to the preparation of this form, as we discuss below in the Paperwork Reduction Act section. Also, our decision to require an issuer to provide its Conflict Minerals Report and its independent private sector audit report as an exhibit to its specialized disclosure report on Form SD will result in costs related to the preparation of such an exhibit.

Requiring covered issuers to file, instead of furnish, their Conflict Minerals Reports gives investors the ability to bring suit if issuers fail to comply with the new disclosure requirements, for instance under Exchange Act Section 18. This may, therefore, potentially improve the avenues of redress available to investors. This, in turn, may provide benefits to investors to the extent they rely on the information to make investment decisions. Because this could improve investors' ability to seek

---

[808] See letter from Claigan I.

[809] Section 1502(e)(4) of the Act. Presently, the Secretary of State has not designated any other mineral as a conflict mineral. Therefore, the conflict minerals include only cassiterite, columbite-tantalite, gold, wolframite, or their derivatives.

[810] See letters from AAFA, ITIC I, and PCP.

[811] We estimate that almost 58% of total number of affected issuers uses December 31 as a fiscal year end.

redress, it is possible that covered issuers could be found liable for the disclosure. Our decision to require issuers to "file," rather than "furnish," the information will potentially subject issuers to litigation under Section 18 and may "incentivize issuers (and auditors and underwriters) to conduct an appropriate level of diligence" in preparing the disclosures,[812] thereby increasing issuers' cost of complying with the final rule.[813] In addition, our decision to require a uniform reporting period could further increase costs to issuers that do not have calendar year fiscal years by requiring separate reporting outside of the issuer's normal reporting period.

### 12. "Necessary to the Functionality or Production"

Exchange Act Section 13(p)(2)(B) defines a "person described" as one for which conflict minerals are "necessary to the functionality or production of a product" manufactured by such a person." The Conflict Minerals Statutory Provision, however, provides no additional explanation or guidance as to the meaning of "necessary to the functionality or production of a product." We use our discretion not to define this phrase in the final rule.

Compared to an alternative of the rule, which would define this phrase, our decision not to provide a definition gives issuers significant flexibility to use a definition that applies best to their particular circumstances. Such flexibility generally lowers issuers' compliance costs as issuers can determine whether the phrase is applicable based upon their specific facts and circumstances. But we also recognize that our decision not to define this phrase could increase uncertainty for issuers on how the phrase should be implemented and may therefore result in additional costs to some issuers. For example, the uncertainty associated with leaving the phrase undefined could lead some issuers to interpret the definitions in a manner that is more expansive than if these terms were defined, thus incurring a higher

compliance cost than is necessary. In this regard, some issuers may decide to use more internal or external resources than if this phrase was defined to make sure they are compliant with the rule, which would also increase compliance costs. The lack of a clear definition could also result in a diminishment of the benefit of the rule if some issuers are less rigorous in determining and reporting on their products that have conflict minerals, which would reduce the informativeness of their disclosure.

We have attempted to mitigate the potential cost of leaving the phrase undefined by the guidance we provide in the release. Our guidance provides issuers with contributing factors that they should use in their determination of "necessary to the functionality or production," which will reduce the possibility that some issuers may interpret the phrase in either an over or underinclusive manner. Also, we noted concerns that there is ambiguity in the application of the provision to conflict minerals that do not end up in the product, and, as noted above, commentators were mixed in their views regarding how the rule should treat catalysts and other conflict minerals necessary to the production of a product that do not appear in the product. After considering the comments, we agree that it would be very difficult for any manufacturer of products that do not themselves contain conflict minerals to know every conflict mineral used in the production process. Therefore, we used our discretion to decide that, for a conflict mineral to be considered "necessary to the production" of the product, the conflict mineral must be contained in the product—and be necessary to the product's production. Therefore, although this requirement may decrease the number of issuers that are covered under the final rule, we believe this is a reasonable approach that reduces costs to issuers by eliminating an especially challenging aspect from the proposal.

### 13. Categories of Issuers

We do not read the statute as making any distinction among issuers based on the issuer's size or domesticity. As discussed above, although not specifically in the context of smaller reporting companies or foreign private issuers, some commentators suggested that we exempt certain classes of companies from full and immediate compliance with the disclosures required by the Conflict Minerals Statutory Provision.[814] We are

concerned that any broad categories of exemptions would undermine the statutory objectives discussed above. For the provision to have the effect we understand Congress intended, we are not exempting any class of issuer from its application. We recognize that this imposes a cost burden on those issuers who are not exempted, but conclude that this burden is required by the statute.

Additionally, as one commentator noted, it is unclear whether exempting smaller reporting companies would significantly reduce their burdens because smaller reporting companies could still be required to track and provide their conflict minerals information for larger issuers.[815] Moreover, as other commentators noted, to the extent there are benefits to smaller companies from an exemption, such an exemption could increase the burden on larger companies that rely on smaller reporting company suppliers to provide conflict minerals information needed by the larger reporting companies.[816] Further, the temporary availability of the "DRC conflict undeterminable" category is likely to reduce the compliance burden for all companies, including smaller reporting companies. In this regard, not including private companies and individuals in the final rule may not unduly burden reporting issuers because the commercial pressure on private companies from issuers that need this information for their reports and from the public in general demanding that issuers make this information available could be sufficient for the private companies to provide voluntarily their conflict minerals information as standard practice.[817] Further, the extension of the availability of the "DRC conflict undeterminable" category for an additional two years is likely to reduce the compliance burden even more for some smaller reporting companies.

Similarly, exempting foreign private issuers from the final rule could increase domestic issuers' burdens by making it very difficult for them to compel their foreign private issuer suppliers to provide conflict minerals information. In addition, exempting foreign private issuers from the final rule could result in a competitive disadvantage for domestic issuers because foreign private issuers would not be subject to the final rule.[818] Overall, we are not exempting foreign

---

[812] *See* letter from Global Witness I.

[813] While the increased potential for litigation may increase costs, we note that Section 18 claims have not been prevalent in recent years and a plaintiff asserting a claim under Section 18 would need to meet the elements of the statute, including materiality, reliance, and damages. *See* Louis Loss and Joel Seligman, Ch. 11 "Civil Liability," Subsect. c "False Filings [§ 18]," *Fundamentals of Securities Regulation* (3rd Ed. 2005). We are unable to estimate the magnitude of this potential cost increase because we cannot predict at this time whether Section 18 claims will increase (and if so, by how much) and how costly it may be to ultimately prove the required elements or defend such a case.

[814] *See, e.g.,* letters from Davis Polk, NCTA, Verizon, and WilmerHale.

[815] *See* letters from IPC I.

[816] *See, e.g.,* letters from IPC I and TriQuint I.

[817] *See* letter from Howland and TIC.

[818] *See* letter from CEII II, Rep. Amodei, Rep. Ellmers, Rep. Murphy, and TriQuint I.

private issuers because we believe that doing so would not give effect to Congressional intent.

14. Not Including Mining Issuers as Manufacturing Issuers

The Conflict Minerals Statutory Provision does not state whether issuers that mine conflict minerals should be considered to be manufacturing those minerals and be included under the provision. We do not consider an issuer that mines or contracts to mine conflict minerals to be manufacturing or contracting to manufacture those minerals unless the issuer also engages in manufacturing, whether directly or through contract, in addition to mining. In this regard, we do not believe that mining is "manufacturing" based on a plain reading of the provision. Excluding such mining issuers from the universe of covered companies could create a competitive advantage for those companies over covered companies to the extent that they are competitors, but this advantage should be diminished for mining companies that are suppliers of conflict minerals to covered companies because the covered companies would require the conflict minerals information from the mining company. Also, excluding such mining issuers from the final rule could increase costs to other issuers along the supply chain because, without being covered, such mining issuers may not have the incentive to share origin and chain of custody information about the conflict minerals they mined. However, not including such mining issuers may decrease certain costs for mining issuers, since such issuers will not have to comply with the Conflict Minerals Statutory Provision with respect to conflict minerals mined by such issuers (unless necessary to the production or functionality of a product manufactured, or contracted to be manufactured, by such issuer). However, we expect that such mining issuers will incur costs to provide information on the source and custody of conflict minerals mined by such issuers to their customers, and other participants in their supply chain, who are subject to the Conflict Minerals Statutory Provision.

D. Quantified Assessment of Overall Economic Effects

As noted above, Congress intended for the rule issued pursuant to Section 1502 to decrease the conflict and violence in the DRC, particularly sexual and gender based violence.[819] A related goal of the

statute is the promotion of peace and security in the Congo.[820] These are compelling social benefits, which we are unable to readily quantify with any precision, both because we do not have the data to quantify the benefits and because we are not able to assess how effective Section 1502 will be in achieving those benefits.[821] We also note that these objectives of Section 1502 appear to be directed at achieving overall social benefits and are not necessarily intended to generate measurable, direct economic benefits to investors or issuers specifically. Additionally, the social benefits are quite different from the economic or investor protection benefits that our rules ordinarily strive to achieve. We therefore have not attempted to quantify the benefits of the final rule.

Based on comments and our analysis, we do expect that the statute will result in significant economic effects. We have noted the views of commentators on direct compliance costs, and we acknowledge that these costs are substantial. In addition, issuers with a reporting obligation under the Conflict Minerals Statutory Provision could be put at a competitive disadvantage with respect to private companies that do not have such an obligation.[822] We note, however, that non-reporting companies are part of the supply chain of reporting issuers and will bear many of the compliance costs of determining whether their minerals are conflict-free.[823] We also expect that the implementation of the statute may provide significant advantage to foreign

[820] See Section 1502(d)(2)(A) of the Act (directing the GAO to assess the effectiveness of Exchange Act Section 13(p) in promoting peace and security in the Covered Countries).

[821] Some commentators argued, however, that the Conflict Minerals Statutory Provision has already pressured DRC authorities to begin to demilitarize some mining areas and to increase mining oversight. See, e.g., letters from International Corporate Accountability Roundtable (Jul. 29, 2011) ("ICAR I"), Sen. Boxer et al. I, Sen. Leahy et al., and United Nations Group of Experts on the Democratic Republic of Congo (Oct. 21, 2011) ("UN Group of Experts").

[822] In our Economic Analysis, we use the term "competition" to mean competition in the industries of the affected issuers, not competition in all of the markets that the Commission is charged with regulating, which are the United States securities markets. We do not expect any effects of the rule on the competition in the United States securities markets.

[823] See, e.g., letters from Japanese Trade Associations and NAM I.

companies that are not reporting in the United States—and thus need not comply—but do compete directly with reporting issuers in the United States. In requiring the Commission to promulgate this rule, however, Congress determined that its costs were necessary and appropriate in furthering the goals of helping end the conflict in the DRC and promoting peace and security in the DRC. To the extent the final rule implementing the statute imposes a burden on competition in the industries of affected issuers, therefore, we believe the burden is necessary and appropriate in furtherance of the purposes of Section 13(p). Also, if foreign jurisdictions implement similar laws or regulations similar to Section 1502 or the final rule,[824] any advantages available to foreign companies listed in such jurisdictions but not listed in the United States may be diminished.

As we have observed, unlike in most of the securities laws, Congress intended the Conflicts Mineral Provision to serve a humanitarian purpose, which is to prevent armed groups from benefiting from the trade of conflict minerals. There may also be a benefit to investors given the view expressed by some commentators that the provision also protects investors by requiring disclosure of information that may be material to their understanding of the risks of investing in an issuer or its supply chain. To the extent that the required disclosure will help investors in pricing the securities of the issuers subject to the Conflict Minerals Statutory Provision, the rule could improve informational efficiency. Because, however, the cost of compliance for this provision will be borne by the shareholders of the company, which could potentially divert capital away from other productive opportunities, the rule may result in a loss of allocative efficiency. The reduction in allocative efficiency could be offset, somewhat, by increased demand for the firm's products and/or shares by socially conscious consumers and investors. We do not expect that the rule would negatively impact prospects of the affected industries to an extent

[824] See cf. letters from Member of the European Parliament (Nov. 17, 2011) ("European Parliament") (stating that in "2010 the European Parliament adopted a resolution welcoming the adoption of the new US 'Conflict Minerals' Law and asked the Commission and the Council to examine a legislative initiative along these lines") and NEI (stating that "[s]imilar action can be expected in other countries in response to the SEC's leadership, and as global awareness of the conflict minerals issue increases," that "conflict minerals legislation [in Canada] has already been tabled," and "the Canadian Securities Administrators (CSA) pay[s] close attention to SEC rule-making developments").

---

[819] Section 1502(a) of the Act ("It is the sense of the Congress that the exploitation and trade of

conflict minerals originating in the Democratic Republic of the Congo is helping to finance conflict characterized by extreme levels of violence in the eastern Democratic Republic of the Congo, particularly sexual- and gender-based violence, and contributing to an emergency humanitarian situation therein, warranting the provisions of section 13(p) of the Securities Exchange Act of 1934, as added by subsection (b).").

that would result in withdrawal of capital from these industries. Thus, we do not expect the rule to have a significant impact on capital formation.

There may, however, be several indirect economic effects that could be significant. The high cost of compliance provides an incentive for issuers to choose only suppliers that obtain their minerals exclusively from outside the Covered Countries, thereby avoiding the need to prepare a Conflict Minerals Report. To the extent that Covered Countries are the lowest cost suppliers of the minerals affected by the statute, issuers preferring to find substitutes or other suppliers of non-DRC minerals would have to increase the costs of their products to recoup the higher costs. Reducing the viable supply of such minerals may have the indirect effect of increasing the cost of acquiring these minerals.

As mentioned above, the overall specific range of costs for compliance with the rule provided by commentators was between $387,650,000 and $16 billion. The wide divergence of the cost estimates among the four separate analyses submitted by a manufacturing industry association,[825] an electronic interconnect industry association,[826] a university group,[827] and an environmental consultancy company[828] illustrates to us the difficulty of ascertaining the estimated costs of implementing the statute and our discretionary choices. We have reviewed the proposal and the comments received and have used the information provided by commentators to inform our Economic Analysis of the final rule. In the remaining part of this section we attempt to quantify, to the extent possible, the compliance costs resulting from the final rule by relying on and critically evaluating the estimates and the analyses that commentators provided. Rather than using a single analysis, a combination of the analyses can provide a useful framework for understanding various cost components of our implementing the rule. Our approach strives to achieve a balanced and reasonable analysis based on the data and assumptions provided by all commentators, as well as our own analysis and assumptions. When it is deemed prudent, we have chosen to make conservative assumptions that may, in some cases, lead to an overestimation of the costs. Overall, after performing our analysis we conclude that the costs of the statute

will be substantial. Thus, we have revised our own prior estimate of the cost of complying with the rule. Based on our analysis of the data, we provide a range of the costs of both initial compliance and the annual cost of ongoing compliance. In our view, because of the potential variations in the manner in which issuers will undertake compliance, providing such a range is more appropriate than providing a precise cost estimate. Our revised estimate is that the initial cost of compliance is between approximately $3 billion to $4 billion, while the annual cost of ongoing compliance will be between $207 million and $609 million.

We start our analysis of the cost of compliance by incorporating all of the comments that provide quantified data on the aggregate potential costs of the proposed rule. So, while our overarching consideration of the costs of the rule we are adopting today takes into account the information provided by a broad range of commentators, the most useful frameworks for considering costs were provided by the manufacturing industry association and university group commentators. Other comments, while also providing certain valuable insights into how our rules would be implemented, were either not as transparent in their analytical frameworks or not easily generalizable in terms of aggregating the costs across multiple industries.[829]

We also found it significant that the two analyses by the manufacturing industry association and university group commentators take into account the categories of costs most often identified as significant by commentators and that we agree are likely to be deemed as such. Moreover, we did not find the assumptions underlying their frameworks to be qualitatively different from the discussions of costs provided by other commentators.

At the same time, in our view, even these two studies did not provide sufficiently documented evidence to support all of their assumptions and assertions and consequently, commentators differed on the quantification of these costs. We have therefore taken into account the views expressed in other comment letters, and made modifications to the analyses provided by the manufacturing industry

association and university group commentators accordingly. What follows is a modified analysis of the manufacturing industry association and university group commentators' estimates that we believe better synthesizes the information provided to us in the comment process.

First, in both of these estimates, an important consideration is the cost of upgrading or implementing changes to IT systems. Based on the letters submitted as well as estimates from other commentators, we believe the manufacturing industry association and university group commentators may have been over-inclusive in their estimates. For example, the environmental consultancy company commentator estimates a much smaller number of $25,000 for the IT system and $10,000 for IT support.[830] The commentator then states that, ''a cost of $6B is 10 times the total annual sales for all restricted materials software (of which conflict minerals is a small part) and does not seem realistic * * * [p]articularly since conflict minerals software for small companies can be downloaded for free.'' The environmental consultancy company commentator further states that ''[t]he systems quoted by [the manufacturing industry association and university group commentators] are the most expensive systems on the market,'' and that ''[m]ost companies we interviewed said they would not need to invest in new software solely for conflict minerals * * * .''[831]

While we are persuaded by the argument that an average issuer should not expect to spend $1,000,000 to invest in a new IT system, we do not accept the environmental consultancy company commentator's own estimate of $35,000 because it does not provide a factual basis for the assertion. In modifying the estimates of the manufacturing industry association and university group commentators, we do not intend to replace the manufacturing industry association and university group commentators' cost estimates with the smaller estimate provided; rather, for purposes of our cost estimate, the appropriate estimate lies somewhere in between those two estimates.

Based on the university group commentator's analysis, we assumed $205,000 for small company computer costs rather than $1,000,000. Further, we assumed that the computer costs for

---

[825] *See* Section III.B.2.b.i.
[826] *See* Section III.B.2.b.ii.
[827] *See* Section III.B.2.b.iii.
[828] *See* Section III.B.2.b.iv.

[829] As shown below, while we draw on the quantified analyses supplied by the electronic interconnect industry association and the environmental consultancy company commentators, these letters did not provide as broad a range of quantified cost estimates as those provided by the manufacturing industry association and university group commentators.

[830] *See* letter from Claigan III. *See also* letter from Assent (critiquing the cost estimates of both the manufacturing industry association commentator and the university group commentator).
[831] Letter from Claigan III.

large issuers would be twice those for smaller issuers, or $410,000, and not four times those for a smaller issuer as assumed by the university group commentator.[832] In order to make the IT cost analysis consistent between the university group and the manufacturing group's revised analysis, we averaged the total IT cost per company in the university analysis and divided it by the total number of issuers for an average IT cost for all companies (irrespective of size) of approximately $250,000 and apply it to the manufacturing group's analysis.[833] This respectively changes the manufacturing industry association and university group commentators' estimates of the total IT cost from $5.9 billion and $2.6 billion, respectively, to approximately $1.5 billion.

Second, another important cost assumption is that the manufacturing industry association commentator assumes that each issuer has an average of 2000 first-tier suppliers. They arrive at this number based on their ''consultations with a number of large manufacturers, and based on research by'' others. This estimate of the average number of first-tier suppliers is, however, not supported by other estimates, and is in fact difficult to reconcile with figures reported by other commentators. For example, the average number of suppliers per company in the electronic interconnect industry association commentator study is only 163.[834] The environmental consultancy company commentator also believes the supply chain would be much simpler than the manufacturing industry association commentator predicts, based on the EICC/GeSI process. The manufacturing industry association commentator maintains, however, that many of its members have well over 2,000 suppliers. We do think a prudent reduction in the manufacturing industry association commentator's estimate is warranted, but here again, we do not know that 163 is any more representative of an average company's experience. Thus, we use the university group commentator's estimate of 1,060 suppliers while employing the manufacturing industry association commentator's analysis. Revising the manufacturing industry association commentator's number of suppliers in the supply chain lowers their estimate

of compliance costs from $1.2 billion to $635 million.

In addition, we are not convinced that the estimate of cost to suppliers is appropriately generated by a top-down approach (number of supplier relationships). Indeed, we think a top-down approach may not reflect how our rule may be implemented because it is not clear how the market may react in placing the various burdens of traces on the countless entities in the supply chains. In this top-down approach (which is the approach used by many commentators) each firm using these minerals will need to track backwards through each supplier. If many firms share the same supplier, the underlying assumption is there are few economies of scale in determining whether the minerals are conflict-free. Under this approach, each firm pays an independent cost of finding out from each of their suppliers where the minerals originate.[835]

We believe, however, that due diligence on the part of suppliers likely will be a bottom-up approach in which materials are tagged at the mine and certified at the smelter and then are introduced into the supply chain. Given this bottom-up approach, each supplier will then track whether the mineral is conflict-free and to whom it will be sold. While the system for tracking the sales of these minerals may increase in magnitude with the number of companies the supplier supplies, we believe the better approach to estimating costs of the supply chain would be to estimate the total number of *affected* suppliers (bottom-up) rather than the total number of supplier *relations* (top-down).

A bottom-up approach places more emphasis on the number of suppliers and assumes that there are economies of scale in the cost because suppliers need only determine the source of their minerals once and then spread the cost of determining the source across many issuing firms. For example, if issuers have many suppliers to choose from, they may find it easier to deal with—and hence more valuable to employ—only those suppliers who can fully attest that they are conflict-free. Therefore, if all first-tier suppliers bear the burden of certifying and providing conflict

reports, then the relative burden on the issuers will be very small. All of this will, however, depend in turn on the comparative bargaining power between the issuers and the suppliers at every level. Ultimately, none of the studies have provided compelling explanations for the precise dynamics that will govern the issuer-supplier or first-tier supplier-second-tier supplier relationships. On the whole, we think it would be much more reasonable to believe that suppliers at all levels will expend some effort individually in providing information to some of their customers regarding the source of their minerals, but each supplier's effort in turn will most likely reduce the cost of its customers to comply with our rules.

Few commentators provided an estimate of the total number of suppliers affected. In the university group commentator's estimate, even after adjusting for potential overlap, the total number of suppliers to be affected totals over 860,000, which is based on the total supply chain. Using the total supply chain to estimate the affected suppliers will create redundancies because a supplier may be in more than one supply chain and therefore, be counted multiple times. Thus, we believe the total number of suppliers affected in the university group commentator's analysis is likely to be too high. The manufacturing industry association commentator, on the other hand, estimated the total number of small and medium-sized manufacturing businesses to be affected at 278,000 and states that many of these small businesses are likely to be suppliers. The 2009 Statistics of U.S. Businesses from the U.S. Census estimates the total number of manufacturing businesses at 266,175, and the number of small manufacturing businesses (those with fewer than 500 employees) at 262,524.[836] Both of these numbers are

---

[832] The environmental consultancy company commentator estimates the IT costs for a company with $1 billion in revenue to be $35,000. Our estimate of IT costs attempts to incorporate these two widely varying viewpoints. *See* letter from Claigan III.

[833] Approximately $1.5 billion/5,994 issuers.

[834] *See* letter from IPC I.

---

[835] The university group commentator states that there are ''overlap'' or ''mutuality'' cost efficiencies that will emerge on the supplier side, as the same supplier may have supply contracts with more than one issuer thus allowing them to use any management systems changes to meet the needs of multiple issuers. This commentator estimates that supplier efforts will be reduced by 60% because of this supplier-issuer overlap and modifies the number of suppliers accordingly. *See* letter from Tulane.

---

[836] *See* U.S. Census Bureau, *Statistics of U.S. Business* (2009), *available at http://www.census.gov/econ/susb/*. We recognize that the U.S. Census Bureau uses the NAICS definitions, including the definition of ''manufacturing.'' As discussed above, we did not adopt that definition for the final rule because it appears to exclude any issuer that manufactures a product by assembling that product out of materials, substances, or components that are not in raw material form, which would exclude large categories of issuers that manufacture products through assembly. However, we believe it is not inappropriate to use the Census Bureau's data regarding the total number of manufacturing businesses and the number of small manufacturing businesses in determining whether to use the number of suppliers provided by the university group commentator or the number provided by the manufacturing industry association commentator. Because we only have two real choices in the number of suppliers to use for our calculations, we need some way to determine which figure is a more viable estimate. Despite the

similar to the number provided by the manufacturing industry association commentator. We therefore have revised the university group commentator's analysis on the number of affected suppliers to be consistent with the manufacturing industry association commentator at 278,000 to reflect this judgment. In addition, consistent with the university group commentator framework, we assumed that the same percentage of suppliers as issuers would be considered large (28%) and small (72%). Thus, in our revised university group commentator's analysis, the total number of large suppliers is 77,840

while the total number of small suppliers is 200,160. This changes the total compliance cost for suppliers from $5.1 billion in the university group commentator's analysis to $1.2 billion in our revised analysis.

The overall impact of these changes to the analysis, a reduction in IT costs (to both the manufacturing industry association and university group commentators), a modification in the number of suppliers in the supply chain (to the manufacturing industry association commentator) and a decrease in the number of suppliers affected (to the university group commentator) changes the total

estimated cost of compliance substantially. The manufacturing industry association commentator's estimate declines from $9.3 billion to $4.1 billion while the university group commentator's estimate drops from $7.94 billion to $3.0 billion.

The combination of these modifications in the two analyses leads us to estimate that initial compliance costs could be between $3.0 and $4.0 billion for all companies to comply with the statutory requirements. Below are the two revised analyses in tabular form with the revised estimates highlighted in bold:

| Revised | Calculation |
| --- | --- | --- |
| Manufacturing Industry Association Commentator Estimate: | | |
| Issuers affected | 5,994 | |
| Average number of 1st tier suppliers | **1,060** | 2000*.53 |
| Issuer Due Diligence Reform: [837] | | |
| Number of compliance hours per supplier | 2 | |
| Cost per hour | $50 | |
| Total compliance cost | $635,364,000 | 5,994*1,060*2*$50 |
| IT Systems Modification: [838] | | |
| Cost per issuer | $250,000 | |
| Total cost | $1,498,500,000 | 5,994*$250,000 |
| Conflict Minerals Report Audits: | | |
| Issuers to do audit [839] | 4,500 | 5,994*75% |
| Audit cost for issuers | $100,000 | |
| Total cost | $450,000,000 | 4,500*100,000 |
| Issuer Verification of Supplier Information: | | |
| Number of hours | 0.5 | |
| Cost per hour | $50 | |
| Total cost | $158,841,000 | 5,994*1,060*0.5*$50 |
| Smaller Supplier Due Diligence: [840] | | |
| Suppliers affected (only 20% to conduct) | 55,600 | 278,000*.2 |
| Due diligence cost | $25,000 | |
| Total cost | $1,390,000,000 | 278,000*.2*$25,000 |
| Total | $4,132,705,000 | |

| Revised | Calculation |
| --- | --- | --- |
| University Group Commentator Estimate: | | |
| Issuers affected | 5,994 | |
| Large issuer (28% of issuers) | 1,678 | 5,994*0.28 |
| Small issuer (72% of issuers) | 4,316 | 5,994*0.72 |
| Number of 1st tier suppliers (53% of NAM) | 1,060 | 2,000*0.53 |
| Issuer Due Diligence Reform: | | |
| Number of compliance hours for large issuer | 100 | |
| Number of compliance hours for small issuer | 40 | |
| Internal cost per hour | $50 | |

---

fact that the Census Bureau uses the NAICS definition of ''manufacturing,'' which may exclude certain manufacturers. If it would need to exclude almost 600,000 manufacturers for the university group commentator's figure to be more accurate than the manufacturing industry association commentator's figure. This appears to be too high. Therefore, because the manufacturing industry association commentator's figure is so much closer to the Census Bureau's figures, we decided it would not be inappropriate to use the manufacturing

industry association commentator's figure even though our reasoning was based on the NAICS definition of ''manufacturing.''

[837] The manufacturing industry association commentator refers to this as ''changes to their corporate compliance policies.'' See letter from NAM I.

[838] The manufacturing industry association commentator refers to this as IT system development or revision. See id.

[839] We are using the rounded estimate (4,500) that was used by the university group and manufacturing industry association commentators in their calculations even though a more exact number of issuers would be 4,496 (.75 × 5,994 = 4,495.5). See infra note 869.

[840] The manufacturing industry association commentator refers to this as the cost of providing ''proper information regarding the source of minerals.'' Id.

| Revised | | Calculation |
|---|---|---|
| Internal costs for large issuer (90% of total work load) ................................. | $7,551,000 | 1,678*0.9*100*$50 |
| Internal costs for small issuer (75% of total work load) ................................. | $6,474,000 | 4,316*0.75*40*$50 |
| Consulting cost per hour ................................. | $200 | ................................. |
| Consulting cost for large issuer (10% of total work load) ................................. | $3,356,000 | 1,678*0.1*100*$200 |
| Consulting costs for small issuer (25% of total work load) ................................. | $8,632,000 | 4,316*0.25*40*$200 |
|     Total cost ................................. | $26,013,000 | ................................. |
| IT Systems Modification: | | |
| Cost per large issuer ................................. | **$410,000** | ................................. |
| Cost per small issuer ................................. | **$205,000** | ................................. |
| Total large issuer cost ................................. | $687,980,000 | 1,678*$410,000 |
| Total small issuer cost ................................. | $884,780,000 | 4,316*$205,000 |
|     Total costs ................................. | $1,572,760,000 | ................................. |
| Conflict Minerals Report Audits: | | |
| Issuers affected [841] ................................. | 4,500 | ................................. |
| Number of large issuers ................................. | 1,260 | 4,500*0.72 |
| Number of small issuers ................................. | 3,240 | 4,500*0.28 |
| Large issuer cost ................................. | $100,000 | ................................. |
| Small issuer cost ................................. | $25,000 | ................................. |
| Total costs for large issuers ................................. | $126,000,000 | 1,260*$100,000 |
| Total costs for small issuers ................................. | $81,000,000 | 3,240*$25,000 |
|     Total costs ................................. | $207,000,000 | ................................. |
| Supplier Due Diligence Reform: | | |
| Total large suppliers ................................. | **77,840** | 278,000*.28 |
| Total small suppliers ................................. | **200,160** | 278,000*.72 |
| Number of compliance hours for large supplier ................................. | 100 | ................................. |
| Number of compliance hours for small supplier ................................. | 40 | ................................. |
| Internal cost per hour ................................. | $50 | ................................. |
| Internal costs for large supplier (90% of total work load) ................................. | $350,280,000 | 77,840*100*0.9*$50 |
| Internal costs for small supplier (75% of total work load) ................................. | $300,240,000 | 200,160*40*0.75*$50 |
| Consulting cost per hour ................................. | $200 | ................................. |
| Consulting costs for large supplier (10% of total work load) ................................. | $155,680,000 | 77,840*100*0.1*$200 |
| Consulting costs for small supplier (25% of total work load) ................................. | $400,320,000 | 200,160*40*0.25*$200 |
|     Total cost ................................. | $1,206,520,000 | ................................. |
|     Total ................................. | $3,012,293,000 | ................................. |

The manufacturing industry association and the university group commentators also provided estimates of ongoing compliance costs. As discussed above, we consider the framework provided by these commentators to be the most useful for estimating costs. The only other commentator to provide an estimate of ongoing costs was the electronic interconnect industry association commentator, but its analysis only included companies in that industry. The analyses provided by the manufacturing industry association and university group commentators yield costs estimates across multiple industries. The manufacturing industry association group commentator estimated an ongoing audit cost of $450 million and an ongoing cost estimate of

approximately $300 million for issuer verification of supplier information.[842] In our table above, however, we revised the estimate for issuer verification of supplier information to approximately $159 million.[843] We did not modify the approximately $450 million cost estimate of the audit, which was based on its estimate that the cost of such an audit for these issuers would be $100,000 per issuer, and not the $25,000 we estimated it to be in the Proposing Release. The total estimate of ongoing compliance costs based on our revisions to the manufacturing industry association commentator's analysis is therefore approximately $609 million.[844] We believe that the university group commentator's only significant recurring costs are the approximately $207 million audit

costs.[845] As with the manufacturing industry association commentator, we did not modify the approximately $207 million cost estimate of the audit. Therefore, we believe that the ongoing compliance cost estimate is likely to be in the range of $207 million to $609 million.[846]

---

[845] The university group commentator noted that ''there would be some internal operations costs associated with performing ongoing due diligence and maintaining the necessary [information technology] systems on a company-to-company basis over the years,'' but that the ''recurring costs of operating same is very low compared with the initial implementation.'' *See* letter from Tulane.

[846] The manufacturing industry association commentator also quotes compliance costs by Technology Forecasters, Inc on the RoHS directive. Using the RoHS directive, they estimate total compliance costs of $32 billion and $3 billion annually for maintenance. *See* letter from NAM I. One potential method to estimate ongoing costs is to apply the ratio of initial compliance costs to ongoing compliance costs (9.375%) in the submitted RoHS analysis ($3 billion/$32 billion or 9.375%) and apply it to our revised estimates of the analyses of the manufacturing industry association and university group commentators. This results in total ongoing estimated compliance costs of $400

---

[841] We are using the rounded estimate (4,500) that was used by the university group and manufacturing industry association commentators in their calculations even though a more exact number of issuers would be 4,496 (.75 × 5,994 = 4,495.5). *See infra* note 869.

[842] *See* letter from NAM I.

[843] 5,994 *1,060 *0.5 *$50 = $158,841,000

[844] $450,000,000 + $158,841,000 = $608,841,000

## IV. Paperwork Reduction Act

### A. Background

Certain provisions of the final rule contain "collection of information" requirements within the meaning of the Paperwork Reduction Act of 1995 (the "PRA").[847] We published a notice requesting comment on the collection of information requirements in the Proposing Release for the proposed rules and amendments. The proposed rules and amendments would have amended one regulation and three forms. In response to comments received from the public, the Commission has decided to adopt a new disclosure form, rather than amend existing rules and forms. We have submitted the new collection of information requirements to the Office of Management and Budget (the "OMB") for review in accordance with the PRA.[848]

The title for the collection of information is: "Form SD" (a new collection of information).

The form is adopted under the Exchange Act and sets forth the disclosure requirements for reports filed by certain issuers regarding their use of conflict minerals from the Covered Countries. The hours and costs associated with preparing and submitting the form constitute the reporting and cost burdens imposed by the collection of information. An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid control number. Compliance with the rule is mandatory. Responses to the information collection will not be kept confidential and there is no mandatory retention period for the information disclosed.

### B. Summary of the Comment Letters

In the Proposing Release, we requested comment on the PRA analysis. We received only one comment letter that addressed the PRA explicitly,[849] but we received a number of other comment letters and submissions that discussed the costs and burdens to issuers generally that would have an effect on the PRA

analysis.[850] A detailed discussion of these comments is included in the section III above regarding the Economic Analysis of the statute. In the Proposing Release, we estimated that approximately 5,994 of the approximately 14,600 annual reports are filed by issuers that would be affected by the proposed rules and form amendments.

The letter discussing the PRA specifically was from the manufacturing industry association commentator.[851] The commentator concluded that, of the 5,994 issuers that the Proposing Release stated could be affected by the final rule, the average issuer would have between 2,000 to 10,000 first-tier suppliers. The commentator agreed, therefore, with our statement in the Proposing Release that the paperwork costs could be significant because the disclosure requirement in the proposed rules "drastically increases the amount of paperwork issuers will have to collect and provide to the SEC to make the required disclosures." [852] The amount calculated by the commentator was $9.4 billion, which included approximately "$8 billion for issuers and $1.4 billion from smaller companies that are not issuers." [853]

Our PRA analysis pertains solely to the paperwork burdens of issuers that file reports with us, although we discuss the burdens and costs of the final rule to both reporting issuers and non-reporting companies in our Economic Analysis section above. Therefore, for the purpose of the PRA analysis, we do

not take into account the commentator's $1.4 billion figure because it relates solely to non-reporting companies. As a result, the commentator's paperwork burden estimate appears to be approximately $8 billion, which is much higher than our estimate of $46,475,000 in the Proposing Release. Also, as we note above, other commentators provided costs estimates. These commentators did not specifically discuss the costs of the statute or the rule as they relate to the PRA. However, as discussed in greater detail below, we have attempted to extrapolate the paperwork costs from the overall cost estimates of these commentators.[854]

### C. Revisions to PRA Reporting and Cost Burden Estimates

For purposes of the PRA, in the Proposing Release, we estimated that the total annual increase in the paperwork burden for all companies to prepare the disclosure that would be required under the proposed rules would be approximately 153,864 hours of company personnel time and a cost of approximately $71,243,000 for the services of outside professionals. These figures reflected our estimated costs for issuers to satisfy the due diligence and audit requirements of the proposed rules, which we estimated would be $46,475,000. As discussed in more detail below, we are revising our PRA burden and cost estimates in light of the comments we received.

For purposes of the PRA for the final rule, we estimate the total annual increase in the paperwork burden for all affected companies to comply with the collection of information requirements in our final rule is approximately 2,225,273 hours of company personnel time and approximately $1,178,378,167 for the services of outside professionals.[855] These estimates include the time and cost of collecting the information, preparing and reviewing disclosure, and submitting documents. In this regard, we include due diligence, which includes updating information technology systems and obtaining an independent private sector audit, as part of collecting information. We estimate that the total cost for issuers to satisfy their due diligence is $1,030,026,667. We added this estimate to our estimate of the cost to issuers to hire outside professionals to prepare and review disclosure, submit

---

[850] See, e.g., letters from Assent, Barrick Gold, CEI I, CEI II, Chamber I, Chamber III, Claigan I, Claigan II, Claigan III, CTIA, Ford, Howland, IPC I, ITRI I, ITRI II, ITRI III, Japanese Trade Associations, NAM I, NRF I, PCP, Rep. Lee, Roundtable, Society of Corporate Secretaries and Governance Professionals (Jun. 21, 2011) ("Corporate Secretaries II"), TriQuint I, Tulane, United States Chamber of Commerce (Jul. 18, 2011) ("Chamber II"), and WGC I.

[851] See letter from NAM I.

[852] Id.

[853] See id. In response to our estimate in the Proposing Release, of 793 reporting companies that would qualify as "small entities" for purposes of the Initial Regulatory Flexibility Act and that have conflict minerals necessary to the functionality or production of products they manufacture or contract to manufacture, the manufacturing industry association commentator noted that "a large portion of America's 278 thousand small and medium-sized manufacturers could be affected by the requirement to provide information on the origin of the minerals in the parts and components they supply to companies subject to the SEC." Id. The commentator estimated, however, that "only one in five smaller companies would be in one or more issuer's supply chains," and these smaller companies' only costs regarding the proposed rules would be a $25,000 audit cost. Id. Therefore, the proposed rules would cost smaller companies that are not required to report with us under Exchange Act Sections 13(a) or 15(d) approximately $1.4 billion. Id.

---

million ($4.1 billion * 9.375%) and $281 million ($3.0 billion * 9.375%), respectively. However, because the manufacturing industry association commentator does not specify the composition of these maintenance costs (e.g., it is not stated whether this includes audit costs), nor does it provide the underlying RoHS study for verification, we are unable to confirm the accuracy of this ratio.

[847] 44 U.S.C. 3501 et seq.

[848] 44 U.S.C. 3507(d) and 5 CFR 1320.11.

[849] See letter from NAM I.

---

[854] See letters from Claigan I, Claigan II, Claigan III, Claigan IV, IPC I, and Tulane.

[855] $1,030,026,667 + $148,351,500 = $1,178,378,167.

documents, and retain records, which is $148,351,500.[856]

Consistent with our methodology in the Proposing Release, in deriving our estimates for the final rule, we recognize that the burdens will likely vary among individual companies based on a number of factors, including the size and complexity of their operations, the number of products they manufacture or contract to manufacture, and the number of those products that contain conflict minerals. We believe that some issuers will experience costs in excess of this average in the first year of compliance with the final rule and some issuers may experience less than these average costs. We base our revised estimates of the effect that the final rule will have on the collection of information as a result of the required reasonable country of origin inquiry, due diligence process, and independent private sector audit of the Conflict Minerals Report primarily on information that we have obtained from comment letters.

In the Proposing Release, we noted that the DRC accounts for approximately 15% to 20% of the world's tantalum, and accounts for a considerably smaller percentage of the other three conflict minerals.[857] Therefore, for the purposes of the PRA, we assumed in the Proposing Release that only 20% of the 5,994 affected issuers would have to provide an audited Conflict Minerals Report, which would have been 1,199 issuers. Both the manufacturing industry association commentator and the university group commentator, however, estimated in their comment letters that 75% of issuers would have to submit a Conflict Minerals Report.[858] Also, the electronic interconnect industry association commentator indicated that it expected "nearly 100% of affected issuers will need to complete" a Conflict Minerals Report because "the vast majority of [issuers] will be unable to identify the origin of their conflict minerals."[859] However, because of the reasonable country of origin inquiry requirement, the fact that

only issuers who know or have reason to believe that their conflict minerals may have originated in the Covered Countries and may not have come from recycled or scrap sources are required to proceed to step three, and the "DRC conflict undeterminable" temporary provision, we believe it is appropriate to estimate that some percentage of issuers will not be required to submit a Conflict Minerals Report, an independent private sector audit, or both. Therefore, for the final rule, we estimate that 75% of all the 5,994 issuers, which is approximately 4,496 issuers,[860] will have to submit a Conflict Minerals Report and provide an independent private sector audit of that report for the first two years after implementation. We note that, under the final rule, issuers that proceed to step three but are unable to determine whether their conflict minerals originated in the Covered Countries, came from recycled or scrap sources, or financed or benefited armed groups in those countries are required to provide a Conflict Minerals Report, but that report does not have to be audited for the first two years following the rule's adoption for all issuers and the first four years for smaller reporting issuers. This change from the proposal could cause the actual costs to issuers for the first two years after implementation, for all issuers and four years after implementation for smaller issuers, to be lower than the commentators' cost estimates. We believe, however, that our assumption that 75% of affected issuers will have to submit a Conflict Minerals Report and provide an independent private sector audit of that report will balance some of the cost estimate discrepancies because 75% was lower than the 100% estimate of the number of affected issuers.[861]

### 1. Estimate of Conducting Due Diligence, Including the Audit

We received a number of comments regarding the estimated costs of the proposed rules, particularly setting up the overall supply chain tracking systems and conducting an audit. The cost estimates provided by the manufacturing industry association commentator and the university group commentator were the most comprehensive because they discussed the costs to all companies, including issuers and private company

suppliers.[862] We note that the electronic interconnect industry association commentator provided an extensive discussion of the costs of the proposed rules.[863] Its discussion and cost estimates, however, were limited to the electronic interconnect industry, which is only one segment of affected issuers. Also, although the tin industry association commentator's estimates were useful, they were limited to the costs of its bag-and-tag system, which covers only the costs of due diligence for the portion of the supply chain from the mine to the smelter.[864] For the PRA estimate of the due diligence costs, we relied primarily on the cost estimates from the manufacturing industry association and the university group commentators and, to a lesser extent, we also relied on the electronic interconnect industry association commentator's estimates.[865]

The manufacturing industry association commentator estimated that the initial costs to affected issuers would be approximately $8 billion.[866] This commentator's only two recurring costs in its $8 billion estimate were the approximately $300 million cost for risk-based programs needed to verify the credibility of suppliers' information, which the commentator indicated would be incurred "on an annual basis,"[867] and the approximately $450 million cost for the annual audit of the Conflict Minerals Report, which together total $750 million.[868]

The university group commentator estimated that the initial costs to affected issuers would be approximately

---

[856] We note that commentators rounded many of the calculations they made and used. However, for clarity in the body of the release, we refer to many rounded figures, but we have included the more exact figures and our calculations in the footnotes. Regardless, it does not appear that the rounded numbers vary significantly from the more exact calculations to make them meaningfully different.

[857] See Proposing Release. See also Jessica Holzer, Retailers Fight to Escape 'Conflict Minerals' Law, The Wall Street Journal, Dec. 2, 2010, at B1. The DRC also accounts for approximately 4% of the world's tin, see id., and approximately 0.3% of global gold mine production, see letter from JVC et al. II (citing to GFMS Gold Survey 2010).

[858] See letters from NAM I and Tulane.

[859] See letter from IPC I.

[860] 5,994 issuers × 75% = 4,495.5.

[861] See letters from IPC I (stating that nearly 100% of affected issuers would have to complete a Conflict Minerals Report) and NAM I (stating that it "conservatively" estimated that 75% of affected issuers would have to provide an audited Conflict Minerals Report).

[862] See letters from NAM I and Tulane.

[863] See letter from IPC I.

[864] See letter from ITRI II.

[865] We note that in the Economic Analysis above, we provided a range to estimate the ongoing compliance costs. For purposes of the PRA, however, which calls for a specific estimate of the total annual paperwork burden imposed by the rule, we are using two of the data points within that range based on the more comprehensive comment letters we received and are then averaging the results to yield a final PRA estimate.

[866] We calculate the exact amount, based on the commentator's estimates and assumptions, to be $7,941,250,000. The commentator stated that this cost would include changing legal obligations, changing IT systems, obtaining an independent private sector audit, and implementing risk-based programs. Changing legal obligations would entail 2 hours for each affected issuer's 2,000 suppliers at $50 per hour [2 × $50 × 2,000 × 5,994 = $1,198,800,000.]. Changing IT systems would entail a cost of $1 million per affected issuer [$1 million × 5,994 = $5,994,000,000]. Obtaining an audit would entail a cost of $100,000 for 75% of all affected issuers [$100,000 × 75% × 5,994 = $449,550,000]. Implementing risk-based programs would entail 1,000 hours at a cost of $50 per hour for all affected issuers [1,000 × $50 × 5,994 = $299,700,000].

[867] See letter from NAM I.

[868] The actual cost would be $749,250,000 [$449,550,000 + $299,700,000 = $749,250,000].

$2.8 billion,[869] and the cost to affected issuers in subsequent years would consist primarily of the approximately $207 million portion of that amount that would be used for the annual audit of the Conflict Minerals Report.[870]

As discussed above in section III, however, we adjusted the cost estimates provided to us by the manufacturing industry association and the university group commentators. Therefore, our overall estimate regarding the costs of conducting due diligence, including the audit, is based on the modified cost figures. Although the manufacturing industry association commentator estimated that the initial costs to affected issuers would be approximately $8 billion, we modified that figure to be approximately $2.7 billion for affected issuers.[871] In this regard, we modified that commentator's approximately $300 million cost estimate for risk-based programs to be approximately $159 million.[872] We did not, however, modify the commentator's approximately $450 million cost estimate of the independent private sector audit for affected issuers, which was based on its estimate that the cost of such an audit for these issuers would be $100,000 per issuer, and not the $25,000 we estimated it to be in the

Proposing Release.[873] We note that the electronic interconnect industry association commentator agreed that the costs for an independent private sector audit could be as much as $100,000.[874] The manufacturing industry association commentator noted, however, that $25,000 would cover the audit for a small company with a simple supply chain.[875]

From the approximately $159 million cost estimate for the risk-based programs needed to verify the credibility of suppliers' information, based on our revised calculations of the manufacturing industry association commentator's figures, and that commentator's approximately $450 million cost estimate for the audit, we derive an approximate estimate of $609 million for annual recurring costs.[876] We note that the initial approximately $2.7 billion burden is much greater than the subsequent approximately $609 million annual burden, and we averaged the burdens over the first three years. Over a three-year period, the average annual cost to affected issuers would be approximately $1.32 billion using the manufacturing industry association commentator's figures.[877]

Additionally, although the university group commentator estimated that the initial costs to affected issuers would be approximately $2.8 billion, we modify that figure to be approximately $1.8 billion.[878] We did not, however, modify the university group commentator's approximately $207 million cost estimate of the independent private sector audit for affected issuers. Therefore, we do not modify the estimate of the cost to affected issuers in subsequent years, which would still be approximately $207 million. Again, the initial approximately $1.8 billion burden is much greater than the subsequent approximately $207 million annual burden, and we also averaged

the burdens over the first three years. Over a three-year period, the average annual cost to affected issuers would be approximately $740 million using the university group commentator's figures.[879]

To estimate the overall costs of conducting due diligence, including the audit, we averaged the modified estimates from the manufacturing industry association and the university group commentators discussed above. The average of these two costs is approximately $1.03 billion.[880]

2. Estimate of Preparing the Disclosure

The few estimates that we received from commentators regarding the number of hours it would take issuers to prepare and review the proposed disclosure requirements varied widely. One commentator, a semiconductor company, asserted that it would require 1,400 hours initially to implement the proposed rules and 700 hours in subsequent years.[881] The university group commentator suggested that a small issuer would require 40 man-hours to comply with the proposed rules and a large issuer would require 100 man-hours,[882] and it appears that these costs would be recurring.[883] The manufacturing industry association commentator concluded that changing legal obligations to reflect a company's new due diligence would require "at a minimum" two hours of employee time,

---

[869] The actual estimated cost was $2,795,793,000. This cost estimate included a $2,562,780,000 cost for instituting the necessary IT systems [$1,678,000,000 for large issuers plus $884,780,000 for small issuers], a $26,013,000 cost for strengthening internal management systems in view of performing due diligence, and a $207,000,000 cost for the independent private sector audit. The university group commentator estimated the audit cost to be exactly $207 million by using the manufacturing industry association commentator's estimate that 4,500 of the 5,994 affected issuers (75%) would be required to obtain an audit of their Conflict Minerals Report. The 4,500 figure, however, is rounded up from a more exact calculation of 75% of 5,994. The more exact calculation for 75% of 5,994 is 4,496 [5,994 × .75 = 4,459.5], and not 4,500, but both the university group commentator and the manufacturing industry association commentator rounded to 4,500. Using these estimates, the university group determined that the total audit cost amount for affected issuers would be $207 million exactly.

[870] See letter from Tulane.

[871] Our estimate of the cost is $2,742,705,000. This cost estimate included a $635,364,000 cost for issuer due diligence reform, a $1,498,500,000 cost for IT system modifications, a $450,000,000 cost for the independent private sector audit, and a $158,841,000 cost of risk-based programs needed to verify the credibility of suppliers' information.

[872] Our estimate of the cost is $158,841,000.

[873] See letter from NAM I.

[874] See letter from IPC I.

[875] See letter from NAM I. We note that the manufacturing industry association commentator separately indicated that costs of the final rule could be $16 billion or more by extrapolating from the costs of compliance with the RoHS. We did not use this estimate in our analysis because, despite the fact that this commentator claimed that both directives require companies to trace materials used in their products, the commentator did not discuss how RoHS compares to the requirements in the final rule.

[876] $450,000,000 + $158,841,000 = $608,841,000.

[877] ($2,742,705,000 + $608,841,000 + $608,841,000)/3 = $1,320,129,000.

[878] The estimated cost was $1,805,773,000. This cost estimate for issuers included the modified $1,572,760,000 cost for instituting the necessary IT systems, the $207,000,000 cost for the independent private sector audit, and the $26,013,000 cost for strengthening internal management systems in view of performing due diligence.

[879] ($1,805,773,000 + $207,000,000 + $207,000,000)/3 = $739,924,333.

[880] ($1,320,129,000 + $739,924,333)/2 = $1,030,026,667.

[881] See letter from TriQuint I.

[882] See letter from Tulane. This commentator stated that an issuer's compliance could be "facilitated" by using third parties. The commentator assumed that large issuers would use third parties for 10% of their compliance needs and small companies would use third parties for 25% of their compliance needs. In our calculations for the number of hours issuers would require in complying with our proposed rules, we did not include third parties because it appears that the use of third parties would not affect the number of hours required for compliance, but would only affect the cost.

[883] Id. This commentator stated that the 100 hours or 40 hours needed to comply with the proposed rules would involve multiple tasks, including: Initial reviews of the issuer's policies, procedures, and controls; developing a gap analysis and compliance plan, and modifying that plan as needed; developing draft revised policies, procedures, and controls; conducting initial testing on those revised policies, procedures, and controls; and implementing the revised policies, procedures, and controls, training personnel on them, and communicating them to suppliers. Although many of these are described as "initial" actions, issuers will need to review and modify many of them as well. For example, it is likely that each year issuers may need to review and test their policies, procedures, and controls, modify them as needed, and implement any new further revised policies, procedures, and controls.

ADD-91

"and considerably more than two hours is a distinct possibility."[884]

In calculating the number of hours necessary to prepare and review the disclosure required by the final rule, we derived an average based on the estimates provided by the semiconductor company and university group commentators.[885] For the semiconductor company estimate, we multiplied its initial 1,400 hour estimate by the 5,994 affected issuers, so the first year's burden for all affected issuers would be approximately 8.4 million hours,[886] and the 700 hour subsequent year estimate also by the 5,994 affected issuers, which resulted in approximately 4.2 million hours for each subsequent year.[887] Averaging the burden hours over the first three years resulted in an average burden hour estimate of approximately 5.6 million hours per year.[888] To determine the estimated number of hours per year per issuer, we divided the 5.6 million hours by 5,994 affected issuers, which resulted in 933 hours per year per affected issuer to comply with the proposed rules.[889]

The university group commentator separated its estimated hours between small and large issuers using the estimated breakdown between the number of affected large and small companies provided by the electronic interconnect industry association in its comment letter.[890] Because we recognized that companies of varying sizes may incur different burdens, we also differentiated between large and small companies in our estimate of burden hours. Therefore, we multiplied the university group commentator's 100 hour estimate for large issuers by the electronic interconnect industry association commentator's estimated 28% for large affected issuers, so the burden for large affected issuers would be 167,832 hours,[891] and multiplied the 40 hour estimate for small issuers by the electronic interconnect industry association commentator's 72% for small affected issuers, which resulted in 172,627 hours for small affected issuers.[892] To determine the estimated number of hours per year per issuer, we added the estimated hours for the small and large companies, which would be 340,459 hours,[893] and divided that number by all the 5,994 affected issuers. Therefore, the average amount of hours per year for each issuer, both large and small, to prepare and review the disclosure required by our rule would be approximately 57 hours.[894] Although not explicit in its comment letter, it appears that the burden hours for the university group commentator's estimates would be incurred annually, so we did not average these hours over the first three years as we did for the semiconductor company commentator's estimate.

Next, we averaged the two burden hour estimates by adding the 933 hour estimate to the 57 hour estimate (and by dividing by two) and determined that each affected issuer, on average, would spend 495 burden hours preparing and reviewing the disclosure.[895] We assumed that 75% of the burden of preparation would have been carried by the company internally and that 25% of the burden of the preparation would have been carried by outside professionals retained by the company at an average cost of $200 per hour.[896] The portion of the burden carried by outside professionals would have been reflected as a cost, while the portion of the burden carried by the company internally would have been reflected in hours. Therefore, the total number of internal preparation hours for affected issuers would be 2,225,273 hours.[897] Similarly, the total cost for external preparation for affected issuers would be $148,351,500.[898]

### 3. Revised PRA Estimate

The following table illustrates the estimated changes in annual compliance burden in the collection of information in hours and costs for the new Exchange Act specialized disclosure report that will result from the final rule. The burden hours figure is the 2,225,273 internal burden hours estimate for preparing the disclosure. We are adding the $148,351,500 estimate of external professional costs for preparing the disclosure to the $1,030,026,667 estimate of conducting due diligence, including the audit, to determine the $1,178,378,167 professional costs in the below table.

| Form | Current annual responses | Final annual responses | Current burden hours (A) | Increase in burden hours (B) | Final burden hours (C) = (A) + (B) | Current professional costs (D) | Increase in professional costs (E) | Final professional costs (F) = (D) + (E) |
|---|---|---|---|---|---|---|---|---|
| S–D ........... | .................. | 5,994 | .................. | 2,225,273 | 2,225,273 | ...................... | $1,178,378,167 | $1,178,378,167 |

## V. Final Regulatory Flexibility Act Analysis

This Final Regulatory Flexibility Analysis ("FRFA")[899] relates to new rule 13p–1 and new Form SD, which implement Section 13(p) of the Exchange Act. Section 13(p) concerns certain disclosure and reporting obligations of issuers with conflict minerals necessary to the functionality or production of any product manufactured or contracted by those

---

[884] See letter from NAM I.

[885] We did not include the two-hour figure from the manufacturing industry association commentator in our estimate because it was so much lower than the other two estimates and did not appear to include all the necessary steps to comply with the proposed rules. Instead, this estimate was based only on the time required to make changes to an issuer's corporate compliance policies and supply chain operating procedures. Also, the university group commentator specifically disagreed with this estimate and the manufacturing industry association commentator acknowledged that these actions may take "considerably more than two hours."

[886] 1,400 hours × 5,994 affected issuers = 8,391,600 hours.

[887] 700 hours × 5,994 affected issuers = 4,195,800 hours.

[888] [8,391,600 hours + (4,195,800 hours × 2)]/3 = 5,594,400 hours average per year.

[889] 5,594,400 hours/5,994 affected issuers = 933 hours average per year.

[890] See letter from Tulane.

[891] 100 hours × 5,994 affected issuers × 28% large affected issuers = 167,832 hours.

[892] 40 hours × 5,994 affected issuers × 72% small affected issuers = 172,627 hours.

[893] 167,832 hours + 172,627 hours = 340,459 hours.

[894] 340,459 hours/5,994 affected issuers = 56.80 hours.

[895] 933 hours + 57 hours/2 = 495 hours.

[896] The university group commentator estimated that outside professionals would cost $200 per hour because it believed that "a substantial portion" of required consulting work will be done by "lower cost environmental and sustainability consulting firms" instead of large accounting firms that would be more expensive. We frequently use a $400 per hour estimate in our PRA analysis on the assumption that attorneys will be involved in the preparation of the securities law disclosures required by our rules. The disclosure required by the final rule may likely involve work by other types of professionals, so that the $200 per hour estimate may be more appropriate in this circumstance.

[897] 495 hours × 75% internal preparation × 5,994 affected issuers = 2,225,272.50 hours.

[898] 495 hours × 25% external preparation × $200 per hour for outside consultants × 5,994 affected issuers = $148,351,500.

[899] This analysis has been prepared in accordance with 5 U.S.C. 601.

issuers to be manufactured. An Initial Regulatory Flexibility Act Analysis was prepared in accordance with the Regulatory Flexibility Act and included in the Proposing Release.

*A. Reasons for, and Objectives of, the Final Action*

The final rule is designed to implement the requirements of Section 1502 of the Act. Specifically, we are adopting amendments to our rules to implement the Conflict Minerals Statutory Provision. The final rule requires any reporting issuer for which conflict minerals are necessary to the functionality or production of a product manufactured or contracted to be manufactured by that issuer to disclose annually in a separate specialized disclosure report on a new form the results of its reasonable country of origin inquiry into whether its conflict minerals originated in the Covered Countries or came from recycled or scrap sources. Under the final rule, following its reasonable country of origin inquiry, if (a) The issuer knows that its conflict minerals did not originate in the Covered Countries or knows that they came from recycled or scrap sources, or (b) the issuer has no reason to believe its conflict minerals may have originated in the Covered Countries, or (c) the issuer reasonably believes its conflict minerals came from recycled or scrap sources, then in all such cases the issuer must disclose its determination and describe briefly in the body of Form SD, the reasonable country of origin inquiry it undertook and the results of the inquiry. On the other hand, following its reasonable country of origin inquiry, if (a) the issuer knows that its conflict minerals originated in the Covered Countries and knows that they did not come from recycled or scrap sources, or the issuer has reason to believe that its conflict minerals may have originated in the Covered Countries, *and* (b) the issuer knows that its conflict minerals did not come from recycled or scrap sources or has reason to believe that its conflict minerals may not have come from recycled or scrap sources, then the issuer must exercise due diligence on the source and chain of custody of its conflict minerals that conforms to a nationally or internationally recognized due diligence framework, if one is available. If one is not available, the issuer must exercise due diligence without the benefit of such a framework. Following its due diligence, unless the issuer determines, based on that due diligence, that its conflict minerals did not originate in the Covered Countries or that its conflict minerals did come

from recycled or scrap sources, the issuer must file a Conflict Minerals Report.

In most circumstances, the issuer must obtain an independent private sector audit of its Conflict Minerals Report. The issuer must also describe in its Conflict Minerals Report, among other information, its products manufactured or contracted to be manufactured that have not been found to be "DRC conflict free." For a temporary two-year period for all issuers, and for a temporary four-year period for smaller reporting issuers, an issuer that must perform due diligence and is unable to determine that the conflict minerals in its products originated in the Covered Countries or came from recycled or scrap sources, or unable to determine that the conflict minerals in those products that originated in the Covered Countries financed or benefited armed groups in those countries, may consider those products "DRC conflict undeterminable." In that case, the issuer must describe, among other information, its products manufactured or contracted to be manufactured that are "DRC conflict undeterminable" and the steps it has taken or will take, if any, since the end of the period covered in its most recent prior Conflict Minerals Report to mitigate the risk that its necessary conflict minerals benefit armed groups, including any steps to improve its due diligence. An issuer with products that are "DRC conflict undeterminable" is not required to obtain an independent private sector audit of the Conflict Minerals Report regarding the conflict minerals in those products.

Finally, after its reasonable country of origin inquiry, an issuer that has reason to believe that its conflict minerals may not have been from recycled or scrap sources must exercise due diligence that conforms to a nationally or internationally recognized due diligence framework developed specifically for conflict minerals from recycled sources to determine that its conflict minerals are from recycled or scrap sources. The issuer must also describe its due diligence in its Conflict Minerals Report. Currently, gold is the only conflict mineral with a nationally or internationally recognized due diligence framework for recycled or scrap conflict minerals. If no nationally or internationally recognized due diligence framework for a particular recycled or scrap conflict mineral is available, which is the case for the other three minerals, until such a framework is developed, the issuer must exercise due diligence in determining that its conflict minerals are from recycled or scrap

sources and describe the due diligence measures it exercised in its Conflict Minerals Report.

*B. Significant Issues Raised by Public Comments*

In the Proposing Release, we requested comment on any aspect of the IRFA, including the number of small entities that would be affected by the proposed rules, the nature of the impact, how to quantify the number of small entities that would be affected, and how to quantify the impact of the proposed rules. We received some comments that specifically referenced the Regulatory Flexibility Analysis ("RFA").[900] Some of these commentators claimed that we underestimated the number of small entities that would be impacted by the proposal because our estimate did not account for the number of small businesses that do not report with us but participate in a reporting issuer's supply chain.[901] In this regard, the SBA recommended that we publish an amended IFRA for the proposed rules to "more accurately reflect the costs of the proposed rule and the number of small businesses that it will affect." [902] Another commentator noted specifically that we must look beyond the 793 reporting issuers that are also small entities because, when an issuer seeks to establish whether its supply chain is free of conflict minerals, it will have to turn to its first-tier suppliers and require due diligence.[903] This commentator indicated, therefore, that "a large portion of America's 278 thousand small and medium-sized manufacturers could be affected by" the final rule. Moreover, for purposes of determining the cost of the independent private sector audit on smaller companies, the commentator estimated that one in five smaller companies would be in an issuer's supply chain. As discussed in the Economic Analysis section above, we acknowledge that the statute and the final rule will affect many companies, including both companies that are directly subject to the rule's requirements and those that are not reporting companies but are part of a reporting issuer's supply chain.[904] For

---

[900] *See, e.g.*, letters from Industry Group Coalition II; IPC I; NAM I; Senator Olympia J. Snowe, Representative Sam Graves, Senator Scott P. Brown, Representative Roscoe Bartlett, Representative Scott Tipton, and Representative Joe Walsh (Nov. 17, 2011) ("Sen. Snowe *et al.*"); and the Small Business Administration's Office of Advocacy (Oct. 25, 2011) ("SBA").

[901] *See, e.g.*, letters from NAM I, SBA, Sen. Snowe *et al.*, and WGC II.

[902] *See* letter from SBA.

[903] *See* letter from NAM I.

[904] *Id.*

purposes of the RFA, however, the focus is the impact on entities on which our rules impose direct requirements.[905] Therefore, although we do acknowledge the rule's impact on non-reporting small entities, they were not included in our RFA estimate of the 793 small entities that would be directly subject to the final rule.

Additionally, several commentators addressed aspects of the proposed rules that could potentially affect smaller reporting companies or small companies generally.[906] These commentators did not clarify whether they were referring to "small entities" as that term is defined under Exchange Act Rule 0–10(a).[907] In particular, certain commentators argued that the costs of the rules could be disproportionally higher to smaller issuers.[908] One commentator suggested that the Conflict Minerals Statutory Provision "does create a burden on small businesses, but not as high or disproportionate to revenue as has been reported" by other commentators.[909] Also, as discussed above, one commentator argued that the final rule should exempt smaller reporting companies.[910] Many other commentators argued, however, that final rule should not exempt smaller reporting companies.[911] Many commentators indicated that exempting smaller reporting companies would not reduce significantly their burdens [912] because, among other reasons, many of these smaller companies are part of larger companies' supply chains and these larger companies would require the smaller companies to provide conflict minerals information so that the larger companies could meet their obligations under the rule.[913] Two

commentators agreed that smaller reporting companies should not be exempt from the rule, but stated that they should be allowed to phase-in the rules to mitigate their costs and not drain their resources.[914]

### C. Small Entities Subject to the Final Rule

The final rule will affect some reporting issuers that are small entities. Exchange Act Rule 0–10(a) [915] defines an issuer to be a "small business" or "small organization" for purposes of the Regulatory Flexibility Act if it had total assets of $5 million or less on the last day of its most recent fiscal year. We believe that the final rule would affect small entities with necessary conflict minerals as defined under Exchange Act Section 13(p). In the Proposing Release, we estimated that there were approximately 793 issuers to which conflict minerals are necessary and that may be considered small entities. As discussed above some commentators indicated that we underestimated the number of small entities that would be impacted by the rule, but that was based on the assertion that we consider small entities that are not directly subject to the requirements of the final rule.[916] We note that no commentator provided any other number of small entities or disagreed that 793 is the number that will be directly subject to the final rule. We continue to believe that there are 793 small entities that file reports with us under Exchange Act Sections 13(a) and 15(d) and that will be directly subject to the final rule because they likely have conflict minerals necessary to the functionality or production of products they manufacture or contract to manufacture.

### D. Reporting, Recordkeeping, and Other Compliance Requirements

The final rule will add to the annual disclosure requirements of issuers with necessary conflict minerals, including small entities, by requiring them to comply with the disclosure and reporting obligations under Section 13(p) and provide certain additional disclosure in their new specialized disclosure reports on Form SD that certain issuers will be required to file annually. Among other matters, that information must include, as applicable:

• Disclosure in the body of the specialized disclosure report as to whether such issuer knows or has reason to believe that conflict minerals

necessary to the functionality or production of a product manufactured or contracted by an issuer to be manufactured originated in the Covered Countries or may have originated in the Covered Countries and may not have come from recycled or scrap sources;

• If not, or if the issuer knows or has reason to believe that its necessary conflict minerals came from recycled or scrap sources, disclosure in the body of the specialized disclosure report and on the issuer's Internet Web site of that determination and a brief description of the reasonable country of origin inquiry used in making that determination and the results of the inquiry it performed, and disclosure in the body of the specialized disclosure report of the address of the issuer's Internet Web site where that information is publicly available;

• If so, and the issuer is able to determine whether its conflict minerals directly or indirectly financed or benefited armed groups in the Covered Countries,

○ A Conflict Minerals Report filed as an exhibit to the specialized disclosure report, which includes a certified independent private sector audit report, a description of the nationally or internationally recognized due diligence framework the issuer used to determine the source and chain of custody of its conflict minerals, a description of the issuer's products that have not been found to be "DRC conflict free," and a description of the facilities used to process the necessary conflict minerals in those products, the country of origin of the necessary conflict minerals in those products, and the efforts to determine the mine or location of origin with the greatest possible specificity;

○ Disclosure in the body of the specialized disclosure report that a Conflict Minerals Report is filed as an exhibit to the specialized disclosure report and is publicly available on the issuer's Internet Web site, and disclosure within the body of the specialized disclosure report of the address of the issuer's Internet Web site on which the Conflict Minerals Report is publicly available;

○ Posting of the Conflict Minerals Report on the issuer's publicly available Internet Web site.

• If so, but the issuer is unable to determine that its conflict minerals did not directly or indirectly finance or benefit armed groups in the Covered Countries, if the issuer has reason to believe that its conflict minerals may have originated in the Covered Countries but is unable to determine the origin,

---

[905] See, e.g., Mid-Tex Electric Cooperative v. FERC, 773 F.2d 327 (D.C. Cir. 1985) and White Eagle Cooperative Ass'n v. Conner, 553 F.3d 467 (7th Cir. 2009). See also Small Bus. Admin., Office of Advocacy, A Guide for Government Agencies: How to Comply with the Regulatory Flexibility Act (June 2010) ("SBA Guidance"), available at http://archive.sba.gov/advo/laws/rfaguide.pdf.

[906] See, e.g., letters from BCIMC, Corporate Secretaries I, CRS I, Earthworks, Global Witness I, Howland, IPC I, JVC et al. II, NAM I, Rep. Bachus et al., Rockefeller, Sen. Durbin/Rep. McDermott, SIF I, State II, TIAA–CREF, TIC, TriQuint I, and WGC II.

[907] 17 CFR 240.0–10(a) (defining an issuer to be a "small business" or "small organization" for purposes of the Regulatory Flexibility Act if it had total assets of $5 million or less on the last day of its most recent fiscal year.

[908] See, e.g., letters from Howland, NAM I, and WGC II.

[909] See letter from Claigan IV.

[910] See letter from Corporate Secretaries I.

[911] See, e.g., letters from BCIMC, CRS I, Earthworks, Global Witness I, Howland, IPC I, JVC et al. II, Rockefeller, Sen. Durbin/Rep. McDermott, SIF I, State II, TIAA–CREF, TIC, and TriQuint I.

[912] See, e.g., letters from IPC I and TriQuint I.

[913] See letter from IPC I.

[914] See letters from Howland and JVC et al. II.

[915] 17 CFR 240.0–10(a).

[916] See, e.g., letters from NAM I, SBA, and WGC II.

○ A Conflict Minerals Report filed as an exhibit to the specialized disclosure report that includes a description of the nationally or internationally recognized due diligence framework the issuer used to determine the source and chain of custody of its conflict minerals, a description of the facilities used to process the necessary conflict minerals in those products, if known, the country of origin of the necessary conflict minerals in those products, if known, and the efforts to determine the mine or location of origin with the greatest possible specificity, and, for a temporary period, a description of the issuer's products that are "DRC conflict undeterminable" (for the temporary period, such issuers are not required to have their Conflict Minerals Report audited regarding such minerals);

○ Disclosure in the body of the specialized disclosure report that a Conflict Minerals Report is filed as an exhibit to the specialized disclosure report and is publicly available on the issuer's Internet Web site and the address of the issuer's Internet Web site on which the Conflict Minerals Report is publicly available;

○ Posting of the Conflict Minerals Report on the issuer's publicly available Internet Web site.

• If there is reason to believe that the conflict minerals may not be from recycled or scrap sources and there is a nationally or internationally recognized due diligence framework for those particular conflict minerals,

○ A Conflict Minerals Report filed as an exhibit to the specialized disclosure report, which includes a description of the nationally or internationally recognized due diligence framework the issuer used to determine that those conflict minerals were or has reason to believe may have been from recycled or scrap sources, which includes a certified independent private sector audit report regarding those minerals;

○ Disclosure in the body of the specialized disclosure report that a Conflict Minerals Report is filed as an exhibit to the specialized disclosure report and is publicly available on the issuer's Internet Web site and the address of the issuer's Internet Web site on which the Conflict Minerals Report is publicly available.

• If there is reason to believe that the conflict minerals may not be from recycled or scrap sources but there is no nationally or internationally recognized due diligence framework for those particular conflict minerals,

○ A Conflict Minerals Report filed as an exhibit to the specialized disclosure report, which includes a description of the due diligence the issuer used to determine that those conflict minerals were or has reason to believe may have been from recycled or scrap (until a nationally or internationally recognized due diligence framework is available for those conflict minerals from recycled or scrap sources, such issuers are not required to have their Conflict Minerals Report audited regarding such minerals);

○ Disclosure in the body of the specialized disclosure report that a Conflict Minerals Report is filed as an exhibit to the specialized disclosure report and is publicly available on the issuer's Internet Web site and the address of the issuer's Internet Web site on which the Conflict Minerals Report is publicly available.

The same disclosure and reporting requirements apply to U.S. and foreign issuers. However, under the final rule, issuers that proceed to step three but are unable to identify the origin of their conflict minerals or whether their conflict minerals came from recycled or scrap sources are required to provide a Conflict Minerals Report, but that report does not have to be audited for the first four years following the rule's adoption for smaller reporting companies. We are creating new Form SD that requires every issuer to file its conflict minerals information for each applicable calendar year on May 31 of the following year.

*E. Agency Action To Minimize Effect on Small Entities*

The Regulatory Flexibility Act directs us to consider significant alternatives that would accomplish the stated objectives, while minimizing any significant adverse impact on small entities. In connection with the final rule, we considered the following alternatives:

(1) Establishing different compliance or reporting requirements which take into account the resources available to small entities;

(2) Exempting small entities from coverage of the disclosure requirements, or any part thereof;

(3) Clarification, consolidation, or simplification of the rules compliance and reporting requirements for small entities; and

(4) Use of performance standards rather than design standards.

We considered but did not establish different compliance requirements for small entities. As discussed above in response to commentators' suggestions that we exempt smaller reporting companies, we similarly believe that separate disclosure requirements for small entities that would differ from the final reporting requirements for other issuers, or exempting them from those requirements, would not achieve Congress's objectives of Section 13(p). The final rule is designed to implement the conflict minerals disclosure and reporting requirements of Section 13(p). That statutory section applies to all issuers with necessary conflict minerals, regardless of size. In any case, as several commentators noted, many smaller companies are part of larger companies' supply chains and would need to provide conflict minerals information so that the larger companies could meet their obligations under the rule.[917] However, under the final rule, issuers that proceed to step three but are unable to determine their conflict minerals originated in the Covered Countries or came from recycled or scrap sources, or unable to determine that the conflict minerals that originated in the Covered Countries financed or benefited armed groups in those countries are required to provide a Conflict Minerals Report, but that report does not have to be audited for the first four years following the rule's adoption for smaller reporting companies and the issuers may describe the product with known origin as "DRC conflict undeterminable."

We clarified and simplified aspects of the final rule for all issuers, including small entities. For example, the final rule specifies and clarifies the objective for the audit of a Conflict Minerals Report for newly-mined conflict minerals. The final rule also requires an issuer to disclose the information in the body of and as an exhibit to its specialized disclosure report, which may simplify the process of submitting the conflict minerals disclosure and Conflict Minerals Report as compared with requiring disclosure in an issuer's annual report on Form 10–K, Form 20–F, or Form 40–F.

We have generally used design rather than performance standards in connection with the final rule because we believe design standards will better accomplish Congress's objectives. The reasonable country of origin inquiry is the performance standard. In addition, the specific disclosure requirements in the final rule will promote consistent and comparable disclosure among all issuers with necessary conflict minerals. However, we are providing guidance regarding "contract to manufacture," and "necessary to the functionality and production," which we believe will allow issuers to comply with the statutory requirements in a manner more tailored to their individual circumstances.

---

[917] *See, e.g.,* letters from NAM I, SBA, Sen. Snowe *et al.,* and WGC II.

## VI. Statutory Authority and Text of the Final Rule

We are adopting the rule amendments contained in this document under the authority set forth in Sections 3(b), 12, 13, 15(d), 23(a), and 36 of the Exchange Act, as amended.

### List of Subjects in 17 CFR Parts 240 and 249b

Reporting and recordkeeping requirements, Securities.

In accordance with the foregoing, we are amending Title 17, Chapter II of the Code of Federal Regulations as follows:

## PART 240—GENERAL RULES AND REGULATIONS, SECURITIES EXCHANGE ACT OF 1934

■ 1. The authority citation for part 240 is amended by adding an authority for § 240.13p–1 in numerical order to read as follows:

**Authority:** 15 U.S.C. 77c, 77d, 77g, 77j, 77s, 77z–2, 77z–3, 77eee, 77ggg, 77jjj, 77kkk, 77nnn, 77sss, 77ttt, 78c, 78d, 78e, 78f, 78g, 78i, 78j, 78j–1, 78k, 78k–1, 78 *l*, 78m, 78n, 78n–1, 78o, 78o–4, 78o–8, 78p, 78q, 78s, 78u–5, 78w, 78x, 78dd(b), 78dd(c), 78 *ll*, 78mm, 80a–20, 80a–23, 80a–29, 80a–37, 80b–3, 80b–4, 80b–11, 7201 *et seq.*, and 8302; 18 U.S.C. 1350; 12 U.S.C. 5221(e)(3), and Pub. L. 111–203, Sec. 712, 124 Stat. 1376 (2010), unless otherwise noted.

\*　\*　\*　\*　\*

Section 240.13p–1 is also issued under sec. 1502, Pub. L. 111–203, 124 Stat. 1376.

\*　\*　\*　\*　\*

■ 2. Add § 240. 13p–1 to read as follows:

**§ 240.13p–1   Requirement of report regarding disclosure of registrant's supply chain information regarding conflict minerals.**

Every registrant that files reports with the Commission under Sections 13(a) (15 U.S.C. 78m(a)) or 15(d) (15 U.S.C. 78o(d)) of the Exchange Act, having conflict minerals that are necessary to the functionality or production of a product manufactured or contracted by that registrant to be manufactured, shall file a report on Form SD within the period specified in that Form disclosing the information required by the applicable items of Form SD as specified in that Form (17 CFR 249b.400).

## PART 249b—FURTHER FORMS, SECURITIES EXCHANGE ACT OF 1934

■ 3. The authority citation for part 249b is amended by adding an authority for § 249b.400 to read as follows:

**Authority:** 15 U.S.C. 78a *et seq.*, unless otherwise noted.

\*　\*　\*　\*　\*

Section 249b.400 is also issued under secs. 1502, Pub. L. 111–203, 124 Stat. 2213.

■ 4. Add § 249b.400 to read as follows:

**§ 249b.400   Form SD, specialized disclosure report.**

This Form shall be filed pursuant to § 240.13p–1 of this chapter by registrants that file reports with the Commission pursuant to Sections 13(a) or 15(d) of the Securities Exchange Act of 1934 and are required to disclose the information required by Section 13(p) under the Securities Exchange Act of 1934 and Rule 13p–1 (§ 240.13p–1) of this chapter.

■ 5. Add Form SD (referenced in § 249b.400) to read as follows:

**Note:** The text of Form SD does not appear in the Code of Federal Regulations.

### UNITED STATES SECURITIES AND EXCHANGE COMMISSION

Washington, D.C. 20549

**FORM SD**

**Specialized Disclosure report**

_____
(Exact name of the registrant as specified in its charter)

_____
(State or other jurisdiction of incorporation or organization)

_____
(Commission File Number)

_____
(IRS Employer Identification No.)

_____
(Address of principal executive offices)
(Zip code)

_____
(Name and telephone number, including area code, of the person to contact in connection with this report.)

Check the appropriate box to indicate the rule pursuant to which this form is being filed, and provide the period to which the information in this form applies:

____ Rule 13p–1 under the Securities Exchange Act (17 CFR 240.13p–1) for the reporting period from January 1 to December 31, _____.

### GENERAL INSTRUCTIONS

#### A. Rule as to Use of Form SD.

This form shall be used for a report pursuant to Rule 13p–1 (17 CFR 240.13p–1) under the Exchange Act.

#### B. Information to be Reported and Time for Filing of Reports.

1. *Form filed under Rule 13p–1.* A report on this Form shall be filed on EDGAR no later than May 31 after the end of the issuer's most recent calendar year.

2. If the deadline for filing this form occurs on a Saturday, Sunday or holiday on which the Commission is not open for business, then the deadline shall be the next business day.

#### C. Inapplicability to Registered Investment Companies.

The disclosures required in Form SD shall not apply to investment companies required to file reports pursuant to Rule 30d–1 (17 CFR 270.30d–1) under the Investment Company Act of 1940.

#### D. Preparation of Report.

This form is not to be used as a blank form to be filled in, but only as a guide in the preparation of the report meeting the requirements of Rule 12b–12 (17 CFR 240.12b–12). The report shall contain the number and caption of the applicable item, but the text of such item may be omitted, provided the answers thereto are prepared in the manner specified in Rule 12b–13 (17 CFR 240.12b–13). All items that are not required to be answered in a particular report may be omitted and no reference thereto need be made in the report. All instructions should also be omitted.

#### E. Application of General Rules and Regulations.

The General Rules and Regulations under the Act (17 CFR Part 240) contain certain general requirements which are applicable to reports on any form. These general requirements should be carefully read and observed in the preparation and filing of reports on this form.

#### F. Signature and Filing of Report.

The report must be signed by the registrant on behalf of the registrant by an executive officer.

### INFORMATION TO BE INCLUDED IN THE REPORT

#### Section 1—Conflict Minerals Disclosure

#### Item 1.01   Conflict Minerals Disclosure and Report

(a) If any conflict minerals, as defined by paragraph (d)(3) of this item, are necessary to the functionality or production of a product manufactured by the registrant or contracted by the registrant to be manufactured and are required to be reported in the calendar year covered by the specialized disclosure report, the registrant must conduct in good faith a reasonable country of origin inquiry regarding those conflict minerals that is reasonably designed to determine whether any of the conflict minerals originated in the Democratic Republic of the Congo or an adjoining country, as

defined by paragraph (d)(1) of this item, or are from recycled or scrap sources, as defined by paragraph (d)(6) of this item.

(b) Based on its reasonable country of origin inquiry, if the registrant determines that its necessary conflict minerals did not originate in the Democratic Republic of the Congo or an adjoining country or did come from recycled or scrap sources, or if it has no reason to believe that its necessary conflict minerals may have originated in the Democratic Republic of the Congo or an adjoining country, or if based on its reasonable country of origin inquiry the registrant reasonably believes that its necessary conflict minerals did come from recycled or scrap sources, the registrant must, in the body of its specialized disclosure report under a separate heading entitled "Conflict Minerals Disclosure," disclose its determination and briefly describe the reasonable country of origin inquiry it undertook in making its determination and the results of the inquiry it performed. Also, the registrant must disclose this information on its publicly available Internet Web site and, under a separate heading in its specialized disclosure report entitled "Conflict Minerals Disclosure," provide a link to that Web site.

(c) Alternatively, based on its reasonable country of origin inquiry, if the registrant knows that any of its necessary conflict minerals originated in the Democratic Republic of the Congo or an adjoining country and are not from recycled or scrap sources, or has reason to believe that its necessary conflict minerals may have originated in the Democratic Republic of the Congo or an adjoining country and has reason to believe that they may not be from recycled or scrap sources, the registrant must exercise due diligence on the source and chain of custody of its conflict mineral, as discussed in paragraph (c)(1) of this item, that conforms to a nationally or internationally recognized due diligence framework, if such a framework is available for the conflict mineral. If, as a result of that due diligence, the registrant determines that its conflict minerals did *not* originate in the Democratic Republic of the Congo or an adjoining country or the registrant determines that its conflict minerals *did* come from recycled or scrap sources, a Conflict Minerals Report is not required, but the registrant must disclose its determination and briefly describe, in the body of its specialized disclosure report under a separate heading entitled "Conflict Minerals Disclosure," the reasonable country of origin inquiry and the due diligence efforts it undertook in

making its determination and the results of the inquiry and due diligence efforts it performed. Also, the registrant must disclose this information on its publicly available Internet Web site and, under a separate heading in its specialized disclosure report entitled "Conflict Minerals Disclosure," provide a link to that Web site. Otherwise, the registrant must file a Conflict Minerals Report as an exhibit to its specialized disclosure report and provide that report on its publicly available Internet Web site. Under a separate heading in its specialized disclosure report entitled "Conflict Minerals Disclosure," the registrant must disclose that it has filed a Conflict Minerals Report and provide the link to its Internet Web site where the Conflict Minerals Report is publicly available.

The Conflict Minerals Report must include the following information:

(1) *Due Diligence:* A description of the measures the registrant has taken to exercise due diligence on the source and chain of custody of those conflict minerals;

(i) The registrant's due diligence must conform to a nationally or internationally recognized due diligence framework, if such a framework is available for the conflict mineral;

(ii) Except as provided in paragraphs (c)(1)(iv), (c)(1)(v), and (c)(1)(vi) of this item, the due diligence measures shall include but not be limited to an independent private sector audit of the Conflict Minerals Report that is conducted in accordance with standards established by the Comptroller General of the United States and certified pursuant to paragraph (c)(1)(ii)(B) of this item, which shall constitute a critical component of the registrant's due diligence in establishing the source and chain of custody of the necessary conflict minerals.

(A) The objective of the audit of the Conflict Minerals Report is to express an opinion or conclusion as to whether the design of the registrant's due diligence measures as set forth in, and with respect to the period covered by, the registrant's Conflict Minerals Report, is in conformity with, in all material respects, the criteria set forth in the nationally or internationally recognized due diligence framework used by the registrant, and whether the registrant's description of the due diligence measures it performed as set forth in the Conflict Minerals Report, with respect to the period covered by the report, is consistent with the due diligence process that the registrant undertook.

(B) The registrant's Conflict Minerals Report must include a statement that the registrant has obtained an independent

private sector audit of the Conflict Minerals Report, which shall constitute an audit certification;

(C) As part of the Conflict Minerals Report, the registrant must identify the independent private sector auditor of the report, if the auditor is not identified in the audit report, and provide the audit report prepared by the auditor in accordance with standards established by the Comptroller General of the United States;

(iii) Any registrant that manufactures products or contracts for products to be manufactured that are "DRC conflict undeterminable," as defined in paragraph (d)(5) of this item, must disclose the steps it has taken or will take, if any, since the end of the period covered in its most recent prior Conflict Minerals Report to mitigate the risk that its necessary conflict minerals benefit armed groups, including any steps to improve its due diligence.

(iv) For the temporary period specified in Instruction 2 to Item 1.01, following its exercise of appropriate due diligence, a registrant with products that are "DRC conflict undeterminable" is not required to obtain an independent private sector audit of its Conflict Minerals Report regarding the conflict minerals that the registrant is unable to determine did not originate in the Democratic Republic of the Congo or an adjoining country, or that the registrant is unable to determine did not directly or indirectly finance or benefit armed groups in the Democratic Republic of the Congo or an adjoining country.

(v) If a nationally or internationally recognized due diligence framework does not exist for a necessary conflict mineral, until such a framework is developed, the registrant is required to exercise appropriate due diligence in determining the source and chain of custody of the necessary conflict mineral, including whether the conflict mineral is from recycled or scrap sources, without the benefit of a due diligence framework. If a nationally or internationally recognized due diligence framework becomes available for the necessary conflict mineral prior to June 30 of a calendar year, the registrant must use that framework in the subsequent calendar year. If the due diligence guidance does not become available until after June 30 of a calendar year, the registrant is not required to use that framework until the second calendar year after the framework becomes available to provide a full calendar year before implementation. If no nationally or internationally recognized due diligence framework is available for a particular conflict mineral from recycled or scrap sources, the due

diligence inquiry regarding the conflict mineral focuses on whether the conflict mineral is from recycled or scrap sources. In addition, an independent private sector audit will not be required for the section of the Conflict Minerals Report pertaining to the registrant's due diligence on that recycled or scrap conflict mineral.

(vi) If the registrant performs due diligence because it has a reason to believe that its conflict minerals originated in the Democratic Republic of the Congo or an adjoining country, and as a result of that due diligence it determines that its conflict minerals did not originate in the Democratic Republic of the Congo or an adjoining country (or it determines as a result of that due diligence that its necessary conflict minerals did come from recycled or scrap sources), a Conflict Minerals Report and an audit is not required.

(2) *Product Description:* Any registrant that manufactures products or contracts for products to be manufactured that have not been found to be "DRC conflict free," as defined in paragraph (d)(4) of this item, must provide a description of those products, the facilities used to process the necessary conflict minerals in those products, the country of origin of the necessary conflict minerals in those products, and the efforts to determine the mine or location of origin with the greatest possible specificity.

(i) For the temporary period specified in Instruction 2 to Item 1.01, following its exercise of appropriate due diligence, any registrant that manufactures products or contracts for products to be manufactured that are "DRC conflict undeterminable" must provide a description of those products, the facilities used to process the necessary conflict minerals in those products, if known, the country of origin of the necessary conflict minerals in those products, if known, and the efforts to determine the mine or location of origin with the greatest possible specificity;

(ii) A registrant is not required to provide the information in paragraph (c)(2) of this item if the necessary conflict minerals in its product are solely from recycled or scrap sources because those products are considered "DRC conflict free."

(d) For the purposes of this item, the following definitions apply:

(1) *Adjoining country.* The term *adjoining country* means a country that shares an internationally recognized border with the Democratic Republic of the Congo.

(2) *Armed group.* The term *armed group* means an armed group that is identified as a perpetrator of serious human rights abuses in annual Country Reports on Human Rights Practices under sections 116(d) and 502B(b) of the Foreign Assistance Act of 1961 (22 U.S.C. 2151n(d) and 2304(b)) relating to the Democratic Republic of the Congo or an adjoining country.

(3) *Conflict mineral.* The term *conflict mineral* means:

(i) Columbite-tantalite (coltan), cassiterite, gold, wolframite, or their derivatives, which are limited to tantalum, tin, and tungsten, unless the Secretary of State determines that additional derivatives are financing conflict in the Democratic Republic of the Congo or an adjoining country; or

(ii) Any other mineral or its derivatives determined by the Secretary of State to be financing conflict in the Democratic Republic of the Congo or an adjoining country.

(4) *DRC conflict free.* The term *DRC conflict free* means that a product does not contain conflict minerals necessary to the functionality or production of that product that directly or indirectly finance or benefit armed groups, as defined in paragraph (d)(2) of this item, in the Democratic Republic of the Congo or an adjoining country. Conflict minerals that a registrant obtains from recycled or scrap sources, as defined in paragraph (d)(6) of this item, are considered DRC conflict free.

(5) *DRC conflict undeterminable.* The term *DRC conflict undeterminable* means, with respect to any product manufactured or contracted to be manufactured by a registrant, that the registrant is unable to determine, after exercising due diligence as required by paragraph (c)(1) of this item, whether or not such product qualifies as DRC conflict free.

(6) *Conflict Minerals from Recycled or Scrap Sources.* Conflict minerals are considered to be recycled or scrap sources if they are from recycled metals, which are reclaimed end-user or post-consumer products, or scrap processed metals created during product manufacturing. Recycled metal includes excess, obsolete, defective, and scrap metal materials that contain refined or processed metals that are appropriate to recycle in the production of tin, tantalum, tungsten and/or gold. Minerals partially processed, unprocessed, or a bi-product from another ore will not be included in the definition of recycled metal.

(7) *Outside the Supply Chain.* A conflict mineral is considered *outside the supply chain* after any columbite-tantalite, cassiterite, and wolframite minerals, or their derivatives, have been smelted; any gold has been fully refined; or any conflict mineral, or its derivatives, that have not been smelted or fully refined are located outside of the Democratic Republic of the Congo or an adjoining country.

(8) *Nationally or internationally recognized due diligence framework.* The term "nationally or internationally recognized due diligence framework" means a nationally or internationally recognized due diligence framework established following due-process procedures, including the broad distribution of the framework for public comment, and is consistent with the criteria standards in the Government Auditing Standards established by the Comptroller General of the United States.

**Item 1.02    Exhibit**

Registrants shall file, as an exhibit to this Form SD, the Conflict Minerals Report required by Item 1.01.

**Instructions to Item 1.01**

(1) A registrant that mines conflict minerals would not be considered to be manufacturing those minerals for the purpose of this item. The specialized disclosure report on Form SD shall cover a calendar year, regardless of the registrant's fiscal year, and be due annually on May 31 for the prior calendar year.

(2) During the first two calendar years following November 13, 2012 for all registrants and the first four calendar years for any smaller reporting company, a registrant will not be required to submit an audit report of its Conflict Minerals Report prepared by an independent private sector auditor with respect to the conflict minerals in any of its products that are "DRC conflict undeterminable." Beginning with the third or fifth reporting calendar year, as applicable, a registrant with products manufactured or contracted to be manufactured that are "DRC conflict undeterminable," must describe those products as having not been found to be "DRC conflict free" and must provide the information required in paragraph (c) of this item including the audit report.

(3) A registrant that acquires or otherwise obtains control over a company that manufactures or contracts to manufacture products with conflict minerals necessary to the functionality or production of those products that previously had not been obligated to provide a specialized disclosure report with respect to its conflict minerals will be permitted to delay reporting on the products manufactured by the acquired company until the end of the first reporting calendar year that begins no

sooner than eight months after the effective date of the acquisition.

(4) A registrant is not required to provide any information regarding its conflict minerals that, prior to January 31, 2013, are located outside of the supply chain, as defined by paragraph (d)(7) of this item.

(5) A registrant must provide its required conflict minerals information for the calendar year in which the manufacture of a product that contains any conflict minerals necessary to the functionality or production of that product is completed, irrespective of whether the registrant manufactures the product or contracts to have the product manufactured.

## Section 2—Exhibits

### Item 2.01   Exhibits

List below the following exhibit filed as part of this report.

Exhibit 1.01—Conflict Minerals Report as required by Items 1.01 and 1.02 of this Form.

### SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the duly authorized undersigned.

_____

(Registrant)

_____

By (Signature and Title)*

_____

(Date)

* Print name and title of the registrant's signing executive officer under his or her signature.

\*    \*    \*    \*    \*

Dated: August 22, 2012.
By the Commission.

**Elizabeth M. Murphy,**
*Secretary.*

[FR Doc. 2012–21153 Filed 9–11–12; 8:45 am]

**BILLING CODE 8011–01–P**

---

## SECURITIES AND EXCHANGE COMMISSION

**17 CFR Parts 240 and 249**

**[Release No. 34–67717; File No. S7–42–10]**

**RIN 3235–AK85**

### Disclosure of Payments by Resource Extraction Issuers

**AGENCY:** Securities and Exchange Commission.

**ACTION:** Final rule.

**SUMMARY:** We are adopting new rules and an amendment to a new form

pursuant to Section 1504 of the Dodd-Frank Wall Street Reform and Consumer Protection Act relating to disclosure of payments by resource extraction issuers. Section 1504 added Section 13(q) to the Securities Exchange Act of 1934, which requires the Commission to issue rules requiring resource extraction issuers to include in an annual report information relating to any payment made by the issuer, a subsidiary of the issuer, or an entity under the control of the issuer, to a foreign government or the Federal Government for the purpose of the commercial development of oil, natural gas, or minerals. Section 13(q) requires a resource extraction issuer to provide information about the type and total amount of such payments made for each project related to the commercial development of oil, natural gas, or minerals, and the type and total amount of payments made to each government. In addition, Section 13(q) requires a resource extraction issuer to provide information regarding those payments in an interactive data format.

**DATES:** *Effective date:* November 13, 2012.

*Compliance date:* A resource extraction issuer must comply with the new rules and form for fiscal years ending after September 30, 2013. For the first report filed for fiscal years ending after September 30, 2013, a resource extraction issuer may provide a partial year report if the issuer's fiscal year began before September 30, 2013. The issuer will be required to provide a report for the period beginning October 1, 2013 through the end of its fiscal year. For any fiscal year beginning on or after September 30, 2013, a resource extraction issuer will be required to file a report disclosing payments for the full fiscal year.

**FOR FURTHER INFORMATION CONTACT:** Tamara Brightwell, Senior Special Counsel, Division of Corporation Finance, Elliot Staffin, Special Counsel, Office of International Corporate Finance, Division of Corporation Finance, or Eduardo Aleman, Special Counsel, Office of Rulemaking, Division of Corporation Finance, at (202) 551–3290, U.S. Securities and Exchange Commission, 100 F Street NE., Washington, DC 20549–4553.

**SUPPLEMENTARY INFORMATION:** We are adopting new Rule 13q–1 [1] and an amendment to new Form SD [2] under the Securities Exchange Act of 1934 ("Exchange Act").[3]

[1] 17 CFR 240.13q–1.
[2] 17 CFR 249.448.
[3] 15 U.S.C. 78a *et seq.*

## Table of Contents

I. Background
II. Final Rules Implementing Section 13(q)
    A. Summary of the Final Rules
    B. Definition of "Resource Extraction Issuer" and Application of the Disclosure Requirements
    1. Proposed Rules
    2. Comments on the Proposed Rules
    3. Final Rules
    C. Definition of "Commercial Development of Oil, Natural Gas, or Minerals"
    1. Proposed Rules
    2. Comments on the Proposed Rules
    3. Final Rules
    D. Definition of "Payment"
    1. Types of Payments
    2. The "Not De Minimis" Requirement
    3. The Requirement To Provide Disclosure for "Each Project"
    4. Payments by "a Subsidiary * * * or an Entity Under the Control of * * *"
    E. Definition of "foreign government"
    1. Proposed Rules
    2. Comments on the Proposed Rules
    3. Final Rules
    F. Disclosure Required and Form of Disclosure
    1. Annual Report Requirement
    2. Exhibits and Interactive Data Format Requirements
    3. Treatment for Purposes of Securities Act and Exchange Act
    G. Effective Date
    1. Proposed Rules
    2. Comments on the Proposed Rules
    3. Final Rules
III. Economic Analysis
    A. Introduction
    B. Benefits and Costs Resulting From the Mandatory Reporting Requirement
    1. Benefits
    2. Costs
    C. Benefits and Costs Resulting From Commission's Exercise of Discretion
    1. Definition of "Commercial Development of Oil, Natural Gas, or Minerals"
    2. Types of Payments
    3. Definition of "Not De Minimis"
    4. Definition of "Project"
    5. Annual Report Requirement
    6. Exhibit and Interactive Data Requirement
    D. Quantified Assessment of Overall Economic Effects
IV. Paperwork Reduction Act
    A. Background
    B. Summary of the Comment Letters
    C. Revisions to PRA Reporting and Cost Burden Estimates
    D. Revised PRA Estimate
V. Final Regulatory Flexibility Act Analysis
    A. Reasons for, and Objectives of, the Final Rules
    B. Significant Issues Raised by Public Comments
    C. Small Entities Subject to the Final Rules
    D. Reporting, Recordkeeping, and Other Compliance Requirements
    E. Agency Action To Minimize Effect on Small Entities
VI. Statutory Authority and Text of Final Rule and Form Amendments

**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | |
|---|---|
| NATIONAL ASSOCIATION OF MANUFACTURERS, CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, BUSINESS ROUNDTABLE<br><br>Petitioners,<br><br>vs.<br><br>UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br><br>Respondent. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)  No. 12-1422<br>)<br>)<br>)<br>)<br>)<br>) |

**DECLARATION OF JOSEPH H. BOLEY**

I, Joseph H. Boley, declare as follows:

1. I am the Vice President of Quality Assurance of Lowe's Companies, Inc., a publicly traded company that files reports with the Securities and Exchange Commission under Section 13(a) or 15(d) of the Securities Exchange Act of 1934.

2. I am one of the primary individuals responsible for overseeing the quality of a substantial portion of the Company's products. I make this declaration based on personal knowledge.

3. Lowe's is a member of the Chamber of Commerce of the United States of America.

4. Lowe's applauds Congress's efforts to further the humanitarian goals of ending the extremely violent conflict in the Democratic Republic of the Congo ("DRC").

ADD-100

5. Lowe's believes, however, that any action taken to further the goals of ending the conflict and humanitarian crisis in the DRC must be calculated to be reasonably effective and should not unduly burden U.S. businesses and legitimate trade.

6. Lowe's enters into contracts with manufacturers, pursuant to which they manufacture products for Lowe's. Some of these products include small amounts of tin, tantalum, tungsten, or gold.

7. Under Rule 13p-1, a company that enters into such contracts may be covered by the Rule, "depending on the degree of influence [the company] exercises over the materials, parts, ingredients, or components to be included in" the products. "The degree of influence necessary for an issuer to be considered to be contracting to manufacture a product is *based on each issuer's individual facts and circumstances*."

8. Because of this vague standard, as well as other ambiguities in the rule, Lowe's has spent significant resources attempting to determine whether it is subject to the Rule, and will continue to spend resources, both to determine the scope of the Rule and, if necessary, to file the reports required under the Rule.

9. On information and belief, if Rule 13p-1 applied only to issuers that themselves manufactured products containing conflict minerals, and did not apply to issuers that merely contract to manufacture such products, Lowe's would not have to incur these expenses or determine the country of origin of the minerals used in its products.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

EXECUTED this 16th day of January, 2013, at 9 a.m.

Joseph H. Boley

3

IN THE
UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

NATIONAL ASSOCIATION OF     )
MANUFACTURERS, CHAMBER OF    )
COMMERCE OF THE UNITED STATES   )
OF AMERICA, BUSINESS       )
ROUNDTABLE         )
           )
    Petitioners,        )
           )    No. 12-1422
vs.              )
           )
UNITED STATES SECURITIES AND     )
EXCHANGE COMMISSION,      )
           )
    Respondent.        )
           )

## DECLARATION OF MARY BETH GAMMONS

I, MARY BETH GAMMONS, declare as follows:

1. I am the Senior Director of Global Supply Chain of Dollar General Corporation, a publicly traded company that files reports with the Securities and Exchange Commission under Section 13 or 15(d) of the Securities Exchange Act of 1934.

2. I am responsible for compliance for imports made by Dollar General Corporation, including compliance for social accountability issues, customs compliance and product safety. I make this declaration based on personal knowledge.

3. Dollar General is a member of the Chamber of Commerce of the United States of America.

4. Dollar General deplores the humanitarian crisis in the Democratic Republic of the Congo ("DRC"), and applauds Congress's desire to bring about an end to the horrific conflict there. Dollar General believes, however, that any action taken in response to

the tragedy in the DRC must be calculated to be effective, and should not make the situation worse while unduly burdening U.S. businesses and legitimate trade.

5. Dollar General does not itself manufacture any products. Nor does it engineer or design any products. Rather, Dollar General purchases products from third party manufacturers or vendors that have third party manufacturers produce such products. Some of these products might include small amounts of tin, tantalum, tungsten, or gold.

6. Under Rule 13p-1, a company that makes such purchases may be covered by the Rule, "depending on the degree of influence the company exercises over the materials, parts, ingredients, or components to be included in" the products. "The degree of influence necessary for an issuer to be considered to be contracting to manufacture a product is *based on each issuer's individual facts and circumstances*."

7. Because of this vague standard, Dollar General has spent significant resources attempting to determine whether it is even subject to the Rule, and will continue to spend resources, both to determine the scope of the Rule and, if necessary, to gather relevant information from its vendor base and file the reports required under the Rule. Dollar General has already spent tens of thousands of dollars in this effort and has received estimates that full compliance with the Rule could cost hundreds of thousands of dollars or more in 2013 alone, depending on how the Rule is interpreted. If Rule 13p-1 did not apply to issuers that merely enter into contracts to purchase products developed and manufactured by others, Dollar General would not have to expend these resources. *See supra* ¶ 5.

2
ADD-104

8. Moreover, Dollar General would not incur these expenses if the Rule contained a reasonable *de minimis* exception. Dollar General believes that, in the aggregate, the products that it purchases include relatively small amounts of the minerals, compared to worldwide usage or usage in the industry.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

EXECUTED this 16th day of January, 2013, at Goodlettsville, Tennessee.

Mary Beth Gammons

3

IN THE
UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | | |
|---|---|---|
| NATIONAL ASSOCIATION OF MANUFACTURERS, CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, BUSINESS ROUNDTABLE | ) ) ) ) ) ) | |
| Petitioners, | ) ) | No. 12-1422 |
| vs. | ) ) | |
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | |
| Respondent. | ) ) ) | |

DECLARATION OF BRENT GRAZMAN

I, Brent Grazman, declare as follows:

1. I am the Vice President of Quality of Viasystems. As such, I am responsible for Quality for all manufacturing and businesses across Viasystems. My responsibilities also include various aspects of compliance including: Conflict Metals, ITAR (International Traffic in Arms Regulations), Corporate Social Responsibility and Corporate Operational Audit. I make this declaration based on personal knowledge, except where stated on information and belief.

2. Viasystems is a member of the National Association of Manufacturers.

3. Viasystems deplores the humanitarian crisis in the Democratic Republic of the Congo ("DRC"), and applauds Congress's desire to bring about an end to the horrific conflict there. Viasystems believes, however, that any action taken in response to the tragedy

in the DRC must be calculated to be effective, and should not make the situation worse while unduly burdening legitimate trade.

4. Viasystems files reports with the Securities and Exchange Commission under Section 13(a) of the Securities Exchange Act of 1934 and has a public float of $73.8 million USD as of June 30, 2012, but based on previous float values is considered a large issuer.

5. Viasystems manufactures a variety of products, including Printed Circuit Boards and Electro-Mechanical Solutions such as assembled racks and other electronic products. Products such as these are designed by our customers and almost always contain miniscule amounts of gold, tin, tantalum, or tungsten that are (a) deliberately added to the products and necessary to their proper functioning; or (b) necessary to the manufacturing process of the products and deliberately used in that process. Accordingly, like most electronics manufacturers, at least some of Viasystems's products contain trace amounts of gold, tin, tantalum, or tungsten that are (a) deliberately added to the products and necessary to their proper functioning; or (b) necessary to the manufacturing process of the products and deliberately used in that process.

6. The use of minerals:

   a. Gold – Our customers design (and we manufacture) many designs that use gold on the circuit board. It is used to cover various parts of the circuitry on the surface of printed circuit boards for three main reasons—

      i. Gold conducts electricity well so will function in the electric circuit;

    ii.  Gold resists oxidation (is inert), ensuring that areas covered with gold will not oxidize and have their function affected for long periods of time; and

    iii.  Gold resists physical wear meaning that

        1.  "Fingers" coated with gold can be inserted and removed from sockets a large  number of times with no physical damage; and

        2.  "Sliders" covered with gold can allow dials to turn on them without physical damage.

Gold is deliberately placed on the circuit boards in a very controlled thickness, determined by the designer.  The thickness is often less than 10/100,000 of an inch, and in no case, ever approaches even 0.1% of the weight of a circuit board.  Some customers specify a final outer layer covering their Circuit Boards made from ENIG (Electroless Nickel Immersion Gold) to provide a high quality surface on which to solder components during assembly. In our Electromechanical Solutions products, gold is present on the circuit boards (used as above) and also on the various connectors—including the gold fingers (described above) and similar applications.  The thicknesses and mass percentage are similar.

b.  Tin—Tin is used extensively in electronics because it has a combination of good chemical and electrical properties combined with a relatively low cost. It is used in the electroplating of the actual circuitry in a printed circuit board and also in the solder used to connect electronic components to the printed circuit board and make it functional.  Tin is widely used in solder—the

material used to "weld" various electronic components to each other (or to a circuit board). In our Electromechanical Solutions segment, tin is both present on the circuit boards (as described above) as well as present as a very thin coating over various base metals (used in precision sheet metal fabrication of various cabinets and other products). In this case, it is also used to prevent oxidation (rust) of the base metal. Tin is present in our products in very thin, controlled layers and in no case at more than 0.5% mass percent.

   c. Tantalum—Tantalum is used in electrolytic capacitors because of its high capacitance per unit weight (and per unit volume). Because a tantalum capacitor usually uses a ball of tantalum less than 10 micrometers in diameter, it will also be present at a mass percent far less than 0.5%.

7. Because Viasystems' uses of these minerals are *de minimis*, Viasystems would not be subject to the Rule if the Rule included a rational *de minimis* exception.

8. Because there is no *de minimis* exception, Viasystems will be required to incur expenses conducting the Rule's "reasonable country of origin inquiry" to determine whether the trace amounts of gold, tin, tantalum, or tungsten in its products originated in the DRC or the adjoining countries.

9. Rule 13p-1 provides that an issuer satisfies the "reasonable country of origin inquiry" requirement by "indicating the facility at which its conflict minerals were processed and demonstrating that those conflict minerals did not originate in the Covered Countries or came from recycled or scrap sources."

10. On information and belief, despite its best efforts, Viasystems will be unable to trace the gold, tin, tantalum, or tungsten used in its products back to the facility at which

the minerals were processed, or to their country of origin. There does not currently exist any adequate means to trace minerals back to the facility, let alone their country of origin; nor, on information and belief, could such a means be successfully implemented in the next few years, especially considering the length, complexity, and fluidity of Viasystems' supply chains. Accordingly, Viasystems' attempts to identify the facility and country of origin would be ineffective and unduly burdensome.

11. Viasystems estimates its cost of conducting the "reasonable country of origin inquiry" to be a minimum of $400,000 per year on a continuing basis.

12. Further, the burden of conducting the inquiry makes it harder for Viasystems to compete against non-U.S. competitors who do not face these same rules and regulations, and who therefore do not need to devote time and resources to compliance, enabling the non-U.S. competitors to provide lower prices and more efficient cost estimates.

13. Viasystems would not have to undertake such a process if Rule 13p-1 permitted issuers to conduct a more sensible "reasonable country of origin inquiry" -- for example, by simply including in their contracts with first-tier suppliers a clause forbidding sourcing conflict minerals from the DRC or adjoining countries and requiring the first-tier suppliers to impose an identical clause on their own suppliers (with a similar requirement that the second-tier suppliers impose such a clause on *their* suppliers, etc.).

14. On information and belief, because Viasystems will not be able to determine the processing facility or country of origin of its minerals, and will be left with a "reason to believe" that some of its gold, tin, or tantalum "may" have originated from the

DRC or adjoining countries, Viasystems will have to conduct "due diligence" on its minerals' origin and chain of custody, and prepare and file one or more Conflict Minerals Reports.

15. On information and belief, Viasystems would not have to conduct due diligence or prepare and file Conflict Minerals Reports if Rule 13p-1 required only those issuers that believe their conflict minerals "did originate" in the DRC or adjoining countries to conduct due diligence and file Conflict Minerals Reports.

16. Viasystems does not qualify as a "smaller reporting company" within the meaning of Rule 13p-1 based on the value of its public float ($73.8 million as of June 30, 2012, $98.8 million as of the same date in 2011).  Accordingly, Section 1502 of the Dodd-Frank Wall Street Reform and Consumer Protection Act and Rule 13p-1 will compel Viasystems to describe some products as "not having been found to be 'DRC conflict free'" in Conflict Minerals Reports covering years 2015 and 2016.  Companies qualifying as "smaller reporting companies" may continue to describe products including conflict minerals with unknown origins as "DRC conflict undeterminable" during this period.

17. Had the SEC provided all issuers with the four-year phase-in period currently provided only to "smaller reporting companies," Viasystems would not have to describe its products as "not having been found to be 'DRC conflict free'" in Conflict Minerals Reports covering 2015 and 2016.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

EXECUTED this 15th day of January, 2013.

Brent Grazman

IN THE
UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| NATIONAL ASSOCIATION OF MANUFACTURERS, CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, BUSINESS ROUNDTABLE )))))) | |
| Petitioners, )) | |
| )) | No. 12-1422 |
| vs. )) | |
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, ))) | |
| Respondent. )) | |

**DECLARATION OF PAUL G. P. HOOGENBOOM**

I, Paul G. P. Hoogenboom, declare as follows:

1. I am the Senior Vice President – Manufacturing and Operations and Chief Information Officer of RPM International Inc. ("RPM"). As such, I am responsible for RPM's overall global supply chain and technology efforts, and for the procurement of materials and packaging. I make this declaration based on personal knowledge.

2. RPM is a member of the Chamber of Commerce of the United States of America and the National Association of Manufacturers.

3. RPM manufactures a variety of high-performance coatings, sealants, and specialty chemicals. Many of these products contain trace amounts of tin. Tin is sometimes a naturally occurring material in a raw material we use, such as calcium carbonate. In addition, many of the companies in our supply chain intentionally use tin as a

catalyst, stabiliser or otherwise in raw materials that we use. Tin can also be added to a raw material unintentionally if, for instance, there is tin plating on processing equipment that is used, or tin was previously used as a catalyst and trace amounts remain on the processing equipment.

4. We do not always know which companies in the supply chain use tin as a catalyst, stabiliser or otherwise. Indeed, many of these companies are not our direct suppliers, or even our suppliers' suppliers. Rather, they are often many steps removed from RPM in the supply chain.

5. Moreover, suppliers often will not disclose whether they use tin as a catalyst, stabiliser or otherwise. Even if asked directly, these companies often refuse to divulge specific ingredient information, claiming it is proprietary.

6. We have numerous suppliers, and they have numerous suppliers, and our supply chains are constantly changing. It is normal for RPM to have at least two, and often more, suppliers for any raw material in order to ensure local geographic availability, to have a secure supply chain and to promote competitive pricing.

7. Accordingly, to determine whether there is any tin in our raw materials, and hence our products, we would have to conduct very frequent testing at substantial expense. It would not be sufficient to test only one batch of raw material from a supplier. Because of batch variances, it is possible that a catalyst remains in one batch but not another. Analyzing multiple batches of every raw material on a regular basis would be the only certain way to determine if tin is present—and, even then, we would not know whether the tin was intentionally used as a catalyst or unintentionally added or

at which point in the supply chain the tin entered the product or from where the tin originated.

8.  Assuming RPM is able to determine if a raw material contains tin, RPM will then incur additional expenses under Rule 13p-1, as RPM attempts to determine whether any of the tin originated in the Democratic Republic of the Congo or the adjoining countries. For several reasons, including the many uses of tin, the multitide of suppliers, and the complexity of constantly-changing supply chains, attempting to trace tin to its country of origin will be extremely expensive and virtually impossible. Indeed, tin is often commingled by suppliers with tin from other sources, including recycled tin, making tracing of the particular tin in RPM's products even more difficult.

9.  RPM would not have to incur most of this expense of identifying the country of origin if the Rule included a rational *de minimis* exception.

10. Even with a *de minimis* exception, RPM would still incur some costs on account of the Rule because some products contain more than trace amounts of tin. For instance, some cans use tin plating.

11. Thus, whether there is a *de minimis* exception or not, Rule 13p-1 will require RPM to incur expenses conducting a "reasonable country of origin inquiry," pursuant to which RPM would have to trace its supply chain to find out where any tin in its raw matierals came from.

12. RPM would not have to incur these expenses in tracing the tin through the supply chain if Rule 13p-1 permitted a more sensible process, such as reliance on flow-down

clauses in contracts with suppliers, requiring the suppliers (and, in turn, the suppliers' suppliers, etc.) not to use minerals from the DRC or adjoining countries.

13. On information and belief, because of the frequent use of tin as a catalyst, stabiliser or otherwise, our other uses of tin, and the complexity of our supply chain, RPM will be unable to determine the country of origin of many of its minerals, but will nonetheless have a reason to believe that tin *may* have originated from the DRC or an adjoining country. RPM will thus have to incur additional expense by conducting "due diligence" on its minerals' origin and chain of custody, and then preparing and filing one or more Conflict Minerals Reports.

14. On information and belief, RPM would not have to conduct due diligence or prepare and file Conflict Minerals Reports if Rule 13p-1 required only those issuers that actually believe their conflict minerals "*did* originate" in the DRC or adjoining countries to conduct due diligence and file Conflict Minerals Reports.

15. Finally, because RPM has a public float of over $400,000,000, RPM does not qualify as a "smaller reporting company" within the meaning of Rule 13p-1. Accordingly, RPM will be required to describe some products as "not having been found to be 'DRC conflict free'" in Conflict Minerals Reports covering years 2015 and 2016.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

EXECUTED this 17th day of January, 2013.

4

**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | |
|---|---|
| NATIONAL ASSOCIATION OF MANUFACTURERS, CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, BUSINESS ROUNDTABLE )))))) | |
| Petitioners, )) | No. 12-1422 |
| vs. ) | |
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, )))) | |
| Respondent. )) | |

**DECLARATION OF MICHAEL G.R. SINNAEVE**

I, Michael G.R. Sinnaeve, declare as follows:

1. I am the Vice-President, Operational Improvement and Quality – The Americas of Magna International Inc. ("Magna"). As such, and reporting to Magna's Chief Executive Officer, I am responsible for, among other things, the implementation of World Class Manufacturing processes at Magna's facilities globally, as well as, Magna's supply chain management, including supplier development and quality. I make this declaration based on personal knowledge, except where stated on information and belief.

2. Magna is a member of the Motor & Equipment Manufacturers Association (MEMA), which is itself a member of the National Association of Manufacturers.

3. Magna deplores the humanitarian crisis in the Democratic Republic of the Congo ("DRC"), and applauds Congress's desire to bring about an end to the horrific conflict

there. Magna believes, however, that any action taken in response to the tragedy in the DRC must be calculated to be effective, and should not make the situation worse while unduly burdening legitimate trade.

4. Magna files reports with the Securities and Exchange Commission under Section 15(d) of the Securities Exchange Act of 1934.

5. Magna manufactures a variety of automotive products, including seats, driveline systems, plastic assemblies, electronic vision systems, power window and door systems, fuel and battery systems and electronics. Products such as these regularly contain gold, tin, tantalum, or tungsten that is (a) deliberately added to the products and is necessary to their proper functioning; or (b) necessary to the manufacturing process of the products and deliberately used in that process. Accordingly, at least some of Magna's products contain gold, tin, tantalum, or tungsten that is (a) necessary to their proper functioning and is intentionally added to the products; or (b) necessary to the manufacturing process of the products and deliberately used in that process.

6. Based on the foregoing facts, Rule 13p-1 will require Magna to incur expenses conducting a "reasonable country of origin inquiry" to determine whether the gold, tin, tantalum, or tungsten in its products originated in the DRC or the adjoining countries.

7. Rule 13p-1 provides that an issuer satisfies the "reasonable country of origin inquiry" requirement by "indicating the facility at which its conflict minerals were processed and demonstrating that those conflict minerals did not originate in the Covered Countries or came from recycled or scrap sources."

8. On information and belief, despite its best efforts, Magna will be unable to trace the gold, tin, tantalum, or tungsten used in its products back to the facility at which the minerals were processed, or to their country of origin. There does not currently exist any adequate means to trace minerals back to the facility, let alone their country of origin; nor, on information and belief, could such a means be successfully implemented in the next few years, especially considering the length, complexity, and fluidity of Magna's's supply chains. Accordingly, Magna's attempts to identify the facility and country of origin would be ineffective and unduly burdensome.

9. Magna would not have to undertake such a process if Rule 13p-1 permitted issuers to conduct a more sensible "reasonable country of origin inquiry" − for example, by simply including in their contracts with first-tier suppliers a clause forbidding sourcing conflict minerals from the DRC or adjoining countries and requiring the first-tier suppliers to impose an identical clause on their own suppliers (with a similar requirement that the second-tier suppliers impose such a clause on *their* suppliers, etc.), and by inquiring of each first-tier supplier whether it has complied with this contractual obligation. Magna would choose this method of compliance, if available.

10. Because Magna will not be able to determine the processing facility or country of origin of its minerals, Magna will have to conduct "due diligence" on its minerals' origin and chain of custody, and prepare and file one or more Conflict Minerals Reports describing, among other things, its due diligence and the products it manufactures or contracts to manufacture that have been found "DRC conflict undeterminable" during Rule 13p-1's initial phase-in period, and that have "not been found to be 'DRC conflict free'" thereafter.

11. Magna will not have knowledge that its products include conflict minerals sourced from the DRC or adjoining countries, and it will be unable to determine the country of origin despite its good faith efforts. Magna would not have to conduct due diligence or prepare and file Conflict Minerals Reports if Rule 13p-1 required only those issuers that believe their conflict minerals "did originate" in the DRC or adjoining countries to conduct due diligence and file Conflict Minerals Reports.

12. On information and belief, Section 1502 of the Dodd-Frank Wall Street Reform and Consumer Protection Act and Rule 13p-1 will compel Magna to describe some or even all of its products containing tin, tantalum, tungsten, or gold as "DRC conflict undeterminable" during Rule 13p-1's initial phase-in period, and as having "not been found to be 'DRC conflict free'" thereafter.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

EXECUTED this 14th day of January, 2013, at Aurora, Ontario, Canada.

_Michael G.R. Sinnaeve_

**Michael G.R. Sinnaeve**
Vice-President,
Operational Improvement and Quality – The Americas
Magna International Inc.

4
ADD-120

**IN THE
UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | |
|---|---|
| NATIONAL ASSOCIATION OF MANUFACTURERS, CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, BUSINESS ROUNDTABLE<br><br>       Petitioners,<br><br>vs.<br><br>UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br><br>       Respondent. | )<br>)<br>)<br>)<br>)<br>)<br>)   No. 12-1422<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**DECLARATION OF DOUGLAS R. MEANS**

I, Douglas R. Means, declare as follows:

1. I am the Executive Vice President and Chief of Supply Chain of Cabelas, Inc., a publicly traded company that files reports with the Securities and Exchange Commission under Section 13 or 15(d) of the Securities Exchange Act of 1934.

2. I am responsible for many contracts to manufacture Cabela's products, the importation of goods and the transportation of goods to the US marketplace. I make this declaration based on personal knowledge.

3. Cabela's, Inc. is a member of the Chamber of Commerce of the United States of America.

4. Cabela's, Inc. does not itself manufacture any products. Rather, it enters into contracts to purchase items that are manufactured by others. Some of these products include small amounts of tin, tantalum, tungsten, or gold.

ADD-121

5. Under Rule 13p-1, a company that enters into such contracts may be covered by the Rule, "depending on the degree of influence Cabela's, Inc. exercises over the materials, parts, ingredients, or components to be included in" the products. "The degree of influence necessary for an issuer to be considered to be contracting to manufacture a product is *based on each issuer's individual facts and circumstances*."

6. Because of this vague standard, Cabela's, Inc. has spent significant resources attempting to determining whether it is subject to the Rule, and will continue to spend resources, both to determine the scope of the Rule and, if necessary, to file the reports required under the Rule.

7. If Rule 13p-1 applied only to issuers that themselves manufactured products containing conflict minerals, and did not apply to issuers that merely contract to manufacture such products, Cabela's, Inc. would not have to incur these expenses or determine the country of origin of the minerals used in its products.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

EXECUTED this 15th day of January, 2013.

Douglas R. Means

Cabela's EVP and Chief of Supply Chain